**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HORSEHEAD HOLDING CORP., et al.,[1] | ) | Case No. 16-10287 (___) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, REIMBURSABLE EXPENSES, AND PAYROLL PROCESSING FEES, (B) PAY WITHHOLDING OBLIGATIONS, (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (D) CONTINUE ORDINARY COURSE INCENTIVE PROGRAMS FOR NON-INSIDERS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A**, and a final order substantially in the form attached hereto as **Exhibit B**: (I) authorizing, but not directing, the Debtors to (a) on an interim basis, pay prepetition wages, salaries, other compensation, reimbursable expenses, and payroll processing fees up to the amount provided herein pending further order of the Court, (b) on an interim basis, pay prepetition Withholding Obligations (as defined herein) up to the amount provided herein pending further order of the Court, (c) on an interim basis, continue employee benefits programs, including payment of certain prepetition obligations related thereto, up to the amount provided herein pending further order of the Court, (d) on a final basis, continue ordinary course incentive programs for non-insiders; and (II) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Horsehead Holding Corp. (7377); Horsehead Corporation (7346); Horsehead Metal Products, LLC (6504); The International Metals Reclamation Company, LLC (8892); and Zochem Inc. (4475). The Debtors' principal offices are located at 4955 Steubenville Pike, Suite 405, Pittsburgh, Pennsylvania 15205.

**Jurisdiction**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1(m).

**Relief Requested**

4. The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** and, pending a final hearing on this Motion, a final order in the form attached hereto as **Exhibit B**: (a) authorizing, but not directing, the Debtors to (i) on an interim basis, pay prepetition wages, salaries, other compensation, reimbursable expenses, and payroll processing fees up to the amount provided herein pending further order of the Court, (ii) on an interim basis, pay prepetition Withholding Obligations (as defined herein) up to the amount provided herein pending further order of the Court, (iii) on an interim basis, continue employee benefits programs, including payment of certain prepetition obligations related thereto, up to the

amount provided herein pending further order of the Court, (iv) on a final basis, continue ordinary course incentive programs for non-insiders; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Background[2]

5. As of the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

6. The Debtors' operations consist primarily of the production of zinc and zinc-based products, and recycling of electric arc furnace dust, a zinc-containing waste generated by steel mini-mills. The Debtors employ approximately 730 individuals on a full-time basis (collectively, the "Full-Time Employees"). Approximately 510 of the Full-Time Employees are paid on an hourly basis (collectively, the "Hourly Employees") and approximately 220 receive a salary (collectively, the "Salaried Employees"). In addition to the Full-Time Employees, the Debtors' workforce includes two individuals employed on a part-time basis (collectively, the "Part-Time Employees,") and approximately 15 temporary production workers employed on a full-time basis and sourced through various staffing agencies (collectively, the "Temp Workers" and together with the Full-Time and Part-Time Employees, the "Employees"). Approximately

2 The facts and circumstances supporting this Motion are set forth in the *Declaration of James M. Hensler in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

300 of the Debtors' workers, representing a majority of the Debtors' Hourly Employees, are represented by unions and are subject to collective bargaining agreements.[3]

7. The Debtors' Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization. The Employees' skills, knowledge, and understanding of the Debtors' production and recycling operations are essential to preserving operational stability and efficiency. Without the continued, uninterrupted services of the Employees, effective reorganization of the Debtors will be materially impaired. At the same time, the vast majority of Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying compensation, providing employee benefits, and maintaining certain programs benefiting the Employees. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

8. The Debtors seek authority to honor ordinary course employment practices and honor amounts owed on a prepetition basis on an interim or final basis (as applicable) subject to the caps detailed below:

| **I. Employee Compensation and Withholding Obligations** | **Amount** |
|---|---|
| Employee Compensation | $2,500,000 |
| Payroll Processing | $5,000 |
| Reimbursement Obligations | $200,000 |
| Withholding Obligations | $250,000 |
| **II. Employee Benefit Programs** | **Amount** |
| Employee Benefit Programs | $1,200,000 |
| **III. Employee Incentive Programs[4]** | **Amount** |
| Employee Incentive Programs (non-insiders only) | $750,000 |
| **Total** | **$4,905,000** |

3 These unions are: (a) UNIFOR Local 591G; (b) Teamsters Local 261; (c) UTU Local 498; (d) USW Local 7-209; (e) USW Local 2599-16; and (f) USW Local 9-990.

