## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HORSEHEAD HOLDING CORP., <u>et al.</u>,[1] | ) | Case No. 16-10287 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF JAMES M. HENSLER
## IN SUPPORT OF FIRST DAY MOTIONS

I, James M. Hensler, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.     I am the Chairman of the Board, President, and Chief Executive Officer of Horsehead Holding Corp. ("<u>Horsehead Holding</u>"), one of the debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned case. I initially joined Horsehead Holding in 2004, and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

2.     I am authorized to submit this declaration (this "<u>Declaration</u>") on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Horsehead Holding Corp. (7377); Horsehead Corporation (7346); Horsehead Metal Products, LLC (6504); The International Metals Reclamation Company, LLC (8892); and Zochem Inc. (4475). The Debtors' principal offices are located at 4955 Steubenville Pike, Suite 405, Pittsburgh, Pennsylvania 15205.

3.     The Debtors have requested a variety of relief in their "first day" motions and applications (collectively, the "First Day Motions") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  I further believe the relief requested in the First Day Motions will aid in the implementation of timely and efficient chapter 11 cases that will preserve and maximize the value of the Debtors' estates.

**Preliminary Statement**

4.     Together with their predecessors, the Debtors have operated in the zinc industry for more than 150 years and in the nickel-bearing waste industry for more than 30 years. Generally, the Debtors operate through three distinct business units:  Horsehead Corporation and its subsidiaries (collectively, "Horsehead"), Zochem Inc. ("Zochem"), and The International Metals Reclamation Company, LLC ("INMETCO").  Horsehead, Zochem, and INMETCO are each subsidiaries of Horsehead Holding.  Horsehead is a prominent recycler of electric arc furnace ("EAF") dust, a zinc-containing waste generated by North American steel "mini-mills,"[2] and in turn uses the recycled EAF dust to produce specialty zinc and zinc-based products. Zochem, located in Brampton, Ontario, Canada, is a producer of zinc oxide.  INMETCO is a recycler of nickel-bearing wastes and nickel-cadmium batteries, and a producer of nickel-chromium-molybdenum-iron remelt alloy for the stainless steel and specialty steel industries. Collectively, the Debtors hold a market-leading position in zinc production in the United States, zinc oxide production in North America, EAF dust recycling in North America, and are a leading environmental service provider to the U.S. steel industry.

---

[2]     "Mini-mills" are traditionally secondary steel producers, where scrap metal is melted and refined in an EAF to make steel products.

2

5.      Horsehead Holding is a publicly-traded company and trades its common stock on the NASDAQ Stock Market, listed under the ticker symbol ZINC.  In the nine months ended September 30, 2015, the Debtors generated revenues totaling approximately $331.9 million on a consolidated basis, consisting of:   (a) revenues totaling approximately $198.8 million arising from Horsehead's operations; (b) revenues totaling approximately $101.7 million arising from Zochem's operations; and (c) revenues totaling approximately $37 million arising from INMETCO's operations, less eliminations of intercompany transactions totaling approximately $5.6 million.  As of the date hereof (the "Petition Date"), the Debtors' collective funded debt balance consists of approximately $420.7 million in secured and unsecured indebtedness, and is described more fully below.

6.      Notwithstanding their market-leading position, the Debtors' financial position has been negatively impacted by many of the same macroeconomic effects presently being felt throughout the metals-processing sector:   historically low commodity prices coupled with weaker near-term global demand.   Base metals prices on the London Metals Exchange (the "LME"), a leading measure of metals pricing, have fallen significantly over the past year, with spot LME zinc prices declining approximately 30% over the past year.  Material decreases in zinc prices significantly and directly affect the Debtors' revenue because the Debtors' zinc pricing is generally tied to overall market pricing.

7.      The Debtors' stressed pricing environment has been further impacted by operational challenges at their zinc processing facility located in Mooresboro, North Carolina (the "Mooresboro Facility").   The Debtors began construction of the Mooresboro Facility in September 2011, which was designed to employ state-of-the-art zinc processing technology. However, the Mooresboro Facility has been plagued by significant operational challenges and

cost overruns, and has operated at levels significantly below its capacity.  These challenges have had a corresponding impact on the Debtors' financial position, and, collectively, these macroeconomic factors and operational issues have strained the Debtors' ability to sustain their existing debt load.  Additionally, decreased cash flow has also impacted the Debtors' ability to complete repairs that are necessary to bring the Mooresboro Facility up to full operating capacity.

