IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HORSEHEAD HOLDING CORP., et al.,[1] | ) | Case No. 16-10287 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363,
AND 364, (II) AUTHORIZING THE POSTPETITION USE OF CASH COLLATERAL,
(III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES, (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY
RULE 4001(B), AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion")[2] seeking entry of an interim order (the "Interim DIP Order")[3] and a

final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"):

(I) authorizing the Debtors to obtain postpetition secured financing pursuant to sections 105, 361,

362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy

Code") and in accordance with rules 2002, 4001, and 9014, of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and rules 2002-1(b) and 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Horsehead Holding Corp. (7377); Horsehead Corporation (7346); Horsehead Metal Products, LLC (6504); The International Metals Reclamation Company, LLC (8892); and Zochem Inc. (4475). The Debtors' principal offices are located at 4955 Steubenville Pike, Suite 405, Pittsburgh, Pennsylvania 15205.

[2]   Unless otherwise noted herein, all capitalized terms used in this Motion shall have the meanings set forth in the DIP Term Sheet (as defined herein).

[3]   The Debtors anticipate filing a proposed form of the Interim DIP Order and the DIP Credit Agreement in the near term.

Delaware (the "Local Rules"), under the DIP Facility contemplated by the term sheet annexed

hereto as **Exhibit A** (the "DIP Term Sheet");[4] (II) authorizing the Debtors to use Cash Collateral;

(III) granting adequate protection; (IV) scheduling a final hearing on this Motion (the "Final

Hearing") to consider entry of the Final DIP Order; and (V) granting related relief.  In support of

this Motion, the Debtors submit the declarations of: (a) Andrew Torgove, a managing director at

Lazard Middle Market LLC ("Lazard"), the Debtors' proposed investment banker in these

chapter 11 cases (the "Torgove Declaration");[5] and (b) James M. Hensler, the Debtors' Chief

Executive Officer, attached hereto as **Exhibit C** (the "Hensler Declaration"), each of which is

incorporated by reference in its entirety.   In further support of this Motion, the Debtors

respectfully state as follows:

## Preliminary Statement

1.       Liquidity is the lifeblood of any debtor's business operations.  This is particularly

true where, as here, the Debtors' operations have had highly limited access to cash for almost

three weeks, with associated levels of business disruption.   The proposed DIP Facility is an

immediate solution to this dire liquidity need.  The Debtors therefore seek this Court's approval

for a $90 million DIP facility proposed by holders of more than 80% of their Secured Notes.[6]

The Debtors' Secured Notes represent the single-largest class of funded debt in the Debtors'

---

[4]    The DIP Term Sheet reflects a non-binding proposal, to which the Debtors and the DIP Lenders have yet to commit, and remains subject to ongoing review and negotiation among the Debtors, on the one hand, and their prospective DIP Lenders, on the other hand.

[5]    The Debtors anticipate filing the Torgove Declaration in advance of the Interim Hearing.

[6]    On information and belief, the Debtors believe their proposed DIP Lenders further beneficially own or control approximately 80% of the Debtors' outstanding Unsecured Notes.

prepetition capital structure, with the Secured Notes totaling $205 million of the approximately

$421 million of funded debt outstanding as of the Petition Date.

2.      As will be set forth in the Interim DIP Order, the Debtors request authority to

draw up to $40 million under the DIP Facility over the first five weeks of these chapter 11 cases.

Subject to entry of the Interim DIP Order, the Debtors anticipate that proceeds from the proposed

DIP facility would be used, among other things, to inject much-needed liquidity to the Debtors'

operations, fund the administration of these chapter 11 cases, and refinance approximately $16.9

million of indebtedness outstanding under the Zochem Facility—in each case pursuant to a

proposed Budget, as contemplated by the DIP Term Sheet.  In addition, the Debtors seek the

Court's approval for the postpetition use of cash collateral on an interim basis in accordance with

the Budget.[7]

3.      The DIP Facility itself, as contemplated by the DIP Term Sheet, reflects a

significant marketing process undertaken with the assistance of the Debtors' advisors, including

Lazard.  In this process, the Debtors solicited debtor-in-possession financing from not less

than 25 third party lenders, hedge funds, and financial institutions.  Significantly, no third party

was ultimately willing to propose financing on anything other than a senior secured, priming

basis with respect to all of the Debtors' assets—despite extensive diligence and marketing efforts

undertaken by the Debtors and their advisors.  Such a "full priming DIP" may be contrasted with

the limited, consensual priming as contemplated by the DIP Term Sheet here, and described

below.

---

[7]    At present, Macquarie, the Debtors' prepetition asset-based lender for each Debtor other than Zochem, Inc., has
not consented to the use of Cash Collateral as provided herein.  The Debtors are working to obtain such consent
if at all reasonably possible.  Regardless, the Debtors respectfully submit their proposed use proposed use of
Cash Collateral is both necessary to avoid immediate and irreparable harm to their estates, that Macquarie's
interests are adequately protected, and that such Cash Collateral use should be approved.

4.      Additionally, the DIP Facility contemplated by the DIP Term Sheet reflects vigorous, arm's-length negotiations between the Debtors, with the assistance of their advisors, on the one hand, and the Debtors' proposed DIP Lenders and their own advisors on the other hand. While the Debtors believe all parties proceeded with the utmost good faith in this process, it is no overstatement to say that such negotiations were hard-fought; indeed, the negotiations continue as of the date of this filing. As set forth more fully herein, and as the Debtors are prepared to further demonstrate at the interim hearing, the anticipated end-product of these negotiations will be a proposed financing and adequate protection package that is fair, reasonable, and in the best interests of these chapter 11 estates. And, at the same time, the Debtors only elected to pursue the proposed DIP Facility after fully considering their available alternatives—such as proceeding with a third party "priming DIP" on a non-consensual basis.

5.      The Debtors' liquidity needs are acute and the business risks are real. As set forth in the Hensler Declaration, the Debtors believe their constrained liquidity position threatens to materially—if not permanently—destroy enterprise value if the proposed DIP Facility is not approved and if the Debtors are denied access to Cash Collateral. (See Hensler Decl. ¶ 5.) Prior to the Petition Date, a number of significant vendors, suppliers, and transportation service providers have either threatened to suspend their working relationship with the Debtors or have in fact cut off the Debtors completely. (See id. ¶ 4.) The proposed DIP Facility and contemplated access to Cash Collateral will provide a necessary liquidity infusion that will benefit all stakeholders while also sending a strong signal to customers, vendors, and contract counterparties that operations are appropriately funded as the Debtors transition into chapter 11. Conversely, and as the Debtors are also prepared to further establish for the Court, the risk of immediate and irreparable harm is absolutely present here if the Debtors are denied access to

4

Cash Collateral, if the proposed DIP Facility, consistent with the DIP Term Sheet, is not approved, and if the Debtors therefore remain cut off from liquidity.

6.    At the same time, the Debtors respectfully submit that the relief requested herein is both narrowly tailored and fairly balances the interests of their stakeholders in light of the Debtors' urgent need.    Again, the Debtors' proposed DIP Facility is itself proposed on a "self-priming" or otherwise junior basis by holders of their Secured Notes versus existing secured debt.    Specifically, the DIP Facility contemplated by the DIP Term Sheet will, in each case subject to customary exclusions, be secured:    (a) on a first priority basis with respect to assets on which the Secured Notes currently hold a first priority lien;[8] (b) on a second priority basis with respect to assets on which Macquarie presently holds first priority liens pursuant to the Macquarie Credit Facility;[9] and (c) on a first priority basis with respect to Zochem's assets, the Debtors' Canadian subsidiary and a Debtor in these chapter 11 proceedings.[10]    The Debtors further propose to provide adequate protection to Macquarie in the form of replacement liens and superpriority claims that, in each case, would be senior to liens and claims arising under the proposed DIP Facility.

7.    More fundamentally, the DIP Facility contemplated by the DIP Term Sheet itself provides a compelling form of adequate protection by ensuring the continued operation of the business in the ordinary course.    Simply put, the Debtors do not have a liquidity alternative, and

---

[8]    Generally, and as discussed more fully below, these assets consist of (a) all assets owned by Horsehead Holdings, including a 65% equity owned by Horsehead Holdings in Zochem, and (b) real property, fixtures, and equipment owned by each Debtor other than Zochem, INMETCO, and Horsehead Holdings.

[9]    Generally, and as discussed more fully below, these assets consist of (a) all INMETCO assets, and (b) cash, inventory, and accounts receivable owned by Horsehead and its subsidiaries.

[10]    As noted above, and subject to the Court's entry of the Interim DIP Order, the proposed DIP Facility is anticipated to refinance the approximately $16.9 million outstanding under the Zochem Facility.

the Debtors' operations require liquidity.  The Debtors have less than $2 million of cash on hand.

