## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HORSEHEAD HOLDING CORP., et al.,[1] | ) | Case No. 16-10287 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket No. 17 & 33** |
| | ) | |

### INTERIM ORDER (A) AUTHORIZING
### THE DEBTORS TO OBTAIN POSTPETITION
### SECURED FINANCING PURSUANT TO SECTION 364 OF THE
### BANKRUPTCY CODE, (B) AUTHORIZING THE DEBTORS TO
### USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION
### TO THE PREPETITION SECURED PARTIES, (D) SCHEDULING A FINAL
### HEARING, AND (E) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order") and a final order (the "Final Order"):

(I)      authorizing the Debtors to obtain secured postpetition financing up to an aggregate principal amount of $90,000,000 (the "DIP Facility") subject to and pursuant to the terms and conditions set forth in this Interim Order and the *Senior Secured Superpriority Debtor-in-Possession Credit, Security and Guaranty Agreement*, dated as of February [ ], 2016 (substantially in the form attached hereto as Exhibit 1, and as hereafter amended, supplemented, or otherwise modified from time to time, the "DIP Credit

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Horsehead Holding Corp. (7377); Horsehead Corporation (7346); Horsehead Metal Products, LLC (6504); The International Metals Reclamation Company, LLC (8892); and Zochem Inc. (4475). The Debtors' principal offices are located at 4955 Steubenville Pike, Suite 405, Pittsburgh, Pennsylvania 15205.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the DIP Documents (as defined herein), as applicable.

Agreement"; together with all agreements, documents, and instruments executed and delivered in connection therewith, as hereafter amended, supplemented, or otherwise modified from time to time in accordance with this Interim Order or the Final Order, the "DIP Documents"), among Horsehead Corporation, The International Metals Reclamation Company, Inc. ("INMETCO"), Horsehead Metal Products, LLC, Zochem Inc. ("Zochem") and Horsehead Holding Corp. (as borrowers, the "Borrowers"), Cantor Fitzgerald Securities, as administrative agent (in such capacity, together with its permitted successors and assigns, the "DIP Agent"), and the lenders from time to time a party to the DIP Facility (collectively, in such capacities, the "DIP Lenders" and, together with the DIP Agent, in such capacities, the "DIP Parties");

(II)     authorizing and directing the Debtors to execute, deliver, and perform their respective obligations under the DIP Credit Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(III)    authorizing the Debtors to (a) use Cash Collateral (as defined herein) and proceeds of the DIP Facility consistent with the Budget (as defined herein), including with respect to any permitted variances provided therein, and (b) provide adequate protection, solely to the extent provided herein, to the Prepetition Secured Parties (as defined herein) under: (i) that certain indenture for the 10.50% senior secured notes due 2017, dated as of July 26, 2012 (as the same has been and may be amended, restated,

supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Senior Secured Notes Indenture"), between and among Horsehead Holding Corp., as issuer, the guarantors party thereto, U.S. Bank National Association, as trustee (in such capacity, the "Prepetition Senior Secured Notes Indenture Trustee") and as collateral agent (in such capacity, the "Prepetition Senior Secured Notes Collateral Agent"), in the principal amount of $205,000,000 (the "Prepetition Senior Secured Notes" and holders of such Prepetition Senior Secured Notes, the "Prepetition Senior Secured Noteholders" and, together with all security, pledge, mortgages, and guaranty agreements and all other documentation executed in connection with the Prepetition Senior Secured Notes, each as amended, supplemented, or otherwise modified, the "Prepetition Senior Secured Notes Documents"); and (ii) that certain revolving credit facility, dated as of June 30, 2015, as amended, between and among Horsehead Corporation, INMETCO and Horsehead Metal Products, LLC as borrowers, Horsehead Holding Corp. and Chestnut Ridge Railroad Corp. as guarantors, Macquarie Bank Limited as administrative agent (in such capacity, the "Prepetition Macquarie Facility Agent" and, with the Prepetition Senior Secured Notes Collateral Agent, the "Prepetition Secured Agents") and as lender (in such capacity, the "Prepetition Macquarie Facility Lender" and, together with the Prepetition Macquarie Agent, the "Prepetition Macquarie Facility Parties" and, together with the Prepetition Senior Secured Noteholders, the "Prepetition

3

Secured Parties"), providing for borrowings of up to $80,000,000 (the "Prepetition Macquarie Facility" and, together with all security, pledge, mortgages, and guaranty agreements and all other documentation executed in connection with the Prepetition Macquarie Facility, each as amended, supplemented, or otherwise modified, the "Prepetition Macquarie Facility Documents" and, together with the Prepetition Senior Secured Notes Documents, the "Prepetition Debt Documents"), solely to the extent of any diminution in the value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (as defined herein) as of the Petition Date (as defined herein);

(IV)    subject to entry of this Interim Order, authorizing the Debtors to refinance in full obligations outstanding under the Zochem Facility with proceeds of the DIP Facility and to grant adequate protection, cash collateral, and other related relief;

(V)    granting (i) to the DIP Agent, for the benefit of itself and the DIP Lenders, priming liens, security interest and pledges on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which Liens shall be senior to all liens, security interests and pledges, except that such liens, security interests and pledges shall be junior solely to (a) the Carve-Out, (b) the Macquarie Adequate Protection Liens, (c) those Macquarie Facility Liens on the Facilities Priority Shared Collateral (as defined in the Intercreditor Agreement) securing the Prepetition Macquarie Facility, to the extent such liens are

4

valid and perfected as of the Petition Date, (d) to PNC Bank, N.A. ("PNC") cash collateral securing the Zochem letter of credit, the Horsehead letter of credit, and the cash collateral granted in Paragraph 22 herein, (e) the Permitted Pre-Petition Liens set forth on Schedule 1.01(a) to the DIP Credit Agreement, and (f) with respect to the DIP Collateral located in Canada, the Administration Charge provided for in the Supplemental Order of the Canadian Court (as defined in the DIP Documents) in an amount not to exceed CAD$100,000, but the DIP Claims and Liens shall be senior to any other charges granted by the Canadian Court in the Recognition Proceedings (as defined in the DIP Documents) and junior to cash collateral securing the Zochem letter of credit issued by PNC; and (ii) to the DIP Agent, for the benefit of the DIP Lenders, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim;

(VI)    subject to entry of this Interim Order, authorizing the DIP Agent to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement);

(VII)   subject to entry of the Final Order, authorizing the Debtors to grant liens to the DIP Lenders on the proceeds of Avoidance Actions (as defined herein) but not on the Avoidance Actions themselves;

(VIII)  subject to entry of this Interim Order, and subject to entry of the Final Order with respect to the Prepetition Senior Secured Notes Parties,

5

waiving the Debtors' right to surcharge against the DIP Collateral (as defined herein) or the Prepetition Senior Secured Note Collateral (as defined herein) pursuant to section 506(c) of title 11 of the United States Code (the "Bankruptcy Code") to the extent provided herein;

(IX)     subject to entry of this Interim Order, and subject to entry of the Final Order with respect to the Prepetition Senior Secured Notes Parties, waiving any application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code to the Prepetition Senior Secured Note Parties, the DIP Agent, and the DIP Lenders with respect to (i) proceeds, products, offspring or profits of any of the Prepetition Senior Secured Notes Collateral (as defined herein), including the Cash Collateral, or the DIP Collateral, as applicable, or (ii) the extension of the Adequate Protection Liens (as defined herein) to cover proceeds of the Prepetition Senior Secured Note Collateral;

(X)     modifying the automatic stay under section 362 of the Bankruptcy Code to use cash collateral pledged to secure the letter(s) of credit to fund the draws from time to time on the letter(s) of credit or to reimburse the issuing bank to reimburse itself for any draws on the letter(s) of credit from time to time;

(XI)     scheduling a final hearing (the "Final Hearing") on the Motion for a date that is before the twenty-first (21st) day after the Petition Date to consider entry of the Final Order authorizing the borrowings under, and the Debtors' entry into, the DIP Credit Agreement on a final basis and approval of notice procedures with respect thereto;

(XII)    modifying the automatic stay imposed by section 362 of the Bankruptcy

Code to the extent necessary to implement and effectuate the terms of this

Interim Order; and

(XIII)    waiving any applicable stay (including under Bankruptcy Rule 6004) and

providing for immediate effectiveness of this Interim Order.

The interim hearing (the "Interim Hearing") for this Court to consider entry of this Interim Order granting the relief requested in the Motion having been held by this Court on February 3, 2016; and upon the record made by the Debtors at the Interim Hearing (including the First Day Declaration, the Hensler Declaration, and the Torgove Declaration); and this Court having heard and resolved or overruled all objections to the relief requested in the Motion; and it appearing that the relief requested on an interim basis in the Motion is in the best interests of the Debtors, their estates and creditors; and after due deliberation and consideration and sufficient cause appearing therefor,

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *The Motion.* The Motion is granted on an interim basis as set forth herein.  Any objection to the Motion to the extent not withdrawn or resolved is hereby overruled.

