# EXHIBIT 1

**Engagement Letter**

KE 40042956.5

# LAZARD

As of December 3, 2015

Horsehead Holding Corp
4955 Steubenville Pike, Suite 405
Pittsburgh, PA 15205

Attention:   James Hensler
             Chairman, Chief Executive Officer and President

Dear Ladies and Gentlemen:

This letter agreement (the "Agreement") confirms the understanding and agreement between Lazard Middle Market LLC ("LMM") and Horsehead Holding Corp. ("Horsehead") and its controlled subsidiaries (collectively with any entity formed or used for the purposes set forth herein, the "Company").

*Assignment Scope:*

The Company hereby retains LMM as its sole investment banker to provide Horsehead with general financial advice and to advise it in connection with any Financing, Amendment, and if so requested any Restructuring or Sale Transactions (each as defined below) on the terms and conditions set forth herein. A separate engagement letter with LMM's affiliate Lazard Frères & Co. LLC ("LF&Co.") will be provided for the potential Convertible Notes exchange offer transaction. By signing this Agreement, we hereby accept our appointment as investment banker under the terms hereof.

*Definitions:*

As used in this Agreement:

- "Financing" shall mean any transaction or series of transactions involving the public or private issuance, sale, or placement of newly issued (including securities held in treasury) equity or equity linked securities (excluding (a) the existing At-The-Market ("ATM") Offering proceeds and (b) any issuances of convertible preferred equity in connection with possible transactions involving Harvest Partners, RENCO or Bedrock Fund (the "Specified Potential Investors") not done in conjunction with a Restructuring (as defined below)), debt securities, instruments, or obligations of the Company, including any debtor-in-possession financing or exit financing in connection with a case under the Bankruptcy Code.

- "Stifel Developed Equity Sale" shall mean any issuance of convertible preferred stock or similar other convertible equity securities (including convertible notes, attached or

Horsehead Holding Corp.
As of December 3, 2015
Page 2

detachable grants of warrants, options) for cash to purchasers that are identified by the Company to both LMM and Steifel, Nicholas & Co. as being potential investors that Stifel, Nicholas & Co. should approach and with which Stifel, Nicholas & Co. should negotiate a purchase of such securities.

- "Amendment" shall mean the rescheduling of the maturities of Existing Obligations and/or a change in interest rates, including the ability to make interest payable-in-kind on Existing Obligations; *provided, however*, that no fee shall be payable in connection with an amendment the primary purpose of which is to permit the incurrence of additional secured indebtedness.

- "Restructuring" shall mean, collectively, any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of all or a significant portion of the Company's outstanding indebtedness (including bank debt, bond debt, and other on and off balance sheet indebtedness), trade claims, or other liabilities (collectively, the "Existing Obligations") that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations (collectively, the "Stakeholders"); repurchase, settlement or forgiveness of Existing Obligations; conversion of Existing Obligations into equity; an exchange offer involving the issuance of new securities in exchange for Existing Obligations; the issuance of new securities, sale or disposition of assets, sale of debt or equity securities or other interests or other similar transaction or series of transactions.

*Description of Services:*

1. LMM agrees, in consideration of the compensation provided in Section 2 below, to perform such of the following investment banking services as the Company may reasonably request, including:

   (a)  Reviewing and analyzing the Company's business, operations and financial projections;

   (b)  Evaluating the Company's potential debt capacity in light of its projected cash flows;

   (c)  Assisting in the determination of a capital structure for the Company;

   (d)  Assisting in the determination of a range of values for the Company on a going concern basis;

   (e)  Advising the Company on tactics and strategies for negotiating with the Stakeholders;

   (f)  Rendering financial advice to the Company and participating in meetings or negotiations with the Stakeholders and/or rating agencies or other appropriate parties in connection with any Amendment or Restructuring;

2

(g) Advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to any Restructuring;

(h) Advising and assisting the Company in evaluating any potential Financing transaction by the Company, including contacting potential sources of capital and assisting the Company in implementing such Financing;

(i) If so requested by the Company, assisting the Company in preparing documentation within our area of expertise that is required in connection with any Financing, Amendment, Sale or Restructuring;

(j) If so requested by the Company, assisting the Company in identifying and evaluating candidates for any potential Sale Transaction, advising the Company in connection with negotiations and aiding in the consummation of any Sale Transaction[1];

(k) Attending meetings of the Board of Directors of Horsehead with respect to matters on which we have been engaged to advise hereunder;

(l) Providing testimony, as necessary, with respect to matters on which we have been engaged to advise hereunder in any proceeding before the Bankruptcy Court; and

(m) Providing the Company with other financial restructuring advice.

