## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HORSEHEAD HOLDING CORP., et al.,[1] | ) | Case No. 16-10287 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### DEBTORS' REPLY TO THE SUPPLEMENTAL OBJECTION OF THE EQUITY COMMITTEE TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply to the *Supplemental Objection of the Official Committee of Equity Security Holders to the Debtors' Exclusivity Motion* [Docket No. 1199] (the "Supplemental Objection"), and respectfully state as follows.[2]

### Preliminary Statement[3]

1.      By its Supplemental Objection, the Equity Committee argues that terminating exclusivity will advance the administration of these chapter 11 estates by forcing the Debtors to undertake a public sale process ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Horsehead Holding Corp. (7377); Horsehead Corporation (7346); Horsehead Metal Products, LLC (6504); The International Metals Reclamation Company, LLC (8892); and Zochem Inc. (4475). The Debtors' principal offices are located at 4955 Steubenville Pike, Suite 405, Pittsburgh, Pennsylvania 15205.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 1, 2016 [Docket No. 1211] (the "Plan") or the Debtors' reply to the Equity Committee's initial objection [Docket No. 1110] (the "Exclusivity Reply"), as applicable.

[3]    The Debtors file redacted portions of this Supplemental Reply pursuant to the relief requested by their pending *Motion for Entry of an Order (I) Authorizing the Debtors to Redact Portions of the Debtors' Omnibus Exclusivity Reply and (II) Granting Related Relief* [Docket No. 1111] to keep confidential certain information regarding the Debtors' financial and business information.

KE 42284376

████████████████████████████████████████████████

████████████████ This argument is without merit.

2.      First and foremost, the Debtors stand ready to proceed with a chapter 11 plan that is supported by their DIP lenders, secured noteholders, unsecured noteholders, and their Creditors' Committee.[4] The Plan provides substantial creditor recoveries, including a full recovery for Zochem unsecured creditors and an estimated 19 cent recovery for Horsehead Corporation, INMETCO, and Horsehead Metal Products general unsecured creditors, all while substantially de-leveraging the Debtors' balance sheet. The Plan further preserves hundreds of employee jobs and provides a holistic solution for the Mooresboro Facility—an inoperative asset that would impose substantial costs on these chapter 11 estates if it is "left behind" in a sale process. And, as the Debtors will be prepared to demonstrate at their confirmation hearing, these negotiated creditor recoveries imply an enterprise value in excess of $400 million. This result has also been achieved without the delays, costs, and risks associated with either the open-ended litigation or the naked sale process demanded by the Equity Committee. Simply put, the Debtors are on the right path to conclude their chapter 11 estates.

3.      ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████[5] But the extent to which such indications of interest must compel the Debtors to

---

4   See *Debtors' First Amended Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 1, 2016 [Docket No. 1212].

5   The Equity Committee's characterization of its "90 day" sale process does not fully capture the timeline demanded by the Equity Committee. (See Exclusivity Reply ¶ 3). The Equity Committee demands a 90 day sale process measured from entry of a bid procedures order. (Supp Obj. ¶ 4). Assuming a customary 21 day notice period and a 14 day post-sale/ pre-closing period, the Equity Committee's proposed sale process would then be approximately 125 days—assuming no delays along the way. Even if such a bid procedures motion were filed today, that sale process would not be completed until November 2016 at the earliest. The Debtors continue

undertake an alternative path may be questioned.  When the Equity Committee first announced on June 13, 2016 that it had received a "remarkable number of inquiries from interested parties who have contacted the Equity Committee in the past four weeks to express serious interest in acquiring the Debtors' assets," (EC Obj. [Docket No. 1055] ¶ 2 (emphasis added)), the Equity Committee had not received a single written indication of interest or letter of intent.  The "serious interest" identified by the Equity Committee in its June 13 objection was, instead, █

█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
██████████████████████████████████████████ █

4.    Only after the Equity Committee filed its objection on June 13, 2016, and after the Debtors filed their initial reply on June 16, 2016, did the Equity Committee then obtain any documents that could be fairly characterized as letters of intent or expressions of interest to purchase some or all of the Debtors' assets. ██████████████████████████████████

█████████████████████████████████████████████████████ ████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.[7]  The Equity

_____

to expend liquidity and presently expect that their $90 million DIP facility will be fully drawn during September 2016.