4 The Debtors seek relief with respect to the Employee Incentive Programs on a final basis only.

**Employee Compensation and Benefits**

9. The Debtors seek to minimize the personal hardship the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected. Thus, by this Motion, the Debtors seek authority, but not direction, and in each case subject to the caps set forth herein, to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, incentive programs and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, vacation time, leaves of absence, life insurance, short- and long-term disability coverage, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the "Employee Compensation and Benefits"); (b) pay all costs incident to the Employee Compensation and Benefits; and (c) pending entry of a final order, continue the Employee Compensation and Benefits in the ordinary course of business.

**I. Employee Compensation and Withholding Obligations**

**A. Employee Compensation**

10. In the ordinary course, the Debtors incur obligations to the Employees for, among other things, wages, salaries, reimbursable expenses, and other obligations described herein (collectively, the "Employee Compensation") with respect to the Employees, in addition to certain incentive and bonus programs described more fully below. Because the majority of Employees are paid in arrears, certain Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Compensation also may be due and owing as of the Petition Date because of, among other things: (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and (b) the delay between the

date when some payroll checks are issued and the date when such checks are presented to an Employee's bank for payment.

11. As of the Petition Date, the Debtors estimate that Employees are owed an aggregate of approximately $2,500,000 on account of accrued wages, salaries, overtime, and other compensation (excluding reimbursable expenses) earned prior to the Petition Date ("Unpaid Compensation"). By this Motion, the Debtors seek authority, but not direction, to pay their Employees any Unpaid Compensation in an amount not to exceed $2,500,000 absent further order of the Court. To be clear, the Debtors are not seeking to pay Unpaid Compensation to any Employee in excess of the $12,475 priority cap imposed by section 507(a)(4) of the Bankruptcy Code.

**B. Payroll Processing**

12. The Debtors utilize the services of Automatic Data Processing, Inc. ("ADP") to provide payroll processing and related services (collectively, the "Payroll Services"). On average, the Debtors pay approximately $5,000 per month for the cost of the Payroll Services. As of the Petition Date, the Debtors estimate they owe approximately $5,000 to ADP on account of the Payroll Services (the "Unpaid Payroll Fees"). The Payroll Services are crucial to the smooth functioning of the Debtors' payroll system because they ensure that Employees are paid accurately and on time. In addition, the Payroll Services are critical to ensuring that the Withholding Obligations are accurately determined and promptly remitted to taxing authorities and other third-party payees. As such, the Debtors seek authority, but not direction, to satisfy Unpaid Payroll Fees outstanding as of the Petition Date and continue payroll processing during the administration of these chapter 11 cases in an aggregate amount not to exceed $5,000 absent further order of the Court.

**C. Reimbursement Obligations**

13. Prior to the Petition Date and in the ordinary course of their business, the Debtors reimburse Employees for certain expenses that such Employees incur in the scope of their employment (the "Expense Reimbursements"). Expense Reimbursements typically include expenses for travel, lodging, relocation, ground transportation, meals, and other business-related expenses related to the discharge of an Employee's duties. Generally, Expense Reimbursements are incurred by Employees through the use of personal funds. In addition, two Employees are issued a company credit card for use related to Expense Reimbursements. If these Employees do not pay the balances due on such credit card, they may be held personally liable for the obligations. Thus, the Debtors' inability to reimburse such expenses to these Employees could impose a hardship on such individuals where such individuals otherwise incurred obligations for the Debtors' benefit. Accordingly, the Debtors seek authority, but not direction, to pay $200,000 of Expense Reimbursements accrued but unpaid as of the Petition Date absent further order of the Court.

**D. Withholding Obligations**

14. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, child support, and other pre-tax deductions payable pursuant to certain of the Health and Welfare Programs and the 401(k) Plan (each as defined below) (collectively, the "Deductions"), and forward those amounts to various third-party recipients. The Debtors also are required by law to withhold from the Employees' wages amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer

Payroll Taxes" and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Payroll Taxes is approximately $250,000.