8.    On January 5, 2016, Macquarie (as defined below), administrative agent under the Debtors' asset-based lending facility, notified the Debtors of an event of default arising from an over-advance position under the Macquarie Credit Facility (as defined below), and froze certain of the Debtors' bank accounts, including the Debtors' main operating account.[3]  As a result, the Debtors have been unable to access a material portion of their liquidity since that time.  On January 6, 2016, PNC (as defined below), administrative agent under the Debtors' asset-based lending facility at Zochem, also asserted an event of default arising under that facility on account of, among other things, the Debtors' failure to comply with a fixed charge covenant test as of November 30, 2015.  PNC also froze certain of the Debtors' bank accounts associated with their Zochem operations, and demanded payment of all outstanding obligations on January 13, 2016.

9.    Since that time, the Debtors and their advisors have engaged in ongoing negotiations with their lenders to obtain incremental access to liquidity.  The Debtors entered into a forbearance agreement on January 14, 2016 with PNC with respect to the asset-based lending facility at Zochem (the "Zochem Forbearance"), pursuant to which PNC agreed to temporarily forbear from exercising rights and remedies related to certain defaults noted above.  In consideration for the Zochem Forbearance, the Debtors agreed, among other things, to pay a

---

[3]    As described more fully below, each of the Debtors other than Zochem is a borrower or obligor under the Macquarie Credit Facility (as defined below).

forbearance fee to PNC of $1 million, due and payable at the termination of the forbearance period, and to provide a mortgage on Zochem's unencumbered real property in Ontario, Canada.

10.     The Debtors further entered into a separate forbearance agreement with Macquarie (the "Macquarie Forbearance") with respect to the Macquarie Credit Facility on January 15, 2016.  Pursuant to the Macquarie Forbearance, Macquarie agreed to temporarily forbear from exercising rights and remedies related to certain events of default related to insufficient availability under the Macquarie Credit Facility.  In exchange, the Debtors agreed to, among other things, pay down borrowings under the Macquarie Credit Facility, pay a restructuring fee of $1 million in the event that obligations under the Macquarie Credit Facility are not paid in full by February 1, 2016, with that fee increasing over time.

11.     Over the past several weeks, the Debtors, with the assistance of their advisors, have engaged in a significant marketing process to solicit debtor-in-possession financing.  In connection with this process, the Debtors contacted no less than 25 third party lenders, hedge funds, and financial institutions.  Through this process, after vigorous, arm's-length negotiations between the Debtors, the Debtors' advisors, and potential lending parties and their advisors, the Debtors seek to obtain a financing package to address their liquidity needs, enable them to operate their businesses in a manner that will permit the Debtors to preserve and maximize the value of their estates, and avoid immediate and irreparable harm to their estates and stakeholders. The Debtors are finalizing negotiations with respect to a financing package (the "DIP Credit Agreement"), which will provide for the terms and conditions of debtor-in-possession financing (the "DIP Financing").  The Debtors and certain holders of their Senior Secured Notes have negotiated, among other things, the following chapter 11 plan milestones:

- file a plan of reorganization acceptable to certain DIP lenders and the ad hoc group of Senior Secured Note holders, on the one hand, and the Debtors, on the other hand (an "Acceptable Plan") within forty (40) days of the Petition Date;

- file a disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with the Court within forty (40) days of the Petition Date;

- entry of an order confirming the Acceptable Plan within one hundred-fifteen (115) days of the Petition Date; and

- consummation of the Acceptable Plan within one hundred-thirty (130) days of the Petition Date.

12.    The Debtors therefore elected to commence these chapter 11 cases to, among other things, subject to the Court's approval, obtain access to liquidity to stabilize operations pursuant to the terms of the Debtors' proposed DIP Financing.  To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized in three parts.  Part I describes the Debtors' business and their capital structure.  Part II details the circumstances surrounding the commencement of these chapter 11 cases.  Part III sets forth relevant facts in support of each of the First Day Motions filed in connection with these chapter 11 cases.

**Part I**
**General Background**

## I.    The Debtors' Corporate History and Business Operations

13.    Based in Pittsburgh, Pennsylvania, Horsehead Holding was incorporated in May 2003, although together with the Debtors' predecessors, the Debtors' zinc operations date to the mid–1800s.  In 2002, the Debtors' predecessors-in-interest filed for chapter 11 protection in the Southern District of New York (collectively, the "Previous Chapter 11 Cases")[4] as a result of their record-low zinc prices, production inefficiencies, high operational costs, and legacy

---

[4]    Case Nos. 02-14024, 02-14025, 02-14026, 02-14027.

environmental costs.   In the Previous Chapter 11 Cases, the Debtors' predecessors sold substantially all of their operating assets to a private equity investor, which subsequently exited that investment following an initial public offering in 2007.   Currently, Horsehead Holding's equity owners are a diversified group of public investors, without a single entity owning or beneficially controlling more than 11% of Horsehead Holding's outstanding equity as of September 30, 2015.   The Debtors produce zinc and nickel-based products for sale primarily to customers throughout the United States and Canada.   Additionally, the Debtors are the largest recycler of EAF dust and a leading recycler of hazardous and non-hazardous waste for the steel industry in the United States.   The Debtors and their non-Debtor affiliates have production and/or recycling operations at seven facilities located in five states and Canada.