Working capital is also extremely limited as the Debtors have not had access to liquidity to

acquire new inventory or raw materials in recent weeks.[11]  The Debtors' operations would, in all

likelihood, be ground to a halt without the liquidity contemplated by the proposed DIP Facility

and access to Cash Collateral.

8.      This concern is of particular significance given that the Debtors' operations

involve the handling, transportation, and recycling of electronic arc furnace (or "EAF") dust, a

material classified by the Environmental Protection Agency as a hazardous waste.  In fact, the

Debtors' operations are responsible for recycling approximately 60 percent of all EAF dust

generated by the North American steel industry.  (See Hensler Decl. ¶ 8.)  The Debtors do not

believe there is sufficient alternative capacity available in the market to handle EAF dust volume

otherwise recycled by the Debtors.  (See id.)  The damage to prepetition secured parties'

collateral resulting from such a "hard shutdown," in addition to the impact on broader

stakeholder interests, could be profound.

9.      The proposed DIP Facility, in turn, will be linked to the Debtors' ability to

successfully prosecute a chapter 11 plan that is acceptable to the DIP Lenders, and the ad hoc

group of Secured Noteholders and the Debtors.  Among other things, the DIP Term Sheet

provides the following plan milestones, in addition to milestones associated with the approval of

the proposed DIP Facility:

- file a plan of reorganization with the Court that is acceptable to the Required
  Lenders and the ad hoc group of Secured Note Noteholders, on the one hand, and

---

[11]    More recently, the Debtors have been obliged to idle their Mooresboro, North Carolina zinc production facility.
See Horsehead Holding Corp., Current Report (Form 8-K), at Ex. 99.1 (Jan. 22, 2016).

the Borrowers, on the other hand (an "Acceptable Plan") within forty (40) days of the Petition Date;

- file a disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with the Court within forty (40) days of the Petition Date;

- entry of an order approving the Disclosure Statement within seventy-five (75) days of the Petition Date;

- entry by the Canadian Court of an order recognizing the order approving the Disclosure Statement within seventy-seven (77) days of the Petition Date;

- entry of an order confirming the Acceptable Plan within one hundred-fifteen (115) days of the Petition Date;

- entry by the Canadian Court of an order recognizing the order confirming the Acceptable Plan within one hundred-seventeen (117) days of the Petition Date; and

- consummation of the Acceptable Plan within one hundred-thirty (130) days of the Petition Date.

The Debtors believe these proposed milestones will facilitate the efforts to implement a consensual restructuring in an appropriate timeframe.

10.    In sum, the Debtors would suffer immediate and irreparable harm to their businesses and bankruptcy estates without both the financing contemplated by the proposed DIP Facility and access to Cash Collateral.  The relief requested by this Motion is narrowly tailored to address the Debtors' immediate liquidity needs and adequately protects the interests of affected parties.  On this record, and as the Debtors are prepared to further demonstrate at the Court's hearing on this Motion, the relief requested herein presents a sound exercise of business judgment and should be approved.

## Jurisdiction

11.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware,

dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

### Relief Requested

14.     By this Motion, the Debtors respectfully request that the Court grant the following relief, which the Debtors anticipate will be provided for in the proposed Interim DIP Order:

- **The DIP Facility**: Authorizing the Debtors to enter into a senior secured first priority debtor-in-possession credit facility (the "DIP Facility"), which shall include loans (the "DIP Loans") to be advanced and made available to each of the Debtors (collectively, the "Borrowers") in an aggregate amount up to $90 million, pursuant to the terms and conditions of the DIP Credit Agreement (the "DIP Credit Agreement"), as contemplated by the DIP Term Sheet, among the Borrowers and certain holders of the Debtors' 10.50% Senior Secured Notes due 2017 (the "Secured Notes") issued by Horsehead Holding (collectively, and in such capacity as lenders under the DIP Facility, the "DIP Lenders").

- **DIP Commitment Fee**:[12] Authorizing the Debtors, in consideration for providing the DIP Facility, to pay [2]% of the aggregate commitments under the DIP Facility to the DIP Lenders in cash or as original issue discount upon the Closing Date, and pay an unused commitment fee of [4]% per annum of the aggregate unfunded commitments under the proposed DIP Facility, which shall be payable to the DIP Lenders in cash, monthly in arrears, on the first day of each such month.

---

[12]   Bracketed items identified herein are subject to ongoing negotiation among the parties.

8

- **DIP Liens**:  Authorizing the Debtors to grant first-priority perfected, self-priming liens (the "DIP Liens") on substantially all of the Borrowers' assets as of the date hereof (the "Petition Date"), subject to certain exceptions described in more detail herein, whether now existing or hereafter acquired or arising (collectively, the "DIP Collateral"), subject and subordinate only to:  (a) the Carve Out; (b) the Macquarie Adequate Protection Liens; (c) the prepetition liens securing the Macquarie Credit Facility; (d) certain valid, perfected liens that are senior to the liens securing the Zochem Facility, the Macquarie Credit Facility, and the Secured Notes as of the Petition Date (the "Permitted Prepetition Liens"); and (e) with regard to Zochem's collateral, the administration charge provided for in the supplemental order of the Canadian Court in an amount not to exceed CAD$[100,000] (the "Administration Charge").

- **DIP Superpriority Claim**:  Granting the DIP Lenders a superpriority administrative claim (the "DIP Superpriority Claim") with respect to the DIP Loans made and obligations incurred by the Debtors on or after the Petition Date pursuant to the DIP Credit Agreement, subject only to the Carve Out and the Macquarie Adequate Protection Claims.

- **Adequate Protection**:  Approving the form and manner of adequate protection to be provided to the holders of Secured Notes and Macquarie, including replacement liens and superpriority claims on a senior basis in favor of Macquarie with respect to substantially all of the Debtors' assets other than the Avoidance Actions or the proceeds of Avoidance Actions with respect to adequate protection liens and claims granted to Macquarie.

- **Cash Collateral**:  Authorizing the Debtors to use cash collateral, as defined by section 363(a) of the Bankruptcy Code (the "Cash Collateral"), on a final basis pursuant to the terms of the Final DIP Order.

### Background[13]

15.    As of the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have

---

[13]    The background facts of these chapter 11 cases and related facts and circumstances are set forth in the *Declaration of James M. Hensler in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

### Concise Statement of the Material Terms of the Interim DIP Order

16.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(a)(ii), the Debtors submit the following concise statement of the material terms of the DIP Term Sheet, as currently proposed, and the relief the Debtors expect to request be provided in the Interim DIP Order:[14]

| Summary of Material Terms | | Pages of DIP Term Sheet |
|---|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Horsehead Corporation ("Horsehead"), The International Metals Reclamation Company, Inc. ("INMETCO"), Horsehead Metal Products, LLC ("HMP"), Zochem, Inc. ("Zochem"), and Horsehead Holding Corp. ("Horsehead Holding"). | p. 1 |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Certain holders of the Secured Notes and/or their affiliates.<br><br>The DIP Lenders holding at least [75%] of total loans and commitments under the DIP Facility, with certain amendments requiring the consent of all directly and adversely affected DIP Lenders or all DIP Lenders, shall be known as the "Required Lenders." | p. 1 |
| **DIP Agent** | Cantor Fitzgerald Securities (the "DIP Agent"). | p. 1 |
| **Entities With an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | 1. Macquarie<br><br>2. U.S. Bank, N.A. as collateral agent for the Secured Notes<br><br>3. PNC Bank, N.A., as collateral agent under the Zochem Facility[15] | N/A |

---

[14]    Any summary of any terms of the DIP Term Sheet contained in this Motion is qualified in its entirety by reference to the provisions of the DIP Term Sheet. The DIP Term Sheet will control in the event of any inconsistency between this Motion and the DIP Term Sheet. The terms referenced in the DIP Term Sheet are subject to modification in connection with the negotiation of definitive documentation. For the avoidance of doubt, in the event of any conflict between the DIP Term Sheet and the DIP Facility documentation, the DIP Facility documentation will control.