2.    *Jurisdiction.* This Court has core jurisdiction over the above-captioned chapter 11 cases commenced on February 2, 2016 (the "Petition Date"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    *Notice.* Telephonic, facsimile notice or overnight mail notice of the Interim Hearing and the proposed entry of this Interim Order has been provided to: (a) the Office of the

United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Environmental Protection Agency; (d) the state attorneys general for states in which the Debtors conduct business; (e) the Office of the United States Attorney for the District of Delaware; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) counsel to the Prepetition Macquarie Facility Parties; (i) the Prepetition Senior Secured Notes Indenture Trustee; (j) the indenture trustee under the Debtors' 9.00% senior unsecured notes; (k) the indenture trustee under the Debtors' 3.80% convertible senior notes; (l) Banco Bilbao Vizcaya Argentaria, S.A.; (m) counsel to PNC Bank, National Association; (n) counsel for the DIP Lenders and the Ad Hoc Group of Prepetition Senior Secured Noteholders; (o) all parties known, after reasonable inquiry, to have asserted a security interest in the Prepetition Collateral; (p) Richter Advisory Group Inc. in its capacity as proposed information officer in the Debtors' foreign recognition proceedings; (q) the Financial Services Commission of Ontario (FSCO); (r) Unifor Local 591G; (s) LIFTCAPITAL Corporation; (t) Liftow Limited; (u) counsel to the DIP Agent; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

4.     *Debtors' Stipulations (Prepetition Senior Secured Notes Obligations)*.  Without prejudice to the rights of any other party to assert Claims and Defenses prior to expiration of the Challenge Period (as defined herein), each Debtor (other than Zochem) admits, stipulates, and agrees that:

(a)     as of the Petition Date, the each Debtor (other than Zochem) is unconditionally indebted and liable to the Prepetition Senior Secured Notes Parties (as defined herein), without defense, counterclaim or offset of any kind, for all of the obligations under the Prepetition Senior Secured Notes Documents (together with the Note Guarantees (as defined below), including the $205,000,000 issued pursuant to the Senior Secured Notes Indenture, plus accrued and unpaid interest and fees in accordance with the terms of the Prepetition Senior Secured Note Documents, the "Prepetition Senior Secured Notes Obligations"); the Prepetition Senior Secured Notes Obligations are unconditionally and irrevocably guaranteed by the Subsidiary Guarantors (as defined in the Prepetition Senior Secured Notes Indenture) (the "Note Guarantees") and, subject to certain permitted liens, secured by certain first and second priority security interests in and liens (collectively, the "Prepetition Senior Secured Notes Liens") on certain of the Debtors' assets described in the Prepetition Senior Secured Notes Documents (collectively, the "Prepetition Senior Secured Notes Collateral" and, with all assets of the Debtors and Debtors' subsidiaries (other than Zochem) subject to security interests and liens, the "Prepetition Collateral");

(b)     the Prepetition Senior Secured Notes Obligations including, without limitation, the Note Guarantees, constitute legal, valid, binding, non-avoidable obligations of each of the Debtors (other than Zochem) and, subject to Paragraphs 4(g) and 24 hereof, the Prepetition Senior Secured Notes Liens are valid, binding, perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Senior Secured Notes Collateral;

9

(c)    (i) no portion of the Prepetition Senior Secured Notes Obligations, the Prepetition Senior Secured Notes Documents, or the transactions contemplated thereby are subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law) or any other applicable U.S. or Canadian law; and (ii) the Debtors (other than Zochem) do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights arising out of, relating to or in connection with the Prepetition Senior Secured Notes Obligations or the Prepetition Senior Secured Notes Documents, whether arising under the Bankruptcy Code, applicable nonbankruptcy law, or any other applicable U.S. or Canadian law, on or prior to the date hereof, against the Prepetition Senior Secured Noteholders, the Prepetition Senior Secured Notes Collateral Agent or the Prepetition Senior Secured Notes Indenture Trustee (together, the "Prepetition Senior Secured Notes Parties"), and, subject to Paragraphs 4(g) and 24 hereof, the Debtors (other than Zochem) each irrevocably waive, for themselves, and their subsidiaries, any right to challenge or contest in any way the perfection, validity, and enforceability of the Prepetition Senior Secured Notes Liens or the validity or

enforceability of the Prepetition Senior Secured Notes Obligations and the Prepetition Senior Secured Notes Documents;

(d)     the Prepetition Senior Secured Notes Obligations constitute allowed claims for all purposes between and against the Debtors' estates (other than Zochem) and neither the Prepetition Senior Secured Notes Indenture Trustee nor any Prepetition Senior Secured Noteholder is required to file a proof of claim with regard to the Prepetition Senior Secured Notes Obligations or the Prepetition Senior Secured Notes Liens, and any order entered by this Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of these chapter 11 cases or subsequent chapter 7 or chapter 11 cases (each, a "Successor Case") shall not apply to the Prepetition Senior Secured Notes Parties with respect to the Prepetition Senior Secured Notes Obligations (including the Prepetition Senior Secured Notes Liens);

(e)     the Prepetition Senior Secured Notes Liens, security interests, and rights granted to the Prepetition Senior Secured Notes Parties pursuant to, and in connection with, the Prepetition Senior Secured Notes Documents, including the Prepetition Senior Secured Notes Indenture and that certain Intercreditor Agreement, dated as of June 30, 2015 (as amended, restated, supplemented or otherwise modified, the "Intercreditor Agreement") between and among the Prepetition Senior Secured Notes Collateral Agent and the Prepetition Senior Secured Notes Indenture Trustee, and Macquarie Bank Limited in its capacity as collateral agent to the Prepetition Macquarie Facility, which grants first priority liens (subject to permitted liens) over the Shared Collateral (as defined in the Intercreditor Agreement) other than the Facilities Priority Shared Collateral to the Prepetition Senior Secured Notes Liens, are, subject to Paragraphs 4(g) and 24

11

hereof, valid, binding, perfected, enforceable, non-avoidable liens and security interests on the Prepetition Senior Secured Notes Collateral, senior in priority over any and all other liens on the Senior Secured Notes Collateral other than the Prepetition Macquarie First Priority Liens (as defined herein), subject to any permitted exceptions under the Prepetition Senior Secured Notes Documents, to the extent such permitted exceptions were valid, properly perfected, non-avoidable liens senior in priority to the liens and security interests of the Prepetition Senior Secured Notes Parties on the Petition Date;

(f)     certain of the Debtors' cash (including, without limitation, any and all accounts referred to in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management Systems, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 6])] (the "Cash Management Motion")), other than with respect to Zochem, and any amounts generated by the collection of accounts receivable, the exercise of letter of credit rights, the sale of inventory, or other disposition of the Prepetition Collateral existing as of the Petition Date, the proceeds of any of the foregoing and the Prepetition Collateral is cash collateral within the meaning of section 363(a) of the Bankruptcy Code (collectively, the "Cash Collateral") provided that the Cash Collateral shall not include the PNC L/C Cash Collateral (as defined herein), the Payoff Indemnity Account (as defined herein), and the rights of PNC to charge the Debtors' deposit accounts for applicable fees and charges in accordance with applicable depository account agreements and/or cash management agreements (collectively, "PNC Cash Collateral"); and

(g)    the Prepetition Senior Secured Noteholders hold legal, valid, binding and enforceable liens securing certain real property located in Mooresboro, North Carolina, granted pursuant to that certain Future Advances Deed of Trustee, Assignment of Rents and Leases and Financing Statement from Horsehead Metal Products Inc. to First American Title Insurance Company, Inc. for the benefit of U.S. Bank N.A., as collateral agent, dated as of October 22, 2012 and any subsequently filed mortgages (the "Mooresboro Senior Secured Notes Lien"), and any claims brought with respect to the Mooresboro Senior Secured Notes Lien (the "Retained Claims") are subject to the Retained Claims Challenge Period (as defined herein).

5.    *Debtors' Stipulations (Zochem Facility)*.  Without prejudice to the rights of any other party to assert Claims and Defenses prior to expiration of the Challenge Period, each Debtor admits, stipulates, and agrees that:

(a)    as of the Petition Date, Zochem, as borrower, and Horsehead Holding, as guarantor, are unconditionally indebted and liable, without defense, counterclaim or offset of any kind, for all of the obligations under the Zochem Facility, totaling not less than $18,519,100.18, plus accrued and unpaid interest and fees in accordance with the terms of the Zochem Credit Agreement (the "Zochem Debt Obligations") and the Other Zochem Documents[3]; the Zochem Debt Obligations are secured by, subject to permitted liens, certain first priority security interests in and liens on certain of Zochem's assets as described in the Zochem Credit Agreement and the Other Zochem Documents (collectively, the "Zochem Facility Collateral" and, with all assets of Zochem and any of

---

[3]    The "Other Zochem Documents" means the Other Documents as defined in the Zochem Credit Agreement.

13

its subsidiaries subject to security interests and liens, the "<u>Zochem Collateral</u>"), pursuant to the Zochem Credit Agreement and the Other Zochem Documents;

(b)    the Zochem Debt Obligations constitute legal, valid, binding, non-avoidable obligations of each of the Horsehead Holding and Zochem, and the Zochem Debt Obligations are secured by valid, binding, perfected, non-avoidable, and enforceable liens on and security interests in the Zochem Collateral;

(c)    (i) no portion of the Zochem Debt Obligations, the Zochem Credit Agreement, or the Other Zochem Documents, or the transactions contemplated thereby are subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law) or any other applicable U.S. or Canadian law; and (ii) Horsehead Holding and Zochem do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights arising out of, relating to, or in connection with, the Zochem Debt Obligations, the Zochem Credit Agreement, or the Other Zochem Obligations, whether arising under the Bankruptcy Code, applicable nonbankruptcy law, or any other applicable U.S. or Canadian law, on or prior to the date hereof, against PNC Bank, N.A., in its capacity as administrative and collateral agent under the Zochem

Facility (in such capacity, the "Zochem Agent") and the current and/or prior lenders under the Zochem Facility as of the Petition Date (the "Zochem Lenders", and, together with the Zochem Agent, the "Zochem Secured Parties"), and (iii) the Debtors waive any right to challenge or contest in any way the perfection, validity, and enforceability of the liens securing the Zochem Debt Obligations or the validity or enforceability of the Zochem Debt Obligations, the Zochem Credit Agreement, and the Other Zochem Documents;

(d)     the Zochem Debt Obligations constitute allowed claims for all purposes between and against Zochem and Horsehead Holdings, and neither the Zochem Agents nor any Zochem Lender is required to file a proof of claim in any of the Debtors' chapter 11 cases with regard to the Zochem Debt Obligations or the liens securing such obligations, and any order entered by this Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any Successor Case shall not apply to the Zochem Agent and the Zochem Lenders with respect to the Zochem Debt Obligations (including the liens securing such obligations); and

(e)     PNC has issued certain letters of credit for the benefit of the Debtors secured by the PNC L/C Cash Collateral (as defined herein), and holds a first priority, perfected secured claim in such cash collateral, and PNC is not required to file a proof of claim in any of the Debtors' chapter 11 cases with regard to such secured claim and any order entered by this Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any Successor Case shall not apply to the PNC with respect to such secured claim (including the liens securing such obligations).