*Fees:*

2. As consideration for the services to be provided, the Company shall pay LMM the following fees:

(a) A monthly fee of $125,000 (the "Monthly Fee"), payable on execution of this Agreement and on the 1st day of each month thereafter until the earlier of the completion of the Restructuring, Financing, Sale or Amendment or the termination of LMM's engagement pursuant to Section 10. Fifty percent (50%) of Monthly Fees paid in respect of any months following the third month of this engagement shall be credited (without duplication) against any Restructuring Fee or Sale Transaction Fee payable; provided, that, in the event of a Chapter 11 filing, such credit shall only apply to the

---

[1] As used in this Agreement, the term "Sale Transaction" means any transaction or series of transactions involving (a) an acquisition, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly, combined with another company; (b) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding stock of the Company or possessing a majority of the then outstanding voting power of the Company (except as may occur with current Stakeholders as a result of a Restructuring); (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of significant assets, securities or other interests of the Company or (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of an interest in the Company to a third party. For purposes hereof, any sale of newly issued securities (including securities held in treasury) shall be deemed a Financing and not a Sale Transaction.

Horsehead Holding Corp.
As of December 3, 2015
Page 4

extent that such fees are approved in entirety by the Bankruptcy Court, if applicable.

(b) A fee, payable upon consummation of a Financing (the "Financing Fee") calculated by multiplying the applicable fee percentage below by the total gross proceeds raised or committed (including, for the avoidance of doubt, amounts committed but undrawn) in each Financing:

(i)

| Funds Raised | Fee % |
|---|---|
| First Lien Debt | 1.50% |
| Second Lien Debt | 2.50% |
| Unsecured Debt | 3.50% |
| Equity (other than Stifel Developed Equity Sales as Specified Below) | 6.00% |

(ii) In the case of any Stifel Developed Equity Sale, if such sale is not made in conjunction with a Restructuring, LMM will be paid a Financing Fee equal to 2.00% of the gross proceeds raised or committed (any Stifel Developed Equity Sales that are made in conjunction with a Restructuring shall be subject to the fee set forth in clause (i) above).

(iii) To the extent the Company issues convertible preferred stock or other convertible equity securities to the Specified Potential Investors and such securities issuance is not made in conjunction with a Restructuring, LMM shall not be deemed to have earned a Financing Fee (any such sales that are made in conjunction with a Restructuring shall be subject to the fee set forth in clause (i) above).

(iv) For the avoidance of doubt, to the extent the Company issues any securities in conjunction with a Restructuring, LMM shall be earn a Financing Fee as calculated in section 2(b)(i) of this agreement.

Fifty percent (50%) of any Financing Fee shall be credited (without duplication) against any subsequent Restructuring Fee or Sale Transaction Fee payable to LMM.

(c) A fee equal to $500,000, payable on the execution of an Amendment (the "Amendment Fee") with a majority of the holders of (i) the 10.5% Senior Secured Notes due 2017 and/or (ii) the 9.0% Unsecured Notes due 2017. Any Amendment Fee shall be credited (without duplication) against any subsequent Restructuring Fee or Sale Transaction Fee payable to LMM; provided, that, in the event of a Chapter 11 filing, such credit shall only

apply to the extent that such fees are approved in their entirety by the Bankruptcy Court, if applicable.

(d) To the extent the Company consummates a Restructuring, LMM shall be paid a fee (the "Restructuring Fee") equal to $3,500,000.