█ ██████████████████████████████████████████████████████████████████

_____

[7]    For reference, (a) the Debtors estimate that approximately $600 million of enterprise value is requested to assure the solvency of their chapter 11 estates; and █████████████████████████████████████████████

3

Committee similarly disregards the very real impact on value that can result if any financial sponsor, strategic competitor, or individual entrepreneur is granted access to the Debtors' confidential information in a sale process. (Cf. Supp. Obj. ¶ 13.)

5.      In this regard, the Debtors are obliged to ask why the Equity Committee continues to press an objection to an exclusivity extension at this time.  The Equity Committee's objections are, in substance, confirmation objections—including the Equity Committee's assertions that enterprise value ranges from $770 million to $850 million.  The Debtors have already agreed to limit their requested exclusivity period to August 30, 2016, (Exclusivity Reply ¶ 10 n.10), the same date on which the Debtors will commence their confirmation hearing.[8]  To that end, the Debtors, through their professionals, have sought to engage with the Equity Committee to avoid the need for contested motion practice, discovery, or an extended evidentiary hearing with respect to what the Equity Committee agrees is a customary extension.  (See Supp. Obj. ¶ 29)  Nevertheless, the Equity Committee has elected to march forward with its objection.

6.      In any event, the Debtors respectfully submit the Equity Committee's objection should be overruled.   The Debtors have taken substantial steps to maximize value, as demonstrated both by their general prosecution of these chapter 11 cases and the value-maximizing settlement reached with their Creditors' Committee regarding the Plan.  Terminating exclusivity at this time will not further the administration of these chapter 11 cases.  Rather, it will require the Debtors to face the prospect (and bear the expense) of competing chapter 11 plans and jeopardize the hard-won value that is already on the table.

---

[8]  For the avoidance of doubt, the Debtors reserve all rights to seek additional extensions of their exclusivity periods by separate motion.

**Supplemental Reply**

I.     **The Equity Committee Concedes that the Debtors Have Satisfied the Overwhelming Majority of Relevant Factors Supporting an Exclusivity Extension**

7.     As detailed in the Exclusivity Motion and the Exclusivity Reply, there is ample cause to justify an extension of the Exclusivity Periods. In only five months, the Debtors have negotiated a Plan supported by a substantial majority of the Debtors' economic stakeholders, including the Creditors' Committee and the largest group of stakeholders in these chapter 11 cases, the Ad Hoc Group of Secured Noteholders. No party claims, nor could they, that the Debtors have failed to make good faith progress negotiating with creditors or that the Debtors have not demonstrated reasonable prospects for filing a viable plan of reorganization. No party contests that the Debtors have been paying their bills as they come due, or that a number of critical milestones have been achieved since the Petition Date, such as their negotiation and implementation of the DIP Facility, the orderly reconciliation of their claims pool, the completion of liquidation and valuation analyses, the successful negotiation of a forbearance with the NMTC lenders, liquidating the claim related to the Macquarie Credit Facility on highly-favorable terms, and, importantly, the filing of a disclosure statement and plan of reorganization, leaving the Debtors on-track for a late-August confirmation. In fact, the only "factor" cited by the Equity Committee in support of its objection is the Debtors' refusal to abandon their proposed reorganization and undertake a "90-day" sale process. (See Supp. Obj. ¶¶ 20–21.)

II.     **The Debtors Have Reasonably Sought to Maximize Value through a Chapter 11 Plan**

8.     The Equity Committee argues that the Bankruptcy Code compels the Debtors to pursue a public auction in order to "market test" their plan of reorganization. (Supp. Obj. ¶¶ 2–3, 5, 7, 12.) In effect, the Equity Committee argues that the administration of every chapter 11

estate must result in a protracted liquidation: no plan is possible until everything is sold, and no stakeholder is out of the money until the "market has spoken".