15. By this Motion, the Debtors seek authority, but not direction, to pay in a manner consistent with historical practice any unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") in an amount not to exceed $250,000 absent further order of the Court on account of prepetition obligations.

## II. Employee Benefit Programs

16. The Debtors offer several insurance policies to eligible Employees for medical, dental, and vision care coverage and certain other benefits (the "Health and Welfare Programs"), including the Life and AD&D Insurance, Disability Benefits, Workers' Compensation Program, the 401(k) Plan, Employee Assistance Program, Zochem Pension Plans, and Vacation Time (each as defined herein, and collectively, with the Health and Welfare Programs, the "Employee Benefit Programs").[5] As of the Petition Date, the Debtors believe that they owe approximately $1,200,000 on account of accrued, but unpaid obligations related to the Employee Benefit Programs, which are detailed below.

17. By this Motion, the Debtors seek authority, but not direction, to: (a) pay any unpaid amounts due with respect to the Employee Benefit Programs; and (b) continue to provide the Employee Benefit Programs during the administration of these chapter 11 cases, in each case, in an aggregate amount not to exceed $1,200,000, on account of prepetition obligations with

[5] The Part-Time Employees and Temp Workers are not eligible for the Debtors' Health and Welfare Programs and Vacation Time described herein, except to the extent required by law.

respect thereto, for all Employee Benefit Programs absent further order of the Court. The Employee Benefit Programs are summarized as follows:

**B. Health and Welfare Programs**

**1. Health Insurance Programs**

18. The Debtors offer medical insurance plans (the "Medical Plans") provided by Highmark Blue Cross Blue Shield ("Highmark") and UPMC Health Plan, Inc. The Debtors are self-insured for these Medical Plans but have a stop-loss insurance plan that caps the Debtors' liability on the claims of any one Employee at $250,000 (the "Stop-Loss Plan"). Employees participate in the cost of the Medical Plans through a regular payroll Deduction.

19. The Debtors also offer dental and vision insurance to Employees (the "Dental and Vision Plans," and together with the Medical Plans and the Flexible Spending Accounts, the "Health Insurance Programs"). The Debtors are self-insured for the Dental and Vision Plans, with Delta Dental administering the dental plan and Highmark administering the vision plan. The Debtors pay claims incurred on account of the Health Insurance Programs on a weekly basis and while there is some fluctuation on a week-to-week basis depending on the number and type of claims submitted, the Debtors have historically averaged approximately $700,000 in total monthly claim payments on account of the Health Insurance Programs. In addition, the Debtors pay approximately $50,000 per month on account of the Stop-Loss Plan.

20. The Debtors also provide flexible spending accounts for medical or dependent care for Employees that participate in the Medical Plans (the "Flexible Spending Accounts"). The Debtors use payroll Deductions to fund the Flexible Spending Accounts, from which Employees can be reimbursed for qualifying health-related expenses. As of the Petition Date, the Debtors estimate they have approximately $5,000 outstanding with respect to the Flexible Spending Account Plans.

**2. Life Insurance, Disability, and Workers' Compensation Programs**

**a. Life Insurance Programs**

21. The Debtors provide life and accidental death and dismemberment insurance coverage for all Full-Time Employees at no cost (the "Life and AD&D Insurance"). The Life and AD&D Insurance is fully insured by Hartford-Comprehensive Employee Benefit Service Company ("Hartford"). This program provides a baseline level of coverage for Employees' spouses and children with the option to purchase supplemental coverage. The Debtors pay for Life and AD&D Insurance on a monthly basis. Although the amount paid per year on account of the Life and AD&D Insurance varies from year to year, the average monthly cost of the Life and AD&D Insurance is approximately $25,000.

**b. Disability Benefits**

22. The Debtors provide certain Employees with short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term Disability Benefits," and together with the "Short-Term Disability Benefits," the "Disability Benefits"). The Debtors provide Short-Term Disability Benefits to all non-union Hourly Employees and all Salaried Employees on a self-insured basis and provide Short-Term Disability Benefits to all union Hourly Employees via Hartford. The Debtors' Long-Term Disability Benefits are fully insured by Hartford but offered only to Salaried Employees after Short-Term Disability Benefits have been exhausted.