14.    As noted above, the Debtors operate in three distinct, but related, lines of business:  (a) the processing of EAF dust and other zinc-bearing material to produce and sell zinc and other metals, undertaken by Horsehead; (b) the production and sale of zinc oxide, undertaken by Zochem; and (c) the processing of a variety of metal-bearing waste material, and the production of nickel-based alloys, undertaken by INMETCO.   These operations are detailed below.

### A.    Horsehead

#### 1.  EAF Dust Recycling.

15.    Through Horsehead, the Debtors are one of North America's largest recyclers of EAF dust.  Steel mini-mills melt and refine scrap metal in EAFs, and such process produces metal dust—the "EAF dust"—which is designated as a hazardous waste by and subject to disposal restrictions from the Environmental Protection Agency.[5]   Mini-mills or third party

---

[5]    See, e.g., 40 C.F.R. §§ 261, 268, 271.

carriers then transport EAF dust to one of Horsehead's four EAF dust recycling facilities.[6] There, Horsehead collects and recycles the zinc-bearing EAF dust by using a proprietary "Waelz Kiln" process, which allows Horsehead to extract zinc from EAF dust in the form of Waelz oxide ("WOX"),[7] and recycle the remaining components of the dust.

16.    Horsehead's multiple EAF dust recycling facilities are strategically located near major EAF operators, which reduces transportation costs and enhances the Debtors' ability to compete effectively with other means of EAF dust disposal.  Additionally, a competitive cost position, an extensive zinc distribution network, and proprietary market knowledge, allow the Debtors to maintain their market-leading position.  The Debtors are one of the leading environmental service providers to the U.S. steel industry, having recycled, together with their predecessors, 11.2 million tons of EAF dust since 1990, which is equivalent to approximately 2.2 million tons of zinc, and represents the dust generated in the production of over 650 million tons of steel.  Horsehead's recycling and conversion of EAF dust reduces a steel mini-mill's exposure to environmental liabilities that may arise when the EAF dust is sent to a landfill.

**2.  Zinc Production.**

17.    Horsehead is also a leading producer of zinc products, including zinc metal, used in the galvanizing[8] of steel, in zinc die castings, and zinc-bearing alloys in the U.S.  Horsehead also produces WOX and zinc calcine for sale to other zinc producers.  Horsehead uses WOX— the primary by-product of its recycling operations—as a low-cost, raw material feedstock in the

---

[6]    These facilities are located in:  (a) Barnwell, South Carolina; (b) Calumet, Illinois; (c) Palmerton, Pennsylvania; and (d) Rockwood, Tennessee.  As described more fully below, the Barnwell, South Carolina recycling facility operated by the Debtors is located on real property owned by Horsehead Zinc Recycling, LLC, a non-Debtor subsidiary of Horsehead, an above-captioned Debtor.

[7]    WOX, known also as crude zinc oxide, contains approximately 55–60% zinc.

[8]    Galvanization is the process of applying a protective zinc coating to steel or iron to prevent rusting.

production of zinc metal and value-added zinc products, which yields a competitive cost advantage. Moreover, by using large amounts of recycled feedstock, the Debtors reduce their exposure to LME zinc pricing, which increases their operating margins during periods of high LME zinc prices. Additionally, the Debtors' EAF dust recycling operations provide them with a reliable, cost-effective source of recycled feedstock without relying on third-party sellers.

18.    Horsehead conducts its zinc production (as opposed to recycling) operations from the Mooresboro Facility, which the Debtors began constructing in September 2011 to replace their former zinc smelter located in Monaca, Pennsylvania (the "Monaca Facility").[9] The Mooresboro Facility, which began production in May 2014, allows the Debtors to produce special high grade zinc, continuous galvanizing grade zinc, and high grade zinc, in addition to the prime western zinc the Debtors produced at the Monaca Facility.