[15]    As noted above, and subject to entry of the Interim DIP Order, the Debtors propose to refinance the Zochem Facility in full with proceeds of the proposed DIP Facility.

| Summary of Material Terms | | Pages of DIP Term Sheet |
|---|---|---|
| **DIP Facility / Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | Aggregate $90,000,000 secured multi-draw term loan<br><br>• _Interim DIP Order_: Up to $40 million<br><br>• _Final DIP Order_: Balance of the DIP Facility<br><br>Funding of advances under the DIP Facility will be subject to terms and conditions set forth in the DIP Credit Agreement, will only be permitted up to an aggregate amount set forth in the line item in the Budget for aggregate loans under the DIP Facility permitted to be borrowed for the applicable period (with amounts set forth in the Budget that are not borrowed permitted to be borrowed at a subsequent time, but subject to minimum borrowing amounts) and otherwise reasonably acceptable to the Borrowers and the Required Lenders. | pp. 1-2 |
| **Term** Bankruptcy Rule 4001(b)(1)(B), (c)(1)(B) Local Rule 4001-2(a)(ii) | The earlier of (a) the twelve month anniversary of the Closing Date, (b) the effective date of a Chapter 11 plan confirmed in the Borrowers' Chapter 11 cases, (c) the date all loans become due and payable under the Loan Documents, whether by acceleration or otherwise and (d) the closing of any sale of assets, which when taken together with all assets sales completed since the Closing Date, constitutes a sale of all or substantially all of the assets of the Borrowers. | pp. 3-4 |
| **Chief Restructuring Officer** Bankruptcy Rule 4001(c)(1)(B) | Upon the request of the Required Lenders, and subject to any approvals required from the Court, the Debtors shall promptly retain a chief restructuring officer (the "CRO"). The identity of the CRO shall be reasonably acceptable to the Required Lenders and to the Debtors and the scope of engagement and fees shall be reasonably acceptable to the Required Lenders and to the Debtors. | p. 10 |
| **Use of DIP Facility, Cash Collateral** Bankruptcy Rule 4001(b)(1)(B), (C)(I)(B) Local Rule Rule 4001-2(a)(ii) | The proceeds of the DIP Facility will be used, on the Closing Date, (a) to repay in full all obligations outstanding under the Zochem Credit Agreement, (b) to pay certain guaranty fees to Zochem in an amount not to exceed [1%] of the principal amount of loans borrowed under the DIP Facility, (c) to pay fees and expenses incurred through the Closing Date in connection with the DIP Facility as provided herein, (d) general corporate purposes substantially in accordance with the Budget (including permitted variances), (e) obligations benefitting from the Carve-Out (as defined herein), and (f) any other amounts permitted by the Budget (including any permitted variances). On and after the Closing Date, the proceeds of the DIP Facility will be used to: (i) pay administrative expenses for goods and services in the ordinary course of business (other than fees and expenses of Professional Persons) and other expenses (other than fees and expenses of Professional Persons) in accordance with the Budget (as defined herein, including any permitted variances); (ii) pay amounts owing to the DIP Agent and the Lenders under the DIP Facility (including fees and expenses reimbursable or payable under the DIP Facility); and (iii) pay obligations benefiting from the Carve-Out (as defined herein) and other agreements as may be agreed to by the Required Lenders, to the extent such obligations are approved by the Bankruptcy Court (and the Canadian Court, as applicable). The use of proceeds of the DIP Facility shall in all cases be substantially in accordance with the Budget (as defined herein, including any permitted variances).<br><br>Notwithstanding the forgoing, except as required by the terms of the DIP Facility, no proceeds of the DIP Facility may be used to pay any obligation arising prior to the Petition Date unless such payment is provided for in the Budget, including any | pp. 2-3 |

| Summary of Material Terms | | Pages of DIP Term Sheet |
|---|---|---|
| | variances permitted with respect thereto, and approved by the Bankruptcy Court pursuant to any "first day" motion (it being agreed that all such "first day" motions shall be required to be reasonably acceptable to the Required Lenders) and, if applicable, recognized by the Canadian Court; provided that the foregoing limitation shall not apply with respect to obligations benefiting from the Carve-Out. | |
| **Payments on Prepetition Debt; Cross Collateralization** Bankruptcy Rule 4001(c)(1)(B) | <u>Payments on Prepetition Debt</u> Subject to entry of the Interim DIP Order, the proposed DIP Facility shall repay obligations outstanding under the Zochem Facility.<br><br><u>Cross Collateralization</u> None, other than liens granted as adequate protection. | p. 2 |
| **Events of Default** Bankruptcy Rule 4001(c)(I)(B) Local Rule 4001-2(a)(ii) | The DIP Credit Agreement will contain customary events of default (each, an "<u>Event of Default</u>"), including failure to comply with the Chapter 11 Milestones, as further described herein. Additionally, it is an Event of Default with respect to the updated Budget to be delivered on or prior to the third business day after the tenth week covered by the initial Budget, if such updated Budget is not satisfactory to the Required Lenders for whatever reason, in their sole discretion. | pp. 12-14 |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | [12]% paid monthly in cash, in arrears on the first day of each such month.<br><br>Upon the occurrence and during the continuance of any event of default, at the election of the Required Lenders, interest will accrue (a) in the case of principal or interest on any loan at a rate of 2% per annum plus the rate otherwise applicable to such loan, and (b) in the case of any other amount, at a rate equal to the interest rate applicable to outstanding loans plus 2% per annum. Default interest will be payable in cash. | p. 4 |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | In consideration for providing the proposed DIP Facility, the Debtors shall pay [2]% of the aggregate commitments under the DIP Facility to the DIP Lenders in cash or as original issue discount upon the Closing Date, and an unused commitment fee of [4]% per annum of the aggregate unfunded commitments under the DIP Facility shall be payable to the DIP Lenders in cash, monthly in arrears, on the first day of each such month.<br><br>All repayments of principal amounts of loans under the DIP Facility, whether through optional prepayments, mandatory prepayments, at maturity, upon acceleration or otherwise, shall be subject to a premium equal to [2]% of the principal amount of such loans to be repaid. | p. 4 |
| **Budget** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The Borrowers shall prepare and deliver to the DIP Lenders a budget on or prior to the Closing Date (as defined herein), which budget shall reflect projected receipts and expenditures of the Borrowers (including Professional Fees) and projected accrued Professional Fees on a weekly basis from the beginning of the week during which the Petition Date occurs and covering the first 13 week period following the beginning of such week and shall be in form and substance acceptable to the DIP Lenders in their sole discretion, and such budget may be updated from time to time pursuant to amendments thereto as approved by the Required Lenders in their sole discretion (such budget, as so amended, the "<u>Budget</u>"); provided that, notwithstanding the foregoing, the Budget shall not provide for any termination or other similar payments to Macquarie. | p. 3 |

| Summary of Material Terms | | Pages of DIP Term Sheet |
|---|---|---|
| | The Borrowers shall deliver to the DIP Agent and the DIP Lenders on or prior to the third business day after (i) the end of every week, a report of any material variance from the Budget for the immediately preceding week, and (ii) the end of every other week, an updated Budget for the rolling 13 week period commencing with the first day of the week in which such delivery occurs, which updated Budget must be approved by the Required Lenders in their sole discretion (and to the extent such updated Budget is not approved, the Budget that is then effect shall continue to constitute the Budget for purposes of the DIP Facility). | |
| **Variance Covenant** Bankruptcy Rule 4001(b)(1)(B), (c)(I)(B) Local Rule 4001-2(a)(ii) | Adverse variance of (i) each of Total Operating Receipts and (ii) Total Operating Disbursements plus accrued Professional Fees to the Budget (a) of no greater than 20% in the aggregate, tested cumulatively for the periods beginning on the first day of the initial Budget and ending at the end of the second, third and fourth weeks covered by the initial Budget, and (b) thereafter, of no greater than 15% in the aggregate, for rolling four week periods, tested weekly commencing at the end of the fifth week covered by the initial Budget. | p. 11 |
| **Conditions Precedent to DIP Financing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | Conditions precedent to initial borrowings under the proposed DIP Facility shall include those customary conditions precedent, as set forth in the DIP Term Sheet, including recognition of the Interim DIP Order by the Canadian Court, and (ii) minimum EBITDA-R covenants for each of (x) INMETCO and (y) Zochem, in each case, tested monthly and set at levels to be agreed. The date on which such conditions precedent are satisfied or waived, and such initial borrowings take place, shall be the "Closing Date." | p. 10 |
| **Liens, Priorities, and Adequate Protection** Bankruptcy Rule 4001(b)(1)(B), (c)(1)(B) Local Rule 4001-2(a)(ii) | DIP Claims and Liens<br><br>Subordinate to the Carve Out, the Prepetition Macquarie First Priority Liens, the Macquarie Adequate Protection Liens, the Macquarie Adequate Protection Claims (all as defined herein), and with respect to collateral located in Canada, the Administration Charge, the DIP Lenders are granted the following liens and claims: (a) pursuant to sections 364(c)(2), 363(c)(2), and 364(d)(1), a priming, first-priority perfected lien (the "DIP Liens"), granted by the Borrowers and approved by the Court pursuant to sections 364(c)(2) and 364(d) of title 11 of the Bankruptcy Code and recognized by the Canadian Court under the CCAA in substantially all assets of the Borrowers (subject to customary exceptions), including, after entry of a Final DIP Order, proceeds of Avoidance Actions (as defined herein) (collectively, the "Collateral"), subject also to the Permitted Prepetition Liens; provided, that, to the extent that the existing indebtedness of Horsehead Zinc Recycling, LLC ("Zinc Recycling") is repaid in full, Zinc Recycling shall become a debtor under these chapter 11 cases and the DIP Lenders shall be granted a first priority lien on all assets of Zinc Recycling, subject to customary permitted liens; and (b) an allowed superpriority administrative expense claim pursuant to sections 364(c)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code on account of the obligations under the DIP Facility and related documents (the "Administration Claim"), allowed against each of the Debtors (jointly and severally) with priority over any and all administrative expenses, adequate protection and other diminution claims (in each case other than the Carve Out, the Macquarie Adequate Protection Claims, and with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge), unsecured claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of | pp. 5-9 |