6.    *Debtors' Stipulations (Prepetition Unsecured Notes Indenture).*    Without prejudice to the rights of any other party to assert Claims and Defenses prior to expiration of the Challenge Period, the Debtors (other than Zochem) admit, stipulate, and agree that:

(a)    Pursuant to that certain indenture, dated as of July 29, 2014 (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Unsecured Notes Indenture" and, together with all other agreements, instruments, notes, guaranties and other documents executed in connection therewith, the "Prepetition Unsecured Notes Documents"), between and among Horsehead Holding Corp., as issuer, the Subsidiary Guarantors (as defined therein), and U.S. Bank National Association, as trustee (in such capacity, the "Prepetition Unsecured Notes Indenture Trustee"), Horsehead Holding Corp. issued the 9.00% senior unsecured notes due 2020 (the "Prepetition Unsecured Notes" and, the holders of such Prepetition Notes, the "Prepetition Unsecured Noteholders" and, together with the Prepetition Unsecured Notes Indenture Trustee, the "Prepetition Unsecured Notes Parties" and, together with the Prepetition Senior Secured Notes Parties, the "Prepetition Notes Parties"), and as of the Petition Date, $40,000,000 in aggregate principal amount of Prepetition Unsecured Notes, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Unsecured Notes Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements as provided under the Prepetition Unsecured Notes Documents (collectively, the "Prepetition Unsecured Notes Obligations" and, together with the Prepetition Senior Secured Notes Obligations, the "Prepetition Notes Obligations") was outstanding;

(b)     (i) the Prepetition Unsecured Notes Obligations constitute legal, valid, enforceable non-avoidable and binding obligations of Horsehead Holding Corp., as issuer, and each of the guarantors party thereto; (ii) no offsets, defenses or counterclaims to the Prepetition Unsecured Notes Obligations exist; (iii) no portion of the Prepetition Unsecured Notes Obligations is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code, applicable nonbankruptcy law, or any other applicable U.S. or Canadian law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute, or common law) or any other applicable U.S. or Canadian law; (iv) the Prepetition Unsecured Notes Documents are valid and enforceable by the Prepetition Unsecured Notes Parties against Horsehead Holding Corp. and the Subsidiary Guarantors (as defined therein); and (v) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Unsecured Notes Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), arising out of, relating to or in connection with the Prepetition Unsecured Notes Indenture or the transactions

contemplated thereunder or the Prepetition Unsecured Notes Obligations, including without limitation, any right to assert any disgorgement or recovery;

(c)    the Prepetition Unsecured Notes Obligations constitute allowed claims for all purposes between and against the Debtors' estates (other than Zochem), and neither the Prepetition Unsecured Notes Indenture Trustee, nor any Prepetition Unsecured Noteholder, is required to file a proof of claim with regard to the Prepetition Unsecured Notes Obligations, and any order entered by this Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of these chapter 11 cases or any Successor Case shall not apply to the Prepetition Unsecured Notes Indenture Trustee or the Prepetition Unsecured Noteholders with respect to the Prepetition Unsecured Notes Obligations.

7.    *Findings Regarding the DIP Facility and the Use of Prepetition Collateral.*

(a)    The Debtors require the DIP Facility and the use of Cash Collateral, *inter alia*, to repay certain outstanding debt obligations as set forth in the DIP Credit Agreement (including the Zochem Debt Obligations), for general corporate purposes, to pay administrative expenses for goods and services in the ordinary course of business in each case as permitted by the DIP Documents and the Budget (including any permitted variances), and to pay fees and expenses and other obligations arising from the DIP Facility and as set forth in the DIP Documents.

(b)    The Debtors are unable to obtain financing on more favorable terms and conditions, both with regard to the DIP Facility itself as well as with regard to support for the Debtors' overall restructuring efforts, from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents.  The Debtors are

18

unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also not able to obtain credit secured by a lien allowable only under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Lenders liens junior to the Macquarie Adequate Protection Liens and the Prepetition Macquarie First Priority Liens (each as described herein), and certain other obligations as further described herein, and further granting the DIP Lenders the DIP Superpriority Claims (as defined herein) on the terms and conditions set forth in this Interim Order and the DIP Documents. In addition, the Debtors are unable to obtain credit for borrowed money without the Debtors granting to the DIP Lenders priming liens under section 364(d)(1) of the Bankruptcy Code over the Senior Secured Notes Replacement Liens (as defined herein) and the Prepetition Senior Secured Notes Liens, on the terms and conditions set forth in this Interim Order and the DIP Documents.

(c)    The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to entry of this Interim Order, and conditioned upon the entry of the Final Order, including findings that such financing is essential to the Debtors' estates, the DIP Lenders are extending credit to the Debtors as set forth in the DIP Facility in good faith, and that the DIP Superpriority Claims, security interests, liens, rights and other protections granted to the DIP Lenders and the DIP Agent will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order, the Final Order or any other order.

19

(d)    All of the Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Facility and all other financial accommodations provided under the DIP Documents and this Interim Order.  The terms of the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(e)    The terms of the DIP Documents and the use of the Prepetition Collateral, including the Cash Collateral, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources.  Based upon the record before this Court, the DIP Documents have been negotiated in good faith and at arm's-length among the Debtors, the DIP Lenders, and the DIP Agent.  The DIP Facility and other financial accommodations made to the Debtors by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereby.

(f)    Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The authorization granted herein to enter into the DIP Documents, to continue using Cash Collateral and to obtain funds under the DIP Facility, including on a priming basis as set forth herein, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Entry of this

20

Interim Order is in the best interests of the Debtors, their estates and creditors because it will, among other things, allow for access to the financing necessary for the Debtors to, among other things, maintain business relationships with vendors, suppliers, customers and other parties, permit the orderly continuation of their businesses and pay for certain costs and expenses related to the Debtors' chapter 11 cases.

8.      *Findings Regarding Adequate Protection.*

(a)        The DIP Facility contemplated hereby provides for a priming of certain of the Prepetition Secured Parties' respective interests in the Prepetition Collateral pursuant to section 364(d) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled to the adequate protection as set forth herein, including, with respect to the Prepetition Secured Parties, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion, the DIP Motion Declarations and on the record presented to the Court, the terms of the proposed adequate protection arrangements and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition Secured Parties.

9.      *Authorization of the DIP Facility and the DIP Documents.*

(a)      The Debtors are hereby authorized to enter into, deliver, and perform under, the DIP Documents and, in the case of the Borrowers, to borrow, subject to the terms and conditions of (1) this Interim Order, (2) the DIP Documents and any related guarantees as contemplated by the DIP Documents, and (3) the Budget, the DIP Facility in an aggregate principal amount of $90,000,000 in the increments and for the purposes set forth in the DIP Documents, including repayment of certain debt obligations and for

working capital and other general corporate purposes of the Debtors consistent with the Budget (including permitted variances).

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts (and to the extent such acts have already occurred, such acts are hereby ratified) and to execute and deliver all instruments and documents that the DIP Lenders and DIP Agent determine to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents including, without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)     the non-refundable payment to the DIP Agent, or the DIP Lenders, as the case may be, of the fees, expenses, indemnification obligations and other amounts set forth in the DIP Documents including, without limitation: (1) 14% interest per annum paid in cash, monthly in arrears on the first day of each such month; (2) upon the occurrence and during the continuance of any Event of Default, at the election of the Required Lenders (as defined in the DIP Documents), interest in cash (a) in the case of principal or interest on any loan at a rate of 2% per annum plus the rate otherwise applicable to such loan and (b) in the case of any other amount, at a rate equal to the interest rate applicable to outstanding loans plus 2% per annum; (3) 4.5% of the aggregate commitments under the DIP Facility to each DIP Lender upon the Closing Date (x) in cash as a commitment fee or (y) as original issue discount (the "Commitment Fee"); (4) an unused commitment fee of 4% per annum of the aggregate unfunded commitments under the DIP Facility, payable to the DIP Lenders in cash monthly

in arrears on the first day of each such month; (5) a repayment premium equal to 2.5% of the principal amount of loans under the DIP Facility that are repaid; and (6) reasonable and documented out of pocket costs and expenses as may be due from time to time as provided in this Interim Order and in the DIP Documents, including, without limitation, reasonable attorneys' fees and other financial advisory, consultant, "seasoning" and professional fees and disbursements as provided in the DIP Documents; and

        (iii)    the performance of all other acts required under or in connection with the DIP Documents.

        (c)    The DIP Documents constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Interim Order and the DIP Documents.  No obligation, payment, transfer or grant of security by the Debtors under the DIP Documents (or, as it relates to the DIP Facility, this Interim Order) shall be subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law).

10.    *Budget.*  Attached as <u>Exhibit 2</u> hereto and incorporated by reference herein is the 13-week budget setting forth the Debtors' projected receipts, disbursements and accrued

Professional Fees (as defined herein) (the "Budget"). Subject to the permitted variances as set forth in the DIP Documents, the use of proceeds of the DIP Facility and Cash Collateral shall in all cases be used consistently with this Interim Order, the Budget and any permitted variances therein. The DIP Agent, the DIP Lenders, and the Prepetition Macquarie Facility Lenders shall have no obligations with respect to the Debtors' use of the Cash Collateral. The consent of the DIP Agent and the DIP Lenders to the Budget shall not be construed as consent to the use of any Cash Collateral during the continuance of an Event of Default, regardless of whether the aggregate funds shown on the Budget have been expended. The Debtors shall have an obligation to deliver, on or prior to the third Business Day after (i) the end of every week, a Variance Report, and (ii) the end of every other week, an updated Budget for the rolling 13-week period commencing with the first day of the week in which such delivery occurs, subject to any applicable grace periods provided in the DIP Credit Agreement (but without duplication of such grace periods); provided that, such updated Budget shall not become the "DIP Budget" for purposes of the DIP Facility unless such updated Budget is approved by the Required Lenders in their sole discretion. Notwithstanding anything herein to the contrary, with respect to the updated Budget to be delivered on or prior to the third Business Day after the tenth week covered by the initial Budget (subject to any applicable grace period provided in the DIP Credit Agreement), delivery of an updated Budget that is not satisfactory to the Required Lenders for whatever reason, in their sole discretion, at such time shall constitute an Event of Default under the DIP Facility, subject to any applicable grace periods provided in the DIP Credit Agreement (but without duplication of such grace periods). Notwithstanding anything to the contrary herein or elsewhere, nothing in this Interim Order nor any other DIP Document shall be construed as a cap or limitation on the accrued amounts benefitting from the Carve-Out.