(e) If, whether in connection with the consummation of a Restructuring or otherwise, the Company consummates a Sale Transaction incorporating all or a majority of the assets or all or a majority or controlling interest in the equity securities of the Company, and the Company has requested LMM's assistance in negotiating and implementing the Sale Transaction, LMM shall be paid a fee (the "Sale Transaction Fee") equal to $3,500,000 plus 5.0% of the Aggregate Consideration[2] over $500,000,000

(f) For the avoidance of any doubt, in addition to the Monthly Fee, three fees may be payable hereunder: (i) the Financing Fee; (ii) the Amendment Fee; and either (iii) (A) the Restructuring Fee or (B) the Sale Transaction Fee. A portion of the Monthly Fee, the Financing Fee, and the Amendment Fee shall be credited (without duplication) against any Restructuring Fee or Sale Transaction Fee, as applicable.

(g) In addition to any fees that may be payable to LMM and, regardless of whether any transaction occurs, the Company shall promptly reimburse LMM for all: (A) reasonable expenses incurred by LMM (including travel and lodging, data processing and communications charges, courier services and other expenditures) and (B) reasonable fees and expenses of one law firm serving as counsel, if any, retained by LMM (provided LMM provides reasonable prior notice to the Company of its intention to retain counsel), unless such fees and expenses were approved in advance of incurrence by the Company (it being agreed that this provision does not apply in the case of expenses subject to Exhibit A); provided however,

---

[2] For purposes hereof, the term "Aggregate Consideration" means (x) the total amount of cash and the fair market value (on the date of payment) of all of the property paid and payable (including amounts paid into escrow) in connection with the Sale Transaction (or any related transaction), including amounts paid and payable in respect of convertible securities, preferred equity securities, warrants, stock appreciation rights, option or similar rights, whether or not vested, plus (y) the principal amount of all indebtedness for borrowed money or other liabilities of the Company or relevant Company entity, as applicable, including capital lease obligations, as set forth on the most recent balance sheet, or, in case of the sale of assets, all indebtedness for borrowed money or other liabilities assumed, cancelled, exchanged or forgiven by a third party, including capital lease obligations. Aggregate Consideration shall also include the aggregate amount of any dividends or other distributions declared by the Company or relevant Company entity, as applicable, after the date hereof other than normal quarterly cash dividends, and, in the case of the sale of assets, the value of any assets not sold by the Company or relevant Company entity, as applicable. For purposes of calculating Aggregate Consideration, (i) all shares will be deemed transferred where a Sale Transaction is effected by the transfer of shares, (a) constituting more than 30% of the then outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, or (b) possessing more than 30% of the then outstanding voting power of the outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, and (ii) the value of securities (whether debt or equity) that are freely tradable in an established public market will be determined on the basis of the average closing price in such market for the 10 trading days prior to the closing of the Sale Transaction (the "Valuation Date"); and the value of securities that have no established public market or other property will be the fair market value of such securities or other property on such Valuation Date and any restricted stock (i.e., stock in a public company not freely tradeable) received shall be valued at 85% of the public market price of such stock. Aggregate Consideration shall also be deemed to include pension liabilities and guarantees of monies borrowed assumed, cancelled, exchanged or forgiven directly or indirectly by a third party. If the Aggregate Consideration is subject to increase by contingent payments related to future events, the portion of our fee relating thereto shall be calculated by us in good faith and paid to us upon consummation of the Sale Transaction.

Horschead Holding Corp.<br>
As of December 3, 2015<br>
Page 6

that the aggregate of fees incurred under clauses (A) or (B) shall not exceed $20,000 during any calendar month without the Company's prior written approval (not to be unreasonably withheld) (it being agreed that this provision does not apply in the case of expenses subject to Exhibit A). LMM shall provide monthly summaries of expenses for which reimbursement is requested by LMM and, if the Company so requests, reasonable documentation of such expenses.

(h) As part of the compensation payable to LMM hereunder, the Company agrees to the indemnification, contribution and related provisions (the "Indemnification Letter") attached to this Agreement as Addendum A and incorporated herein in their entirety.

(i) All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash after such amounts accrue hereunder.