9.    This is simply not the outcome that chapter 11 demands or even contemplates. Pursuant to the plain language of Bankruptcy Code, section 1123(b)(4), a chapter 11 plan "may" provide for the "sale of all or substantially all of the property of the estate."   And, as another Court in this district stated earlier this year, "the Court holds that [section] 1129, and specifically, [s]ection 1129(a)(3) does not impose upon the Debtor to affirmatively shop a plan that otherwise meets the confirmation standards," and further stating that "[e]xclusivity does not require a market test." Hr'g Tr. at 8:16–19; 13:13, In re Am. Apparel, No. 15-12055 (BLS) (Bankr. D. Del. Jan. 25, 2016).   The Equity Committee is also wrong when it claims that section 363 of the Bankruptcy Code imposes a "marketing process" requirement.   (See, e.g., Supp Obj. ¶¶ 5, 8, 11.) No such requirement exists:  "Section 363 of the Bankruptcy Code does not require a debtor to engage in a marketing process, but rather requires a debtor to demonstrate that the price paid for the assets is fair."   In re Smurfit-Stone Container Corp., Case No. 09–10235, 2010 WL 2403793 at *10 (Bankr. D. Del. June 11, 2010).

10.    Instead, the Bankruptcy Code creates a presumption in favor of plans of reorganization:  "Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case." In re Lisanti Foods, Inc., 329 B.R. 491, 497 (D.N.J. 2005) (internal quotation marks omitted)); see In re Lykes Bros. S.S. Co., 207 B.R. 282, 284 (Bankr. M.D. Fla. 1997) ("[In] Chapter 11, the debtor proposes a plan of reorganization to maximize value for the general benefit of all creditors, thus avoiding a mad scramble for assets."); In re Ngan Gung Restaurant, 254 B.R. 566, 571 (Bankr. S.D.N.Y. 2000) ("[A] clear purpose of Chapter 11 is to benefit all parties, including the debtor and creditors" by providing breathing room and time for the debtor

to propose a plan of reorganization). Section 1129's requirements, in turn, protect stakeholder interests through the confirmation process, but a public auction is simply not a precondition for plan confirmation. Indeed, the sorts of 363 sale process demanded by the Equity Committee have been frequently criticized as depriving stakeholders of section 1129's substantive and procedural protections.[9]

11.     The Equity Committee therefore wants to flip the Bankruptcy Code on its head, arguing that the Debtors instead must pursue a sale process to confirm whether (or not) these chapter 11 estates are, in fact, insolvent. (See, e.g., Supp. Obj. ¶¶ 13–14.) But, as noted above, no such requirement exists. The Equity Committee's effort to push the Debtors into a sale undermines the very purpose of exclusivity—to allow debtors time to stabilize their businesses, engage with creditors, and to identify a path forward (consensually, if possible). In re Mother Hubbard, Inc., 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993) (holding exclusivity allows the debtor "a reasonable time to obtain [plan confirmation] without the threat of a competing plan"). But the Equity Committee's unhappiness with the Debtors' chosen path is no basis to terminate or limit exclusivity. See In re Geriatrics Nursing Homes, Inc., 187 B.R. 128, 134 (D.N.J. 1995); In re Adelphia Commn's Corp., 352 B.R. 578, 589–90 (Bankr. S.D.N.Y 2006). The Bankruptcy Code fixes the Debtors at the center of this process: "The concept of an exclusivity period in favor of a debtor, a consideration at the heart of the Bankruptcy Code, on its face contradicts this notion that parties in a Chapter 11 bankruptcy case be given an equal opportunity to seek confirmation of a plan." In re Eagle-Picher Indus., Inc., 176 B.R. 143, 148 (Bankr. S.D. Ohio 1994).

---

[9]   See, e.g., American Bankruptcy Institute, *Commission to Study the Reform of Chapter 11*, at 84 ("The primary concerns of courts and commentators with this practice are premised on the absence of stakeholder protections that are otherwise incorporated into the section 1129 plan process . . . .").

III.     **Delaware Corporate Law Does Not Compel a Public Auction Process**

12.     The Equity Committee next argues that <u>Revlon</u> duties arising under Delaware corporate law compel the Debtors to undertake a 90 day sale process. (<u>See</u> Supp. Obj. ¶¶ 9–12). More specifically, the Equity Committee argues the Debtors' Plan constitutes a 'change of control' transaction, and that the Debtors' fiduciary duties can be satisfied <u>only</u> if the Debtors immediately undertake a sale process for all or substantially all their assets. (<u>Id.</u> ¶ 7).