23. Under the Short-Term Disability Benefits program, the Full-Time Employees are entitled to, among other things, continuation of a portion of their wages in the event of a short-term medical disability due to an illness or injury. Under the Long-Term Disability Benefits program, Employees are entitled to, among other things, continuation of a portion of their wages in the event of a long-term medical disability due to illness or injury. Approximately sixteen Employees are currently receiving Short-Term Disability Benefits, and approximately

four Employees are currently receiving Long-Term Disability Benefits. The average monthly cost of the Disability Benefits is approximately $25,000.

### c. Workers' Compensation Program

24. The Debtors maintain workers' compensation insurance for Employees at the statutorily required level in the states where the Debtors operate (collectively, the "Workers' Compensation Program"). Although the amount paid per year on account of the Workers' Compensation Program varies from year to year, the average monthly cost of the Workers' Compensation Program is approximately $175,000. The Debtors are self-insured for the first $400,000 for each incident and routinely pay these claim costs as they are incurred. For amounts over $400,000, the Debtors have third-party insurance. The third-party coverage is provided by ESIS, an affiliate of ACE Limited, and costs approximately $150,000 per quarter.

25. The Debtors must continue the claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[6] There are approximately 50 outstanding and open workers compensation claims totaling approximately $5.4 million as of the Petition Date (including amounts covered by the Debtors' insurance). As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid administrative fees and loss payments on account of the Workers' Compensation Program are approximately $250,000.

26. In addition to seeking authority, but not direction, to pay any unpaid amounts due with respect to the Workers' Compensation Program, the Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with claims against

---

6 Certain of the Debtors' Workers' Compensation Programs may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Programs postpetition, including making any changes to current policies and practices that become necessary.

the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Programs without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements. Such claims typically must name one or more of the Debtors, on a nominal basis only, in order to comply with the relevant guidelines. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, by this Motion, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Workers' Compensation Program to proceed.

**3. 401(k) Plan**

27. The Debtors provide all U.S.-based Hourly and Salaried Employees with the ability to participate in a 401(k) program (the "401(k) Plan"). The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code and an Employee's 401(k) contributions are deducted automatically from each paycheck. For participating Salaried Employees, the Debtors contribute three percent of the applicable Employee's wages and match up to an additional two percent. The Debtors' contribution is funded within three days of each paycheck. The Debtors also have a 401(k) umbrella plan for their Hourly Employees, with requirements that vary according to the Employees' work location, but generally include a match as well as a quarterly contribution. The 401(k) Plan is administered at no cost to the Debtors by The Principal Financial Group. Employees at the Debtors' Canadian facility are eligible to participate in a retirement plan that is similar to a 401(k) and is administered at no cost to the Debtors by Manulife Financial (the "RRSP"). The Debtors estimate that, as of the Petition Date, $20,000 is outstanding on account of accrued and unpaid contributions arising from 401(k) Plan and the RRSP in the ordinary course of business.

**4. Employee Assistance Program**

28. The Debtors provide Employees with an employee assistance program (the "Employee Assistance Program"), at no cost to Employees. The Employee Assistance Program is provided through the Hartford who the Debtors pay approximately $700 per month. The Employee Assistance Program is a confidential counseling and referral service that can assist Employees with a range of personal and health related problems. As of the Petition Date, the Debtors owe approximately $1,000 with respect to the Employee Assistance Program

**5. Zochem Pension Plans**

29. Debtor Zochem, Inc. ("Zochem") maintains separate pension plans for its salaried and hourly personnel, which have been closed to new members since July 1, 2012 (collectively, the "Zochem Pension Plans"). Employees who have joined Zochem since July 1, 2012 have joined Zochem's group RRSP. According to a report prepared by Corporate Benefit Analysis, Inc., the Zochem Pension Plans were, collectively, overfunded as of December 31, 2015, though the salaried plan had a small unfunded projected benefit obligation in the amount of $181,499. Neither plan has been wound up. The average monthly cost of the Zochem Pension Plans is approximately $17,000.