19.    The Mooresboro Facility's design is intended to use sustainable manufacturing practices to produce zinc solely from recycled materials, and uses significantly less fossil fuel than the Monaca Facility, which allows the Debtors to significantly reduce greenhouse gas emissions and particulates into the atmosphere. To illustrate, before WOX can be used to produce various zinc metals, it has to first generally be "calcined" into a product called zinc calcine. The calcining process further refines WOX and involves heating WOX to eliminate impurities, which increases the zinc content of WOX from approximately 55–60% to approximately 65–70%. Horsehead uses rotary kiln-based operations at its recycling facilities to calcine WOX to create zinc calcine. The Mooresboro Facility was operating at approximately 25% of capacity during the fourth quarter of 2015, but due to financial constraints, the Debtors

---

[9]    The Debtors permanently shut down the Monaca Facility in April 2014, although the Debtors retain ownership of a non-hazardous captive landfill located at that site.

announced the temporary idling of the facility on January 22, 2016.[10]   However, once fully operational, the Mooresboro Facility will eliminate the need to calcine the majority of WOX prior to its use, thereby reducing Horsehead's manufacturing conversion and operational costs.

**B.    Zochem**

20.    The Debtors acquired Zochem in November 2011, which produces zinc oxide at a dedicated facility in Brampton, Ontario, Canada.   Zochem is one of the largest single-site producers of zinc oxide in North America.  Zinc oxide is used as an additive in various materials and products, including plastics, ceramics, glass, rubbers, cement, lubricants, pigments, sealants, ointments, fire retardants, and batteries.  The Debtors sell zinc oxide to over 250 producers of tire and rubber products, chemicals, paints, plastics, and pharmaceuticals, and have supplied zinc oxide to the majority of their largest customers for over 10 years.  Zochem has the capacity to produce approximately 72,000 tons of zinc oxide a year.

**C.    INMETCO**

21.    The Debtors acquired INMETCO in November 2009.  INMETCO is a leading recycler of nickel-bearing waste generated by the stainless and specialty steel producers, and a leading recycler of nickel-cadmium and other types of batteries in North America.  INMETCO operates out of a facility located in Ellwood City, Pennsylvania, which produces nickel-based products by using 100% recycled materials.   Additionally, INMETCO collects and recycles batteries through its own collection programs and Call2Recycle, which was founded in 1994 by five major rechargeable battery makers.   INMETCO also provides environmental services to over 200 customers that generate nickel-containing waste products, such as filter cake, spent pickle liquor, grinding swarf, and mill scale.

---

[10]    See Horsehead Holding Corp., Current Report (Form 8-K), at Ex. 99.1 (Jan. 22, 2016).

### D.      Non-Debtor Affiliates

#### 1.  Thirty Ox, LLC.

22.     In December 2013, Horsehead Metal Products, LLC ("HMP") entered into a joint venture with Imperial Zinc Corp., known as Thirty Ox, LLC ("Thirty Ox"), for the acquisition and processing of zinc-bearing secondary materials.  Thirty Ox's processing operation is located in North Carolina near the Mooresboro Facility, and Horsehead's EAF dust recycling operations supply the majority of feedstock used by Thirty Ox.

#### 2.  Horsehead Zinc Recycling, LLC.

23.     Horsehead owns or controls 99.99% of Horsehead Zinc Recycling, LLC ("HZR").[11]  HZR was formed in 2009 as part of the financing arrangement that resulted in the NMTC Loans (as defined below), which were used to fund Horsehead's expansion project at its EAF dust-recycling facility located in Barnwell, South Carolina (the "Barnwell Facility").  The Barnwell Facility began production in April 2010.

#### 3.  Chestnut Ridge Railroad Corp.

24.     Chestnut Ridge Railroad Corp. ("Chestnut") was incorporated in 2004 and is a direct, wholly-owned subsidiary of Horsehead.  Chestnut provides short-line railroad service in Palmerton, Pennsylvania, for the transportation of materials for both intercompany and outside-customer use.

### E.      The Debtors' Employees

25.     The Debtors currently employ approximately 730 individuals on a full-time basis, of which approximately 220 are salaried and 510 are paid on an hourly basis.  Approximately 38% of the Debtors' full-time employees are represented by collective bargaining units.  In

---

[11]   The other .01% of HZR is owned by Banc of America CDE III, LLC and CCM Community Development IV LLC (collectively, the "Minority HZR Owners").

addition to the Debtors' full-time employees, the Debtors' workforce includes two individuals employed on a part-time basis, and approximately 120 temporary production workers employed on a full-time basis that are sourced through various staffing agencies.