| Summary of Material Terms | Pages of DIP Term Sheet |
|---|---|
| the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, payable from and with recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof; *provided* that all DIP Facility liens and claims will have recourse to the proceeds of causes of action under chapter 5 of the Bankruptcy Code (the "Avoidance Actions") only upon entry of the Final DIP Order. Notwithstanding the foregoing, the DIP Liens shall be subordinated to the prepetition liens securing the Macquarie Credit Facility on a first priority basis relative to the Secured Notes, to the extent such liens are valid and perfected as of the Petition Date, and shall prime the liens securing the Secured Notes, and shall further include a first priority priming lien on the equity interests of non-Debtor subsidiaries of the Borrowers, including Zinc Recycling; *provided*, *further*, that the DIP Lenders will get first liens on all collateral subject to the Macquarie First Priority Liens once the Macquarie Credit Facility has been paid off. All of the liens described herein shall be effective and perfected as of the entry of the Interim DIP Order, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, but the Required Lenders may request any such documentation or agreements to the extent they determine that such documentation or other agreements are necessary or desirable to provide for a valid, perfected lien on the assets.<br><br>Secured Notes Parties<br><br>As adequate protection for, and to secure payment of an amount equal to, any diminution in the value as of the Petition Date of their interests in their prepetition collateral, holders of the Secured Notes shall receive, to the extent of any aggregate diminution in the value of their collateral following the Petition Date, and in each case subject in all respects to the Carve Out, the DIP Superpriority Claim, the Macquarie Adequate Protection Claims, the Macquarie Adequate Protection Liens, and with respect to the Debtors' collateral located in Canada, the Administration Charge: (a) (i) on unencumbered property, subject and junior in priority in all respects to the Carve Out, the DIP Liens, and the Macquarie Adequate Protection Liens, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement liens on, and security interests in, all property (including any previously unencumbered property), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), *provided* that, such liens shall encumber the proceeds of Avoidance Actions (but not the Avoidance Actions themselves) only upon entry of the Final DIP Order, (ii) on all other property, subject and junior in priority in all respects to the Carve-Out, the DIP Liens, and the Macquarie Adequate Protection Liens, a valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interests in, all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code) (collectively, the "Secured Notes Adequate Protection Liens"); and (b) an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on | |

| Summary of Material Terms | Pages of DIP Term Sheet |
|---|---|
| account of the Adequate Protection Obligations (the "Secured Notes Adequate Protection Claim"), allowed against each of the Debtors (jointly and severally) with priority over any and all administrative expenses, adequate protection or diminution claims (except as otherwise stated herein), unsecured claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, payable from and with recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. Except as expressly stated otherwise in the Interim DIP Order, the Secured Notes Parties shall not receive or retain any payments, property, or other amounts in respect of any Secured Notes Adequate Protection Claim unless and until all DIP Obligations shall have indefeasibly been paid in full in cash or otherwise satisfied in a manner acceptable to the DIP Lenders and until the Carve Out shall have been satisfied as provided herein<br><br>Macquarie Facility Parties<br><br>As adequate protection for, and to secure payment of an amount equal to, any diminution in the value as of the Petition Date of their interests in their prepetition collateral, which includes Cash Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Facility, and the Debtors' use Cash Collateral pursuant to the DIP Orders, holders of obligations outstanding under the Macquarie Credit Facility as of the Petition Date shall receive, subject in all respects to the Carve Out: (a) subject and junior in priority in all respects to the Carve Out, the Administration Charge, and duly perfected Permitted Prepetition Liens that are senior to the Prepetition Macquarie First Priority Liens as of the Petition Date, and without the necessity of the execution by the Debtors (or recordation or other filing) of any documents or agreements, or the possession or control by the Prepetition Macquarie Facility Parties, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable senior priority replacement lien on, and security interest in, all DIP Collateral (the "Macquarie Facility Adequate Protection Liens"), provided that, the Macquarie Facility Adequate Protection Liens shall not encumber the Avoidance Actions or proceeds from Avoidance Actions; and (b) solely in an amount equal to the aggregate postpetition diminution in value of the Prepetition Macquarie Lenders' interests in the Prepetition Collateral, an allowed super-priority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code (the "Macquarie Facility Adequate Protection Claim"), allowed against each of the Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, provided that, and notwithstanding anything | |

| Summary of Material Terms | | Pages of DIP Term Sheet |
|---|---|---|
| | herein to the contrary, the Macquarie Facility Adequate Protection Claim shall have no recourse to the proceeds of Avoidance Actions. For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Macquarie Facility Adequate Protection Liens and the Macquarie Facility Adequate Protection Claims shall be junior to the Carve Out in all respects. | |
| **Findings of Validity, Perfection, or Amount of Prepetition Liens** Bankruptcy Rule 4001(c)(1)(B)(iii) | Subject to certain exceptions, the Debtors expect to stipulate and acknowledge in the Interim DIP Order, among other things: (a) the amount, validity, priority, and enforceability of the Secured Notes, the Zochem Facility, and the Unsecured Notes; and (b) that no portion of the foregoing are subject to any offset, challenge, defense, claim, or counterclaim (the foregoing, collectively, the "Stipulations"). | p. 12 |
| **Waiver of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The Debtors expect that the DIP Orders shall provide a customary waiver of the automatic stay in connection with the DIP Agent's enforcement of remedies upon an Event of Default. | pp. 11-12 |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) Local Rule 4001-2(a)(ii) | • Filing of the Acceptable Plan and the Disclosure Statement with the Bankruptcy Court: 40 days postpetition<br><br>• Entry by the Court of an order approving the Disclosure Statement: 75 days postpetition<br><br>• Entry by the Canadian Court of an order recognizing the order approving the Disclosure Statement: 77 days postpetition<br><br>• Entry by the Court of an order confirming the Acceptable Plan: 115 days postpetition<br><br>• Entry by the Canadian Court of an order recognizing the order confirming the Acceptable Plan: 117 days postpetition<br><br>• Consummation of the Acceptable Plan: 130 days postpetition<br><br>The foregoing milestones are referred to herein as the "Chapter 11 Milestones." The Acceptable Plan is a plan of reorganization that is acceptable to the Required Lenders and the ad hoc group of Secured Note Noteholders, on the one hand, and the Borrowers, on the other hand. | Annex II |
| **Waiver/Modification of Applicability of Non-Bankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The Debtors expect that all of the DIP Liens shall be effective and perfected as of the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements, but the Required Lenders may request such documentation or agreements to the extent they determine that such documentation or other agreements are necessary or desirable to provide for valid, perfected liens on the assets. | p. 6 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrowers will indemnify the DIP Lenders, the DIP Agent, and their respective affiliates, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (including but not limited to reasonable | pp. 15-16 |

| Summary of Material Terms | Pages of DIP Term Sheet |
|---|---|
| | and documented legal fees and expenses) (which shall include the fees and expenses of one primary counsel for each of the DIP Agent and the DIP Lenders altogether and one local counsel in each applicable jurisdiction for the DIP Agent and the DIP Lenders altogether, and any additional counsel to the extent reasonably required due to actual or perceived conflicts), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility; provided, however, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, bad faith, material breach or willful misconduct of such person (or their related persons). | |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(I)(B)(xi)<br>Local Rule 4001-2(a)(i)(D) | The DIP Facility will be secured by a priming, first-priority perfected lien on the proceeds of the Avoidance Actions, after entry of the Final DIP Order, and the DIP Superpriority Claim will have recourse to proceeds of the Avoidance Actions upon entry of the Final DIP Order. | pp. 5-8 |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(I)(B)<br>Local Rule 4001-2(a)(i)(B) | The Stipulations the Debtors expect to make in the Interim DIP Order shall be binding upon all other parties in interest, including any Trustee, unless (a) the Creditors' Committee, if any, or any other party in interest (including any Trustee), in each case, with requisite standing, has duly filed an adversary proceeding (each, a "Challenge") challenging the validity, enforceability, priority or extent of the Prepetition Senior Secured Notes Obligations, Prepetition Senior Secured Notes Liens or Prepetition Unsecured Notes Obligations or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses against the Prepetition Senior Secured Note Parties or Prepetition Unsecured Note Parties in connection with any matter related to the Prepetition Senior Secured Note Obligations, Prepetition Senior Secured Notes Collateral, or Prepetition Unsecured Notes Obligations by no later than the latest of (i) in the case of a Challenge commenced by a party in interest other than the Creditors' Committee, seventy-five (75) days after the date of entry of the Interim DIP Order, (ii) in the case of a Challenge commenced by a Creditors' Committee, sixty (60) days after the appointment of such Creditors' Committee, and (iii) any such later date agreed to in writing by the Ad Hoc Group (as defined herein) in their respective sole and absolute discretion. | p. 8 |
| **Credit Bid**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors expect that the DIP Lenders shall have the right to credit bid as part of any asset sale process or plan sponsorship process and shall have the right to credit bid the full amount of their claims during any sale of Collateral (in whole or in part), including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.<br><br>The Debtors expect that the collateral agent for holders of the Secured Notes shall have the right to credit bid as part of any asset sale process or plan sponsorship process and shall have the right to credit bid the full amount of their claims during any sale of the Borrowers' assets (in whole or in part) with respect to any asset subject to a duly perfected lien in favor of the Secured Notes as of the Petition Date, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to | p. 12 |