24

11.    *DIP Claims and Liens*.  As security for the DIP Obligations, the DIP Lenders are hereby granted the following claims, liens, security interests, rights, and benefits, in each case, and notwithstanding anything herein to the contrary in each case subject and subordinate to (i) the Carve-Out (as defined herein), (ii) the Prepetition Macquarie First Priority Liens, (iii) the Macquarie Adequate Protection Liens (as defined herein), (iv) the Macquarie Adequate Protection Claims (as defined herein); and (v) with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge (defined below); (including paragraphs (a), (b), and (c) below, collectively, the "DIP Claims and Liens"):

(a)    *DIP Superpriority Claims*.    An allowed superpriority administrative expense claim pursuant to sections 364(c)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code on account of the DIP Obligations (the "DIP Superpriority Claim"), subject only to the Carve-Out, the Macquarie Adequate Protection Claims, and, with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge. The DIP Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses, adequate protection and other diminution claims (in each case other than the Carve Out, the Macquarie Adequate Protection Claims, and with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge), unsecured claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 503(a), 503(b),

506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, payable from and with recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof; provided that (x) the DIP Superpriority Claim will have recourse to proceeds of Avoidance Actions (as defined herein) only upon entry of the Final Order and (y) the DIP Superpriority Claim will not have recourse to proceeds of the Excluded Accounts (as defined in the DIP Credit Agreement).

(b) *DIP Liens on DIP Collateral.* Except as set forth herein, and pursuant to sections 364(c)(2), 363(c)(2), and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, first priority, (i) pledge of (a) all promissory notes owned by the Debtors and (b) all capital stock owned by the Debtors and (ii) senior, priming lien on, and security interest in, all property, except as otherwise set forth herein, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and

equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including, without limitation, a first priority priming lien on the equity interests of Horsehead Zinc Recycling, LLC, equity interests in subsidiaries (including non-wholly owned and non-Debtor subsidiaries), money, investment property, upon entry of the Final Order, any proceeds of causes of action under chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions," and, together with the foregoing in clauses (i) and (ii), the "DIP Collateral", and the liens, pledges, and security interests granted pursuant to this Paragraph 11(b), the "DIP Liens"), but the not the Avoidance Actions themselves, and the DIP Collateral shall further exclude (x) the Excluded Collateral and (y) the PNC Cash Collateral (including the PNC L/C Cash Collateral[4]); provided that: (i) the DIP Liens shall be subordinate to (a) the Carve-Out, (b) the Macquarie Adequate Protection Liens, (c) the Macquarie Facility Liens on the Facilities Priority Shared Collateral, to the extent such liens are valid and perfected as of the Petition Date (the "Prepetition Macquarie First Priority Liens"), (d) certain valid, perfected liens that are senior to the liens securing the Zochem Facility, the Prepetition Macquarie Facility and the Prepetition Senior Secured Notes as of the Petition Date, which are set forth on Schedule 1.01(a) to the DIP Credit Agreement (liens referenced in this clause (d), the "Permitted Prepetition Liens"), (e) with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge provided for in the Supplemental Order of the Canadian Court (as

---

[4] The "PNC L/C Cash Collateral" means cash collateralizing those certain letters of credit issued by PNC Bank, N.A for the benefit of the Debtors, including but not limited to, that certain Letter of Credit No. 18112064 (HH) and that certain Letter of Credit No. 18112054 (HH), which in the aggregate total not less than $7,940,197.65 as of the Petition Date, and that certain Letter of Credit No. 18121075 (Zochem), which totals not less than CAD$422,342.00 as of the Petition Date.

defined in the DIP Documents) in an amount not to exceed CAD$100,000 (the "Administration Charge"), but the DIP Liens shall be senior to any other charges granted by the Canadian Court in the Recognition Proceedings, and (f) the Excluded Collateral. Notwithstanding the foregoing, however, to the extent that the Prepetition Macquarie Facility is repaid in full, the DIP Lenders shall be granted a first priority lien on the Prepetition Macquarie First Priority Liens.  In addition, to the extent that the existing indebtedness of Horsehead Zinc Recycling, LLC is repaid in full, Horsehead Zinc Recycling, LLC shall become a debtor under these chapter 11 cases and the DIP Lenders shall be granted a first priority lien on all assets of Horsehead Zinc Recycling, LLC, subject to customary permitted liens.

(c)     *DIP Liens Senior to Other Liens*.  Other than with respect to the Carve-Out, the Macquarie Adequate Protection Liens, the Prepetition Macquarie First Priority Liens, the Permitted Prepetition Liens, and Administration Charge, the DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date, or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise, or (iii) any liens or deemed trusts that may arise under statute including without limitation the *Pension Benefits Act* (Ontario).

(d)     *Carve-Out.*  For purposes hereof, the "Carve-Out" shall mean the sum of (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to

$50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (including transaction fees or success fees) (the "Professional Fees") incurred, at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined herein), by persons or firms ("Borrower Professionals") retained by the Borrowers pursuant to section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors (the "Creditors' Committee" and, together with the Borrower Professionals, the "Professional Persons") appointed in these chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice, but only to the extent actually earned prior to the delivery of a Carve-Out Trigger Notice and not subsequently disallowed; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $1,250,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim or final compensation order (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap), but only to the extent actually earned after the delivery of a Carve-Out Trigger Notice and not subsequently disallowed; provided, however, that nothing herein shall be construed to impair the ability of any party to object to the reasonableness of any fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) above, on any grounds.  "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Required Lenders to the Borrowers, their lead restructuring counsel, the U.S. Trustee, and

29

lead counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.  On the day on which a Carve-Out Trigger Notice is given by the DIP Agent to the Borrowers, the Carve-Out Trigger shall constitute a demand to the Borrowers to utilize all cash on hand as of such date and any available cash thereafter held by any Borrower to fund a reserve in an aggregate amount equal to the accrued and/or unpaid amounts of the Professional Fees, and the Borrowers shall deposit and hold any such amounts in a segregated account at the DIP Agent or under the exclusive control of the DIP Agent in trust to pay such then unpaid Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims, including DIP Administrative Claims.  The Borrowers shall deposit and hold such amounts in a segregated account at DIP Agent or under the exclusive control of the DIP Agent in trust to pay such Professional Fees benefiting from the Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims, including DIP Superiority Claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve-Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the obligations under the DIP Facility have been paid in full, in which case any such excess shall be paid as directed by this Court.  All funds in the Post-

Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been paid in full, in which case any such excess shall be paid as directed by this Court.

(e)     Following delivery of a Carve-Out Trigger Notice, the DIP Agent and any Prepetition Secured Party shall deposit any cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) in the Carve-Out Reserves until such Carve-Out Reserves have been fully funded, and shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.    Further, notwithstanding anything to the contrary herein, (i) disbursements by the Borrowers from the Carve-Out Reserves shall not constitute loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve-Out Reserves to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out, and (iii) in no way shall the Carve-Out, Post-Carve Out Trigger Notice Cap, Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Borrowers.

(f)     Subject to Paragraph 4 herein and with respect to the Investigation Budget, the Borrowers shall not assert or prosecute, and no portion of the proceeds of the DIP Facility, the DIP Collateral, or the Carve-Out, and no disbursements set forth in the Budget, shall be used for the payment of Professional Fees, disbursements, costs or expenses incurred by any Professional Person, including, without limitation, any

committee appointed in these chapter 11 cases, in connection with (a) preventing, hindering or delaying any of the DIP Agent's, the DIP Lenders' or the Zochem Secured Parties' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, (b) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the obligations under (x) the DIP Facility, the Prepetition Senior Secured Notes, or the Zochem Facility, (y) the liens securing the DIP Facility, the Prepetition Senior Secured Notes, or the Zochem Facility, (z) any other rights or interest of any of the DIP Agent, the DIP Lenders, the Prepetition Senior Secured Noteholders, or the Zochem Secured Parties, or (c) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any Avoidance Actions against the DIP Agent, any DIP Lender, any Prepetition Senior Secured Noteholder, any Zochem Secured Party, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; provided that, an amount not to exceed $75,000 in the aggregate (the "Investigation Budget") of the proceeds of the DIP Facility and the DIP Collateral may be used for the Creditors' Committee to investigate (but not prepare, initiate or prosecute) prepetition liens of, and claims and defenses against, the Prepetition Senior Secured Noteholders so long as it is utilized prior to the termination of the Challenge Period, it being understood that the Investigation Budget shall not constitute part of the Carve-Out.

12.    *Protection of DIP Parties' and Prepetition Senior Secured Notes' Rights.*

(a)    Unless the DIP Agent and DIP Lenders shall have provided prior written consent, or all obligations under the DIP Documents have been paid in full, there shall not be entered in these cases, or in any Successor Cases, any order which authorizes the

32

obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is senior to or *pari passu* with the DIP Liens and/or the DIP Superpriority Claim.

(b)     Unless the requisite Prepetition Senior Secured Notes Parties under the Prepetition Senior Secured Notes Documents shall have provided their prior written consent, or all obligations under the Prepetition Senior Secured Notes Documents have been paid in full, there shall not be entered in these cases, or in any Successor Cases, any order (other than this Interim Order or the Final Order) which authorizes the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is senior to or *pari passu* with the Senior Secured Notes Adequate Protection Liens, the Senior Secured Note Adequate Protection Claims, or the liens under the Prepetition Debt Documents.