*Retention in Chapter 11 Proceedings:*

3. In the event of the commencement of chapter 11 proceedings, the Company agrees that it will use commercially reasonable efforts to obtain prompt authorization from the Bankruptcy Court to retain LMM on the terms and conditions set forth in this Agreement under the provisions of Section 328(a) of the Bankruptcy Code. Subject to being so retained, LMM agrees that during the pendency of any such proceedings, it shall continue to perform its obligations under this Agreement and that it shall file interim and final applications for allowance of the reasonable and documented fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure, and the local rules and order of the Bankruptcy Court. The Company shall supply LMM with a draft of the application and proposed retention order authorizing LMM's retention sufficiently in advance of the filing of such application and proposed order to enable LMM and its counsel to review and comment thereon. LMM shall be under no obligation to provide any services under this agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless LMM's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court, which order is reasonably acceptable to LMM. The retention application shall note that in so agreeing to seek LMM's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that LMM's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Financing, Amendment, Sale Transaction, or Restructuring, that the value to the Company of LMM's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the deferred fees, including the Financing Fee, Amendment Fee, Sale Transaction Fee and Restructuring Fee is reasonable regardless of the number of hours to be expended by LMM's professionals in the performance of the services to be provided hereunder and that the deferred fees shall not be considered to be "bonuses" or fee enhancements under applicable law.

Horsehead Holding Corp.
As of December 3, 2015
Page 7

*Other:*

4. No amount payable to any third party, by the Company or any other person or entity, shall reduce or otherwise affect any amount payable hereunder to us.

5. The Company will furnish or cause to be furnished to LMM such current and historical financial information and other information regarding the business of the Company as LMM may request in connection with this engagement. The Company represents and warrants to LMM that all of the foregoing information will be accurate and complete at the time it is furnished, and agrees to keep LMM advised of all developments materially affecting the Company or its financial position. In performing its services pursuant to this Agreement, LMM shall be entitled to rely upon information furnished to it by the Company or any third party and information that is publicly available, may assume the accuracy and completeness of such information and shall not assume any responsibility for independent verification of any such information. LMM will not, as part of its engagement, undertake any independent valuation or appraisal of any of the assets or liabilities of the Company or of any third party, or opine or give advice to the Board of Directors, the Company or management or shareholders with respect thereto or with respect to any issues of solvency.

6. In performing its services pursuant to this Agreement, LMM is not assuming any responsibility for the decision of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Financing, Amendment, Sale Transaction, Restructuring or other transaction. LMM shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements; nor shall LMM be responsible for providing or be deemed to have provided any tax, accounting, actuarial, legal or other specialist advice.

7. It is understood and agreed that nothing contained in this Agreement shall constitute an express or implied commitment by LMM or any of our affiliates to underwrite, place or purchase any securities in a financing or otherwise, which commitment shall only be set forth in a separate underwriting, placement agency or purchase agreement, as applicable, relating to the financing.

8. Simultaneously herewith, the parties hereto are entering into the Indemnification Letter. The Indemnification Letter shall survive any termination or expiration of our engagement hereunder.

9. In order to coordinate our efforts on behalf of the Company during the period of our engagement hereunder, the Company will promptly inform LMM of any discussions, negotiations, or inquiries regarding a potential transaction, including any such discussions or inquiries that have occurred during the six month period prior to the date of this Agreement. In the event that LMM receives an inquiry concerning any transaction, we will promptly inform the Company of such inquiry.

10. Our engagement hereunder will automatically expire on consummation of a Restructuring and may be earlier terminated by Horsehead or us at any time without liability or

Horsehead Holding Corp.<br>
As of December 3, 2015<br>
Page 8

continuing obligation to the Company or us following any termination or expiration, except that (a) following any termination or expiration of our engagement we shall remain entitled to any fees accrued pursuant to Section 2 but not yet paid prior to such termination or expiration, as the case may be, and to reimbursement of expenses incurred prior to such termination or expiration, as the case may be, and (b) in the case of termination by Horsehead or any expiration of our engagement, we shall remain entitled to full payment of all fees contemplated by Section 2 hereof in respect of any Financing, Amendment, Sale Transaction and any Restructuring announced or resulting from negotiations occurring during the period from the date hereof until one year following such termination or expiration, as the case may be.