13.     As an initial matter, the Debtors start from the proposition that Horsehead Holding Corp. is insolvent. As a result, the Equity Committee has no standing to invoke fiduciary duties that belong to the corporation and its creditors (as the economic beneficiaries of those duties). <u>See</u> <u>N. Am. Catholic Educational Programming Found., Inc. v. Gheewalla</u>, 930 A.2d 92, 101–102 (Del. 2007) ("When a corporation is solvent, those duties may be enforced by its shareholders, who have standing to bring derivative actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value. When a corporation is insolvent, however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value."); <u>Prod. Res. Grp., LLC v. NCT Grp., Inc.</u>, 863 A.2d 772, 797 (Del. Ch. 2004) ("When a firm is insolvent, the directors are said to owe fiduciary duties to the creditors, much like the directors of solvent firms owe such duties to the stockholders.").

14.     For its part, the Equity Committee contends that the Debtors are solvent— claiming that the Debtors are worth between $770 million and $850 million— ███████ ██████████████████████████████████████████████████████████ ███████████████████████ But even if the Debtors' insolvency were reasonably in doubt (which it is not), Delaware courts have cautioned against the sort of "swing for the fences" strategy endorsed by the Equity Committee:

8

> [D]irectors will recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act.

Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp., Civ. No. 12150, 1991 WL 277613, at *34 n. 55 (Del. Ch. Dec. 30, 1991).

15.    Here, the Debtors have undertaken a course to maximize value in a manner that does not also unduly risk the ultimate disposition of their estates.  The Debtors have built consensus "from the top down" in their capital structure, locking in support first from their secured creditors (and fulcrum creditor class), the Ad Hoc Group of Secured Noteholders, and next by improving value for unsecured creditors through a negotiated resolution with their Creditors' Committee—in each case mitigating the risk of a failed process or an administratively insolvent estate.  This path is supported both by the Debtors' valuation analysis and the well-recognized maxim that compromise, not litigation, is often the best path forward in chapter 11. See Fogel v. Zell, 221 F.3d 955, 960 (7th Cir. 2000) (Posner, J.) ("Judges naturally prefer to settle complex litigation than to see it litigated to the hilt, especially when it is litigation in a bankruptcy proceeding—the expenses of administering the bankruptcy often consume most or even all of the bankrupt's assets.").  The Debtors further submit, and at confirmation will establish, that the value and recoveries implied by their Plan will demonstrate the extent to which they have fully and fairly discharge their duties to maximize value.

16.    Regardless, neither Delaware law, the Bankruptcy Code, nor the case law support the Equity Committee's proposition that the Debtors' duty to maximize value can be satisfied only and exclusively through the "90-day" sale process it demands.  Rather, the Debtors' core obligation is to prudently and responsibly maximize value—and a sale process is not the only

means to that end. Barkan v. Amsted Industries, Inc., 567 A.2d 1279 (Del. 1989), makes this point directly. Here, it should be noted that the Equity Committee cites Barkan for the proposition that a change of control transaction compels a public auction. (Supp. Obj. ¶ 8.) That is, the Equity Committee quotes Barkan as follows: "As the Barkan court explained, the 'concern for fairness demands a canvas of the market to determine if higher bids may be elicited. Barkan, 576 [sic] A.2d at 1286–87.'" (Id. at ¶ 8 (quoting Barkan)). However, the full passage from Barkan actually reads as follows: "When the board is considering a single offer and has no reliable grounds upon which to judge its adequacy, this concern for fairness demands a canvas of the market to determine if higher bids may be elicited." Barkan, 567 A.2d at 1287 (emphasis added). Thus, a "canvas of the market" is required only where there is "no reliable grounds" on which an offer may be judged.

17.     Barkan goes on to state that Delaware law in no way mandates the sort of compulsory sale process demanded by the Equity Committee: "Revlon does not demand that every change in the control of a Delaware corporation be preceded by a heated bidding contest." Barkan, 567 A.2d at 1286. Rather, "[w]hen, however, the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market." Id. at 1287 (emphasis added). In this regard, the Equity Committee's assertion that a market test is required in all instances is simply wrong. (Supp. Obj. ¶ 12 ("[U]nder any circumstances, this passive approach embraced by the Debtors . . . does not and cannot meet their significant duties . . . .") For instance, a corporation may prudently forego an affirmative market check where it reasonably determines a public auction could threaten value. See In re Smurfit-Stone Container Corp. Shareholder Litig., C.a. No. 6164–VCP, 2011 WL 2028076, at *19 (Del. Ch. May 20, 2011) ("I find that the Board

possessed a sufficient amount of reliable evidence from which it reasonably could conclude that a market check was not worth the risks of jeopardizing the Rock–Tenn Transaction and that dealing exclusively with Rock–Tenn would maximize stockholder value.").