**C. Vacation Time and Other Leave Benefits**

30. In the ordinary course of business, the Debtors provide vacation time ("Vacation Time") to Employees as a paid time off benefit. Employees receive a certain amount of days in Vacation Time each year depending on level of seniority and tenure. While Employees may use their Vacation Time at any point throughout the year, the Vacation Time may also be "cashed out" for immediate payment. Vacation Time for "cash out" purposes accrues on a pro-rated basis throughout the year for most Employees, but many Employees become eligible for their full allotment of Vacation Time once they work the first day of the

applicable coverage year.[7] By this Motion, the Debtors do not seek authority to pay any "cash out" amounts due with respect to the Vacation Time, except where required by applicable law, and to otherwise continue the Vacation Time policies, in the ordinary course of business subject to the applicable caps set forth herein.

## III. Employee Incentive Programs

31. By this Motion, the Debtors seek authority, on a final basis only, to continue their ordinary course incentive programs and to honor their obligations to non-insider Employees under the pre-existing bonus programs described below; provided that "insiders" (as that term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested herein. Solely for the purposes of this Motion, the Debtors have identified "insiders" excluded from the relief requested herein as the Debtors' three executive officers (including the Chief Executive Officer, Chief Financial Officer, and General Counsel) and seven Employees with a title of Vice President or higher.[8] To the extent the Debtors propose to make a bonus payment to, or implement an incentive plan for, any insiders or senior Horsehead executives, the Debtors will seek separate approval from the Court with respect to such program.[9]

32. As described more fully below, the Debtors offer certain incentive programs (collectively, the "Employee Incentive Programs") as an additional component of overall Employee Compensation. The Debtors believe the Employee Incentive Programs are integral to

---

[7] In addition, the Debtors permit their Employees to take certain other paid and unpaid leaves of absence for personal reasons, many of which are required by laws such as the Family and Medical Leave Act. These policies are assessed on a case-by-case basis and may require the Debtors to pay the Employees for missed work time in the ordinary course of business up to certain limits. Importantly, the Employees are not entitled to any separate cash payments in addition to their normal compensation for these leave policies.

[8] Notwithstanding anything herein to the contrary, the Debtors reserve all rights with respect to the "insider" status of such parties with respect to any further relief that the Debtors may seek from the Court by separate motion and to seek authority to honor obligations arising with respect to the Debtors at a later date.

[9] Certain of the Horsehead Employees that hold the title of Vice President or above may be entitled to severance, if applicable, pursuant to their employment agreements. By this Motion, the Debtors do not seek authority to honor such severance provisions. The Debtors, however, reserve all rights with respect to such severance payments and reserve the right to seek authority to honor obligations from the Court by separate motion.

their operations. In particular, the Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.

33. As of the Petition Date, the maximum annual bonus pool with respect to each of the Employee Incentive Programs is set forth below:

| Employee Incentive Program | Participants[10] | Maximum Bonus Pool | Average per Employee |
|---|---|---|---|
| Profit Sharing Plan | 120 | $1.6 million | $13,333 |
| Safety and Production Incentive Program | 25 | $100,000 | $4,000 |
| Mooresboro Incentive Program | 225 | $360,000 | $1,600 |
| Management Incentive Program | 30 | $200,000 | $6,667 |

34. By this Motion, the Debtors request authority (on a final basis only) to honor obligations arising under the Profit Sharing Plan, the Safety and Production Incentive Program, the Mooresboro Incentive Program, and the Management Incentive Program (each as defined herein) in the ordinary course of business. The Profit Sharing Plan, the Safety and Production Incentive Program, the Mooresboro Incentive Program, and the Management Incentive Program are described below.