## II.    The Debtors' Corporate and Capital Structure

26.    The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit A**.  As set forth therein, Horsehead, Zochem, and INMETCO are each wholly owned by Horsehead Holding.  In addition, and as noted above, Horsehead owns HMP,[12] non-Debtor Chestnut, and owns or controls 99.99% of non-Debtor HZR.  As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $420.7 million.  The primary components of the Debtors' consolidated funded debt obligations outstanding as of the Petition Date are described below.

| Indebtedness | Principal Outstanding ($ millions) |
|---|---|
| Macquarie Credit Facility | $  27.2 |
| 10.50% Secured Notes | 205.0 |
| Zochem Secured Credit Facility | 16.9 |
| 9.00% Unsecured Notes | 40.0 |
| 3.80% Convertible Notes | 100.0 |
| Banco Bilbao Credit Facility | 17.4 |
| NMTC Loans | 14.2 |
| **Total** | **$420.7** |

### A.    The Macquarie Senior Secured Revolver

27.    On June 30, 2015, each of the Debtors other than Zochem entered into an $80 million secured revolving credit facility (the "Macquarie Credit Facility") as borrowers or guarantors with Macquarie Bank Limited ("Macquarie").  The Macquarie Credit Facility became effective on July 6, 2015, and matures on May 15, 2017.  This facility replaced the maximum

---

[12]    As discussed above, HMP has a 50% interest in non-Debtor Thirty Ox through a joint venture it entered into in 2013.

aggregate $80 million principal amount of two prior facilities.  Obligations arising under the Macquarie Credit Facility are secured by first priority liens (subject to certain permitted liens) on substantially all of the Debtors' assets, other than those relating to Zochem.  Certain of these assets securing the Debtors' obligations under the Macquarie Credit Facility also secure the Debtors' obligations under the Senior Secured Notes (as defined below).

28.    In connection with the applicable Debtors' entry into the Macquarie Credit Facility, the collateral agents for the Senior Secured Notes and the Macquarie Credit Facility also entered into an intercreditor agreement dated June 30, 2015 (the "Intercreditor Agreement"), which, among other things, assigns relative priority between Macquarie and holders of the Senior Secured Notes with regard to certain shared collateral.  Pursuant to the Intercreditor Agreement, liens granted by the Debtors to secure the Macquarie Credit Facility:  (a) are senior to any liens granted by the Debtors to secure the Senior Secured Notes with respect to (i) all INMETCO assets, and (ii) certain personal property of Horsehead and its subsidiaries, including accounts receivables, inventory, cash, and deposit accounts; and (b) are junior to (i) any liens granted to secure the Senior Secured Notes with respect to real property, fixtures, and equipment of Horsehead and its subsidiaries, and (ii) with respect to liens granted on Horsehead Holding's assets.  As of the Petition Date, approximately $27.2 million remains outstanding under the Macquarie Credit Facility.

### B.    The Senior Secured Notes

29.    In July 2012, the Debtors completed a private placement of $175 million in principal amount of 10.50% senior secured notes due 2017 (the "Senior Secured Notes") at an issue price of 98.188% of par.  The Debtors used the proceeds from the Senior Secured Notes primarily for construction costs of the Mooresboro Facility.  On June 3, 2013, the Debtors issued $20 million of additional Senior Secured Notes at an issue price of 106.50% of par, and

13

completed the sale of an additional $10 million of Senior Secured Notes at an issue price of 113.00% of par on July 29, 2014. As of the Petition Date, approximately $205.0 million of Senior Secured Notes are outstanding.

30. The Senior Secured Notes are guaranteed by each of the Debtors other than Zochem, and obligations arising under the Senior Secured Notes are secured by such Debtors' existing and future property and assets. Pursuant to the Intercreditor Agreement, liens securing the Senior Secured Notes with respect to accounts receivable, inventory, certain deposit accounts, cash, and certain other assets (including the proceeds thereof) are junior to liens securing the Macquarie Credit Facility. Similarly, the Intercreditor Agreement provides that liens securing the Senior Secured Notes shall be senior to liens securing the Macquarie Credit Facility with respect to real property, fixtures, and equipment of Horsehead and Horsehead Holding's assets. In addition, the Senior Secured Notes are secured by a first-priority pledge from Horsehead Holding of 65% of Horsehead Holding's equity interest in Zochem.

### C. The Zochem Senior Secured Revolver

31. On April 29, 2014, Zochem, as borrower, and Horsehead Holding, as guarantor, entered into a $20 million secured revolving credit facility (the "Zochem Facility") with PNC Bank, N.A. ("PNC") as agent. The Zochem Facility is secured by a first priority lien (subject to certain permitted liens) on substantially all of Zochem's tangible and intangible personal property, and, pursuant to the Zochem Forbearance, a lien on Zochem's processing facility located in Brampton, Ontario. Horsehead Holding unconditionally guarantees Zochem's obligations under the Zochem Facility, and pursuant to that certain Pledge Agreement dated as of April 29, 2014, Horsehead Holding pledged 65% of its equity interests in Zochem as additional collateral. The Debtors pay an unused line fee of 0.75% per annum, based on average undrawn availability multiplied by the amount that the maximum revolving advance amount exceeds the

14

average daily unpaid balance of the Zochem Facility's loans and undrawn amount of any outstanding letters of credit during any calendar quarter.  As of the Petition Date, approximately $16.9 million remains outstanding under the Zochem Facility.