| Summary of Material Terms | | Pages of DIP Term Sheet |
|---|---|---|
| | confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code. | |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (including transaction fees or success fees) (the "<u>Professional Fees</u>") incurred by persons or firms ("Borrower Professionals") retained by the Borrowers pursuant to section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors (the "<u>Committee</u>" and, together with the Borrower Professionals, the "<u>Professional Persons</u>") appointed in the Bankruptcy Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice but only to the extent not subsequently disallowed and actually earned prior to the delivery of a Carve Out Trigger Notice; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $1,250,000 incurred after the first Business Day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>"). For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Required Lenders to the Borrowers, their lead restructuring counsel, the United States Trustee, and lead counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Borrowers, the Carve Out Trigger Notice shall constitute a demand to the Borrowers to utilize all cash on hand as of such date and any available cash thereafter held by any Borrower to fund a reserve in an amount equal to the then accrued and/or unpaid amounts of the Professional Fees. The Borrowers shall deposit and hold such amounts in a segregated account at the DIP Agent or under the exclusive control of the DIP Agent in trust to pay such then unpaid Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims. The Borrowers shall deposit and hold such amounts in a segregated account at DIP Agent or under the exclusive control of the DIP Agent in trust to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims, including DIP Administrative Claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the Lenders, unless the obligations under the DIP Facility have been paid in full, in which case any such excess shall be paid as directed by the Bankruptcy Court. All funds in the Post-Carve Out | pp. 6-8 |

| Summary of Material Terms | Pages of DIP Term Sheet |
|---|---|
| Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above, and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the Lenders, unless the obligations under the DIP Facility have been paid in full, in which case any such excess shall be paid as directed by the Bankruptcy Court.<br><br>The Interim Order shall provide that, following delivery of a Carve Out Trigger Notice, the DIP Agent and any agents under a primed facility shall deposit any cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) in the Carve Out Reserves until such Carve Out Reserves have been fully funded, and shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the Loan Documents.<br><br>Notwithstanding anything to the contrary in the Loan Documents or the Final DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and any agents under a primed facility shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Borrowers until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the Loan Documents.<br><br>Further, notwithstanding anything to the contrary herein, (i) disbursements by the Borrowers from the Carve Out Reserves shall not constitute Loans or increase or reduce the Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Professional Fees shall not affect the priority of the Carve Out and (iii) in no way shall the Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Borrowers. Subject to the negotiated stipulations, the Borrowers shall not assert or prosecute, and no portion of the proceeds of the DIP Facility, the Collateral, or the Carve Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any person, including, without limitation, any committee appointed in the Bankruptcy Cases, in connection with (a) preventing, hindering or delaying any of the DIP Agent's or the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred, (b) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the obligations under (x) the DIP Facility or the Secured Notes, (y) the liens securing the DIP Facility or the Secured Notes or (z) or any other rights or interest of any of the DIP Agent, the Lenders or the holders of the Secured Notes; or (c) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any Avoidance Actions against the DIP Agent, any Lender, any holder of the Secured Notes or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; provided that, an amount not to exceed $75,000 in the aggregate (the "Investigation Budget") of the proceeds of the DIP Facility and the Collateral may be used for the Committee to investigate (but not prepare, initiate or prosecute) prepetition liens of, and claims and defenses against, the holders of the Secured Notes before the termination of a challenge period satisfactory to the Lenders, it being understood that the Investigation Budget shall not constitute part of the Carve-Out. | |

**Highlighted Provisions under Local Rule 4001-2**

17.    Local Rule 4001-2(a)(i) requires a debtor to: (a) recite whether the proposed form

of order underlying a request to use cash collateral or to obtain financing contains certain

provisions of the type enumerated therein; (b) identify the location of such provisions in such

proposed order; and (c) justify the inclusion of such provisions in such proposed order. See Del.

Bankr. L.R. 4001-2(a)(i).   The Debtors hereby identify the certain highlighted provisions in

accordance with Local Rule 4001-2(a)(i) (collectively, the "Highlighted Provisions"), to the

extent applicable, that are contemplated to be included (or not included, as applicable) in the

Interim DIP Order and/or Final DIP Order:

a.    **Local Rule 4001-2(a)(i)(A) — *Cross-Collateralization*.**   The Debtors anticipate that the Final DIP Order will not provide for cross-collateralization, other than replacement liens as adequate protection.

b.    **Local Rule 4001-2(a)(i)(B) — Validity, Perfection, and Amount of Prepetition Liens.**   Subject to certain exceptions, and a customary challenge period for parties in interest (including a Creditors' Committee), the Debtors anticipate that they will stipulate and acknowledge, among other things: (a) the amount, validity, priority, and enforceability of the Secured Notes, the Zochem Facility, and the Unsecured Notes; and (b) that no portion of the foregoing are subject to any offset, challenge, defense, claim, or counterclaim.

c.    **Local Rule 4001-2(a)(i)(C) — *506(c) Waiver*.**   The Debtors anticipate that the Interim DIP Order will provide waivers of their rights under section 506(c) of the Bankruptcy Code with respect to the DIP Lenders' and DIP Agent's interests in collateral, or, subject to entry of the Final DIP Order, the Secured Notes Parties' interests in collateral.

d.    **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions*.**   The Debtors anticipate that the Final DIP Order will provide for liens on proceeds from the Avoidance Actions in favor of the DIP Lenders and, as adequate protection, for holders of Secured Notes, but not the actions themselves.

e.      **Local Rule 4001-2(a)(i)(E) —** *Provisions Deeming Prepetition Debt to be Post Petition Debt*. The Debtors anticipate that the Interim DIP Order will not deem prepetition secured debt to be postpetition debt, although the proposed Interim DIP Order may authorize the full repayment of the Zochem Facility with proceeds of the DIP Facility upon entry of the Interim DIP Order.

f.      **Local Rule 4001-2(a)(i)(F) —** *Disparate Treatment of Professionals Retained by the Committee*. The Debtors expect that Professional Persons retained by any Creditors' Committee that may be appointed will be included in the Carve Out; provided that the $75,000 Investigation Budget that the Debtors expect to be provided by the DIP Facility shall not constitute part of the Carve Out.

g.      **Local Rule 4001-2(a)(i)(G) —** *Non-Consensual Priming*. The Debtors do not expect the Interim DIP Order to provide for non-consensual priming of any existing secured lien, other than with respect to the Carve Out.

h.      **Local Rule 4001-2(a)(i)(H) —** *Provisions Affecting the Court's Power to Consider the Equities of the Case*. The Debtors anticipate that the Interim DIP Order will provide for a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code with regard to the DIP Agent and the DIP Lenders, and, subject to entry of the Final DIP Order, with regard to the Secured Notes Parties.

### The Debtors' Prepetition Capital Structure

18.      As of the Petition Date, the Debtors have approximately $420.6 million in indebtedness and related obligations outstanding, consisting of the Macquarie Credit Facility, the Secured Notes, the Unsecured Notes, the Convertible Notes, the Banco Bilbao Credit Facility, the Zochem Facility, and the NMTC Loans (each, as defined below). As of the Petition Date, the obligations outstanding under these facilities, excluding accrued interest, are summarized as follows:

| Indebtedness | Principal Outstanding ($ millions) |
|---|---|
| Macquarie Credit Facility | $ 27.1 |
| 10.50% Secured Notes | 205.0 |
| Zochem Secured Credit Facility | 16.9 |
| 9.00% Unsecured Notes | 40.0 |
| 3.80% Convertible Notes | 100.0 |
| Banco Bilbao Credit Facility | 17.4 |
| NMTC Loans | 14.2 |
| **Total** | **$420.6** |

These obligations are discussed more fully below.

## I. The Secured Obligations

### A. The Macquarie Credit Facility

19.     On June 30, 2015, each of the Debtors, other than Zochem, entered into an $80 million secured revolving credit facility (the "Macquarie Credit Facility") as borrowers or guarantors with Macquarie Bank Limited ("Macquarie") pursuant to that certain Credit Agreement (the "Macquarie Credit Agreement").[16]   The Macquarie Credit Facility became effective on July 6, 2015, and matures on May 15, 2017.  This facility replaced the maximum aggregate $80 million principal amount of two prior facilities.  Obligations arising under the Macquarie Credit Facility are secured by first priority liens (subject to certain permitted liens) on substantially all of the Debtors' assets, other than those relating to Zochem.  Certain of these assets securing the Debtors' obligations under the Macquarie Credit Facility also secure the Debtors' obligations under the Secured Notes.