(c)     The Debtors (and/or their legal and financial advisors in the case of clauses (a) and (c) below) will, in each case as set forth and subject to the terms of the DIP Documents, including all applicable grace periods:  (a) maintain books, records, and accounts to the extent and as required by the DIP Documents; (b) reasonably cooperate, consult with, and provide to the DIP Agent, DIP Lenders, and the Prepetition Senior Secured Notes Parties all such information and documents as required or allowed under the DIP Documents, the Prepetition Senior Secured Notes Documents and/or the provisions of this Interim Order; and (c) grant representatives of the DIP Agent, DIP Lenders, and the Prepetition Senior Secured Notes Parties reasonable access during

33

normal business hours and upon reasonable prior notice to information (including historical information) and personnel as DIP Agent, DIP Lenders, or the Prepetition Senior Secured Notes Parties may reasonably request from time to time, including, without limitation, regularly scheduled meetings among senior management, company advisors and the DIP Agent, DIP Lenders, and the Prepetition Senior Secured Notes Parties.

13.    *Proceeds of Subsequent Financing.*  Subject to the rights of parties with liens or claims senior to the DIP Claims and Liens (including the Carve Out, the Macquarie Adequate Protection Claims, and, with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge), if at any time prior to the payment in full of all the obligations under the DIP Documents (including subsequent to the confirmation of any Chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of the DIP Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent until payment in full of the obligations under the DIP Documents occurs.

14.    *Disposition of DIP Collateral.*  Unless the obligations under the DIP Documents are paid in full upon the closing of such sale or other disposition, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) outside the ordinary course of business without the prior written consent of the DIP Agent and the DIP Lenders (and no such consent shall be implied from any

other action, inaction, or acquiescence by any DIP Agent or DIP Lender or any order of this Court), except as permitted in the DIP Documents and/or this Interim Order.

15.     *Remedies upon Event of Default.*  The Debtors shall promptly provide notice to the DIP Agent (with a copy to counsel for the Creditors' Committee, if any, the information officer appointed in the Recognition Proceedings and the U.S. Trustee) of the occurrence of any Event of Default.  Upon the occurrence of an Event of Default and following the giving of five (5) business days' written notice (the "DIP Enforcement Notice") to the Debtors, counsel for the Creditors' Committee, if any, and the U.S. Trustee (the "DIP Notice Period"), the DIP Lenders and the DIP Agent may exercise any remedies available to them under this Interim Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to foreclosing upon the DIP Collateral or otherwise enforcing the DIP Obligations and the DIP Claims and Liens on any or all of the DIP Collateral and/or exercising any other default-related remedies under the DIP Credit Agreement, this Interim Order or applicable law in seeking to recover payment of the DIP Obligations.  Unless this Court orders otherwise during the DIP Notice Period (unless such period may be extended by this Court), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated at the end of the DIP Notice Period, without further notice or order of the Court, and the DIP Lenders and the DIP Agent shall be permitted to exercise all rights and remedies set forth in this Interim Order, the DIP Documents, and as otherwise available at law without further order or application or motion to this Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code, including, without limitation, (i) immediately terminate the Debtors' limited use of any Cash Collateral; (ii) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Agent or DIP Lenders, but without affecting any of the

35

DIP Obligations or the liens securing the DIP Obligations; (iii) declare all DIP Obligations to be immediately due and payable; (iv) freeze monies or balances in the Debtors' accounts; and (v) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Agent or DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; provided, however, that PNC shall have no liability to the Debtors, their estates, or any other lienholder on the deposit accounts for following any direction notice received from the DIP Agent, provided further, however, that any enforcement action taken under this Paragraph shall be subject to PNC's right to receive required fees and charges for disallowed items as prescribed by the applicable depository account agreements and/or cash management agreements.

16.     *Entitlement to Adequate Protection (Prepetition Senior Secured Notes Parties)*. The Prepetition Senior Secured Notes Parties are entitled to adequate protection of their interests in the Prepetition Senior Secured Notes Collateral as of the Petition Date in an amount equal to the aggregate postpetition diminution in value, if any, of such interests from and after the Petition Date, consisting of any such diminution resulting from the use by the Debtors of such Prepetition Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Facility and the granting of the priming liens and claims with respect thereto, the subordination of the Prepetition Collateral to the Carve-Out, and the use of the Cash Collateral pursuant to this Interim Order (such diminution in value, the "Senior Secured Notes Adequate Protection Obligations").  All distributions made on account of the Senior Secured Notes Adequate Protection Obligations shall be made and applied

in accordance with the Prepetition Senior Secured Notes Documents, including the Intercreditor Agreement. The Prepetition Senior Secured Notes Parties shall be, and hereby are, granted the following forms of adequate protection:

(a)    Senior Secured Notes Adequate Protection Claim.    An allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on account of the Adequate Protection Obligations (as defined herein) (the "Senior Secured Notes Adequate Protection Claim"). Subject and junior in priority in all respects to the Carve-Out, the DIP Superpriority Claim, the Administration Charge and the Macquarie Adequate Protection Claims, and with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge, the Senior Secured Notes Adequate Protection Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses, adequate protection or diminution claims (in each case other than the Carve-Out, the DIP Superpriority Claim and the Macquarie Adequate Protection Claims, and with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge), unsecured claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment,

37

payable from and with recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. Except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of any Senior Secured Notes Adequate Protection Claim unless and until all DIP Obligations shall have indefeasibly been paid in full in cash or otherwise satisfied in a manner acceptable to the DIP Lenders and until the Carve-Out shall have been satisfied as provided herein; provided that the Senior Secured Notes Adequate Protection Claim shall not have recourse to proceeds from the Excluded Accounts.

(b)    Senior Secured Notes Adequate Protection Liens. Subject and junior in priority in all respects to the Carve-Out, the Administration Charge, the DIP Liens, the Permitted Prepetition Liens, the Prepetition Macquarie First Priority Liens and the Macquarie Adequate Protection Liens (as defined herein), effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Prepetition Senior Secured Notes Secured Parties, the following security interests and liens are hereby granted to the Prepetition Senior Secured Notes Parties (all such liens and security interests, the "Senior Secured Notes Adequate Protection Liens"); provided that the Senior Secured Notes Adequate Protection Liens shall not encumber the Excluded Collateral or the PNC Cash Collateral;

(i)    *Liens on Unencumbered Property.* Subject and junior in priority in all respects to the Carve-Out, the DIP Liens, the Administration Charge and the

38

Macquarie Adequate Protection Liens, pursuant to sections 361(2) and 363(c)(2)

of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected,

non-avoidable additional and replacement liens on, and security interests in, all

property (including any previously unencumbered property), whether now owned

or hereafter acquired or existing and wherever located, of each Debtor and each

Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code),

of any kind or nature whatsoever, real or personal, tangible or intangible, and now

existing or hereafter acquired or created, including, without limitation, all cash,

accounts, inventory, goods, contract rights, instruments, documents, chattel paper,

patents, trademarks, copyrights, and licenses therefor, accounts receivable,

receivables and receivables records, general intangibles, payment intangibles, tax

or other refunds, insurance proceeds, letters of credit, owned real estate, real

property leaseholds, fixtures, deposit accounts, commercial tort claims, securities

accounts, instruments, investment property, letter-of-credit rights, supporting

obligations, machinery and equipment, real property, leases (and proceeds from

the disposition thereof), all of the issued and outstanding capital stock of each

Debtor, other equity or ownership interests, including equity interests in

subsidiaries and non-wholly-owned subsidiaries, money, investment property,

Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions,

accessions, and profits of any of the collateral described above, documents,

vehicles, intellectual property, securities, partnership or membership interests in

limited liability companies and capital stock, including, without limitation, the

products, proceeds and supporting obligations thereof, whether in existence on the

39

Petition Date or thereafter created, acquired, or arising and wherever located (all such property in each case that is not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code); provided that, such liens shall encumber the proceeds of Avoidance Actions (but not the Avoidance Actions themselves) only upon entry of the Final Order and such liens shall not encumber the Excluded Collateral and the PNC Cash Collateral.

(ii)    *Liens Junior to Certain Existing Liens.*  Subject and junior in priority in all respects to the Carve-Out, the DIP Liens, the Administration Charge, and the Macquarie Adequate Protection Liens, a valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims,

securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether now existing or hereafter acquired, that is only subject to (x) valid, perfected, non-avoidable and enforceable liens in existence immediately prior to the Petition Date or (y) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code. For the avoidance of doubt, any and all liens granted as adequate protection to the Prepetition Senior Secured Noteholders on the Prepetition Collateral shall be junior in all respects to the Carve-Out, the DIP Liens, the Macquarie Facility Adequate Protection Liens, the Administration Charge, the Prepetition Macquarie First Priority Liens, and the Permitted Prepetition Liens.

(c)     Right to Seek Additional Adequate Protection.   This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Senior Secured Note Parties to request additional forms of

adequate protection during the continuation of a Termination Event, or the rights of all parties (including the Debtors) to oppose such relief.

17.     *Entitlement to Adequate Protection (Prepetition Macquarie Facility Parties).*  The Prepetition Macquarie Facility Parties are entitled to adequate protection of their interests in the Prepetition Collateral (it being understood that the Prepetition Macquarie Facility Parties' interests extend to the Cash Collateral) as of the Petition Date in an amount equal to the aggregate postpetition diminution in value, if any, of such interests from and after the Petition Date, consisting of any such diminution resulting from the use by the Debtors of such Prepetition Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Facility, and the use of the Cash Collateral pursuant to this Interim Order (such diminution in value, the "Macquarie Facility Adequate Protection Obligations" and, together with the Senior Secured Notes Adequate Protection Obligations and the Zochem Adequate Protection Obligations (as defined herein), the "Adequate Protection Obligations").  For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Macquarie Facility Adequate Protection Liens and the Macquarie Facility Adequate Protection Claim (each as defined herein) shall be junior to the Carve-Out and the Administration Charge in all respects.  The Prepetition Macquarie Facility Parties shall be, and hereby are, granted the following forms of adequate protection:

(a)     Macquarie Facility Adequate Protection Claim.  Solely in an amount equal to the aggregate postpetition diminution in value of the Prepetition Macquarie Lenders' interests in the Prepetition Collateral, an allowed super-priority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on account of the Macquarie

Facility Adequate Protection Obligations (the "<u>Macquarie Facility Adequate Protection Claim</u>").  Subject and junior in priority in all respects only to the Carve-Out, the Administration Charge, the Macquarie Facility Adequate Protection Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment; <u>provided that</u> notwithstanding anything herein to the contrary, the Macquarie Adequate Protection Claim shall have no recourse to the proceeds of Avoidance Actions or proceeds from Excluded Collateral or the PNC Cash Collateral.