11. LMM has been retained under this Agreement as an independent contractor to Horsehead, and nothing herein is intended to confer any rights or remedies as against LMM upon any person (including the management, Board of Directors, employees, securityholders and creditors of the Company) other than Horsehead. In addition, it is understood and agreed that this Agreement and our engagement do not create a fiduciary relationship between LMM and any person, including the Company and its management, Board of Directors, employees, securityholders and creditors. No one, other than senior management or the Board of Directors of Horsehead (in their capacities as such) is authorized to rely upon the Company's engagement of LMM or any statements, advice, opinions or conduct by LMM. Without limiting the foregoing, any advice, written or oral, rendered in the course of the Company's engagement of LMM are solely for the purpose of assisting senior management or the Board of Directors of Horsehead (in their capacities as such) in evaluating the relevant Financing, Amendment, Sale Transaction or Restructuring and does not constitute a recommendation to any stakeholder of the Company that such stakeholder might or should take in connection with any Financing, Amendment, Sale Transaction or Restructuring. The Company agrees that, notwithstanding any termination or expiration of our engagement, any advice, written or oral, rendered by LMM and the terms of our engagement hereunder may not be disclosed publicly or made available to third parties without the prior written consent of LMM. Notwithstanding the foregoing, nothing herein shall prohibit the Company from disclosing to any and all persons the tax treatment and tax structure of any transaction and the portions of any materials that relate to such tax treatment or tax structure.

12. In connection with the services to be provided hereunder, LMM may employ the services of our affiliates (including LF&Co.), and may share with any such entity any information concerning the Company, provided that LMM and such entities shall hold any non-public information confidential in accordance with their respective customary policies relating to nonpublic information. Any such entity so employed shall be entitled to all of the benefits afforded to LMM hereunder and under the Indemnification Letter and shall be entitled to be reimbursed for its expenses on the same basis as LMM.

13. The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company, LMM and any other person entitled to indemnity under the Indemnification Letter. The Company's obligations pursuant to this Agreement shall be joint and several. This Agreement and the related Indemnification Letter embody the entire agreement and understanding among the parties hereto and supersede any and all prior agreements, arrangements, and understandings, related to the matters provided for herein. No

Horsehead Holding Corp.<br>
As of December 3, 2015<br>
Page 9

waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby.

14. This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to our engagement hereunder) shall be governed by and construed in accordance with the laws of the State of New York without regard to the principle of conflicts of law. No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or the United States District Court for the Southern District of New York, and each of the parties hereby submits to the jurisdiction of such courts. The Company hereby waives on behalf of itself and its successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable in any legal proceeding. The Company waives all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of this Agreement or the engagement of LMM pursuant to, or the performance by LMM of the services contemplated by, this Agreement.

Horsehead Holding Corp.<br>
December 3, 2015<br>
Page 10

If the foregoing Agreement is in accordance with your understanding of the terms of our engagement, please sign and return to us the enclosed duplicate hereof.

Very truly yours,

Lazard Middle Market LLC

By: _____

Andrew J. Torgove
Managing Director


AGREED TO AND ACCEPTED
as of the date first written above.

Horsehead Holding Corp., on behalf of itself
and its controlled subsidiaries

By: _____
James Hensler
Chairman, Chief Executive Officer and President

# EXHIBIT 2

**Indemnification Letter**

Horsehead Holding Corp.
Indemnification Letter
December 3, 2015
Page 1

# LAZARD

As of December 3, 2015

Horsehead Holding Corp
4955 Steubenville Pike, Suite 405
Pittsburgh, PA 15205

Attention:   James Hensler
Chairman, Chief Executive Officer and President

Gentlemen:

In connection with our engagement to advise and assist Horsehead Holding Corp. and its controlled subsidiaries (collectively, "you") with the matters set forth in the engagement letter of even date herewith, you and we are entering into this letter agreement. It is understood and agreed that in the event that Lazard Middle Market LLC or any of our affiliates, or any of our or their respective directors, officers, members, employees, agents or controlling persons, if any (each of the foregoing, including Lazard Middle Market LLC, being an "Indemnified Person"), become involved in any capacity in any action, claim, proceeding or investigation brought or threatened by or against any person, including your securityholders, related to, arising out of or in connection with our engagement, you will promptly reimburse each such Indemnified Person for its legal and other expenses (including the cost of any investigation and preparation) as and when they are incurred in connection therewith. You will indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages, liabilities or expenses to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with our engagement, whether or not any pending or threatened action, claim, proceeding or investigation giving rise to such losses, claims, damages, liabilities or expenses is initiated or brought by you or on your behalf and whether or not in connection with any action, claim, proceeding or investigation in which you or any such Indemnified Person are a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted primarily from such Indemnified Person's bad faith, willful misconduct or gross negligence. You also agree that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your securityholders or creditors related to, arising out of or in connection with our engagement except to the extent that any loss, claim, damage or liability is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted primarily from such Indemnified Person's bad faith, willful misconduct or gross negligence. If multiple claims are brought against any Indemnified

1

Person in an arbitration related to, arising out of or in connection with our engagement, and indemnification is permitted under applicable law with respect to at least one such claim, you agree that any arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for hereunder, except to the extent the arbitration award expressly states that the award, or any portion thereof, is based solely on a claim as to which indemnification is not available.

If for any reason the foregoing indemnification is held unenforceable (other than due to a failure to meet the standard of care set forth above), then you shall contribute to the loss, claim, damage, liability or expense for which such indemnification is held unenforceable in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by you and your securityholders and creditors on the one hand and the Indemnified Persons on the other hand in the matters contemplated by our engagement as well as the relative fault of yourselves and such persons with respect to such loss, claim, damage, liability or expense and any other relevant equitable considerations. You agree that for the purposes hereof the relative benefits received, or sought to be received, by you and your securityholders and creditors and the Indemnified Persons shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid by or to you and your securityholders and creditors, as the case may be, pursuant to any transaction (whether or not consummated) for which we have been engaged to perform investment banking services bears to (ii) the fees paid or proposed to be paid to us in connection with such engagement; provided, however, that, to the extent permitted by applicable law, in no event shall we or any other Indemnified Person be required to contribute an aggregate amount in excess of the aggregate fees actually paid to us for such investment banking services. Your reimbursement, indemnity and contribution obligations under this agreement shall be joint and several, shall be in addition to any liability which you may otherwise have, shall not be limited by any rights we or any other Indemnified Person may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of yourselves, ourselves, and any other Indemnified Persons.

You agree that, without our prior written consent (which will not be unreasonably withheld), you will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, proceeding or investigation in respect of which indemnification or contribution could be sought hereunder (whether or not we or any other Indemnified Persons are an actual or potential party to such claim, action, proceeding or investigation), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Person from all liability arising out of such claim, action, proceeding or investigation. No waiver, amendment or other modification of this agreement shall be effective unless in writing and signed by each party to be bound thereby. This agreement and any claim related directly or indirectly to this agreement shall be governed and construed in accordance with the laws of the State of New York (without giving regard to the conflicts of law provisions thereof). No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or the United States District Court for the Southern District of New York, and each of us hereby submits to the jurisdiction of such courts. You hereby waive on behalf of yourself and your successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable. You (on your own behalf and, to the extent permitted by applicable law, on behalf

Horsehead Holding Corp.<br>
Indemnification Letter<br>
December 3, 2015<br>
Page 3

of your securityholders and creditors) waive all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to, arising out of or in connection with this agreement or our engagement. This agreement shall remain in effect indefinitely, notwithstanding any termination or expiration of our engagement.

Very truly yours,

Lazard Middle Market LLC

By _/s/ Andrew J. Torgove_

Andrew J. Torgove
Managing Director

AGREED TO AND ACCEPTED
as of the date first
above written:

Horsehead Holding Corp., on behalf of itself
and its controlled subsidiaries

By _/s/ James Hensler_