18.     The Equity Committee's reliance on so-called "no shop" caselaw to mandate a sale process is similarly misplaced.  (See Supp. Obj. ¶ 11).  Of course, the Debtors are not presently subject to any "no shop" limitations, nor are the Debtors seeking approval by the Court of any such provision at this time.  The Debtors are free to entertain higher or better offers for their enterprise should *bona fide* offers emerge.  At the same time the Debtors acknowledge that their Plan is predicated on a $160 million capital commitment from their Plan Sponsors, memorialized in a *Unit Purchase Agreement* (the "UPA"), which was filed in draft form on June 30, 2016 [Docket No. 1213] and which remains subject to ongoing review and revision among the parties.  That draft UPA, in turn, currently provides for a "window shop" provision that precludes the Debtors from independently soliciting third party interest, but allows the Debtors to develop any inbound indications of interest that my provide higher or better treatment than the Plan.  (See UPA § 6.13.)

19.     To be clear, the Debtors are not subject to such provisions at the present time, and such provisions will only be binding on the Debtors if or when the UPA is actually approved— i.e., contemporaneously with Plan confirmation in late August 2016.  But even if such provisions were currently binding on the Debtors, such provisions are entirely consistent with the Debtors' duty to maximize value. See In re Plains Exploration & Prod. Co. Stockholder Litig., C.A. No. 8090–VCN, 2013 WL 1909124, at *6 (Del. Ch. May 9, 2013) ("The no-solicitation clause combined with a fiduciary out allowed the Board to respond to unsolicited bids if the Board determined in good faith that the bid would reasonably be expected to lead to a superior

proposal."); In re MONY Group Inc. Shareholder Litigation, 852 A.2d 9, 19–24 (Del. Ch. 2004) (concluding that the board of directors acted reasonably, complied with fiduciary obligations, and obtained highest possible value for company by approving acquisition agreement that prohibited active solicitation of purchasers but permitted board to entertain inbound offers); Yanow v. Sci. Leasing, Inc., C.A. Nos. 9356, 9561, 1991 WL 165304, at *10–11 (Del. Ch. July 31, 1991) see also In re Integrated Res., Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[A]dmittedly, the BT Proposal may have deterred some bidding, but such deterrence must be weighed against the value of securing BT's commitment to a plan of reorganization"); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 880 (Bankr. S.D.N.Y. 1990) (holding that the limited deterrence of bidding created by no-solicitation clauses is "often necessary to bring prospective bidders to the table with serious bids.").[10]

20.    In sum, the Equity Committee is incorrect when it claims that Delaware corporate law mandates a public marketing process in a change of control transaction. Rather, Delaware law requires the Debtors to carefully maximize value in a manner that does not threaten the overall viability of the enterprise. This is precisely what the Debtors have done, and the Debtors will be prepared to make their case to that effect at confirmation.

IV.    █████████████████████████████████████████

21.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[10] The Equity Committee's citation to the Bankruptcy Court's opinion in In re Los Angeles Dodgers LLC, 468 B.R. 652, 660 (Bankr D. Del 2011), for the proposition that "no shop" provisions are unenforceable in bankruptcy, (see EC Obj. ¶ 11), is similarly misplaced. The Los Angeles Dodgers bankruptcy court's opinion was heavily criticized in this regard by the District Court, which found there to be a "strong likelihood" of reversal on the basis that "no shop" provisions are, in fact, regularly enforced by Delaware courts. See In re Los Angeles Dodgers LLC, 465 B.R. 18, 31 (D. Del. 2011).



**Conclusion**

22.     For the reasons set forth herein, in the Exclusivity Motion, and in the Exclusivity Reply, the Equity Committee's objections should be overruled and the Motion should be granted.

Wilmington, Delaware
Dated: July 5, 2016

/s/ Laura Davis Jones
_____
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
    joneill@pszjlaw.com
    jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    patrick.nash@kirkland.com
    ryan.dahl@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

**EXHIBIT A**