**B. Profit Sharing Plan**

35. All Salaried Employees at the Debtors' Canadian operations and all Employees at the Debtors' Pennsylvania facility participate in a profit sharing plan (the "Profit Sharing Plan"), whereby the eligible Employees are able to receive additional compensation based on the achievement of certain plant-specific financial performance goals.[11]

36. The Profit Sharing Plan is paid on an annual basis to eligible participants at the Debtors' Canadian facility and on a quarterly basis to eligible participants at the Debtors'

10 Solely for purposes of the relief requested in this Motion, participants exclude Horsehead Employees with the title of Vice President or above. For the avoidance of doubt, the Debtors reserve all rights with respect to the "insider" status of such parties with respect to any further relief that the Debtors may seek from the Court by separate motion.

11 The Debtors also maintain profit sharing programs for the remainder of their facilities, but such facilities have not achieved their financial targets in many years. The Debtors are not requesting authority to continue such programs.

Pennsylvania facility. Eligible Employees must be employed on the payment date to be entitled to the Profit Sharing Plan compensation. The compensation paid to non-insider Employees in 2015 with respect to the Profit Sharing Plan Program was approximately $1.6 million, with an average bonus of $13,333 per eligible Employee. As of the Petition Date, the Debtors believe they owe approximately $500,000 on account of the Profit Sharing Plan.[12]

**C. The Safety and Production Incentive Program**

37. In an effort to promote a strong "safety-first" culture and incentivize a stable employee base to provide the Debtors with more efficient and knowledgeable Employees, the Debtors provide a quarterly cash reward for certain of their frontline plant supervisors who achieve various safety and production targets (the "Safety and Production Incentive Program"). Approximately 25 Employees are eligible for the Safety and Production Incentive Program and average quarterly cash payouts total approximately $25,000. The compensation paid to non-insider Employees in 2015 with respect to the Profit Sharing Plan Program was approximately $100,000, with an average bonus of $4,000 per eligible Employee. As of the Petition Date, the Debtors believe they owe approximately $50,000 on account of the Safety and Production Incentive Program.[13]

**D. The Mooresboro Incentive Program**

38. The Debtors have historically provided an incentive program to their Hourly Employees located at their Mooresboro, North Carolina facility (the "Mooresboro Incentive Program"). Approximately 225 Employees are eligible for payments under the Mooresboro Incentive Program, with average monthly payments totaling $30,000. The compensation paid to non-insider Employees in 2015 with respect to the Mooresboro Incentive Program was

[12] For the avoidance of doubt, this estimated amount that may be payable under the Profit Sharing Plan is not an admission of any liability by the Debtors to any Employees on account of the Profit Sharing Plan.

[13] For the avoidance of doubt, this estimated amount that may be payable under the Safety and Production Incentive Program is not an admission of any liability by the Debtors to any Employees on account of the Safety and Production Incentive Program.

approximately $360,000, with an average bonus of $1,600 per eligible Employee. The Debtors believe they have paid all amounts outstanding under the Mooresboro Incentive Program as of the Petition Date.

### E. The Management Incentive Program

39. Approximately 40 of the Debtors' most high-ranking Employees participate in an annual incentive program whereby eligible Employees are able to receive additional compensation based on the achievement of certain operational, financial, and personal performance goals (the "Management Incentive Program"). Payments on account of the Management Incentive Program are earned on the last day of the calendar year and are generally paid out in the first quarter of the following calendar year. The compensation earned by non-insider Employees in 2015 with respect to the Management Incentive Program was approximately $200,000, with an average bonus of $6,667 per eligible non-insider Employee. As of the Petition Date, the Debtors believe they owe approximately $200,000 to non-insider Employees on account of the Management Incentive Program.[14]

## Basis for Relief

## IV. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits

### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment

40. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. See 11 U.S.C. § 1129(a)(9)(b). Thus, granting the relief sought herein should only affect the timing of certain payments to the Debtors' Employees, and should not negatively affect

14 For the avoidance of doubt, this estimated amount that may be payable under the Management Incentive Program is not an admission of any liability by the Debtors to any Employees on account of the Management Incentive Program.

recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Debtors' Employees' Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

**B. Payment of Certain Employee Compensation and Benefits Is Required By Law**

41. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. See 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. See 26 U.S.C. §§ 6672, 7501(a); see also City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); In re DuCharmes & Co., 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Debtors' Employees to the proper parties subject to the caps set forth herein.

42. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers' compensation

amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## V. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity

43. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); see also In re Phx. Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); see also In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

44. In addition, the Court may authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Court may use its power under section 105(a) to authorize payment of the Employee Compensation and Benefits under the "necessity of payment" doctrine. See In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

45. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").

46. The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

47. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, the Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Moreover, the Employees provide the Debtors with services necessary to conduct the Debtors'

businesses, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such Employees may thus elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

48. Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here. See, e.g., In re Magnum Hunter Res. Corp., No. 15-12533 (KG) (Bankr. D. Del. Jan. 11, 2016) (authorizing debtors to continue employee compensation and benefits programs and pay certain prepetition obligations related thereto on a postpetition basis); In re Quicksilver Res. Inc., No. 15-10585 (LSS) (Bankr. D. Del. Apr. 14, 2015) (same); In re Energy Future Holdings Corp., No. 14-10979 (CSS) (Bankr. D. Del. June 30, 2014) (same); In re GSE Envtl., Inc., No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014) (same); In re Dolan Co., No. 14-10614 (BLS) (Bankr. D. Del. Apr. 15, 2014) (same).[15] Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to pay the Employees the

15 Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Employee Compensation and Benefits and to continue the Employee Compensation and Benefits subject to the cap requested herein.

## VI. A Limited Waiver of the Automatic Stay for Workers' Compensation Program Is Appropriate in this Case

49. Section 362(a) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1). Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." See 11 U.S.C. § 362(d)(1).

50. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit its Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying an Employee's workers compensation claims could have a detrimental effect on the financial well-being and morale of all Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Workers' Compensation Program to proceed.

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

51. The Debtors have sufficient funds to pay any amounts related to the Employee Compensation and Benefits in the ordinary course of business. Under the Debtors' existing cash

management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits, as applicable. The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Thus, the Debtors request that the Court authorize all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Employee Compensation and Benefits.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

52. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For reasons discussed above, authorizing the Debtors to pay the Employee Compensation and Benefits and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Reservation of Rights**

53. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights or any other party's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought

herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights or any other party's rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

54. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

55. The Debtors will provide notice of this Motion to the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Environmental Protection Agency; (d) the state attorneys general for states in which the Debtors conduct business; (e) the Office of the United States Attorney for the District of Delaware; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) counsel to Macquarie Bank Limited; (i) the indenture trustee under the Debtors' 10.50% senior secured notes; (j) the indenture trustee under the Debtors' 9.00% senior unsecured notes; (k) the indenture trustee under the Debtors' 3.80% convertible senior notes; (l) Banco Bilbao Vizcaya Argentaria, S.A.; (m) PNC Bank, National Association; (n) counsel for the lenders under the Debtors' debtor-in-possession financing facility (such facility the "DIP Facility" and such lenders, the "DIP Lenders") and the ad hoc group of holders of the Debtors' secured notes (the "Ad Hoc Group of Secured Noteholders"); (o) the agent to the DIP Facility; (p) Richter Advisory Group Inc. in its capacity as proposed information officer in the Debtors' foreign recognition proceedings; (q) the Financial Services Commission of Ontario (FSCO); (r) Unifor Local 591G; (s) any party that has requested notice pursuant to Bankruptcy

Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

56. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of an interim order, substantially in the form attached hereto as **Exhibit A**, and, pending a final hearing on this Motion, a final order in the form attached hereto as **Exhibit B**: (I) authorizing, but not directing, the Debtors to (a) on an interim basis, pay prepetition wages, salaries, other compensation, reimbursable expenses, and payroll processing fees up to the amount provided herein pending further order of the Court, (b) on an interim basis, pay prepetition Withholding Obligations (as defined herein) up to the amount provided herein pending further order of the Court, (c) on an interim basis, continue employee benefits programs, including payment of certain prepetition obligations related thereto, up to the amount provided herein pending further order of the Court, (d) on a final basis, continue ordinary course incentive programs for non-insiders; and (II) granting related relief.

Dated: February 2, 2016
Wilmington, Delaware

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
joneill@pszjlaw.com
jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Patrick J. Nash Jr., P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
patrick.nash@kirkland.com
ryan.dahl@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*