### D.    The Banco Bilbao Credit Facility

32.    Horsehead, as borrower, and Horsehead Holding, as guarantor, entered into a credit agreement with Banco Bilbao Vizcaya Argentaria, S.A. on August 28, 2012 (the "Banco Bilbao Credit Facility"), which closed on November 14, 2012.  The Banco Bilbao Credit Facility provides financing up to approximately €18.8 million (approximately $25.8 million) in addition to $968,090.25 for purchases under certain contracts related to the Mooresboro Facility between Horsehead and Técnicas Reunidas, S.A.  The obligations under the Banco Bilbao Credit Facility are secured by an unconditional guarantee from Horsehead Holding, but are not otherwise secured by any of the Debtors' property.  As of the Petition Date, approximately $17.4 million remains outstanding under the Banco Bilbao Credit Facility.

### E.    The Senior Unsecured Notes

33.    The Debtors issued $40 million aggregate principal amount of 9.00% senior notes due 2017 (the "Unsecured Notes") on July 29, 2014 at an issue price of 100.00% of par, pursuant to an indenture among certain Debtors and U.S. Bank, N.A. as trustee.  The Unsecured Notes are listed as guaranteed by each of the Debtors, other than Zochem.  The Unsecured Notes and the related guarantees were offered to investors in a private placement, and mature on June 1, 2017.  As of the Petition Date, approximately $40 million of Unsecured Notes remain outstanding.

### F.    The Convertible Senior Unsecured Notes

34.    On July 27, 2011, the Debtors issued $100 million of 3.80% convertible senior notes due 2017 (the "Convertible Notes") in a private placement, the proceeds of which were primarily used for the initial construction stages of the Mooresboro Facility.  The Convertible

Notes mature on July 1, 2017.  The Convertible Notes are unsecured obligations of Horsehead Holding and are not guaranteed by any other Debtor.  As of the Petition Date, approximately $100 million of Convertible Notes remain outstanding.

**G.     The New Markets Tax Credit Program Financing Arrangement**

35.    On May 29, 2009, non-Debtor HZR entered into two construction loan agreements with Banc of America CDE III, LLC and CCM Community Development IV LLC (collectively, the "NMTC Lenders") for approximately $6.9 million and approximately $7.3 million, respectively (collectively, the "NMTC Loans").  A small portion of the funding provided in connection with the NMTC Loans included an equity investment in HZR by the NMTC Lenders, who also own 0.01% of HZR.  HZR entered into the NMTC Loans to fund the development and completion of the EAF dust recycling facility located in Barnwell, South Carolina through a tax-advantaged structure that permitted the monetization of certain tax credits through the New Markets Tax Credit program enacted through the Community Renewal Tax Relief Act of 2000.[13]

36.    Horsehead Holding guarantees HZR's obligations under the NMTC Loans.  As of the Petition Date, approximately $14.2 million of the NMTC Loans remain outstanding.  The NMTC Loans mature in June 2016, and the Debtors believe that they have certain set-off rights and related repayment obligations due to them that will permit the Debtors to fully satisfy the NMTC Loans for approximately $1 million in the aggregate upon maturity.

**H.     The Debtors' Equity**

37.    On August 15, 2007, the Debtors completed an initial public offering and began trading their common stock on the NASDAQ Stock Market, listed under the ticker symbol

---

[13]    Generally, the New Markets Tax Credit Program is intended to provide tax credit incentives for qualifying investments in certain low-income communities.

ZINC.  The Debtors completed underwritten public offerings of 6,325,000 shares of common stock at $12.00 per share on October 30, 2013, and 5,750,000 shares of common stock at $12.75 per share on January 28, 2015.  The Debtors' last equity offering was launched in October 2015 as a $50 million "At the Market" program.  The Debtors raised approximately $8.8 million before suspending trading under this program.

### I.    The Debtors' Other Obligations

#### 1.    Hedging Obligations.

38.    The Debtors' marketing strategy includes a metal hedging program that allows its customers to secure a firm price for future deliveries under a sales contract.  The Debtors enter into hedges based on firm sales contracts to deliver specified quantities of product on a monthly basis for terms generally not exceeding one (1) year.  As of the Petition Date, approximately two of such agreements remain outstanding.