20.     In connection with the applicable Debtors' entry into the Macquarie Credit Facility, the collateral agents for the Secured Notes and the Macquarie Credit Facility also

---

[16]   Obligations due under the Macquarie Credit Facility are also guaranteed by Chestnut Ridge Railroad Corp. ("Chestnut Ridge"), a non-Debtor.

entered into an intercreditor agreement dated June 30, 2015 (the "Intercreditor Agreement"), attached hereto as **Exhibit B**, which, among other things, assigns relative priority between Macquarie and holders of the Secured Notes with regard to certain shared collateral.  Pursuant to the Intercreditor Agreement, liens granted by the Debtors to secure the Macquarie Credit Facility:  (a) are senior to any liens granted by the Debtors to secure the Secured Notes with respect to (i) all INMETCO assets, and (ii) certain personal property of Horsehead and its subsidiaries, including accounts, inventory, cash, and deposit accounts; and (b) are junior (i) to any liens granted to secure the Secured Notes with respect to real property, fixtures, and equipment of Horsehead and its subsidiaries, and (ii) with respect to liens granted to secured the Secured Notes on Horsehead Holding's assets.   As of the Petition Date, approximately $27.1 million remains outstanding under the Macquarie Credit Facility, exclusive of accrued interest, fees, or expenses.

B.    **The Secured Notes**

21.    In July 2012, the Debtors completed a private placement of $175 million in principal amount of 10.50% senior secured notes due 2017 at an issue price of 98.188% of par, which notes were issued under that certain Indenture dated as of July 26, 2012 among Horsehead Holding, as issuer, the subsidiary guarantors party thereto, and U.S. Bank, N.A., as indenture trustee (as the same may have been amended, supplemented, modified, or amended and restated from time to time, the "Secured Notes Indenture").  The Debtors used the proceeds from the Secured Notes primarily for construction costs of the Mooresboro Facility.  On June 3, 2013, the Debtors issued $20 million of additional Secured Notes at an issue price of 106.50% of par, and completed the sale of an additional $10 million of Secured Notes at an issue price of 113.00% of par on July 29, 2014.  As of the Petition Date, approximately $205.0 million of Secured Notes remain outstanding.  The Secured Notes mature on June 1, 2017 and pay interest

23

semi-annually at a rate of 10.50%, with such payments due in arrears on June 1 and December 1 of each year.

22.    The Secured Notes are guaranteed by each of the Debtors, other than Zochem (such guarantors, the "Notes Guarantors"), [17] and obligations arising under the Secured Notes are secured by such Debtors' existing and future property and assets.  Pursuant to the Intercreditor Agreement, liens securing the Secured Notes with respect to accounts receivable, inventory, certain deposit accounts, cash, and certain other assets (including the proceeds thereof) are junior to liens securing the Macquarie Credit Facility.  Similarly, the Intercreditor Agreement provides that liens securing the Secured Notes shall be senior to liens securing the Macquarie Credit Facility with respect to real property, fixtures, and equipment of Horsehead and Horsehead Holding's assets.  In addition, the Secured Notes are secured by a first-priority pledge from Horsehead Holding of 65% of Horsehead Holding's equity interest in Zochem.

### C.    The Zochem Senior Secured Revolver

23.    On April 29, 2014, Zochem, as borrower, and Horsehead Holding, as guarantor, entered into a $20 million secured revolving credit facility (the "Zochem Facility") with PNC Bank, N.A. ("PNC") as agent pursuant to that certain Revolving Credit and Security Agreement dated December 21, 2012 by and between Zochem, as borrower, the guarantors party thereto from time to time, PNC, and the lenders party thereto from time to time (the "Zochem Credit Agreement").  The Zochem Facility is secured by a first priority lien (subject to certain permitted liens) on substantially all of Zochem's tangible and intangible personal property, and, pursuant to the Zochem Forbearance, a lien on Zochem's processing facility located in

---

[17]    Obligations under the Secured Notes are also guaranteed by Chestnut Ridge.

Brampton, Ontario. Horsehead Holding unconditionally guarantees Zochem's obligations under the Zochem Facility, and pursuant to that certain Pledge Agreement dated as of April 29, 2014, Horsehead Holding pledged 65 percent of its equity interests in Zochem as additional collateral. The Debtors pay an unused line fee of 0.75% per annum, based on average undrawn availability multiplied by the amount that the maximum revolving advance amount exceeds the average daily unpaid balance of the Zochem Facility's loans and undrawn amount of any outstanding letters of credit during any calendar quarter. As of the Petition Date, approximately $16.9 million remains outstanding under the Zochem Facility.

24.    Borrowings under the Zochem Facility bear interest at a rate per annum which, at the option of Zochem, can be either:  (a) a domestic rate equal to the "alternate base rate," as determined under the Zochem Facility, plus an applicable margin of 1.00% based on average undrawn availability; or (b) a CDOR, LIBOR, or eurodollar rate, as applicable, plus a margin of 2.50% based on the average undrawn availability. Zochem pays a letter of credit fee to the lenders under the Zochem Facility of 2.50%, based on the average undrawn availability, and a fronting fee to the issuing bank equal to 0.25% per annum on the average daily face amount of each outstanding letter of credit, as well as certain other related charges and expenses. The Zochem Facility matures on May 15, 2017. As noted above, the Debtors anticipate that they will refinance the Zochem Facility with proceeds of their initial draw under the proposed DIP Facility.

## II.    The Unsecured Obligations

### A.    The Unsecured Notes

25.    Horsehead Holding issued $40 million in aggregate principal amount of 9.00% Senior Notes due 2017 (the "Unsecured Notes") pursuant to that certain Indenture, dated as of July 29, 2014 (the "Unsecured Notes Indenture"), among (a) Horsehead Holding, as issuer,

(b) the Notes Guarantors, as guarantors, and (c) U.S. Bank National Association, as trustee (the "Unsecured Notes Trustee"). The Unsecured Notes mature on June 1, 2017, and pay interest at a rate of 9.00% per annum, payable in cash semi-annually, in arrears, on June 1 and December 1 of each year. The Unsecured Notes are fully and unconditionally guaranteed by the Notes Guarantors, which includes each of the Debtors, except Zochem.[18]   As of the Petition Date, approximately $40 million in Unsecured Notes remain outstanding.

### B.    The Convertible Notes

26.    On July 27, 2011, Horsehead Holding issued $100 million of 3.80% Convertible Senior Notes due 2017 (the "Convertible Notes") in a private placement. The Convertible Notes pay interest semi-annually in arrears on July 1 and January 1 of each year at a rate of 3.80% per annum, and mature on July 1, 2017. The Convertible Notes are convertible into shares of Horsehead Holding's common stock or cash, or a combination thereof, at Horsehead Holding's election, at an initial conversion rate of 0.0666667 shares of common stock per $1.00 principal amount of the Convertible Notes (of which there are approximately 6,666.67 underlying shares), which is equivalent to an initial conversion price of approximately $15.00 per share of common stock, subject to adjustment. Holders of Convertible Notes may be converted prior to April 2017 only under certain circumstances. The Convertible Notes are unsecured obligations of Horsehead Holding, are not guaranteed by any other Debtor, and are structurally subordinated to the Debtors' other obligations. As of the Petition Date, approximately $100 million in Convertible Notes remain outstanding.

### C.    The Banco Bilbao Credit Facility

---

[18]   Chestnut Ridge also guarantees the obligations under the Unsecured Notes.

27.    On August 28, 2012, Horsehead, as borrower, and Horsehead Holding, as guarantor, entered into that certain Credit Agreement (the "Banco Bilbao Credit Agreement") with Banco Bilbao Vizcaya Argentaria, S.A., a Spanish bank.    The Banco Bilbao Credit Agreement provides for the financing of up to €18,831,401.25 (approximately $25.8 million), in addition to $968,090.25 (the "Banco Bilbao Credit Facility"), for purchases under certain contracts between Horsehead and Técnicas Reunidas, S.A. related to the Debtors' zinc facility in Mooresboro, North Carolina.    Horsehead's obligations under the Banco Bilbao Credit Agreement are guaranteed by Horsehead Holding, but are not secured by any mortgages or other security interest on the Debtors' property. As of the Petition Date, approximately $17.4 million remains outstanding under the Banco Bilbao Credit Facility, and the indebtedness under the Banco Bilbao Credit Facility is trading at 83.50%.