(b)     <u>Macquarie Facility Adequate Protection Liens</u>.  Subject and junior in priority in all respects to the Carve-Out, the Administration Charge, and duly perfected Permitted Prepetition Liens that are senior to the Prepetition Macquarie First Priority Liens as of the Petition Date, and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Prepetition Macquarie Facility Parties, the following security interests and liens are hereby granted to the Prepetition Macquarie Facility Parties (all such liens and security interests, the "<u>Macquarie Facility Adequate Protection Liens</u>") a

43

valid, binding, continuing, enforceable, fully-perfected, non-avoidable senior priority replacement lien on, and security interest in, all DIP Collateral; provided that, the Macquarie Facility Adequate Protection Liens shall not encumber the Avoidance Actions or proceeds from Avoidance Actions or the Excluded Collateral or the PNC Cash Collateral.

18.    *Release*.  Effective upon entry of the Interim Order as to the DIP Parties and otherwise subject to the expiration of the Challenge Period, each of the Debtors, and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns (collectively, the "Releasors") shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Zochem Secured Parties, the Prepetition Senior Secured Notes Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, predecessors and predecessors in interest, each in their capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract (under U.S. or Canadian laws), of every nature and description that exist on the date hereof arising out of, relating to, or in connection with any of the (a) Prepetition

Senior Secured Notes Documents or the transactions contemplated under such documents (subject to the Challenge Period and the Retained Claims Challenge Period), (b) the Zochem Facility, the Zochem Credit Agreement, and the Other Zochem Documents, and (c) the DIP Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the liens of the Prepetition Senior Secured Note Parties, subject to the Retained Claims Challenge Period.

19.    *Termination.*  The Debtors' right to use the Cash Collateral and proceeds of the DIP Financing Loans pursuant to this Interim Order shall automatically terminate (the date of any such termination, the "Termination Date") (unless such period is extended by the DIP Lenders) on the occurrence of any of the events set forth in Paragraphs 19(a) through Paragraph 19(b) below (unless waived by the DIP Lenders or Macquarie, as applicable) (the events set forth in Paragraph 19(a)-19(f) below are collectively referred to herein as the "Termination Events"), in each case without limiting grace periods provided under the DIP Credit Agreement (but without duplication of such grace periods):

(a)    the Debtors' failure to comply with the adequate protection provisions or the covenants and other Adequate Protection Obligations of the Debtors contained in this Interim Order upon three (3) business day's written notice and an opportunity cure;

(b)    any Event of Default under the DIP Documents that is not waived by the DIP Lenders.  For the avoidance of doubt, such Events of Default include, but are not limited to, failure by the Debtors to timely achieve any of the following milestones:

45

(i)      Entry of this Interim Order within three (3) days of the Petition Date;

(ii)     Entry of the Interim DIP Recognition Order (as defined in the DIP Documents) within four (4) days of the Petition Date;

(iii)    Entry of the Final Order within twenty-one (21) days of the Petition Date;

(iv)     Entry of the Final DIP Recognition Order (as defined in the DIP Documents) within twenty-three (23) days of the Petition Date;

(v)      Filing of a plan of reorganization that is acceptable to the Required Lenders and the Ad Hoc Group, on the one hand, and the Borrowers, on the other hand (an "Acceptable Plan") and disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with this Court within forty (40) days of the Petition Date;

(vi)     Entry by this Court of an order approving the Disclosure Statement within seventy-five (75) days of the Petition Date;

(vii)    Entry by the Canadian Court (as defined in the DIP Documents) of an order recognizing the order approving the Disclosure Statement within seventy-seven (77) days of the Petition Date;

(viii)   Entry by this Court of an order confirming the Acceptable Plan within 115 days of the Petition Date;

(ix)     Entry by the Canadian Court of an order recognizing the order confirming the Acceptable Plan within 117 days of the Petition Date; and

(x)     Consummation of the Acceptable Plan within 130 days of the Petition Date;

(c)     the Maturity Date;

(d)     with respect to the updated Budget to be delivered on or prior to the third business day after the tenth week covered by the initial Budget, delivery of an updated Budget that is not satisfactory to the Required Lenders for whatever reason, in their sole discretion;

(e)     the Debtors seek any amendment, modification, or extension of this Interim Order without the prior written consent of the DIP Agent and the DIP Lenders, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent or DIP Lenders;

(f)     default shall be made by Borrower or any Guarantor in the due observance or performance of any term, condition or obligation contained in the DIP Orders, the Interim DIP Recognition Order or the Final DIP Recognition Order in each case beyond any grace period for such specific default set forth therein or herein, other than any such default of an administrative or procedural nature which is cured within 3 days after the earlier of (x) notice by the Administrative Agent or the Required Lenders or (y) knowledge of such default by any of the Borrower Parties;

(g)     Upon the occurrence and during the continuation of a Termination Event, upon written notice to the Debtors, the counsel to the DIP Agent, and counsel to the DIP Lenders (with a copy to counsel to any Committee appointed in the Bankruptcy Cases and the U.S. Trustee), and upon five (5) Business Days' prior written notice, Macquarie may in its sole discretion exercise remedies in accordance with the Macquarie Credit

Agreement and this Interim Order (including by collecting accounts receivable and applying the proceeds thereof to the Prepetition Macquarie Debt Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral or the Prepetition Collateral); provided that the Debtors may seek relief from the Court within such five (5) Business Days period with respect to such Termination Event asserted by Macquarie.

20.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    Without regard to the terms of section 362 of the Bankruptcy Code regarding the automatic stay, the DIP Agent or the Prepetition Secured Agents, as applicable, are each hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted on account of the DIP Liens and the Adequate Protection Obligations hereunder. Whether or not the DIP Agent or the Prepetition Secured Agents, as applicable, shall, in their respective sole discretion, file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, subordination, contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law as of the date of entry of this Interim Order. If the DIP Agent or the

any of the Prepetition Secured Agents, as applicable, determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings as reasonably requested by the DIP Agent or the Prepetition Secured Agents and the automatic stay shall be modified to allow such filings.

(b)    DIP Agent or the Prepetition Secured Agents as applicable, may, in their discretion, cause a certified copy of this Interim Order to be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

21.    Subject to the terms and conditions of the DIP Documents, the Debtors shall promptly execute and deliver to the DIP Agent or the Prepetition Secured Agents, as applicable, all such agreements, financing statements, instruments and other documents as the DIP Agent or the Prepetition Secured Agents, as applicable, may reasonably request in writing to evidence, confirm, validate, or perfect the DIP Liens and the Adequate Protection Liens, as applicable.

22.    *Zochem Payoff.*

(a)    The Debtors are authorized to and shall pay the Zochem Debt Obligations, including, without limitation, cash collateralization of the Zochem letters of credit, to the Zochem Agent and provide certain cash collateral in an amount not to exceed $150,000 as security for indemnity and expense obligations of the Borrower under the Zochem Credit Agreement (the "Payoff Indemnity Account"), including all legal fees and expenses of the Zochem Agent and the right to indemnification of the Zochem Secured Parties incurred or arising in the Bankruptcy Cases (and the Zochem Secured Parties are permitted to be paid for such legal fees and expenses from time to time upon submission of a summary invoice to the

49

Debtors, the Creditors' Committee, and the Office of the United States Trustee), and the Zochem Secured Parties are hereby granted, as adequate protection for such indemnity and expense obligations, replacement liens (without the necessity of filing any lien perfection documents or charges) on the DIP Collateral securing the Zochem Debt Obligations including all indemnity and expense reimbursement obligations under the Zochem Credit Agreement (collectively, the "Zochem Adequate Protection Liens") and an administrative claim in each of the Debtors' chapter 11 cases ("Zochem Adequate Protection Claim" collectively with the Zochem Adequate Protection Liens, the "Zochem Adequate Protection Obligations"), and the Debtors shall obtain from the Canadian Court a Recognition Order recognizing the enforceability of this Interim DIP Order in the Canadian Court; provided that, the (x) the Zochem Adequate Protection Liens shall be automatically released and of no force and effect and any unused balance held in the Payoff Indemnity Account shall be promptly released to the Debtors upon expiration of the Challenge Period where no Challenge has been timely filed with respect to the Zochem Facility and/or the Zochem Secured Parties and (y) the Zochem Adequate Protection Liens shall be junior in priority to the DIP Liens, the Prepetition Senior Secured Notes Liens, Senior Secured Notes Adequate Protection Liens, and any liens that are senior to the DIP Liens (including the Carve Out, the Macquarie Adequate Protection Liens, and with respect to all DIP Collateral of the Debtors located in Canada, the Administration Charge) or that are senior to the prepetition liens securing the Zochem Debt Obligations.

(b)     For the avoidance of doubt, repayment of the Zochem Debt Obligations shall be conditional and subject to disgorgement, in whole or in part, pending expiration of the applicable Challenge Period with respect to the admissions, stipulations, and agreements set forth at Paragraph 5 hereof.