#### 2.    Surety Bonds.

39.    The Debtors maintain three surety bonds to address financial assurance requirements for potential future remediation costs and permit termination under the Resource Conservation and Recovery Act (the "RCRA") for three facilities located in Pennsylvania.  The RCRA permit requirements require financial assurance for the Ellwood City and Palmerton facilities, and financial assurance is required for the eventual closure of the Debtors' residual landfill located at the site of the Monaca Facility.  As of the Petition Date, the Debtors have approximately $11.2 million in outstanding surety bonds.

#### 3.    Other Secured Claims.

40.    In the ordinary course of business, the Debtors routinely transact business with a number of third-party contractors and vendors who may be able to assert liens against the

Debtors and their property if the Debtors fail to pay for the goods delivered or services rendered, as well as cash collateralizing certain letters of credit.

## Part II
### Events Leading to the Chapter 11 Cases

### I.    Economic Environment

41.     The Debtors' operating performance has been negatively impacted by challenges arising from the Mooresboro Facility and the current economic environment, including material fluctuations in zinc prices.  Base metals prices, including zinc and nickel prices, have fallen significantly over the past year.  The spot LME zinc price in December 2015 averaged $0.69/lb, which represents a decrease of approximately 30% since 2014, while nickel prices declined roughly 41% over the same period, and averaged $3.94/lb in December 2015.  The challenges facing the global steel industry, a major market for zinc, further depress zinc prices.  The depressed commodity environment continues to put the Debtors' balance sheet under severe stress.

42.     Increased competition in the industry and decreased demand from their customer base has contributed to the Debtors' need to restructure their debts.  On a national level, the demand for zinc is softening.  For example, certain types of zinc that the Debtors produce are used by continuous galvanizers to produce galvanized flat-rolled sheet steel for the automotive market, and many automotive companies have begun using lightweight aluminum sheet to replace galvanized steel.  Additionally, while the Debtors' nickel-based products are used in the stainless steel industry, demand for such products faces competition from stainless steel containing a lower level of nickel or no nickel.  Moreover, the strong U.S. dollar makes it cheaper for companies in the United States to import stainless steel and galvanized carbon steel, further driving down demand for zinc and nickel-iron remelt alloy as well as the generation of

18

EAF dust by both carbon steel and stainless steel producers.  Thus, the Debtors face twin challenges of a declining zinc-pricing environment and reduced customer demand.

## II.    Mooresboro Facility Challenges

43.    Since construction began in 2011, the Debtors have experienced a number of significant operational, production, and equipment issues associated with the ramp-up of the Mooresboro Facility.   For example, the newly-constructed facility already has required replacements of faulty and poor-quality anodes, pumps, and filters.  As a result, costs associated with the Mooresboro Facility significantly exceeded the estimated expenses.  To date, the Debtors have invested approximately $550 million for the construction, development, and operation of the Mooresboro Facility.  The Debtors expect that at full capacity, the Mooresboro Facility will be capable of producing over 155,000 tons of zinc per year, and up to 170,000 tons per year with certain modifications.  However, during the third quarter of 2015, the Mooresboro Facility only produced approximately 9,700 tons of zinc, at an annualized rate of approximately 38,800 tons per year.  The Debtors presently anticipate that approximately 12 to 18 months may be required to implement engineering and operational repairs or modifications necessary to bring the Mooresboro Facility up to full capacity.

44.    Over the past few weeks, the Debtors, with the assistance of their advisors, have engaged in a significant marketing process to solicit debtor-in-possession financing.   In connection with this process, the Debtors contacted no less than 25 third party lenders, hedge funds, and financial institutions.  Through this process, after vigorous, arm's-length negotiations between the Debtors, the Debtors' advisors, and potential lending parties and their advisors, the Debtors are finalizing negotiations with respect to a financing package that will address their liquidity needs, enable them to operate their businesses in a manner that will permit the Debtors to preserve and maximize value of their estates, and avoid immediate and irreparable harm to

19

their estate and stakeholders.  The Debtors and certain holders of their Senior Secured Notes have negotiated, among other things, the following chapter 11 plan milestones:

- file the Acceptable Plan with the Court, acceptable to certain DIP lenders, the ad hoc group of Senior Secured Note holders, and the Debtors, within forty (40) days of the Petition Date;

- file the Disclosure Statement with respect to the Acceptable Plan with the Court within forty (40) days of the Petition Date;

- entry of an order confirming the Acceptable Plan within one hundred-fifteen (115) days of the Petition Date; and

- consummation of the Acceptable Plan within one hundred-thirty (130) days of the Petition Date.