**D.     The New Markets Tax Credit Program Financing Arrangement**

28.    On May 29, 2009, non-Debtor Zinc Recycling entered into two construction loan agreements with Banc of America CDE III, LLC and CCM Community Development IV LLC (collectively, the "NMTC Lenders") for $6.8 million and approximately $7.3 million, respectively (collectively, the "NMTC Loans"). Zinc Recycling entered into the NMTC Loans to fund the development and completion of the electric arc furnace dust recycling facility located in Barnwell, South Carolina through a tax-advantaged structure that permitted the monetization of certain tax credits through the New Markets Tax Credit program enacted through the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763.[19]

---

[19]    Generally, the New Markets Tax Credit Program is intended to provide tax credit incentives for qualifying investments in certified low-income communities.

29.     Horsehead Holding guarantees Zinc Recycling's obligations under the NMTC Loans. As of the Petition Date, approximately $14.2 million of the NMTC Loans remain outstanding. The NMTC Loans mature in June 2016, and the Debtors believe that they have certain set-off rights and related repayment obligations due to the Debtors that will permit the Debtors to satisfy the NMTC Loans in full for approximately $1 million in the aggregate upon maturity.

### The Debtors Have an Immediate Need for Liquidity

30.     The Debtors have less than $2 million of cash on hand.[20]  At the same time, the Debtors have an urgent need for liquidity, now, to fund wages, employee benefits, and satisfy critical operational needs. Assuming negotiations between the proposed DIP Lenders and the Debtors are successfully completed, the Debtors intend to use the proceeds of the proposed DIP Loans, together with Cash Collateral, as provided herein and in accordance with the to-be-agreed upon Budget. Without this relief, the Debtors will have insufficient funds to pay wages to their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases. The Debtors' anticipated access to the proposed DIP Loans, and their corresponding use of Cash Collateral, will facilitate the Debtors' efforts to maximize value for their stakeholders as they begin these chapter 11 cases. Absent the grant of this authority, the Debtors will be unable to adequately fund their operations, resulting in immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders and parties in interest. Thus, the Debtors respectfully submit that the Court should grant the relief requested in this Motion.

---

[20]   This balance does not include restricted cash collateralizing certain letters of credit. The Debtors do not seek authority to use such restricted cash by this Motion.

## Basis for Relief

### I.    The DIP Facility Should be Approved Pursuant to Section 364(c)

31.    The Debtors propose to obtain financing under the proposed DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).  See In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

32.    Courts have generally set forth a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code.  Specifically, courts consider whether:

> (a)    the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by allowing a lender only an administrative claim);
>
> (b)    the credit transaction is necessary to preserve estate assets; and
>
> (c)    the terms of the transaction are fair, reasonable, and adequate under the circumstances of the debtor-borrower and the proposed lender.

See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990); Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.), 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); Crouse, 71 B.R. at 549.

33.    As described further below, the Debtors, together with their advisors, broadly marketed alternative sources of postpetition financing to determine whether the Debtors could obtain debtor in possession financing as an administrative expense.  No such parties were willing to provide postpetition financing on an unsecured, administrative priority basis.  Furthermore,

and as described in the Hensler Declaration, the Debtors do not believe they can cannot adequate

protect, preserve, and maximize the value of their estates without access to postpetition

financing. Indeed, absent sufficient financing to administer these chapter 11 cases, the value of

the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given

the Debtors' circumstances, the Debtors believe that the anticipated terms of the DIP Facility are

fair, reasonable, and adequate, all as more fully set forth below.

34.    Where, as here, a debtor is unable to obtain unsecured credit, section 364(c)(1) of

the Bankruptcy Code provides that the debtor may obtain credit secured by an administrative

expense claim having priority "over any or all administrative expenses of the kind specified in

section 503(b) or 507(b) of [the Bankruptcy Code]." 11 U.S.C. § 364(c)(1). As described above,

the Debtors are unable to obtain unsecured credit. Therefore, approving the DIP Superpriority

Claim in favor of the proposed DIP Lenders is reasonable and appropriate. Further,

(a) section 364(c)(2) of the Bankruptcy Code provides that the debtor may obtain credit that is

secured by a lien on property of the estate that is not otherwise subject to a lien, and (b) section

364(c)(3) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by a

junior lien on property of the estate. The proposed DIP Liens sought herein are senior only with

respect to only the first priority liens held by the proposed DIP Lenders themselves—again, a

"self-priming" structure. As the Debtors are unable to obtain the critical financing they need to

administer their chapter 11 cases from any other source, they respectfully represent that the

granting DIP Liens to the proposed DIP Lenders is warranted under the circumstances.

II.    **The DIP Financing Should be Approved Pursuant to Section 364(d)(1) of the
Bankruptcy Code**

35.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code,

a debtor may be authorized to obtain postpetition credit secured by a lien that is senior or equal

in priority to existing liens on encumbered property without the consent of the existing lienholders if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).  Consent by the secured creditors subject to priming, however, obviates the need to show adequate protection.  See, e.g., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the "primed" party has consented, or (b) such "primed" party's interests in collateral are adequately protected.

36.    Here, the Debtors seek authority to enter into the proposed DIP Facility, which is anticipated to provide the proposed DIP Lenders with priming liens on the Collateral on which the Secured Notes hold first priority liens.  Holders of the Secured Notes have consented to the proposed DIP Facility (subject to final agreement on terms and definitive documentation) and the priming liens granted thereunder.  Similarly, the liens contemplated to secured the proposed DIP Facility will be junior to liens on assets where Macquarie holds a first priority lien.  And, as adequate protection, and as discussed more fully below, the Debtors expect that the Interim DIP Order will provide Macquarie with both replacement liens and a superpriority claim with respect to all of the Debtors' assets on a senior basis to the DIP Facility, thereby ensuring that Macquarie's interest in its collateral (including Cash Collateral) as of the Petition Date is adequately protected.[21]  In addition, given the applicable subordination provisions provided by

---

[21]    The Debtors expect that such adequate protection liens and claims shall be junior to the Carve Out in all respects, and such liens and claims shall not have recourse to proceeds from Avoidance Actions.

the Intercreditor Agreement with respect to collateral on which the Secured Notes parties hold a secured lien, the Debtors respectfully submit that Macquarie has effectively consented, and should be deemed to have consented, to the anticipated DIP Liens granted on such collateral. (See **Ex. B**, Intercreditor Agreement § 3.2 (providing remedies in favor of the Prepetition Secured Notes Collateral Agent upon an Event of Default "whether or not any Insolvency or Liquidation Proceeding has been commenced").)

### A.    The Debtors are Unable to Obtain Unsecured or Junior Secured Credit

37.    To show that credit is not obtainable on an unsecured basis, the Debtors need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by subsections 364(c) or (d) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also Anchor Savings, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); Ames, 115 B.R. at 37–40 (holding that the debtor must show that it made a reasonable effort to seek other sources of financing under subsections 364(a) and (b) of the Bankruptcy Code).  Moreover, the Bankruptcy Code and courts do not require debtors to "seek credit from every possible lender before concluding that such credit is unavailable." Snowshoe, 789 F.2d at 1088; see also In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"), aff'd sub nom. Anchor Savings, 99 B.R. at 117; In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."); but see Crouse Group, 71 B.R. at 550 (noting

the "relative ease" of establishing the unavailability of unsecured credit, but denying the motion where the debtor only approached one potential lender, and did not contact two large prepetition lenders).

38.     In this process, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) or (d), as applicable, of the Bankruptcy Code.  See, e.g., Snowshoe, 789 F.2d at 1088; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  As noted, the Debtors do not believe that alternative sources of financing are reasonably available—if at all. Again, the Debtors conducted a marketing process after consulting with their advisors, and reached out to over 25 potential sources of debtor-in-possession financing, and entered into nondisclosure agreements with 14 of those parties to conduct customary diligence.  Ultimately, the Debtors received term sheets from 4 potential sources of financing, and the Debtors and their advisors negotiated with the potential financers to obtain the best financing terms each was willing to offer.  The Debtors do not believe they have liquidity available to operate their business on a "cash collateral" only basis given, among other things, the limited amount of available cash on hand and current operational pressures on their businesses.  Thus, the Debtors have determined that their proposed DIP Facility, as contemplated by the DIP Term Sheet, provides the best path forward under the circumstances to both fund these chapter 11 cases and provide a clear path toward the confirmation and consummation of a chapter 11 plan. Therefore, in addition to evidence to be introduced at the hearing on the Interim DIP Order, if necessary, the Debtors submit that the requirements of section 364 of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

**B.      The DIP Financing Provides Self-Priming, Consensual Liens on the Secured Notes' First Priority Collateral**

39.    Here, the only parties who may have their interests in the Debtors' assets subject to a priming lien are the Secured Notes Parties because, under the terms of the DIP Term Sheet, proceeds of the DIP Facility will repay PNC in full and refinance the Zochem Facility, and the anticipated DIP Liens will be subject and junior to the interests of Macquarie.  As noted, the proposed DIP Lenders hold in excess of 80% of the Secured Notes.  Accordingly, the Secured Notes Parties have consented to the priming feature of the DIP Facility, subject, again, to ongoing negotiations and the execution of definitive documentation.