23.    *Preservation of Rights Granted Under this Interim Order.*

(a)    Notwithstanding any order dismissing any of these chapter 11 cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, but subject to the Carve-Out and the Administration Charge in all respects, (x) the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, the Zochem Adequate Protection Liens, the Zochem Adequate Protection Claim, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and the Adequate Protection Obligations shall have been indefeasibly paid and satisfied in full in cash, as applicable, and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(b)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect: (i) the validity, priority, or enforceability of the DIP Liens, Zochem Adequate Protection Liens, or DIP Obligations or any Adequate Protection Obligations incurred prior to the actual receipt of written notice by counsel to the DIP Agent (with respect to the DIP Obligations) and counsel to the Prepetition Secured Agents and counsel to the Zochem Secured Parties, of the effective date of such reversal, stay, modification or vacatur; or (ii) the validity, priority or enforceability of the DIP Liens and the Adequate Protection Liens, as applicable.  Notwithstanding any such reversal, stay, modification or vacatur, any use of the Prepetition Collateral (including the Cash Collateral), the DIP Liens, or the Adequate Protection Obligations incurred by the Debtors hereunder, as the case may be,

prior to the actual receipt of written notice by counsel to the DIP Agent (with respect to the DIP Obligations) and counsel to the Prepetition Secured Agents (with respect to the Adequate Protection Obligations) of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders, the DIP Agent, the Zochem Secured Parties, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 363(m) of the Bankruptcy Code with respect to all uses of the Prepetition Collateral (including the Cash Collateral), all Adequate Protection Obligations, and the DIP Obligations.

(c)    Except as expressly provided in this Interim Order, and subject to the Carve-Out, the Administration Charge, the DIP Liens, the Zochem Adequate Protection Liens, and the Adequate Protection Liens and all other rights and remedies of the DIP Lenders, Zochem Secured Parties, and the Prepetition Secured Parties granted by the provisions of this Interim Order shall survive, and shall not be modified, impaired, or discharged by the entry of an order converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of these chapter 11 cases. The terms and provisions of this Interim Order shall continue in these chapter 11 cases and in any Successor Cases, and the DIP Liens, Zochem Adequate Protection Liens, Zochem Adequate Protection Claim, and the Adequate Protection Liens, the DIP Superpriority Claim, and the other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the DIP Agent, the DIP Lenders, Zochem Secured Parties, and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect.

24.    *Effect of Stipulations.*  The Debtors' acknowledgments, stipulations, and releases set forth in Paragraphs 4, 5, 6, and 18 of this Interim Order (collectively, the "Stipulations") shall be binding on the Debtors, the Debtors' estates, and their respective representatives, successors, and assigns and, subject to any action timely commenced before the expiration of the Challenge Period by: (x) the Creditors' Committee, if any; or (y) a party in interest with requisite standing other than the Creditors' Committee, if any, on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors, and assigns, including any trustee appointed or elected for any of the Debtors, whether such trustee or representative is appointed in chapter 11 or chapter 7 (a "Trustee").  The Stipulations contained in this Interim Order, including in Paragraphs 4 through 6 hereof, shall be binding upon all other parties in interest, including any Trustee, unless (a) the Creditors' Committee, if any, or any other party in interest (including any Trustee), in each case, with requisite standing, has duly filed an adversary proceeding (each, a "Challenge") challenging the validity, enforceability, allowability, priority or extent of the Prepetition Notes Obligations or the Prepetition Senior Secured Notes Liens, or the Zochem Debt Obligations or prepetition liens on the Zochem Collateral, as applicable, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Notes Parties or Zochem Secured Parties, as applicable, in connection with any matter related to the Prepetition Notes Obligations, Prepetition Notes Senior Secured Notes Collateral, or the Zochem Debt Obligations or the Zochem Collateral, as applicable, by no later than the latest of (i) in the case of a Challenge commenced by a party in interest other than a Committee, seventy-five (75) days after the date of entry of this Interim Order, (ii) in the case of a Challenge commenced by a Creditors' Committee, sixty (60) days after the appointment of such Creditors'

53

Committee, and (iii) any such later date agreed to in writing by (x) the Zochem Agent under the Zochem Facility, with respect to the stipulations set forth in Paragraphs 5 and Paragraph 18 (with respect to the Zochem Secured Parties and their related Releasees) hereof, or (y) the Ad Hoc Group (as defined herein) with respect to the Stipulations set forth in Paragraph 4, 6, and 18 hereof (with respect to all Releasees other than the Zochem Secured Parties and the Zochem Secured Parties' related Releasees), as applicable, each in their respective sole and absolute discretion (the time period established by the latest of the foregoing clauses (i), (ii), and (iii), the "Challenge Period"); provided, however, that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these chapter 11 cases, then, in each such case, the Challenge Period shall be extended for a period of sixty (60) days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding. If no such Challenge is timely filed prior to the expiration of the Challenge Period, without further order of this Court (x) the Prepetition Notes Obligations and the Zochem Debt Obligations, as applicable, shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law), for all purposes in these chapter 11 cases and any subsequent chapter 7 case; (y) the Prepetition

Notes Obligations, the Prepetition Notes Parties, and the Prepetition Senior Secured Notes Liens, and the Zochem Debt Obligations, Zochem Secured Parties, and the prepetition liens on the Zochem Collateral, as applicable, shall not be subject to any other or further challenge, including, without limitation, any Claims and Defenses, which shall be deemed to be forever waived and barred, and all parties in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); and (z) all of the findings, the Debtors' stipulations, waivers, releases, and affirmations hereunder shall be of full force and effect and forever binding upon the applicable Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in these cases and any Successor Cases. If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Interim Order, including in Paragraph 4 hereof, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Creditors' Committee, if any, and any other Person (as defined in the Prepetition Senior Secured Notes Documents) or party in these cases, including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding. Notwithstanding anything contained herein to the contrary, the challenge period as it pertains to any Retained Claims shall be 150 days after the date of entry of this Interim Order (the "Retained Claims Challenge Period"). If the Retained Claims are not commenced prior to the expiration of the Retained Claims Challenge Period, the Mooresboro Senior Secured Notes Lien shall be deemed valid and enforceable as against the Debtors' bankruptcy estates and all creditors, interest holders and other parties in these cases and any Successor Cases, and shall not otherwise be avoidable or subject to any other

or further challenge, and such Retained Claims shall be deemed forever waived and barred, and all parties in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Retained Claims Challenge Period). Nothing in this Interim Order vests or confers on any Person, including a Creditors' Committee (if any) or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

25.    *Limitation on Charging Expenses Against Collateral.*  As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents, (a) no costs or expenses of administration of these chapter 11 cases, any Successor Cases or any other future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Prepetition Senior Secured Note Collateral or the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or equity without the prior written consent of the DIP Agent, the DIP Lender, or, subject to entry of the Final Order, the Prepetition Senior Secured Notes Parties, as applicable, (b) no such consent or waiver shall be implied from any further action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Notes Parties, and (c) any exercise of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the chapter 11 cases or any Successor Cases from or against the DIP Collateral, the Prepetition Senior Secured Note Collateral or the Cash Collateral shall be prohibited and shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Agent's and DIP Lenders' other interests in the DIP Collateral and the Prepetition Senior

Secured Note Liens and the Prepetition Secured Parties' other interests in the Prepetition Collateral, the Cash Collateral and the Adequate Protection Liens accorded the Prepetition Secured Parties; provided that the foregoing shall not limit nor be deemed to limit the rights of the Debtors or parties in interest to seek such a surcharge solely with respect to Prepetition Macquarie Debt Obligations to the maximum extent permitted by section 506(c) of the Bankruptcy Code.

26.    *Limitations under Section 552(b) of the Bankruptcy Code*.  The Prepetition Senior Secured Notes Parties (upon entry of the Final Order), the DIP Agent, and the DIP Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Senior Secured Notes Parties, the DIP Agent, and the DIP Lenders with respect to (i) proceeds, products, offspring or profits of any of the Prepetition Senior Secured Notes Collateral (upon entry of the Final Order) or the DIP Collateral, as applicable, or (ii) the extension of the Senior Secured Notes Adequate Protection Liens and the Macquarie Facility Adequate Protection Liens to cover proceeds of the Prepetition Senior Secured Notes Collateral.

27.    *Credit Bidding*.  Subject to and upon entry of this Interim Order: (i) the DIP Agent shall have the right to credit bid as part of any asset sale process or plan sponsorship process and shall have the right to credit bid the full amount of their claims during any sale of the Debtors' assets (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code; and (ii) the Debtors acknowledge that the Prepetition Senior Secured Notes Collateral Agent shall have the right to credit bid as part of any asset sale process or plan sponsorship process and shall have the right to

credit bid the full amount of their claims during any sale of the Debtors' assets (in whole or in part) with respect to any asset subject to a duly perfected lien in favor of the Prepetition Senior Secured Notes Collateral Agent as of the Petition Date, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code; provided that such relief will be binding on the Debtors' estates and all parties in interest upon entry of the Final Order.

28. *Marshaling*. Subject to entry of the Final Order, none of the DIP Collateral, the DIP Lenders, the DIP Agent, the Prepetition Senior Secured Notes Collateral or the Prepetition Senior Secured Noteholders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine.

29. *Information and Other Covenants*. The Debtors shall comply with the reporting requirements set forth in the DIP Credit Agreement, together with such additional information as the DIP Agent may reasonably request from time to time. The Debtors shall maintain their cash management arrangements in a manner consistent with that described in Cash Management Motion and any successor or final orders with respect thereto.