**Part III**
**First Day Motions**[14]

45.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet. The First Day Motions include:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief*;

- *Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) (I) Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent to the Debtors, Effective* Nunc Pro Tunc *to the Petition Date, and (II) Granting Related Relief*;

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and (III) Granting Related Relief*;

---

[14]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

- *Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief;*

- *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Authorizing the Postpetition Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (V) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management Systems, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, Reimbursable Expenses, and Payroll Processing Fees, (B) Pay Withholding Obligations, (C) Continue Employee Benefits Programs, and (D) Continue Ordinary Course Incentive Programs for Non-Insiders, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Claims of Shippers and Miscellaneous Lien Claimants, (B) Pay Section 503(b)(9) Claims, and (C) Grant Administrative Expense Priority to All Undisputed Obligations for Goods Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition, (B) Honor Their Prepetition Insurance Premium Financing Agreements, and (C) Renew Their Premium Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Authorizing, but Not Directing, the Payment of Certain Prepetition Taxes, Governmental Assessments, and Fees, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility*

21

> *Companies from Altering, Refusing, or Discontinuing Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock, and (II) Granting Related Relief; and*

- *Debtors' Motion for Entry of an Order (I) Authorizing Horsehead Holding Corp. to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505, and (II) Granting Related Relief.*

46.     The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing on an interim basis, honor employee-related wages and benefits obligations, preserve client and customer relationships, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to giving the Debtors an opportunity to work towards a successful restructuring that will benefit all of the Debtors' stakeholders.

47.     Several of the First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

48.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors

to operate in chapter 11 with minimal disruption to their business operations and constitutes a

critical element in successfully restructuring the Debtors' businesses.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 2, 2016

/s/ James M. Hensler
James M. Hensler
Horsehead Holding Corp.
Chairman of the Board, President,
and Chief Executive Officer

**<u>EXHIBIT A</u>**

**Corporate Organizational Chart**



# Horsehead Holding Corp. -- Corporate and Capital Structure Chart

**Key**

Borrower/Issuer/Guarantor

Equity Pledged

Public Shareholders

Horsehead Holding Corp.
(DE)
Nasdaq Ticker: ZINC

Zochem Inc.
(CANADA)

The International Metals Reclamation Company, LLC ("INMETCO")
(DE)

Horsehead Corporation
(DE)

Banc of America CDE III, LLC; CCM Community Development IV LLC

.01%    99.99%

Horsehead Zinc Recycling, LLC
(SC)

Chestnut Ridge Railroad Corp.
(DE)

Horsehead Metal Products, LLC
(NC)

Imperial Acquisitions, LLC
(IL)

50%    50%

Thirty Ox, LLC
(NC)

| Loan | Borrower/Issuer(s) | Guarantor(s) | Agent/Trustee | Lender/Noteholder(s) | Maturity | Interest Rate | Principal Outstanding* |
|------|-------------------|--------------|---------------|---------------------|----------|---------------|------------------------|
| Macquarie Credit Facility | Horsehead Corporation Horsehead Metal Products, LLC INMETCO | Horsehead Holding Corp. Chestnut Ridge Railroad Corp. | Macquarie Bank Limited (Administrative Agent) | Macquarie Bank Limited | May 15, 2017 | L + 410 | $27.2 |
| 10.50% Senior Secured Notes | Horsehead Holding Corp. | Horsehead Corporation Horsehead Metal Products, LLC INMETCO Chestnut Ridge Railroad Corp. | U.S. Bank, N.A. (Trustee and Collateral Agent) | Greywolf Capital Management; Other Unknown Noteholders | June 1, 2017 | 10.50% | 205.0 |
| 9.00% Senior Unsecured Notes | Horsehead Holding Corp. | Horsehead Corporation Horsehead Metal Products, LLC INMETCO Chestnut Ridge Railroad Corp. | U.S. Bank, N.A. (Trustee) | Unknown | June 1, 2017 | 9.00% | 40.0 |
| 3.80% Convertible Senior Notes | Horsehead Holding Corp. | None | U.S. Bank, N.A. (Trustee) | Unknown | July 1, 2017 | 3.80% | 100.0 |
| Banco Bilbao Credit Facility | Horsehead Corporation | Horsehead Holding Corp. | Banco Bilbao Vizcaya Argentaria, S.A. | Banco Bilbao Vizcaya Argentaria, S.A. | August 15, 2023 | L + 320 | 17.4 |
| Zochem Credit Facility | Zochem Inc. | Horsehead Holding Corp. | PNC Bank, N.A. | Poseidon Holdings II, LP | September 28, 2016 | L + 250 | 16.9 |
| NMTC Loans | Horsehead Zinc Recycling, LLC | Horsehead Holding Corp. | N/A | CCM Community Development IV LLC; Banc of America CDE III, LLC | June 17, 2016 | 3.5-7.3% | 14.2 |
| *All dollars in millions unless otherwise noted | | | | | | Total Funded Debt: | $420.7 |