40.    Notwithstanding the Secured Notes Parties' consent to priming, the Debtors propose the following adequate protection to secure payment of an amount equal to any diminution in the value as of the Petition Date of the Secured Notes Parties' prepetition collateral, subject in all respects to the Carve Out and the Macquarie Adequate Protection:

- valid, binding, enforceable, and perfected replacement liens on and security interests in the Collateral; and

- allowed superpriority administrative expense claims having priority over all administrative expenses.

Based on the foregoing, the Debtors respectfully submit that the proposed priming liens are fair and reasonable under the circumstances and the Secured Notes Parties' interests are adequately protected.  Therefore, the Debtors respectfully request that the priming liens be granted.

**C.    Macquarie's Secured Interests as of the Petition Date are Adequately Protected**

41.    Notwithstanding the fact that the proposed DIP Facility would not prime Macquarie's interests, the Debtors propose the following adequate protection for Macquarie to secure the payment of any diminution in value of Macquarie's interest in the Debtors' collateral, including with respect to the Debtors' use of Cash Collateral, as of the Petition Date:

- **Superpriority Claims**:  valid, binding, enforceable, and perfected replacement liens on and security interests in the Collateral, junior only to the Carve Out; and

34

- **Superpriority Replacement Liens**: allowed superpriority administrative expense claims having priority over all other administrative expenses, subject only to the Carve Out.

42.    As of the Petition Date, approximately $27 million remains outstanding under the Macquarie Facility, exclusive of interest, fees, and other charges. The Debtors' inventory and receivables which Macquarie holds first priority liens are valued at approximately $31 million as of the Petition Date.[22] And although the Debtors are projected to be cash flow negative in the first five weeks of these chapter 11 cases, the adequate protection package proposed in the DIP Term Sheet would effectively provide Macquarie with a senior lien on <u>all</u> of the Debtors' assets (including assets on which the Secured Notes presently hold a first priority lien), subject only to the Carve Out, thereby ensuring that any diminution in value Macquarie might suffer will be more than adequately protected. Moreover, and as noted above, the Debtors' inability to operate the business could result in a catastrophic loss of value, which could directly impair Macquarie's own ability to monetize its collateral. Conversely, the Debtors' ability to maintain business value by operating in the ordinary course is itself a significant source of adequate protection to Macquarie. <u>See</u> <u>In re Salem Plaza Assocs.</u>, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).[23] Thus,

---

[22] In addition, Macquarie holds a first priority lien on additional assets owned by INMETCO, which incremental value itself may provide Macquarie adequate protection in the form of an equity cushion on its collateral position as of the Petition Date.

[23] As a general matter, continued operations are far more likely to maintain or increase underlying collateral values as compared with the catastrophic loss of value that could result from a debtor's inability to operate in the ordinary course. <u>See, e.g.</u> <u>In re Jim Kelly Ford of Dundee, Ltd.</u>, 14 B.R. 812 (N.D. Ill. 1980) (finding lender was adequately protected and debtor was authorized to use cash collateral to fund operations where lender benefited from the difference between the average sale price of car sold at retail and the average sale price if the same vehicle was sold at a wholesale auction).

the Debtors' proposed DIP financing and use of Cash Collateral, in accordance with the Budget to be negotiated, in itself, provides Macquarie with an appropriate level of adequate protection in light of the interim and necessary relief requested here. See, e.g., In re Beker Indus. Corp., 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) ("Adequate protection, not absolute protection, is the statutory standard." (citation omitted)).

IV.    **The Adequate Protection Proposed in the DIP Term Sheet Is    Fair and Appropriate**

43.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  See In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. Swedeland, 16 F.3d at 564; In re Satcon Tech. Corp., No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); In re N.J. Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804 (HSB), 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding" (citations omitted)).

44.    As described above, and as the Debtors are prepared to further describe to the Court, the proposed adequate protection set forth in the DIP Term Sheet is sufficient to protect

the Prepetition Secured Parties from any diminution in value to the Collateral, including Cash Collateral. In light of the foregoing, the Debtors submit that the proposed Secured Notes Adequate Protection and Macquarie Adequate Protection anticipated to be provided for the benefit of the Prepetition Secured Parties is appropriate. Thus, the Debtors' anticipated provision of such adequate protection is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Collateral, subject to the terms and limitations the Debtors expect to be set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates.

V.      **Failure to Obtain the Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm**

45.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. Failure to obtain access to the DIP Loans and Cash Collateral would result in immediate and irreparable harm to the Debtors and their stakeholders, and cause diminution in value to the Debtors' estates. (See, e.g., Hensler Decl. ¶ 5.) Without access to the proposed DIP Facility and Cash Collateral, the Debtors would quickly suffer significant disruption to their business operations, and would likely have to cease operations, to the material detriment of all parties in interest.

## VI.     The Use of Cash Collateral Is Warranted and Should Be Approved

46.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

47.     It is essential to the Debtors' successful reorganization and the going concern value of their businesses that they have sufficient funds to operate.  Absent the use of Cash Collateral and the anticipated proceeds from the proposed DIP Facility, the Debtors will not have sufficient liquidity available to make pre- and postpetition employee-related obligations.  Moreover, the inability to use Cash Collateral and proceeds of the proposed DIP Facility to carry on maintenance of their EAF-dust processing facilities to prevent the escape of hazardous waste and pollution could result in the potential release or stockpiling of hazardous wastes, as designated by the Environmental Protection Agency, including the uncontrolled release of contaminated stormwater at the Debtors' facilities.  And, as noted above, Macquarie's interest in such Cash Collateral is adequately protected by the provisions described in the DIP Term Sheet.

## VII.    The Automatic Stay Should be Modified on a Limited Basis

48.     The Debtors expect that the proposed Interim DIP Order will provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the

38

DIP Lenders to file any financing statements, security agreements, notices of Liens, and other similar instruments and documents in order to validate and perfect the liens and security interests the Debtors expect to be granted to the DIP Lenders under the Interim DIP Order. The Debtors further expect that the proposed Interim DIP Order will provide that the automatic stay will be modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim DIP Order. Finally, the proposed Interim Order will provide that, following the occurrence of the Termination Date (as will be defined therein), the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Facility Documents, or applicable law.

49.    Courts routinely grant stay modifications of this kind as standard features of DIP financing arrangements. See, e.g., In re Magnum Hunter Res. Corp., No. 15-12533 (KG) (Bankr. D. Del. Jan. 11, 2016); In re Everyware Global, Inc., No. 15-10743 (LSS) (Bankr. D. Del. Apr. 28, 2015); In re Altegrity, Inc., No. 15-10226 (LSS) (Bankr. D. Del. Mar. 16, 2015); In re Energy Future Holdings Corp., No. 14-10979 (CSS) (Bankr. D. Del. May 2, 2014); In re Longview Power, LLC, No. 13-12211 (BLS) (Bankr. D. Del. Nov. 21, 2013).[24]

### Request for Final Hearing

50.    Pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2(c), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion. The Debtors may further seek additional or other interim relief from the Court prior to the Final Hearing.

---

[24]    Due to the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

## Waiver of Bankruptcy Rules 4001(a)(3) and 6004(a)

51.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

52.    The Debtors will provide notice of this Motion to the following parties or their respective counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware;  (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis);  (c) the United States Environmental Protection Agency;  (d) the state attorneys general for states in which the Debtors conduct business;  (e) the Office of the United States Attorney for the District of Delaware;  (f) the Internal Revenue Service;  (g) the Securities and Exchange Commission;  (h) counsel to Macquarie Bank Limited;  (i) the indenture trustee under the Debtors' 10.50% senior secured notes;  (j) the indenture trustee under the Debtors' 9.00% senior unsecured notes;  (k) the indenture trustee under the Debtors' 3.80% convertible senior notes;  (l) Banco Bilbao Vizcaya Argentaria, S.A.;  (m) PNC Bank, National Association; (n) counsel for the DIP Lenders and the Ad Hoc Group of holders of the Secured Notes;  (o) all parties known, after reasonable inquiry, to have asserted a security interest in the Prepetition Collateral;  (p) Richter Advisory Group Inc. in its capacity as proposed information officer in the Debtors' foreign recognition proceedings;  (q) the Financial Services Commission of Ontario (FSCO);  (r) Unifor Local 591G;  (s) LIFTCAPITAL Corporation;  (t) Liftow Limited; and (u) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule

9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

53.      No prior request for the relief sought in this Motion has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

41

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the

Torgove Declaration, and the Hensler Declaration, the Debtors respectfully request entry of the

DIP Orders and such other relief as is just and proper.

Wilmington, Delaware
Dated: February 2, 2016

/s/ *Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:          ljones@pszjlaw.com
                    joneill@pszjlaw.com
                    jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Patrick J. Nash Jr., P.C. (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          james.sprayregen@kirkland.com
                    patrick.nash@kirkland.com
                    ryan.dahl@kirkland.com

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*