30. *Insurance Policies*. Upon entry of this Interim Order, the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

31. *Expenses and Indemnification*. All reasonable and documented out-of-pocket expenses (including but not limited to reasonable legal fees and expenses (which shall include the fees and expenses of one primary counsel for each of the DIP Agent, the DIP Lenders and

Greywolf Capital Management, LP ("Greywolf") and one local counsel in each applicable jurisdiction for each of the DIP Agent, the DIP Lenders and Greywolf), reasonable and documented out-of-pocket fees and expenses of one financial advisor for the DIP Lenders, reasonable and documented out-of-pocket fees and expenses of one or more operational consultants for the DIP Lenders, expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) and administrative fees and "seasoning fees" of the DIP Agent and its affiliates and the DIP Lenders in connection with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the DIP Credit Agreement and the DIP Documents, whether or not the DIP Facility is successfully consummated, and in connection with the syndication of the DIP Facility and all collateral appraisals and field exams prepared or conducted by or on behalf of the DIP Agent or the DIP Lenders are to be paid by the Debtors in cash promptly upon submission of invoices therefor.  In addition, all reasonable and documented out-of-pocket fees, costs and expenses (including but not limited to reasonable and documented legal fees and expenses (which shall include the fees and expenses of one primary counsel for each of the DIP Agent and the DIP Lenders and one local counsel in each applicable jurisdiction for each of the DIP Agent and the DIP Lenders) and a financial advisor for the DIP Lenders) of the DIP Agent and the DIP Lenders for workout proceedings, enforcement costs and documentary taxes associated with the DIP Facility are to be paid by the Debtors in cash promptly upon submission of invoices therefor.  The Debtors shall also reimburse the ad hoc group of Prepetition Senior Secured Noteholders (the "Ad Hoc Group") and Greywolf for reasonable and documented out-of-pocket fees and expenses for one financial advisor, one or more operational consultants and legal advisors (including one primary counsel for each of the

group and Greywolf, and local counsel in each applicable jurisdiction for the group), and the obligation of the Debtors to reimburse such fees and expenses shall continue and survive the termination and payment in full of the DIP Facility, but shall terminate upon payment in full in cash of all obligations under the Prepetition Senior Secured Notes. All fees and expenses described above shall be payable by the Debtors whether accrued or incurred prior to, on, or after the Petition Date; underline provided that the Debtors shall promptly provide copies of the invoices related to such fees and expenses to the U.S. Trustee and the U.S. Trustee shall have ten (10) days from receipt of such invoices to raise an objection. If the U.S. Trustee raises an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Court shall hear and determine such dispute. In addition, the Debtors will indemnify the DIP Lenders, the DIP Agent and their respective affiliates, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any (which shall include the fees and expenses of one primary counsel for each of the DIP Agent and the DIP Lenders and one local counsel in each applicable jurisdiction for each of the DIP Agent and the DIP Lenders, and any additional counsel to the extent reasonably required due to actual or perceived conflicts) actual or proposed use of the proceeds of any loans made under the DIP Facility; provided, however, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the (x) gross negligence or willful misconduct of such person (or their related persons) or a (y) a material breach of the obligations of such person (other than the DIP Agent or any sub-agent thereof) under the DIP Documents.

32.    *Limitation on Use of the DIP Facility, the DIP Collateral, and the Prepetition Collateral (Including the Cash Collateral).*  The Debtors shall use the proceeds of the DIP Facility and the Prepetition Collateral, including the Cash Collateral, as provided in this Interim Order, consistent with the Budget (including any permitted variances with respect thereto), and the DIP Documents.  Notwithstanding anything herein or in any other order of this Court to the contrary, neither the DIP Facility, the DIP Collateral, the Prepetition Senior Secured Note Collateral, including the Cash Collateral, nor the Carve-Out (other than the Investigation Budget) may be used to (a) object, contest, or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Senior Secured Notes Documents, the Zochem Facility, or the liens or claims granted under this Interim Order, the DIP Documents or Prepetition Senior Secured Note Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Senior Secured Notes Parties, the Zochem Secured Parties, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's, the Prepetition Secured Agents', or the Zochem Secured Parties' assertion, enforcement, or realization on the Prepetition Collateral, the DIP Collateral, the Zochem Collateral, or Zochem Adequate Protection Obligations, as applicable, in accordance with the DIP Documents, the Prepetition Debt Documents or this Interim Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders or the Prepetition Senior Secured Note Agent hereunder or under the DIP Documents or the Prepetition Senior Secured Notes Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted

61

under the DIP Documents; provided, however, that notwithstanding anything to the contrary herein, the Debtors shall not be authorized to use the DIP Facility or DIP Collateral to pay fees or expenses in excess of the Investigation Budget for the Creditors' Committee, if any, to investigate Claims and Defenses against the Prepetition Senior Secured Note Parties or the Prepetition Unsecured Note Parties before the termination of the Challenge Period, or to initiate or prosecute proceedings or actions on account of any Claims or Defenses against the Prepetition Senior Secured Note Parties or the Prepetition Unsecured Notes Parties.

33.    *Draws on Letters of Credit; Modification of Automatic Stay.*  To the extent there is one or more draws on the letters of credit issued by PNC to the Debtors, the automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to permit PNC to use the PNC L/C Cash Collateral to fund the draws from time to time on the letter(s) of credit or to reimburse itself for any draws on the letter(s) of credit from time to time, and any lien on any such cash collateral shall be discharged without notice to any party including any junior lienholders.

34.    *No Standing Granted.*  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee or any other statutory committee appointed in these chapter 11 cases, standing or authority to pursue any Claims and Defenses or other causes of action belonging to the Debtors or their estates with respect to the Prepetition Debt Documents or any obligations arising thereof.

35.    *Binding Effect; Successors and Assigns.*  The provisions of this Interim Order, the DIP Credit Agreement, and the other DIP Documents shall be binding upon all parties in interest in the Debtors' chapter 11 cases and any Successor Cases, including the Prepetition Secured Parties, any Creditors' Committee, the Debtors and their respective successors and assigns

(including any Trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of the DIP Agent and the Zochem Secured Parties.

36.    *Modifications of DIP Documents.*  The Debtors and the DIP Parties are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent) of the DIP Documents (other than this Interim Order and the Final Order) without further notice, motion or application to, order of or hearing before, this Court. Any material modification or amendment to the DIP Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon notice to counsel for the Creditors' Committee, if any, the U.S. Trustee, the Prepetition Secured Agents and the Prepetition Unsecured Notes Indenture Trustee, including with respect to any fees or expenses payable by the Debtors in connection with such modification; provided, however, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Documents shall not require an order of this Court.

37.    *Limitation of Liability.*  In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents or the Prepetition Senior Secured Note Documents, the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Note Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or

operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order, the DIP Documents, or the Prepetition Senior Secured Note Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Note Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

38.    *Rights Reserved.*  Notwithstanding anything herein to the contrary, but subject to Paragraphs 11-14 hereof, no term or provision of this Interim Order or the Budget shall prejudice the rights or interests of any party in interest with respect to the Intercreditor Agreement or the rights of offset or recoupment of any party.

39.    *Choice of Law; Jurisdiction.*  The DIP Facility and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code, except for certain security documents to be delivered by Zochem, which will be governed by applicable Canadian law.  The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or DIP Documents.

40.    *Controlling Effect of Interim Order.*  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion or the DIP Documents, the provisions of this Interim Order shall control.

64

41.     *No Waiver.*   The failure of the DIP Agent or DIP Lenders to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Documents, or otherwise (or any delay in seeking or exercising same), shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Interim Order shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition Notes Party or any of the DIP Agent, DIP Lenders, or the Zochem Secured Parties.  Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the Prepetition Notes Parties or the DIP Agent or DIP Lenders or the Zochem Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of these cases to cases under chapter 7, dismissal of the cases, or the appointment of a trustee in these cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any Chapter 11 plan or plans with respect to any of the Debtors, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Agent, DIP Lenders, the Prepetition Notes Parties, or the Zochem Secured Parties, respectively.

42.     *No Third Party Rights.*   Except as explicitly provided for herein or in any DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Documents or otherwise) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent and DIP Lenders shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

43. *Jurisdiction.* This Court shall retain jurisdiction to enforce the terms of this Interim Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Interim Order.

44. *Zochem's Obligations.* Notwithstanding anything herein to the contrary, Zochem's obligations with respect to the DIP Facility, including the DIP Claims and Liens, shall not exceed $25,000,000.00 pending further order of the Court.

45. *Interim Borrowings.* Notwithstanding anything herein to the contrary, the Debtors' borrowings under the DIP Credit Agreement shall not exceed $38,500,000.00 pending further order of the Court.

46. *Final Hearing.* The Final Hearing shall be heard before this Court on February 22, 2016 at 3:00 p.m., prevailing Eastern Time in Courtroom No. 6 (Fifth Floor) at the United States Bankruptcy Court, 824 Market Street, Wilmington, DE 19801.

47. *Objections.* Any objections or responses to entry of the Final Order shall be filed on or before 12:00 p.m., prevailing Eastern Time, on February 18, 2016, and shall be served on: (a) the Debtors, 4955 Steubenville Pike, Suite 405, Pittsburgh, Pennsylvania 15205, Attn: Gary R. Whitaker; (b) proposed counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Ryan Preston Dahl, Esq. and Angela M. Snell, Esq.; (c) proposed co-counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn: Laura Davis Jones, Esq.; (d) counsel to the Prepetition Senior Secured Notes Indenture Trustee, Waller Lansden Dortch & Davis, LLP, Nashville City Center, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, Attn: Beth E. Vessel; (e) counsel to the Prepetition Macquarie Facility Agent, Stroock & Stroock & Lavan LLP, Attn: Mark A. Speiser; (f) counsel

to the Prepetition Unsecured Note Indenture Trustee, Waller Lansden Dortch & Davis, LLP, Nashville City Center, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, Attn: Beth E. Vessel; (g) counsel to the DIP Agent, Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut 06103, Attn: Nathan Z. Plotkin; (h) counsel to the DIP Lenders, Akin Gump Strauss Hauer & Held, One Bryant Park, New York, New York 10036, Attn: Michael S. Stamer and Meredith A. Lahaie; (i) counsel to any statutory committee appointed in these cases; (j) counsel to PNC Bank, N.A., Blank Rome LLP, 1200 Market Street, Wilmington, Delaware 19801, Attn: Regina Stango Kelbon; (k) counsel to any statutory committee appointed in these cases; and (l) Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Timothy J. Fox, Esq.  In the event no objections to entry of the Final Order are timely received, this Court may enter such Final Order without need for the Final Hearing.

Dated: Feb. 4 , 2016
      Wilmington, Delaware

UNITED STATES BANKRUPTCY JUDGE