**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HORSEHEAD HOLDING CORP., <u>et al.</u>,[1] | ) | Case No. 16-10287 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Re:  Docket No. 1309** |

**SUPPLEMENT TO THE DEBTORS' SECOND AMENDED JOINT PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), hereby file this plan supplement (this "<u>Plan Supplement</u>"), in support of the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1309] (as amended or modified from time to time and including all exhibits and supplements thereto, the "<u>Plan</u>"),[2] filed in these chapter 11 cases on July 15, 2016.

**PLEASE TAKE FURTHER NOTICE** that this Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time:

- **<u>Exhibit A</u>** – Form of New Organizational Documents

- **<u>Exhibit B-1</u>** – Assumed Executory Contract and Unexpired Lease Schedule

- **<u>Exhibit B-2</u>** – Rejected Executory Contracts and Unexpired Lease Schedule

- **<u>Exhibit C</u>** – Schedule of Retained Causes of Action

- **<u>Exhibit D</u>** – Identity of New Board for Reorganized Horsehead

- **<u>Exhibit E</u>** –  The Unit Purchase Agreement

- **<u>Exhibit F</u>** – Form of the Banco Bilbao Note

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Horsehead Holding Corp. (7377); Horsehead Corporation (7346); Horsehead Metal Products, LLC (6504); The International Metals Reclamation Company, LLC (8892); and Zochem Inc. (4475). The Debtors' principal offices are located at 4955 Steubenville Pike, Suite 405, Pittsburgh, Pennsylvania 15205.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

KE 42570951

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to alter, amend, modify, or supplement any document in this Plan Supplement as provided by the Plan, provided that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Confirmation Hearing, the Debtors will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek confirmation of the Plan at a hearing scheduled to begin on **Tuesday, August 30, 2016, at 10:00 a.m. (prevailing Eastern Time)** before the Honorable Christopher Sontchi in Courtroom 6 in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801, at which time and at which place you may appear if you so desire.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Plan Supplement, and any other related documents are available upon request to Epiq Bankruptcy Solutions, LLC, the Debtors' administrative advisor, at (646) 282-2400, or by visiting the website maintained in these chapter 11 cases at http://dm.epiq11.com/Horsehead.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

2

KE 42570951

Wilmington, Delaware
Dated: August 9, 2016

/s/ *Joseph M. Mulvihill*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
          joneill@pszjlaw.com
          jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
          patrick.nash@kirkland.com
          ryan.dahl@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

3

KE 42570951

## EXHIBIT A

Form of New Organizational Documents

KE 42570951

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HORSEHEAD HOLDING LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

THE SECURITIES ISSUED PURSUANT TO THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS AND, AS SUCH, THEY MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS THE SECURITIES HAVE BEEN QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS SUCH QUALIFICATION AND REGISTRATION IS NOT LEGALLY REQUIRED.  TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT ARE FURTHER SUBJECT TO THE RESTRICTIONS, TERMS AND CONDITIONS SET FORTH HEREIN.

111919414 v24

**TABLE OF CONTENTS**

ARTICLE 1   DEFINITIONS ................................................................................................ 2

ARTICLE 2   ORGANIZATION ....................................................................................... 10

    2.01   Formation of Company ............................................................................... 10

    2.02   Name ........................................................................................................... 10

    2.03   Office; Agent for Service of Process ......................................................... 10

    2.04   Effective Date; Term................................................................................... 10

    2.05   Purpose and Scope ..................................................................................... 10

    2.06   Filings; Authorized Persons ....................................................................... 10

    2.07   Admission of Members ............................................................................... 11

    2.08   Fiscal Year ................................................................................................. 11

ARTICLE 3   CAPITAL CONTRIBUTIONS; INTERESTS ....................................... 12

    3.01   Capital Contributions ................................................................................. 12

    3.02   Allocation of Equity Interests .................................................................... 13

    3.03   Voting Rights; Written Consents ................................................................ 13

    3.04   Withdrawals ............................................................................................... 13

    3.05   Liability of the Members Generally ........................................................... 14

ARTICLE 4   MANAGEMENT ........................................................................................ 14

    4.01   Management; Board of Directors ................................................................ 14

    4.02   Liability Insurance ..................................................................................... 20

    4.03   Officers ....................................................................................................... 20

    4.04   Exculpation ................................................................................................ 21

    4.05   Indemnification .......................................................................................... 23

    4.06   Transactions with Affiliates ....................................................................... 25

    4.07   Limited Liability Company Opportunity. .................................................. 25

    4.08   Change in Corporate Form.......................................................................... 26

ARTICLE 5   REPORTING REQUIREMENTS ............................................................ 26

    5.01   Reporting Requirements ............................................................................. 26

ARTICLE 6   DISTRIBUTIONS ....................................................................................... 27

    6.01   Distributions Generally .............................................................................. 27

    6.02   Restricted Distributions .............................................................................. 27

ARTICLE 7   ACCOUNTING AND TAX MATTERS.......................................................... 28

111919414 v24

7.01    Books and Records .................................................................................. 28

7.02    Tax Returns ............................................................................................. 28

ARTICLE 8    TRANSFERS AND WITHDRAWALS ................................................. 28

8.01    Transfers of Equity Interests .................................................................. 28

8.02    Drag-Along Obligations .......................................................................... 31

8.03    Tag-Along Rights ..................................................................................... 33

8.04    Preemptive Rights to Purchase New Securities ...................................... 35

8.05    Effect of Prohibited Transfers ................................................................ 37

8.06    Records ................................................................................................... 37

8.07    Withdrawal of Members ......................................................................... 37

8.08    Registration Rights ................................................................................. 37

ARTICLE 9    ADDITIONAL MEMBERS .................................................................. 37

9.01    Admission of Additional Members ......................................................... 37

ARTICLE 10    DISSOLUTION; LIQUIDATION ....................................................... 38

10.01   Dissolution .............................................................................................. 38

10.02   Final Accounting ..................................................................................... 38

10.03   Liquidation .............................................................................................. 38

10.04   Cancellation of Certificate of Formation ............................................... 39

ARTICLE 11    GENERAL PROVISIONS .................................................................. 39

11.01   Notices .................................................................................................... 39

11.02   Confidentiality ........................................................................................ 40

11.03   Fees and Expenses .................................................................................. 41

11.04   Certain Member Representations and Warranties ................................... 41

11.05   Amendments ........................................................................................... 42

11.06   Specific Performance .............................................................................. 42

11.07   Termination ............................................................................................. 42

11.08   Counterparts ........................................................................................... 43

11.09   Construction; Headings .......................................................................... 43

11.10   Severability ............................................................................................. 43

11.11   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ...................... 43

11.12   Waiver of Action for Partition ................................................................ 44

11.13   Successors and Assigns ........................................................................... 44

11.14   Entire Agreement .................................................................................... 44

11.15   No Third-Party Beneficiaries .................................................................. 44

11.16   Other Instruments and Acts .................................................................. 45

11.17   Binding Agreement .............................................................................. 45

11.18   Remedies and Waivers .......................................................................... 45


Annex A Registration Rights

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HORSEHEAD HOLDING LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

THIS LIMITED LIABILITY COMPANY AGREEMENT of Horsehead Holding LLC, a Delaware limited liability company (the "**Company**"), dated as of [●], 2016, is entered into by and among the Company, each Investor Member, each other Person who beneficially owns any Common Shares as of the date hereof, each Person receiving any Common Shares on the date hereof and each other Person who from time to time beneficially owns any Common Shares or other Equity Interests of the Company and is deemed a party to this Agreement in accordance with the provisions herein (collectively, the Investor Members and each such other Person, the "**Members**," and, individually, a "**Member**").  Capitalized terms used in this Agreement and not otherwise defined have the meaning set forth in Article 1 hereto.

**W I T N E S S E T H :**

WHEREAS, the Company is the result of a conversion, effective as of the date hereof, of Horsehead Holding Corp., a Delaware corporation ("**Horsehead Debtor**"), to a limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act, Del. Code title. 6, Section 18-101, et seq., as amended from time to time (the "**Act**"), effected by filing a certificate of conversion (the "**Certificate of Conversion**") and a certificate of formation (the "**Certificate of Formation**") with the Delaware Secretary of State on the date hereof;

WHEREAS, (a) on February 2, 2016, Horsehead Debtor, and certain of its debtor affiliates (collectively with Horsehead Debtor, the "**Debtors**") commenced jointly administered proceedings styled *In re Horsehead Holding Corp. et al.* under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and (b) on February 5, 2016, the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") recognized the Chapter 11 Proceedings as foreign main proceedings (the "**Recognition Proceedings**") in proceedings commenced under Part IV of the Companies' Creditors Arrangement Act (the "**CCAA**");

WHEREAS, on [•], 2016, the Debtors filed with the Bankruptcy Court the Chapter 11 Plan of Reorganization (the "**Plan**") and [filed the Plan with the Canadian Court][1];

WHEREAS, on [•], 2016, the Bankruptcy Court entered an order confirming the Plan and [the Canadian court recognized the confirmation order of the Bankruptcy Court];

WHEREAS, pursuant to the Plan, all Equity Interests of Horsehead Debtor issued and outstanding immediately prior to the date hereof have been cancelled, discharged and terminated;

---

[1]     NTD: Subject to comment from Canadian bankruptcy counsel.

- 1 -

WHEREAS, the Company made an election to be treated as a corporation for federal income tax purposes;

WHEREAS, pursuant to the Plan and as of the Effective Date, each Member is automatically deemed to have accepted the terms of this Agreement (in its capacity as a Member of the Company) and is automatically deemed to be a party hereto as a Member without any further action and as if, and with the same effect as if, such Member had delivered a duly executed counterpart signature page to this Agreement; and

WHEREAS, the Members wish for this Agreement to constitute the limited liability company agreement of the Company in accordance with the Act, and to provide for, among other things, the management of the business and affairs of the Company, the allocation of profits and losses among the Members, the respective rights and obligations of the Members to each other and to the Company, and certain other matters.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed by and among the parties hereto as set forth in this Agreement.

ARTICLE 1

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings set forth below:

"**Act**" has the meaning set forth in the recitals hereof.

"**Additional Capital Commitment**" has the meaning set forth in the Plan.

"**Additional Capital Contribution**" has the meaning set forth in Section 3.01(b).

"**Additional Capital Commitment Units**" has the meaning set forth in the Plan.

"**Additional Member**" means any additional member admitted to the Company pursuant to Section 9.01(a).

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control or shares a common investment adviser with, such first Person.

"**Agreement**" means this Limited Liability Company Agreement, including all exhibits and schedules hereto, as it may be amended, supplemented or restated from time to time in accordance with its terms.

- 2 -

"**Associate**" has the meaning set forth in Rule 12b-2 under the Exchange Act.

"**Authorized Representative**" has the meaning set forth in Section 11.02.

"**Bankruptcy**" of a Member means (a) the filing by a Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other Federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition, (b) the making by a Member of any assignment for the benefit of its creditors or (c) the expiration of sixty (60) calendar days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for the assets of a Member, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other Federal or state insolvency law; provided that the same shall not have been vacated, set aside or stayed within such sixty (60) day period.

"**beneficially own**", "**beneficial ownership**" and similar phrases shall have the meaning ascribed to such terms in Section 13(d) of the Exchange Act.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Board**" has the meaning set forth in Section 4.01(a).

"**Board Supermajority**" has the meaning set forth in Section 4.01(g).

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized by law to close.

"**Capital Contribution**" has the meaning set forth in Section 3.01(b).

"**Certificate of Conversion**" has the meaning set forth in the recitals.

"**Certificate of Formation**" has the meaning set forth in the recitals.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Commission**" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"**Common Shares**" means the Shares representing limited liability company Equity Interests in the Company as the Company may issue from time to time in accordance with the terms of this Agreement and that are denominated as Common Shares.

"**Company**" has the meaning set forth in the recitals to this Agreement.

"**Confidential Information**" means information (whether written or oral) relating to or concerning the business or affairs of the Company or any of its Subsidiaries, that is proprietary, confidential or otherwise not known to or available to the public generally (other

than as a result of a breach of this Agreement or any other duty or obligation of any Member or Authorized Representative thereof).

"**control,**" including the correlative terms "**controlling,**" "**controlled by**" **and** "**under common control with**," means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.

"**Damages**" has the meaning set forth in Section 4.05(a).

"**Debtors**" has the meaning set forth in the recitals.

"**Director**" means a member of the Board.

"**Distribution**" means each distribution in respect of Common Shares made by the Company to a Member, whether in cash, property or Equity Interests of the Company and whether pursuant to Article 6 of this Agreement, by liquidating distribution, redemption, repurchase or otherwise; provided that, unless otherwise determined by the Board, any recapitalization or exchange or conversion of Equity Interests of the Company, redemption or repurchase of Equity Interests of the Company in exchange for other Equity Interests in the Company and any subdivision (by Share split or otherwise) or any combination (by reverse Share split or otherwise) of any outstanding Shares or other Equity Interests of the Company, in each of the foregoing cases, that is accomplished on a *pro rata* basis among all holders of Equity Interests in the Company in proportion to their respective Share Percentage Interests, shall not be deemed a Distribution.

"**Drag-Along Member**" has the meaning set forth in Section 8.02(a).

"**Drag-Along Notice**" has the meaning set forth in Section 8.02(a).

"**Effective Date**" means the date of consummation of the transactions contemplated by the Plan.

"**Employee**" means an employee of the Company or any of its Subsidiaries.

"**Entity**" means any general partnership, limited partnership, limited liability company, unlimited liability company, corporation, joint venture, trust, business trust, cooperative, association or other entity.

"**Equity Interest**" means (a) any shares of capital stock of a corporation, (b) any general or limited partnership interest in any partnership, (c) any membership or other ownership interest in any limited liability company, (d) any equity security of or other ownership interest in any other legal entity, (e) any phantom equity or equity appreciation or similar rights, (f) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing entity, (g) any subscriptions, calls, warrants, options, or commitments of any kind or character relating to, or entitling any Person or entity to purchase or otherwise acquire membership interests or Shares, capital stock, or any other equity securities, (h) any securities (whether debt or equity securities) convertible into or exercisable or

- 4 -

exchangeable for partnership interests, membership interests or Shares, capital stock, or any other equity securities or (i) any other interest classified as an equity security of a Person. For the avoidance of doubt the Common Shares are Equity Interests of the Company.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"**Exit Transfer**" has the meaning set forth in Section 8.02(a).

"**Exit Transferees**" has the meaning set forth in Section 8.02(a).

"**Exiting Members**" has the meaning set forth in Section 8.02(a).

"**Fiscal Quarter**" means the three (3) consecutive calendar month period commencing on the first day of the Fiscal Year, and each three (3) consecutive calendar month period in such Fiscal Year commencing on the day immediately following the end of the preceding Fiscal Quarter.

"**Fiscal Year**" has the meaning set forth in Section 2.08.

"**Fully Exercising Rights Holder**" has the meaning set forth in Section 8.04(b).

"**Fund Indemnitee**" has the meaning set forth in Section 4.05(f).

"**Fund Indemnitor**" has the meaning set forth in Section 4.05(f).

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" means a nation or government, a state or other political subdivision of it, an entity exercising executive, legislative, judicial, regulatory or administrative functions of or relating to government (including a government authority, agency, department, board, commission or instrumentality of any government, or a tribunal), any other regulatory body, an arbitrator of competent jurisdiction or a self-regulatory organization (including a stock exchange).

"**Greywolf Member**" collectively means Greywolf Event Driven Master Fund and Greywolf Strategic Master Fund SPC, LTD. – MSP2.

"**Horsehead Debtor**" has the meaning set forth in the recitals to this Agreement.

"**Hotchkis and Wiley Member**" collectively means Hotchkis and Wiley High Yield Fund, Hotchkis and Wiley Capital Income Fund, San Diego County Employees Retirement Association, Santa Barbara County Employees Retirement System, National Elevator Industry Pension Plan, Texas County and District Retirement System, University of Dayton and its Affiliates.

- 5 -

"**HSR**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Indemnified Parties**" has the meaning set forth in Section 4.05(a).

"**Independent Director**" has the meaning set forth in 4.01(b)(iv).

"**Indemnity Obligations**" has the meaning set forth in Section 4.05(e).

"**Initial 10% Member**" means each Member holding at least ten percent (10%) of the then outstanding Shares as of the Effective Date.

"**Initial Capital Contributions**" has the meaning set forth in Section 3.01(a).

"**Initial Public Offering**" means an initial underwritten public offering of Common Shares with a value in excess of $100,000,000 in gross proceeds by the Company pursuant to an effective registration statement filed by the Company with the Commission (other than on Forms S-4 or S-8 or successors to such forms) under the Securities Act.

"**Interested Transaction**" has the meaning set forth in Section 4.06.

"**Investor Director**" has the meaning set forth in Section 4.01(b).

"**Investor Members**" means the Greywolf Member, the Lantern Member and the MAK Capital Member.

"**Lantern Member**" means [Lantern Asset Management].

"**Liens**" means pledges, claims, liens (statutory or otherwise), charges, mortgages, deeds of trust, hypothecations, leases, subleases, occupancy agreements, title retention agreements, adverse interests, title defects, charges, options, warrants, rights of first refusal, rights of first offer, preemptive rights, voting trusts or agreements, proxies, easements, encroachments, licenses, rights of way, servitudes, restrictions, covenants, burdens, encumbrances and security interests of any kind or nature whatsoever.

"**Liquidation Event**" means the liquidation or dissolution of the Company.

"**Liquidator**" has the meaning set forth in Section 10.03(b).

"**MAK Capital Member**" means [MAK Capital Fund L.P or MAK-ro Capital Master Fund LP].

"**Maintenance Capital Expenditures**" means that level of capital expenditures required to maintain the Company's Mooresboro, North Carolina facility in good working order in the ordinary course of business consistent with past practice, but in no event shall such amount be in excess of $5 million during any fiscal year.

"**MEIP**" means the management equity incentive plan of the Company adopted as of the date hereof pursuant to the Plan.

"**Member**" means each Person admitted to the Company as a Member whose name is set forth on Schedule I hereto as a Member as of the date hereof, and any other Person admitted as an additional or substituted Member in accordance with the terms hereof, solely (a) for so long as such Person remains a Member and (b) in such Person's capacity of a holder of Shares or other Equity Interests.

"**Member Parties**" has the meaning set forth in Section 4.05(e).

"**Merger**" has the meaning set forth in Section 8.02(a).

"**New Holding Company**" has the meaning set forth in Section 4.01(h)(iii).

"**New Issuance Shortfall**" has the meaning set forth in Section 8.04(b).

"**New Securities**" means any Equity Interests of the Company or any of its Subsidiaries, whether now authorized or not, and rights, options or warrants to purchase such Equity Interests; provided, however, that the term "New Securities" does not include securities issued or issuable (a) pursuant to any management or equity incentive plan or award or other similar compensation plan or award, including the MEIP, approved by the Board, (b) pursuant to the Plan or upon the exercise of any security issued pursuant to the Plan, (c) by the Company or any of its subsidiaries in connection with any *pro rata* stock dividend or subdivision of securities (including any subdivision or stock split) or any *pro rata* combination of securities (including any reverse stock split), (d) pursuant to the Additional Capital Commitment, or (e) as consideration for any acquisition by the Company of the stock, assets, properties or business of any Person (including through a merger, consolidation or other business combination involving the Company that has been approved by the Board; provided that such Person is neither a Member nor a Relative or Affiliate of a Member, current or former director of the Company or any of its Subsidiaries, or, if a Member or Relative or Affiliate of a Member or current or former director of the Company or any of its Subsidiaries, such acquisition is approved by a majority of the Independent Directors (for the avoidance of doubt in any instance where this Agreement calls for a specified approval which includes a majority of Independent Directors, if there are two (2) or fewer Independent Directors then on the Board, such approval shall require all of the Independent Directors) as well as being approved in accordance with the provisions of Section 4.06.

"**New Securities Notice**" has the meaning set forth in Section 8.04(b).

"**Non-Purchasing Holder**" has the meaning set forth in Section 8.04(b).

"**Non-Selling Members**" has the meaning set forth in Section 8.03.

"**Notice of Intent**" has the meaning set forth in Section 8.03(a).

"**Oversubscription Pro Rata Share**" has the meaning set forth in Section 8.04(b).

"**Partial Exit Transfer**" has the meaning set forth in Section 8.03.

"**Permitted Transfer**" means:

(a)    in the case of any Member who is an individual, a Transfer of Common Shares or other Equity Interests of the Company to a trust or estate planning-related entity for the sole benefit of such Member or such Member's Relatives;

(b)    in the case of any Member that is a partnership (i) a Transfer of Common Shares or other Equity Interests of the Company by such Member to its limited, special or general partners or their equivalents as a distribution by such partnership to its partners or equivalents, (ii) a Transfer of Common Shares or other Equity Interests of the Company made to any Affiliate of such Member or (iii) a Transfer of either Common Shares or other Equity Interests of the Company or of Equity Interests in such Member by any limited partner of such Member; or

(c)    in the case of any Member that is a corporation, company or limited liability company, (i) a Transfer of Common Shares or other Equity Interests of the Company by such Member to its stockholders or members, as the case may be, as a distribution by such Person to its stockholders or members, as the case may be, (ii) a Transfer of Common Shares or other Equity Interests of the Company made to any Affiliate of such Member or (iii) a Transfer of either Common Shares or other Equity Interests of the Company or of Equity Interests in such Member by any non-controlling stockholder or non-managing member of such Member.

"**Permitted Transferee**" shall mean any Transferee of a Member that received Common Shares or other Equity Interests of the Company by means of a Permitted Transfer in accordance with the terms of this Agreement.

"**Person**" means any individual or Entity and, where applicable based on the context, the legal representatives, successors in interest and permitted assigns of such Person.

"**Plan**" has the meaning set forth in the recitals.

"**Preemptive Rights Holders**" has the meaning set forth in Section 8.04(a).

"**Pro Rata Share**" has the meaning set forth in Section 8.04(a).

"**Regulations**" means the regulations issued by the U.S. Department of the Treasury under the Code (whether in proposed, final or temporary form), as amended.

"**Relative**" means with respect to each Member, such Member's spouse, former spouse, child, stepchild, parent, parent of spouse, sibling or grandchild or a trust, family limited partnership or other similar legal entity for the benefit of such Member or any of the foregoing.

"**Restricted Common Shares**" means all Common Shares other than Common Shares issued pursuant to section 1145 of the Bankruptcy Code or otherwise pursuant to an effective registration statement.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"**Share Percentage Interest**" means, with respect to any Member at any relevant time, the percentage obtained by dividing (a) the aggregate number of all of such Member's Common Shares at such time by (b) the aggregate number of the then-outstanding Common Shares at such time.

"**Shares**" means the Common Shares and any other Equity Interests of the Company issued pursuant to the terms of this Agreement.

"**Subsidiary**" means with respect to any Person, (a) any corporation, partnership or other Entity of which shares of capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other similar managing body of such corporation, partnership or other Entity are at the time owned or controlled, directly or indirectly, by such Person, or (b) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries by such Person.

"**Tag-Along Acceptance Period**" has the meaning set forth in Section 8.03(d).

"**Tag-Along Member**" has the meaning set forth in Section 8.03(d).

"**Tax Advances**" has the meaning set forth in Section 7.09(a)).

"**Taxes**" means any and all federal, state, provincial, local, foreign and other taxes, levies, fees, imposts, duties, and similar governmental charges of any sort whatsoever (including any interest, fines, assessments, penalties or additions to tax imposed in connection therewith or with respect thereto).

"**Transfer**" means to transfer, sell, assign, pledge, hypothecate, give, create a security interest in or Lien on, place in trust (voting or otherwise), transfer by operation of law or in any other way encumber or dispose of, directly or indirectly and whether or not voluntarily, any Common Shares or other Equity Interests of the Company (or any beneficial interest in Common Shares or other Equity Interests of the Company), and for purposes of Section 8.02, includes any Merger.

"**Transferee**" means any Person to whom a Member has Transferred Common Shares pursuant to a Transfer.

"**Unpurchased New Securities**" has the meaning set forth in Section 8.04(b).

"**Unpurchased New Securities Share**" has the meaning set forth in Section 8.04(b).

"**UPA**" has the meaning set forth in the Plan.

"**Warrants**" has the meaning set forth in the Plan.

- 9 -

## ARTICLE 2

## **ORGANIZATION**

2.01    Formation of Company.  The Company was formed pursuant to the Act by means of a Certificate of Conversion and Certificate of Formation on the date hereof.  The Members hereby agree to continue the Company, which was formed pursuant to the provisions of the Act on the Effective Date, and hereby agree that the Company shall be governed by the terms and conditions of this Agreement and, except as otherwise provided herein, the Act.  To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.02    Name.  The name of the Company shall be "Horsehead Holding LLC".  The business of the Company shall be conducted under such name or under such other names as the Board may deem appropriate and the Board may (without the consent of any Member) change the Company's name at any time and from time to time in accordance with the provisions of the Act and upon notice to the other Members.

2.03    Office; Agent for Service of Process.  The address of the Company's registered office in Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware, 19801.  The name and address of the registered agent in Delaware for service of process are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware, 19801.  The Company shall maintain a principal place of business and office(s) at such place or places as the Board may from time to time designate.  The Company shall provide prompt written notice to the Members of any change in the Company's principal place of business.

2.04    Effective Date; Term.  This Agreement is entered into, and is effective as of the Effective Date. The Company commenced on the date of the original certificate of incorporation of Horsehead Debtor, and the term of the Company shall continue until the dissolution of the Company in accordance with the provisions of Article 10 hereof or as otherwise provided by law.

2.05    Purpose and Scope.  The purpose of the Company is to engage in any lawful business, operations or activities permitted under the Act and any other applicable law or regulation.  The Company is empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described herein, for the protection and benefit of the Company, and relating to asset management, unless otherwise agreed to in writing by the Members.

2.06    Filings; Authorized Persons.  The Members shall execute and deliver such documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and each other jurisdiction in which the Company shall own property or conduct business.  [●] was designated as an "authorized person," within the meaning

- 10 -

of the Act, solely to execute, deliver and file the Certificate of Conversion applicable to and the Certificate of Formation of the Company, and the execution, delivery and filing of such Certificate of Conversion and such Certificate of Formation by [●] on [●], 2016 is hereby ratified.

2.07    Admission of Members.

(a)    On the Effective Date and pursuant to the Plan, each of the Members has converted, or is deemed to have converted, directly or indirectly, to or for the benefit of the Company, such shares of common stock in Horsehead Debtor, for newly authorized and issued Common Shares of the Company, as set forth on Schedule I attached hereto opposite such Member's name.  Pursuant to the Plan, (i) all Equity Interests issued by Reorganized Holdings prior to the effective time of the Certificate of Conversion on the Effective Date are hereby cancelled and extinguished and of no further force or effect, (ii) each Member consents to such cancellation and extinguishment, and (iii) each Member is automatically deemed to have accepted the terms of this Agreement (in its capacity as a Member of the Company) and is automatically deemed to be a party hereto as a Member as if, and with the same effect as if, such Member had delivered a duly executed counterpart signature page to this Agreement, in each case, without any further action by any party. After giving effect to the transactions set forth in this Section 2.07(a), each Member holds the Units set forth on Schedule I opposite such Member's name. Notwithstanding anything to the contrary contained herein, no further approval of the Board, any Member or any other Person shall be required with respect to the foregoing

(b)    No additional Person shall be admitted as a Member other than in connection with (i) a Transfer of Shares, (ii) the exercise of a Warrant or (iii) the issuance of New Securities in compliance with the terms of this Agreement, but only if such Person has also complied with all the restrictions and conditions imposed by this Agreement on such Transfer, exercise or issuance, including, without limitation, those conditions and restrictions set forth in Article 8, and those conditions imposed by this Agreement on a Person seeking to become an Additional Member, including those set forth in Article 9.  A Person so consented to be admitted as a Member shall be so admitted upon furnishing to the Board an acceptance, in form satisfactory to the Board, of all the terms and conditions of this Agreement, and such other documents as the Board shall require.

(c)    The name of each Member shall be listed on Schedule I attached hereto. The Board shall cause Schedule I to be updated from time to time as necessary to accurately reflect the information required to be included therein.  Any amendment or revision to Schedule I made in accordance with this Agreement shall not be deemed an amendment to this Agreement.  Any reference in this Agreement to Schedule I shall be deemed to be a reference to Schedule I as amended and in effect from time to time.

2.08    Fiscal Year.  The fiscal year of the Company shall be the twelve month period ending on December 31 of each calendar year (such period, along with any relevant portion thereof, "**Fiscal Year**").  The Board may change the Fiscal Year of the Company from time to

time, in accordance with applicable law, and will promptly give written notice of any such change to the Members.

ARTICLE 3

**CAPITAL CONTRIBUTIONS; INTERESTS**

3.01    Capital Contributions.

(a)    Initial Capital Contributions.  As of the Effective Date, the Members have made (or have been deemed to have made) initial capital contributions to the Company in the amounts set forth on Schedule I hereto (taking into consideration and as of immediately following and giving effect to the consummation of the Additional Capital Commitment (if the Additional Capital Commitment is effective as of the Effective Date) and the other transactions contemplated by the Plan to take place on the Effective Date) (collectively, the "**Initial Capital Contributions**").  No interest shall accrue on any Capital Contribution except as otherwise provided in this Agreement, and no Member shall have the right to withdraw or be repaid any Capital Contribution.

(b)    Additional Capital Contributions.  Except as otherwise set forth in the Additional Capital Commitment Subscription Agreements, no Member shall be obligated to make any Additional Capital Contribution to the Company.  Except in accordance with Section 8.04, no Member shall be permitted to make an Additional Capital Contribution (other than the Additional Capital Commitment).  All amounts paid to the Company by a Member as additional equity capital (other than Initial Capital Contributions, but including the capital commitment paid in the Additional Capital Commitment (when and as paid)) shall be deemed to be an additional capital contribution (collectively, the "**Additional Capital Contribution**" and, together with the Initial Capital Contributions, the "**Capital Contributions**") by such Member for the purposes of this Agreement, and Schedule I shall be amended at the time of such Additional Capital Contribution.

(c)    Class of Shares; Ownership, Issuance and Redemption of Shares.  The Company is authorized to issue up to [●] Common Shares (subject to adjustment and increase for any Common Shares to be issued in connection with the Additional Capital Commitment).  [_____] are reserved for issuance in connection with the MEIP; and [_____] are reserved for issuance upon exercise of the Warrants.

(d)    Exercise of Warrants.  Upon exercise of any Warrant, a Warrant holder shall be issued the number of Common Shares to which it is entitled under the terms of the Warrant and shall be admitted to the Company as a Member.  Each Warrant holder upon exercise is automatically deemed to have accepted the terms of this Agreement as a Member of the Company and is automatically deemed to be a party hereto as a Member upon exercise of any Warrant as if, and with the same effect as if, such Member had delivered a duly executed counterpart signature page to this Agreement, in each case without any further action by any party, and Schedule 1 shall be amended at the time of such exercise to reflect the issuance of the Common Shares for which such Warrant was

- 12 -

exercised, provided, however, that the Company may require any such Warrant holder to execute a counterpart signature page to this Agreement upon such exercise.

3.02    Allocation of Equity Interests.    In consideration of the Initial Capital Contributions and in accordance with the Plan, each Member has been allocated and hereby confirms acceptance, as of the Effective Date, of the Common Shares set forth against such Member's name in Schedule I and the Company hereby confirms that such Common Shares are duly and validly issued limited liability company interests, free and clear of Liens and of any other encumbrances.  Nothing herein shall prohibit the Company from (in the Board's discretion) issuing a certificate or certificates evidencing such Member's Equity Interests in the Company (in accordance with the terms of the Act) but in no event shall the Company be required to issue any certificates evidencing Equity Interests in the Company unless the Board decides that issuing such certificates is appropriate.

3.03    Voting Rights; Written Consents.  Except to the extent expressly provided in this Agreement or as required by applicable law, Members (in their capacities as such) shall not be entitled to any vote, consent or approval rights; provided, however, that whenever any vote, consent or approval is expressly required of the Members by this Agreement or the Act, the vote consent or approval of Members holding at least a majority of the Common Shares held by all Members shall be required, unless a greater percentage is otherwise expressly specified.  Any action required or permitted to be taken at a meeting may be taken without a meeting if a consent, in writing, setting forth the action so taken shall be signed by the Members holding a majority of the Common Shares held by all Members (or any such greater percentage as is otherwise required with respect to the action); provided, however, that prompt notice of the taking of an action by less than unanimous written consent shall be given by the Company to those Members who did not sign such consent.  Notwithstanding the foregoing or anything in this Agreement to the contrary, any transactions involving the sale of all or substantially all of the assets of the Company and its Subsidiaries, fifty percent (50%) or more of the voting power of the Common Shares or other Equity Interests of the Company, fifty percent (50%) or more of the economic value, taken as a whole, of the Company and its Subsidiaries, or a merger, consolidation or other business combination in which the Company or its applicable Subsidiary will not be the surviving entity (a "Sale Transaction"), shall require (i) if such Sale Transaction is to be approved within six (6) months of the date of this Agreement, a vote of Members of the Company holding at least three-fourths (3/4th) of the number of then outstanding Common Shares, (ii) if such Sale Transaction is to be approved at a time after six (6) months of the date of this Agreement, but within twelve (12) months of the date of this Agreement, a vote of Members of the Company holding at least two-thirds (2/3rds) of the number of then outstanding Common Shares and (iii) if such Sale Transaction is to be approved after the twelve (12) month anniversary of the date of this Agreement, a vote of Members of the Company holding at least a majority of the number of then outstanding Common Shares.

3.04    Withdrawals.  Except as explicitly provided herein, no Member shall have any right (a) to withdraw as a Member from the Company, (b) to withdraw from the Company all or any part of such Member's Capital Contributions, (c) to receive property other than cash in return for such Member's Capital Contribution or (d) to receive any Distribution from the Company, except in accordance with the terms of this Agreement.

- 13 -

3.05    Liability of the Members Generally.  Except as explicitly provided in the Act, no Member shall be liable for any debts, liabilities, contracts or obligations of the Company or any of its Subsidiaries whatsoever.  Each of the Members acknowledges that its Capital Contributions are subject to the claims of any and all creditors of the Company to the extent provided by the Act and other applicable law.

ARTICLE 4

**MANAGEMENT**

4.01    Management; Board of Directors.

(a)    Management.  The Board of Directors of the Company (the "**Board**") shall have the authority of "manager" for purposes of the Act.   The management, operation and control of the business and affairs of the Company shall be vested exclusively in the Board, except as otherwise expressly provided for in this Agreement or as required by applicable law.  Subject to any consent rights specifically provided to the Members in this Agreement, the Board shall have full and complete power, authority and discretion for, on behalf of and in the name of the Company, to enter into and perform all contracts and other undertakings that it may deem necessary or advisable to carry out any and all of the objects and purposes of the Company.  A Director acting individually will not have the power to bind the Company.  The power and authority of the Board may be delegated by the Board to a committee of Directors, to any officer of the Company or to any other Person engaged to act on behalf of the Company.  For so long as any Greywolf Director, Lantern Director, or MAK Capital Director, respectively, is serving on the Board, then at least one (1) Greywolf Director, Lantern Director, and MAK Capital Director, respectively, shall be invited to serve on each committee of Directors upon formation thereof and, if there is any material change in the powers or authority delegated to such committee, each such Investor Director shall be invited to serve on such committee to the extent any such Investor Director is not already serving thereon.

(b)    Board Composition and Voting.  Each Investor Member shall vote all Common Shares or other Equity Interests of the Company entitled by their terms to vote on such matters owned by such Investor Member or over which such Investor has voting control, and shall take all other necessary or desirable actions within his, her or its control (including in his, her or its capacity as a Member (including attending all meetings of Members in person or by proxy for purposes of obtaining a quorum and executing all written consents in lieu of meetings, as applicable), Director, member of a Board committee, officer of the Company or otherwise), and the Company shall take all necessary or desirable actions within its control, to ensure that the Board shall initially be composed of at least six (6) Directors, consisting of:

(i)    for so long as the Greywolf Member, together with its Affiliates and Permitted Transferees, owns at least 30% of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), three (3) individuals

- 14 -

designated by the Greywolf Member (each a "**Greywolf Director**"), each of whom for the initial Board will be designated by the Greywolf Member prior to the date hereof; provided, however, that (A) at such time as the Greywolf Member together with its Affiliates and Permitted Transferees, owns less than 30%, but 20% or more of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), the Greywolf Member shall only be entitled to designate two (2) Greywolf Directors, (B) at such time as the Greywolf Member together with its Affiliates and Permitted Transferees, owns less than 20%, but 15% or more of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), the Greywolf Member shall only be entitled to designate one (1) Greywolf Director, and (C) at such time as the Greywolf Member together with its Affiliates and Permitted Transferees, owns less than 15% of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), the Greywolf Member shall cease to have the right to designate any Greywolf Director pursuant to this Section 4.01(b)(i);

(ii)    for so long as the Lantern Member, together with its Affiliates and Permitted Transferees, owns at least 20% of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), two (2) individuals designated by the Lantern Member (each, a "**Lantern Director**"), each of whom for the initial Board will be designated by the Lantern Member prior to the date hereof; provided, however, that (A) at such time as the Lantern Member together with its Affiliates and Permitted Transferees, owns less than 20%, but 15% or more of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), the Lantern Member shall only be entitled to designate one (1) Lantern Director and (B) at such time as the Lantern Member together with its Affiliates and Permitted Transferees, owns less than 15% of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), the Lantern Member shall cease to have the right to designate any Lantern Director pursuant to this Section 4.01(b)(ii); and

(iii)    for so long as the MAK Capital Member, together with its Affiliates and Permitted Transferees, owns at least 15% of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), one (1)

- 15 -

individual designated by the MAK Capital Member (the "**MAK Capital Director**" and, together with the Greywolf Directors and the Lantern Director, the "**Investor Directors**"), who for the initial Board will be designated by the MAK Capital Member, prior to the date hereof; provided, however, that at such time as the MAK Capital Member, together with its Affiliates and Permitted Transferees, owns less than 15% of the outstanding Common Shares (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction), the MAK Capital Member, shall cease to have the right to designate a MAK Capital Director pursuant to this Section 4.01(b)(iii);

(iv)    subject to Section 4.01(e)(ii), the number of remaining Directors, if any, shall be selected by the vote of a majority of the issued and outstanding Common Shares owned by the Members or otherwise provided in this Agreement.

Notwithstanding the foregoing, either on the date of this Agreement or no later than 135 days after the date of this Agreement the number of Directors constituting the Board shall be increased to eight (8) Directors and the additional two (2) Directors shall be individuals each of whom is (A) not an Affiliate or Associate of the Company or any of its Subsidiaries or any Member and (B) a person with experience and expertise in the industry in which the Company operates (each, an "**Independent Director**"), who shall be selected by the vote of a majority of the issued and outstanding Common Shares owned by the Members and who shall serve until such time as his or her respective successors shall have been selected in accordance with Section 4.01(b)(iv) or as otherwise provided in this Agreement so long as such individual meets the criteria for an Independent Director set forth above; provided, however, that if, at the time an Independent Director is to be selected pursuant to Section 4.01(b)(iv), any Member or any "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of Members, together with its Affiliates, owns, or is the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Exchange Act, or any successor provision, but only as a result of a written contract, arrangement, understanding, or agreement) of, more than 50% of the outstanding Common Shares, then such Independent Director shall be selected by the vote of two-thirds or more of the outstanding Common Shares. With respect to the initial two (2) individuals to be designated to serve as Independent Directors, interviews with potential Independent Director candidates will be set up at a time and location mutually agreed by the Investor Members, and each Investor Member who wishes shall be entitled to participate in such interviews. If the number of Directors that an Investor Member has the right to designate to the Board is decreased pursuant to Section 4.01(b)(i), (ii) or (iii), then the Board may remove such Director or Directors, as the case may be, from the Board by a vote of three (3) or more Directors, not including the Investor Director(s) that such Investor Member has lost the right to designate. Any vacancy created by such removal shall be filled in the manner prescribed by Section 4.01(b)(iv).

(c)    Board Observers. Any Initial 10% Member (other than any Investor Member so long as such Investor Member has a right to designate an Investor Director pursuant to Section 4.01(b)) who owns at least ten percent (10%) or more of the then outstanding Common Shares may designate one (1) observer to the Board; provided,

however, that, so long as the Hotchkis and Wiley Member owns the same or greater percentage (in each case, (x) excluding any securities issued or issuable pursuant to the MEIP or the Warrants and (y) as adjusted for any share splits, Equity Interest distributions, recapitalizations or similar transaction) of Common Shares as it holds on the Effective Date, it shall have the right to appoint an observer in the same manner as an Initial 10% Member.  The Company shall give each observer prior written notice of every meeting of the Board at the same time and in the same manner as notice is given to the Directors and all such observers shall have the rights to attend meetings of the Board.  The Company shall provide each observer with copies of all written materials and other information given to the Directors in connection with such meetings or otherwise (including, without limitation, all resolutions proposed to be adopted by written consent in lieu of a meeting of the Board and all information provided to the Directors in connection therewith) at the same time such materials or information is given to the Directors.  In the case of telephonic meetings, the observers shall be given the opportunity to participate in such telephonic meetings.  Notwithstanding the foregoing, the Company may exclude observers from having access to any notices, materials or information, and the portions of any meetings, in each case to the extent that such exclusion is reasonably necessary to preserve the Company's attorney-client privilege.  For the avoidance of doubt, no observer shall be entitled to vote on any matter before the Board, and no observer shall be considered a Director for any purpose of this Agreement.  The Company shall not pay the observers any fee, but shall reimburse the observers for reasonable travel and other out of pocket expenses incurred by the observers, related to him or her serving in such capacity as an observer or in performing his or her duties in connection herewith.

(d)     Company Action.  The Company shall take all necessary and desirable actions within its control (including calling special Board and stockholder meetings) to effectuate the provisions of this Section 4.01.

(e)     Removal; Vacancies.

(i)     Except as provided in the penultimate sentence of Section 4.01(b), an Investor Director may be removed at any time as a Director with or without cause upon the written request of the Investor Member that appointed such Investor Director.  In the event that a vacancy is created on the Board at any time due to the death, disability, retirement, resignation or removal of an Investor Director, then, subject to Section 4.01(b), the Investor Member that designated such Investor Director shall have the right to designate an individual to fill such vacancy.  Each Investor Member shall vote all its Common Shares or other Equity Interests of the Company entitled by their terms to vote for Directors, and shall take all other necessary or desirable actions within its control in furtherance of the provisions of this Section 4.01(e)(i) (including attending all meetings of Members in person or by proxy for purposes of obtaining a quorum and executing all written consents in lieu of meetings, as applicable), and the Company shall take all necessary or desirable actions within its control, to remove or replace from the Board such Investor Director upon, and only upon, such written request or affirmative vote, as applicable.  Except as provided in this Section 4.01(e)(i),

- 17 -

unless the applicable Investor Member shall otherwise consent in writing, no other Investor Member shall take any action to cause the removal of an Investor Director.

(ii)     Each Director (other than an Investor Director) may be removed at any time as a Director (A) with or without cause upon the affirmative vote a majority of the issued and outstanding Common Shares owned by the Members or (B) with cause upon the affirmative vote of a majority of the Board; provided, however, that, if (1) an Independent Director is being removed by the holders of the Common Shares and (2) any Member or any "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of Members, together with its Affiliates, owns, or is the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Exchange Act, or any successor provision, but only as a result of a written contract, arrangement, understanding, or agreement) of, more than 50% of the outstanding Common Shares, then such removal shall require the affirmative vote of two-thirds or more of the outstanding Common Shares.  Subject to the first sentence of this Section 4.01(e)(ii), each Investor Member shall vote all Common Shares or other Equity Interests of the Company entitled by their terms to vote on such matters owned by such Investor Member or over which such Investor Member has voting control, and shall take all other necessary or desirable actions within his, her or its control (including in his, her or its capacity as a Member (including attending all meetings of Members in person or by proxy for purposes of obtaining a quorum and executing all written consents in lieu of meetings, as applicable), Director, member of a Board committee, officer of the Company or otherwise) so that each Director other than an Investor Director shall hold his or her office until his or her death or until his or her successor shall have been duly elected and qualified.  In the event that a vacancy is created on the Board at any time due to the death, disability, retirement, resignation or removal of a Director other than an Investor Director, then such vacancy shall be filled in accordance with the provisions of Section 4.01(b)(iv).

(f)     Resignation.  A Director may resign at any time from the Board by delivering his or her written resignation to the Board.  Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event.  The Board's acceptance of a resignation shall not be necessary to make it effective.  Any vacancy created by such resignation shall be filled in the manner prescribed by Section 4.01(b).

(g)     Subsidiary Boards of Directors.  The Company (in its capacity as the direct or indirect equityholder of each other subsidiary of the Company) shall cause the Persons constituting the Board to be appointed as the sole members of the board of directors (or similar governing body) of each of the Subsidiaries of the Company; provided, however, that a vote of two-thirds of the Board (a "**Board Supermajority**") may determine to admit additional members to the board of directors (or similar governing body) of any particular Subsidiary.

- 18 -

(h)      Board Meetings; Quorum; Vote Required.

(i)      Board Meetings.  The Board shall schedule regular meetings at least once every Fiscal Quarter (or such other frequency as may reasonably be determined by the Board) to be held at a location reasonably agreeable to the members of the Board.  Any meetings of the Board may be held by, and any member of the Board may attend any Board meeting by, telephonic conference call or other electronic communication where the members of the Board can hear each other.  Special meetings of the Board (other than regularly scheduled quarterly meetings) may be called by two (2) or more members of the Board.  All meetings shall be held upon not less than five (5) calendar days' notice by mail or not less than forty eight (48) hours' notice delivered personally or by telephone, facsimile or electronic mail.  Each notice (other than regularly scheduled quarterly meetings) shall specify the general purpose of the applicable meeting.  Notice of a meeting need not be given to any member of the Board who signs a waiver of notice or consent to holding the meeting, or who attends the meeting without protesting the lack of notice to such member of the Board.

(ii)      Quorum.  The quorum in a meeting of the Board shall be (A) at any time the number of Directors constituting the Board consists of six (6) Directors, at least three (3) members of the Board and (B) at any time the number of Directors constituting the Board consists of eight (8) Directors, at least five (5) members of the Board, in each of case (A) and (B) at least one (1) of whom must be a Greywolf Director, at least one (1) of whom must be a Lantern Director and at least one (1) of whom must be the MAK Capital Director, in each case, at all times that the Greywolf Member, the Lantern Member or the MAK Capital Member, as applicable, is entitled to appoint a Director pursuant to Section 4.01(b); provided, however, if at any particular meeting a quorum is not present because of the absence of a Greywolf Director, a Lantern Director or a MAK Capital Director, then at any subsequent meeting of the Board within seven (7) days where the same matters are among those scheduled for discussion, a quorum shall not require the Investor Director who was absent from such previous meeting(s) of the Board.  Any action to be taken by the Board may be taken by telephonic conference call or other electronic communication where the members of the Board can hear each other, in-person meeting, or written consent; provided, however, that any written consent of the Board must be executed by all members of the Board in order to be valid and effective.

(iii)      Vote Required.  Except as otherwise expressly provided in this Agreement, all action taken by the Board shall require the affirmative vote of a majority of the members of the Board eligible to vote thereon.  In any matter that is to be voted on by members of the Board, the members of the Board may vote in person or by telephone.  Notwithstanding the foregoing, (1) any decision by the Board to commit any amount in excess of Maintenance Capital Expenditures to the Company's facility located in Mooresboro, North Carolina, shall require a vote of at least three-fourths (3/4th) of the Board, (2) any decision by the Board to (A) issue any New Securities or (B) form any parent company or holding

- 19 -

company of the Company (other than as a result of a Sale Transaction entered into in compliance with the terms of this Agreement) (such company, a "**New Holding Company**"), shall require a vote of a Board Supermajority and (3) any decision by the Board to call the Additional Capital Commitment shall require a vote of at least three-fourths (3/4th) of the Board and be subject to the terms of the UPA, the satisfaction of each of the conditions set forth in the UPA and the satisfaction of the following conditions:

(1)      the Additional Capital Commitment Units will be issued (if at all) at a price per unit equal to the lower of (x) a value per unit implied by a total equity value of the Company and its Subsidiaries equal to $235,450,000; and (y) if, and only if, the spot price of zinc listed on the London Metals Exchange has been below $0.80/lb for ten (10) consecutive Business Days prior to the date of issuance of the applicable ACC Call Notice (as defined in the UPA), the fair market value of such units at the time of issuance (as determined by a nationally recognized independent valuation firm selected in good faith by the Board); provided, however, that such fair market value shall in no event be less than seventy-five percent (75%) of $277,000,000; and

(2)      the Company shall not have spent, or committed to spend, any money on operating or improving its Mooresboro facility unless and until it has first called all of the Additional Capital Commitment Units for such purpose, and the Additional Capital Commitment Units shall only be called and shall be used exclusively for such purpose.

(i)      Director Expenses.  The Company shall reimburse members of the Board for all reasonable out-of-pocket travel expenses incurred in connection with attending the meetings of the Board.

(j)      Committees of the Board.  The Board shall be authorized to designate an audit committee, a compensation committee and such other committees as it shall determine, each consisting of two (2) or more Directors, to serve at the pleasure of the Board, prescribe the manner in which proceedings of such committees shall be conducted and delegate the authority which such committees shall have.

4.02   Liability Insurance.  The Company will maintain directors & officers insurance and errors & omissions coverage for its Board members, committee members and management personnel on terms and conditions reasonably determined by the Board.

4.03   Officers.

(a)      The Board may appoint individuals as officers ("**Officers**") of the Company as the Board deems advisable with the duties and responsibilities set forth by the Board.  No Officer need be a Member or a Director.  An individual can be appointed to more than one office.  Officers appointed by the Board shall have the authority to bind the Company to the extent authorized by the Board.

(b)     Subject to the terms of any employment agreement between the Company or a Subsidiary and such Officer, the Board may remove any Officer, for any reason or for no reason, at any time.  Subject to the terms of any employment agreement between the Company or a Subsidiary and such Officer, any Officer may resign at any time by giving written notice to the Board, and such resignation shall take effect at the date of the receipt of that notice or any later time specified in that notice; provided, however, that unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.  A vacancy in any office because of death, resignation, removal or otherwise shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

(c)     Subject to the terms of any employment agreement between the Company or a Subsidiary and such Officers, the Officers shall be entitled to receive compensation from the Company as determined by the Board.

(d)     Under the direction of and, at all times, subject to the authority of the Board, the Chief Executive Officer shall have general supervision over the day-to-day business, operations and affairs of the Company.  The Chief Executive Officer shall have such other powers and perform such other duties as may from time to time be prescribed by the Board or this Agreement.

(e)     Any Chief Financial Officer appointed by the Board shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital and Interests.  The Chief Financial Officer shall have the custody of the funds and securities of the Company, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company. The Chief Financial Officer shall have such other powers and perform such other duties as may from time to time be prescribed by the Chief Executive Officer or the Board.

(f)     Any Secretary appointed by the Board shall (i) keep the minutes of the meetings of the Members and the Board in one or more books provided for that purpose, (ii) see that all notices are duly given in accordance with the provisions of this Agreement and as required by law, (iii) be custodian of the company records, (iv) keep a register of the addresses of each Member which shall be furnished to the Secretary by such Member, and (v) in general perform all duties incident to the office of a secretary of a company. The Secretary shall have such other powers and perform such other duties as may from time to time be prescribed by the Chief Executive Officer or the Board.

4.04   Exculpation.

(a)     To the fullest extent permitted by law (including Section 18-1101(b), (c), (d), and (e) of the Act), each Member agrees that:

(i)     notwithstanding any duty otherwise existing at law or in equity, and notwithstanding any other provision of this Agreement, no Member or

- 21 -

Director shall owe any duty (including fiduciary duties) to the Company, any of the Members or any other Person that is a party to or is otherwise bound by this Agreement, in connection with any act or failure to act, whether hereunder, thereunder or otherwise; provided, however, that this clause (i) shall not eliminate the implied contractual covenant of good faith and fair dealing; provided, further, however, that no Director shall serve as a director or officer for, or otherwise act as an advisor to, any portfolio company in direct or indirect competition with the Company, and

(ii)    no Director or Member shall have any personal liability to the Company, any of the Members, or any other Person that is a party to or is otherwise bound by this Agreement for monetary damages in connection with any act or failure to act, or breach, whether hereunder, thereunder or otherwise; provided, however, that this paragraph (ii) shall not limit or eliminate liability for any act or omission that constitutes (A) a bad faith violation of the implied contractual covenant of good faith and fair dealing or (B) willful misconduct.

(b)    If any provision of Section 4.04(a) is held to be invalid, illegal or unenforceable, the duties and personal liability of the Directors to the Company, any of the Members or any other Person that is a party to or is otherwise bound by this Agreement shall be eliminated to the greatest extent permitted under the Act.

(c)    Other than with respect to the Board to the extent to which Section 4.04(a) is applicable (unless Sections 4.04(a) and (b) are held to be invalid, illegal or unenforceable, in which case this Section 4.04(c) shall apply to the Directors), subject to applicable law, no such Director shall be liable, in damages or otherwise, to the Company, the Members or any of their Affiliates for any act or omission performed or omitted by any of them (including, without limitation, any act or omission performed or omitted by any of them in reliance upon and in accordance with the opinion or advice of experts, including, without limitation, of legal counsel as to matters of law, of accountants as to matters of accounting, or of investment bankers or appraisers as to matters of investment advice, appraisal advice, or valuation), except for any act or omission with respect to which a court of competent jurisdiction has issued a final, nonappealable judgment that such Director committed fraud, was grossly negligent or engaged in willful misconduct.

(d)    The Members expressly acknowledge that the Board is acting on behalf of the Company.  The Board shall not be obligated to consider the separate interest of any Member or other Person (including the tax consequences to any Member or other Person) in deciding, pursuant to its authority granted under this Agreement, whether to cause the Company to take (or decline to take) any actions that are in the interest of the Company. The Directors shall not be liable for monetary damages for losses sustained, liabilities incurred, or benefits not derived by Members in connection with such decisions; provided, however, that neither this Section 4.04(d) shall limit or eliminate liability for any act or omission that constitutes (A) a bad faith violation of the implied contractual covenant of good faith and fair dealing or (B) willful misconduct.

- 22 -

(e)     Notwithstanding anything to the contrary herein, all Officers of the Company shall be subject to all fiduciary and other duties under applicable law to the Company and the Members (but not any creditor of the Company).  Without limiting the generality of the foregoing, each officer of the Company shall have fiduciary duties to the Company and the Members (but not any creditor of the Company) to the same extent that officers of a Delaware corporation would have to such corporation and its stockholders.

(f)     The provisions of this Section 4.04 are for the benefit of the Directors, Members, Officers, their heirs, successors, assigns and administrators, all of whom are third party beneficiaries of this Section 4.04, and shall not be deemed to create any rights for the benefit of any other Persons.

4.05    Indemnification.

(a)     To the fullest extent permitted by applicable law, the Company shall and does hereby agree to indemnify and hold harmless against any liabilities and pay all judgments and claims against each Director, each Officer, each Member, any Affiliate of any of the foregoing Persons, each employee of the Company, and each of the foregoing Persons' respective officers, directors, employees, stockholders, partners (limited and/or general), managers, members, consultants and agents (in each case in their respective capacities as such) (the "**Indemnified Parties**"), each of which shall be a third party beneficiary of this Agreement solely for purposes of this Section 4.05 from and against claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated (collectively, "**Damages**") incurred by them or by the Company for any act or omission taken or suffered by the Indemnified Parties (including, without limitation, any act or omission taken or suffered by any of them in reliance upon and in accordance with the opinion or advice of experts, including, without limitation, of legal counsel as to matters of law, of accountants as to matters of accounting, or of investment bankers or appraisers as to matters of valuation) in connection with the business or operation of the Company or any of its Subsidiaries (including in connection with such Indemnified Party serving as an officer, director, manager, employee or agent of any other Entity at the request of the Board), including costs and reasonable attorneys' fees and any amount expended in the settlement of any claims or loss or damage, except to the extent such liability arose out of an act or omission by such Person which constitutes gross negligence, bad faith or willful misconduct.  Notwithstanding the foregoing, the Company shall not be obligated to indemnify any Indemnified Party pursuant to this Section 4.05 for such Indemnified Party's obligations under any other agreement with the Company or any of its Subsidiaries.

(b)     The satisfaction of any indemnification obligation pursuant to Section 4.05(a) hereof shall be from and limited to assets of the Company and its Subsidiaries (including insurance and any agreements pursuant to which the Company, the Directors, Officers or employees are entitled to indemnification) and no Member, in such capacity, shall be subject to personal liability.

- 23 -

(c)      Expenses reasonably incurred by an Indemnified Party in defense or settlement of any claim that is reasonably expected to be subject to a right of indemnification hereunder shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of such Indemnified Party to repay such amount to the extent that it shall be determined upon final adjudication after all possible appeals have been exhausted that such Indemnified Party is not entitled to be indemnified hereunder.

(d)      Without limitation of Section 4.02, to the extent reasonably determined by the Board, the Company may purchase and maintain insurance on behalf of one or more Indemnified Parties and other Persons against any liability which may be asserted against, or expense which may be incurred by, any such Person in connection with the Company's activities, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

(e)      The Company further agrees that with respect to any Indemnified Party who is employed, retained or otherwise associated with, or appointed or nominated by, any of the Members or any of their Affiliates and who acts or serves as a member of the Board, a member of any committee of the Board, director, officer, fiduciary, employee, consultant, advisor or agent of, for or to the Company or any of its Subsidiaries, that the Company or such Subsidiaries, as applicable, shall be primarily liable for all indemnification, reimbursements, advancements or similar payments (the "**Indemnity Obligations**") afforded to such Indemnified Party acting in such capacity or capacities on behalf or at the request of the Company or such Subsidiary, whether the Indemnity Obligations are created by law, organizational or constituent documents, contract (including this Agreement) or otherwise.  Notwithstanding the fact that any of the Members or any of their Affiliates, other than the Company (such Persons, together with its and their heirs, successors and assigns, the "**Member Parties**"), may have concurrent liability to an Indemnified Party with respect to the Indemnity Obligations, the Company hereby agrees that in no event shall the Company or any of its Subsidiaries have any right or claim against any of the Member Parties for contribution or have rights of subrogation against any Member Parties through an Indemnified Party for any payment made by the Company or any of its Subsidiaries with respect to any Indemnity Obligation. In addition, the Company hereby agrees that in the event that any Member Parties pay or advance an Indemnified Party any amount with respect to an Indemnity Obligation, the Company will, or will cause its Subsidiaries to, as applicable, promptly reimburse such Member Parties for such payment or advance upon request.  The Company and the Indemnified Parties agree that, notwithstanding anything to the contrary herein, the Member Parties are express third-party beneficiaries of the terms of this Section 4.05.

(f)      Certain Indemnitees that are directors, officers, employees, stockholders, partners, limited partners, members, equityholders, managers, or advisors of any Member or any of such Member's Affiliates (each such Person, a "**Fund Indemnitee**") may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of such Member and/or its Affiliates (collectively, the "**Fund Indemnitors**").  Notwithstanding anything to the contrary in this Agreement or otherwise:  (i) the Company is the indemnitor of first resort (*i.e.*, the Company's

- 24 -

obligations to each Fund Indemnitee are primary and any obligation of the Fund Indemnitors to advance Damages or to provide indemnification for such Damages incurred by each Fund Indemnitee are secondary), (ii) the Company shall be required to advance the full amount of Damages incurred by each Fund Indemnitee and will be liable for the full amount of all such Damages paid in settlement to the extent legally permitted and as required by this Agreement, without regard to any rights each Fund Indemnitee may have against the Fund Indemnitors, and (iii) the Company irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by the Fund Indemnitors on behalf of a Fund Indemnitee with respect to any claim for which such Fund Indemnitee has sought indemnification or advancement of Damages from the Company shall affect the foregoing and the Fund Indemnitors will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Fund Indemnitee against the Company. The Fund Indemnitors are express third party beneficiaries of the terms of this Section 4.05(f).

4.06    Transactions with Affiliates  Except as otherwise expressly permitted under this Agreement, the Company shall conduct, and shall cause each of its Subsidiaries to conduct, all transactions with its Affiliates and Members (other than wholly-owned Subsidiaries of the Company), current or former directors of the Company or any of its Subsidiaries, or any Relative or Affiliate of any of the foregoing (including, without limitation, any loan or other extension of credit from any such Person to the Company or any of its Subsidiaries) (each, an "**Interested Transaction**") on terms that are fair and reasonable and no less favorable to the Company or such Subsidiary than it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate, Member, current or former director of the Company or any of its Subsidiaries, or Relative or Affiliate of any of the foregoing, and in compliance with all applicable laws.  Any such Interested Transaction must be approved by both a majority of the members of the Board (not including any Director nominated by a Member with an interest in such Interested Transaction) and by a majority of the Independent Directors.

4.07    Limited Liability Company Opportunity.

(a)    Each Member, and the Company, acknowledges and affirms that the Members and their Affiliates and Associates may have, and may continue to, participate, directly or indirectly, in investments in assets and businesses which are, or will be, suitable for the Company or competitive with the Company's business.

(b)    Notwithstanding any other provision of this Agreement to the contrary (and to the fullest extent permitted by applicable laws), each Member, individually and on behalf of the Company, and the Company, expressly (i) waives any conflicts of interest or potential conflicts of interest that exist or arise as a result of any such investments and agrees that no Member, Director nor any of their respective Affiliates or Associates, nor any of the foregoing Persons' respective directors, officers, members, managers, partners or representatives, shall have liability to any other Member or any Affiliate or Associate thereof, or to the Company, its Subsidiaries or any of their

- 25 -

respective Affiliates or Associates, with respect to such conflicts of interest or potential conflicts of interest, (ii) acknowledges and agrees that any Member or Director and any of their respective Affiliates and Associates, and any of the foregoing Persons' respective directors, officers, members, managers, partners or representatives, may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, its Subsidiaries and their respective Affiliates and Associates, (iii) acknowledges and agrees that no Member nor any of their respective Affiliates or Associates, nor any of the foregoing Persons' respective directors, officers, members, managers, partners or representatives (including any Director) will have any duty to disclose to the Company or any other Person any such business opportunities, whether or not competitive with the Company's business and whether or not the Company might be interested in such business opportunity for itself (except to the extent that such representative is an officer, consultant or employee of the Company or its Subsidiaries), (iv) agrees that the terms of this Section 4.07 to the extent that they modify or limit a duty or other obligation (including fiduciary duties), if any, that a Member or a Director may have to the Company or any other Person under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and (v) waives to the fullest extent permitted by the Act any duty or other obligation, if any, that a Member or Director may have to the Company or another Person, pursuant to the Act or any other applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 4.07.

4.08    Change in Corporate Form.  Prior to any (a) conversion of the Company from a limited liability company to any other corporate form or (b) election by the Company to no longer be treated as a corporation for federal income tax purposes, the affirmative vote of both a Board Supermajority and Members of the Company holding three-fourths (3/4th) of the number of then outstanding Common Shares shall be required to approve any such conversion or election.

ARTICLE 5

**REPORTING REQUIREMENTS**

5.01    Reporting Requirements.

(a)    The Company shall furnish to each Member, in accordance with GAAP, to the extent applicable:

(i)    for the first three Fiscal Quarters of each year, as soon as available, and in any event within [forty-five (45)] days after the end of each such Fiscal Quarter, the consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such fiscal quarter and the related consolidated statements of income, members' equity and cash flows of the Company and its consolidated Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year in reasonable detail; and

(ii)     for each Fiscal Year, as soon as available, and in any event within [one hundred and five (105)] days after the end of each Fiscal Year, the audited consolidated financial statements of the Company and its consolidated Subsidiaries (including a balance sheet, statement of income and statement of cash flows, together with the notes thereto) as at the end of such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year in reasonable detail and a report thereon by the Company's certified independent accountants.

(b)     The Company shall provide quarterly reports to the Members summarizing the results of the Company's operations and the financial performance of the Company for the prior fiscal quarter and year-to-date.

(c)     The Company shall make the information and reports to be provided pursuant to Sections 5.01(a) and 5.01(b) hereof available to the Members and potential transferees of a Member's Shares, which access shall be provided by posting such information and reports on an online data system, such as intralinks, with a 'click-through' confidentiality agreement.

(d)     In no event shall any financial information required to be furnished pursuant to Sections 5.01(a) and 5.01(b) be required to include any information required by, or to be prepared or approved in accordance with, or otherwise be subject to, any provision of Section 404 of the Sarbanes-Oxley Act of 2002 or any rules, regulations, or accounting guidance adopted pursuant to that section.

(e)     The current accounting firm of the Company is [●].  The Board (or a duly authorized committee thereof) shall retain the current accounting firm or select a new accounting firm for the Company annually.  Any new accounting firm shall be selected from among the following "big four" nationally recognized accounting firms:  KPMG, PriceWaterhouseCoopers, Deloitte & Touche or Ernst & Young.

ARTICLE 6

**DISTRIBUTIONS**

6.01     Distributions Generally.  Except as otherwise provided herein, the Company shall make distributions at such times and in such amounts as the Board determines in its sole discretion.  Any such distributions made with respect to the Common Shares shall be made to the Members *pro rata* in proportion to their respective Share Percentage Interest.

6.02     Restricted Distributions.  Notwithstanding anything to the contrary contained in this Agreement, the Company shall not make a Distribution to any Member if such Distribution would violate the Act or other applicable law (but shall use commercially reasonable efforts to make such Distribution in a manner that does not violate the Act or any other applicable law).

ARTICLE 7

**ACCOUNTING AND TAX MATTERS**

7.01   Books and Records.  The Company shall keep or cause to be kept books and records reflecting all of the Company's activities and transactions in accordance with GAAP, to the extent applicable.  Each Member, and their respective agents and representatives shall be afforded access to the Company's books and records for any proper purpose reasonably related to its status as a Member (as reasonably determined by the Board), at any reasonable time during regular business hours upon reasonable notice to the Company.  The Company shall preserve all books and records kept pursuant to this Section 7.01 for a period of three (3) years after the date of dissolution of the Company.  Notwithstanding anything contained herein, the Board shall have the right to limit the access to any sensitive information (financial or otherwise) regarding the Company of any Member who the Board reasonably determines is, or is affiliated with or related to, a competitor of the Company.

7.02   Tax Returns.  The Company shall use commercially reasonable efforts to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required state and local tax returns in each jurisdiction in which the Company owns property or does business.

ARTICLE 8

**TRANSFERS AND WITHDRAWALS**

8.01   Transfers of Equity Interests.  No holder of any Common Shares or other Equity Interests in the Company shall Transfer all or any part of the economic or other rights that comprise any such Common Share or other Equity Interest except for such Transfers made in accordance with the Securities Act, applicable blue sky laws and this Agreement.

(a)   Securities Restrictions; Legends.

(i)   [Each certificate (if any) representing Common Shares issued subject to this Agreement shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT DATED AS OF [ ], 2016 (AS AMENDED FROM TIME TO TIME). ANY PURCHASER OR TRANSFEREE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE WILL BE SUBJECT TO SUCH AGREEMENT.  A COPY OF SUCH AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(ii)    Each certificate (if any) representing Restricted Common Shares subject to this Agreement shall be further stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR IN ACCORDANCE WITH AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS.

BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER:

(1) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR IN ACCORDANCE WITH AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AND THE CONSTITUENT DOCUMENTS OF THE COMPANY;

(2) IN CONNECTION WITH ANY RESALE OR TRANSFER PURSUANT TO AN EXEMPTION UNDER THE SECURITIES ACT, SHALL, PRIOR TO SUCH TRANSFER OR SALE, FURNISH TO THE COMPANY SUCH CERTIFICATIONS, LEGAL OPINIONS OR OTHER INFORMATION AS IT MAY REASONABLY REQUIRE; AND

(3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND."]

(iii)    Each Member agrees, prior to any Transfer of any Common Shares or other Equity Interests of the Company, to give two (2) Business Days written notice to the Company of such Member's intention to effect such Transfer and to comply in all other respects with the provisions of this Article 8.  Each such notice shall describe the manner and circumstances of the proposed Transfer. Each Member agrees that it will, prior to any Transfer of Restricted Common Shares, deliver to the Company a letter from such Member's proposed Transferee informing the Company whether or not such Transferee is an "accredited investor" (as such term is defined in Rule 501 of the Securities Act).  Upon request by the Company, the Member delivering a notice with respect to Restricted Common Shares shall deliver a written opinion, addressed to the

Company, from counsel for the Member holding such Restricted Common Shares, stating that in the opinion of such counsel (which opinion and counsel shall be reasonably satisfactory to the Company) such proposed Transfer of Restricted Common Shares does not involve a transaction requiring registration or qualification of such shares under the Securities Act provided, however, that the Company shall not have the right to request any such opinion and shall not be entitled to object to such Transfer if the Member has held the Restricted Common Shares proposed to be Transferred for at least one (1) year and the Member is not an "affiliate" of the Company as such term is defined under Rule 405 of the Securities Act, it being understood and agreed that any Member who is not entitled to nominate or has not nominated an Investor Director and otherwise owns less than ten percent (10%) of the outstanding Common Shares and other Equity Interests of the Company shall not be an "affiliate" for this purpose.  It is understood and agreed that the right to nominate or the nomination of an Investor Director or ownership of ten percent (10%) or more of the outstanding Common Shares and other Equity Interests of the Company shall not presumptively establish that a Member is an "affiliate" for purposes of the previous sentence. Such Member holding such Restricted Common Shares shall be entitled to effect a Transfer of such shares in accordance with the terms of the notice delivered to the Company, if the Company does not reasonably object to such Transfer and request such opinion within two (2) Business Days after delivery of such notice, or, if it reasonably requests such opinion, does not reasonably object to such Transfer within two (2) Business Days after delivery of such opinion.  The Company may only object to such Transfer of Restricted Common Shares if in its reasonable opinion the proposed Transfer involves a transaction requiring registration or qualification of such shares under the Securities Act.  Each certificate or other instrument evidencing any transferred Common Shares shall bear the legend or legends set forth above in Section 8.01(a), as applicable. Notwithstanding the foregoing, a Member holding Restricted Common Shares may Transfer all or a portion of its Restricted Common Shares to a Permitted Transferee without complying with the terms of this Section 8.01(a)(iii) so long as such Member provides written notice of such Transfer to the Company within three (3) Business Days after the effective date of the Transfer and the other terms of this Agreement have been satisfied.

(b)    Except for any Transfer of Shares on the effective date of a public offering of the Company's securities pursuant to this Agreement, no Transfer shall be permitted if (i) as a result of such Transfer, the Company would be reasonably likely to be subject to reporting obligations under the Exchange Act or otherwise required to make any filing with the Commission or (ii) the proposed transferee or any of its Affiliates is a direct or indirect competitor of the Company or any of its Subsidiaries.  Any attempted Transfer that is prohibited by this Section 8.01(b) shall be null and void and shall not be effective to Transfer any Common Shares or other Equity Interests of the Company, but only to the minimum extent necessary to prevent the Transfer from being prohibited by this Section 8.01(b).

8.02    Drag-Along Obligations.Except for a Permitted Transfer, if any Member or Members holding more than fifty percent (50%) of the voting power of the Common Shares or other Equity Interests of the Company (individually or collectively, the "**Exiting Members**"), acting together or pursuant to a common plan, understanding or arrangement (i) enter into an agreement to Transfer to any Person, in a *bona fide* arm's-length transaction to one or more third parties none of which is an Affiliate or Associate of any Exiting Member, all the Common Shares or other Equity Interests of the Company beneficially owned by such Exiting Members, (ii) request that the Company or any subsidiary thereof consolidate or merge with any Person which is not an Affiliate or Associate of any Exiting Member in a *bona fide* arm's-length transaction (in a consolidation or merger in which (A) Members receive cash or securities of any other Person upon such consolidation or merger and (B) such Person and/or its Affiliates become the beneficial owner of more than fifty percent (50%) of the voting power of the Common Shares or other Equity Interests of (x) the Company or (y) any Subsidiary or Subsidiaries of the Company owning, controlling or otherwise constituting a majority of the consolidated assets of the Company and its Subsidiaries taken as a whole (based on value) (a "**Merger**")) or (iii) request that the Company sell all or substantially all the assets of the Company and its Subsidiaries, to a Person which is not an Affiliate or Associate of any Exiting Member in a *bona fide* arm's-length transaction in which Members receive cash or securities of such other Person upon completion of such transaction (the Person referred to in clause (i), clause (ii) or clause (iii) being referred to herein as "**Exit Transferees**" and any of the transactions referred to in clause (i), clause (ii) or clause (iii) being referred to herein as an "**Exit Transfer**"; provided, that in no event shall an Exit Transfer be deemed to include any transaction effected solely for the purpose of changing, directly or indirectly, the form of organization or the organizational structure of the Company or any of its Subsidiaries), then, subject to the terms (including the limitations) of this Section 8.02, such Exiting Members may elect to require that each other Member (each, a "**Drag-Along Member**") Transfer to such Exit Transferees all the Common Shares and other Equity Interests of the Company beneficially owned by such Drag-Along Member, on terms and conditions that are no less favorable than those applicable to the Exiting Members and that comply with the limitations set forth in Section 8.02(d) (in the case of clause (i) and/or that each Drag-Along Member vote (or consent in writing, as the case may be) in favor of the Merger or sale of assets (in the case of clause (ii) or clause (iii)).  The Exiting Members shall exercise the rights in Section 8.02(a) by providing to the Company written notice of any Exit Transfer (the "**Drag-Along Notice**") setting forth the terms of the proposed Exit Transfer (including the identity of the counterparties thereto) and the proposed closing date.  The Company shall provide each Drag-Along Member with a copy of the Drag-Along Notice within three (3) Business Days of receipt from the Exiting Member.

(c)    All Transfers pursuant to this Section 8.02 shall be consummated contemporaneously at the principal offices of the Company on the later of (i) a Business Day not less than fifteen (15) or more than sixty (60) days after the Drag-Along Notice is delivered to Drag-Along Members or (ii) no later than the fifth Business Day following the expiration or termination of all waiting periods under HSR or any other applicable regulatory regime, to the extent applicable to such Transfer, or at such other time or place as the Exiting Members and the Exit Transferees may agree.  The certificates or other

- 31 -

instruments, if any, evidencing the Common Shares or other Equity Interests of the Company Transferred pursuant to the Exit Transfer shall be duly endorsed for transfer, and delivered on such closing date against payment for the purchase price of such Common Shares or other Equity Interests of the Company, together with all other documents which are necessary to effect such Transfer.

(d)    All Drag-Along Members shall execute and deliver any documents reasonably requested by the Exiting Members, including any agreement containing representations, warranties, covenants, and indemnification obligations (each of which shall be several and neither joint nor joint and several obligations and shall be no more extensive or adverse to any Drag-Along Member than those applicable to the Exiting Members) on the part of the Exiting Members and each Drag-Along Member, provided, however, that the indemnification obligation of each Drag-Along Member (i) shall be limited to the percentage of such consideration that is equal to any comparable percentage limitation with respect to the consideration payable to the Exiting Members, in the case of representations and warranties made by such Drag-Along Member (which shall be limited to customary representations regarding its existence, authority to participate in such Exit Transfer, due execution, ownership of its Common Shares or other Equity Interests of the Company and ability to Transfer such Common Shares or other Equity Interests of the Company free and clear of all Liens and other encumbrances, as applicable), (ii) shall be computed *pro rata* based on the aggregate consideration payable to all Members, in the case of representations and warranties made by the Company, and (iii) shall not under any circumstances exceed in the aggregate the net proceeds actually paid to such Drag-Along Member upon completion of the transaction.  Any documented and reasonable costs and expenses incurred directly in connection with the Exit Transfer by the Exiting Members shall be paid out of the gross proceeds of the Exit Transfer to the extent permissible by the terms and conditions of such Exit Transfer, and, if so permissible, no Drag-Along Member shall have any direct liability for any such costs and expenses.  No Drag-Along Member shall be required to agree to any restrictive covenant in connection with any Exit Transfer.  In addition, the Drag-Along Members shall not exercise any rights of appraisal or dissenters rights that such Member may have (whether under applicable law or otherwise) or could potentially have or acquire in connection with any Exit Transfer that complies with the provisions of this Section 8.02 or any other proposal that is necessary or desirable to consummate the Exit Transfer that complies with the provisions of this Section 8.02.   Any consideration, including escrow or holdbacks, applicable to such Drag-Along transaction shall be applied *pro rata* based on the aggregate consideration payable to all Members.

(e)    In no manner shall Section 8.02(a)-(d) or anything else in this Agreement, be construed to grant to any Member any dissenters rights or appraisal rights or give any Member any right to vote in any Exit Transfer structured as a merger or consolidation (it being understood that the Members hereby expressly waive rights under Section 18-210 of the Delaware Act (entitled "Contractual Appraisal Rights") and any similar right in all circumstances).  This Section 8.02(e) and any waiver of dissenters rights, appraisal rights or similar rights provided by a Member hereunder, shall survive and continue in full force and effect with respect to each Member following the consummation of an Exit Transfer.

(f)    Notwithstanding anything to the contrary contained herein, (A) each Drag-Along Member shall be treated equally and on a *pro rata* basis with each other Drag-Along Member and the Exiting Members, and (B) no Exiting Member shall be entitled, directly or indirectly, to receive a control premium or an extra or special benefit with respect to (i) its Common Shares not shared on a *pro rata* basis by all other holders of Common Shares and (ii) its other Equity Interests of the Company not shared on a *pro rata* basis by all other holders of such class of Equity Interests of the Company.

8.03    Tag-Along Rights.    Except for a Permitted Transfer, if (X) Exiting Members propose an Exit Transfer and do not require each other Member to Transfer the Common Shares beneficially owned by such Members to the Exit Transferees, or (Y) any Member or Members (such Member or Members shall be deemed to be "Exiting Member" for purposes of this Section 8.03), acting together or pursuant to a common plan, understanding or arrangement, elect to enter into an agreement to Transfer to any Person, in a *bona fide* arm's-length transaction to one or more third parties none of which is an Affiliate of any Exiting Member, fifty percent (50%) or more of the outstanding Common Shares (any such Transfer pursuant to clause (X) or (Y), a "**Partial Exit Transfer**"), the Members who are not Exiting Members in such Partial Exit Transfer (the "**Non-Selling Members**") shall have the right to participate in such Partial Exit Transfer on the following terms:

(a)    The Exiting Members shall give the Company prompt written notice (the "**Notice of Intent**"), setting forth the terms of each proposed Partial Exit Transfer (including the identity of the counterparties thereto) and the proposed closing date.

(b)    The Company shall deliver the Notice of Intent to each Non-Selling Member within three (3) Business Days of receipt from the Exiting Members.

(c)    In connection with any Partial Exit Transfer, each Non-Selling Member shall have the right, in its sole discretion, to participate in such Partial Exit Transfer on the same terms and conditions as those applicable to the Exiting Members, including, in the case of an Exit Transfer pursuant to Section 8.02(a)(ii) or Section 8.02(a)(iii) that each Non-Selling Member vote (or consent in writing, as the case may be) in favor of the Merger or sale of assets.

(d)    The Non-Selling Members must exercise their "tag-along" rights by giving written notice to the Exiting Members within twenty (20) days of the delivery of a Notice of Intent by the Company to the Non-Selling Members (the "**Tag-Along Acceptance Period**"), and, in the case of a Partial Exit Transfer specified in clause (Y) of Section 8.03 above, specifying the number of Common Shares that such Non-Selling Member desires to include in the Partial Exit Transfer.  Each Non-Selling Member exercising these "tag-along rights" is referred to as a "**Tag-Along Member**."  The Exiting Members shall attempt to obtain inclusion in the Partial Exit Transfer of the entire number of Common Shares which the Tag-Along Members beneficially own and are seeking to include.  In the event the Exiting Members shall be unable to obtain the inclusion of such entire number of Common Shares in such Partial Exit Transfer, the number of Common Shares to be sold in the Partial Exit Transfer by the Exiting Members and each Tag-Along Member shall be reduced on a *pro rata* basis according to

- 33 -

the proportion which the number of Common Shares which each such party beneficially owns bears to the total number of Common Shares beneficially owned by all such parties.

(e)    All Transfers of Common Shares pursuant to this Section 8.03 shall be consummated contemporaneously at the principal offices of the Company on the later of (i) a Business Day not less than ten (10) or more than sixty (60) days after the last day of the Tag-Along Acceptance Period or (ii) no later than the fifth Business Day following the expiration or termination of all waiting periods under HSR, to the extent applicable to such Partial Exit Transfer, or at such later time or place as the Exiting Members and the Exit Transferees may agree.  The certificates or other instruments, if any, evidencing the Common Shares Transferred pursuant to the Partial Exit Transfer shall be duly endorsed for transfer, and delivered on such closing date against payment for the purchase price of such Common Shares, together with all other documents which are necessary to effect such Partial Exit Transfer.  No party to this Agreement shall Transfer any of its Common Shares to any prospective Transferee if such prospective Transferee declines to allow a Tag-Along Member to participate in a Partial Exit Transfer.

(f)    All Tag-Along Members shall execute and deliver any documents reasonably requested by the Exiting Members, including any agreement containing representations, warranties, covenants, and indemnification obligations (each of which shall be several and neither joint nor joint and several obligations and shall be no more extensive or adverse to any Tag-Along Member than those applicable to the Exiting Members) on the part of the Exiting Members and each Tag-Along Member so electing to participate; provided, however, that the indemnification obligation of each Tag-Along Member shall solely consist of and (i) shall be limited to the percentage of such consideration that is equal to any comparable percentage limitation with respect to the consideration payable to the Exiting Members, in the case of representations and warranties made by such Tag-Along Member (which shall be limited to customary representations regarding its existence, authority to participate in such Partial Exit Transfer, due execution, ownership of its Common Shares and ability to Transfer such Common Shares free and clear of all Liens and other encumbrances, as applicable), and (ii) shall be computed *pro rata* based on the aggregate consideration payable to the Exiting Members and all Tag-Along Members, in the case of representations and warranties made by the Company, and (iii) shall not under any circumstances exceed in the aggregate the net proceeds actually paid to such Tag-Along Member upon completion of the transaction.  Any documented and reasonable costs and expenses incurred directly in connection with the Partial Exit Transfer by the Exiting Members shall be paid out of the gross proceeds of the Partial Exit Transfer to the extent permissible by the terms and conditions of such Partial Exit Transfer, and, if so permissible, no Tag-Along Member shall have any direct liability for any such costs and expenses.  No Tag-Along Member shall be required to agree to any restrictive covenant in connection with any Partial Exit Transfer.  In addition, the Tag-Along Members shall not exercise any rights of appraisal or dissenters rights that such Member may have (whether under applicable law or otherwise) or could potentially have or acquire in connection with any Partial Exit Transfer or any other proposal that is necessary or desirable to consummate the Partial Exit Transfer.  Any consideration, including escrow or holdbacks, applicable to such

- 34 -

Tag-Along transaction shall be applied *pro rata* based on the aggregate consideration payable to the Exiting Members and all Tag-Along Members.

8.04    Preemptive Rights to Purchase New Securities.

(a)    Grant.    Subject to the provisions of this Section 8.04, each Preemptive Rights Holder shall have the right to purchase such Preemptive Rights Holder's Pro Rata Share of all or any part of any New Securities that the Company or any Subsidiary thereof may from time to time issue after the date of this Agreement.  A Preemptive Rights Holder's "**Pro Rata Share**" for purposes of this right shall mean a fraction, the numerator of which is the number of Common Shares owned by such Preemptive Rights Holder immediately prior to the issuance of the New Securities and the denominator of which is the total number of shares of Common Stock then outstanding.   The "**Preemptive Rights Holders**" are each Member of the Company.  Notwithstanding the foregoing, any Preemptive Rights Holder may assign its rights under this Section 8.04 to any of its Affiliates upon written notice to the Company.

(b)    Procedure.    The Company shall give each Preemptive Rights Holder at least twenty (20) days prior written notice, of the Company's intention to issue New Securities (the "**New Securities Notice**"), describing the type and amount of New Securities to be issued to any Person and the price and the general terms and conditions upon which the Company proposes to issue such New Securities.  Each Preemptive Rights Holder may purchase any or all of such Preemptive Rights Holder's Pro Rata Share of such New Securities and may elect to purchase more than such Preemptive Rights Holder's Pro Rata Share in the event that another Preemptive Rights Holder does not elect to purchase its full Pro Rata Share of an issuance of New Securities (a "**New Issuance Shortfall**"), by delivering to the Company, within ten (10) Business Days after the date of mailing of any such New Securities Notice by the Company, a written notice specifying (i) such number of New Securities which such Preemptive Rights Holder desires to purchase and (ii) whether such Preemptive Rights Holder desires to purchase more than its Pro Rata Share of New Securities in the event of a New Issuance Shortfall and, if so, the maximum amount of the unsubscribed-for New Securities (the "**Unpurchased New Securities**") such Preemptive Rights Holder desires to purchase (an "**Unpurchased New Securities Share**"), for the price and upon the general terms and conditions specified in the New Securities Notice.  If any Preemptive Rights Holder fails to notify the Company in writing within such ten (10) Business Day period of its election to purchase any or all of such Preemptive Rights Holder's full Pro Rata Share of an offering of New Securities (a "**Non-Purchasing Holder**"), then such Non-Purchasing Holder will forfeit the right hereunder to purchase that part of such Preemptive Rights Holder's Pro Rata Share of such New Securities that such Preemptive Rights Holder did not agree to purchase.  If a New Issuance Shortfall occurs, the Unpurchased New Securities shall be allocated to each Preemptive Rights Holder that has elected to purchase its Pro Rata Share of New Securities and that has elected to purchase Unpurchased New Securities in the event of a New Issuance Shortfall (each, a "**Fully Exercising Rights Holder**") in the amount of their Unpurchased New Securities Share. In the event that the Company is unable to allocate to each Fully Exercising Right Holder its respective Unpurchased New Securities Share due to the aggregate amount of the

Unpurchased New Securities Shares equaling more than the amount of the Unpurchased New Securities, then the Unpurchased New Securities shall be allocated to each Fully Exercising Rights Holder based on its Oversubscription Pro Rata Share. A Fully Exercising Rights Holder's "**Oversubscription Pro Rata Share**" shall mean a fraction, the numerator of which is the number of Common Shares owned by such Fully Exercising Rights Holder immediately prior to the issuance of the New Securities and the denominator of which is the total number of Common Shares owned by all of the Fully Exercising Rights Holders immediately prior to the issuance of the New Securities.

(c)     Failure To Exercise. In the event that the Preemptive Rights Holders fail to exercise in full the purchase right within the ten (10) Business Day period following delivery of the New Securities Notice, then the Company will have sixty (60) days thereafter to sell the New Securities with respect to which the Preemptive Rights Holders' rights hereunder were not exercised or to enter into an agreement for the sale of the New Securities (in which event the Company shall have forty-five (45) days from the date of the execution of such agreement to sell the New Securities). Any sale of the New Securities shall be at a price and upon terms and conditions not more favorable to the purchasers thereof than specified in the New Securities Notice to the Preemptive Rights Holders. In the event that the Company has not issued and sold the New Securities within the deadlines set forth in this Section 8.04(c), then the Company shall not thereafter issue or sell any New Securities without again first offering such New Securities to the Preemptive Rights Holders pursuant to this Section 8.04.

(d)     Notwithstanding anything to the contrary herein, the Company may issue New Securities to any Person (a "**Purchasing Holder**"), without first complying with the foregoing provisions of this Section 8.04; provided, however, that (i) the Board has determined in good faith that the delay caused by compliance with the foregoing provisions of this Section 8.04 in connection with such New Securities would be reasonably likely to adversely affect the Company and its Subsidiaries; (ii) the notice provided by the Company for such issuance of New Securities shall contain a reasonably detailed summary of all material terms and conditions of the New Securities (including the type of each such New Securities, the amount of each, and the price per Common Share or other Equity Interest) to be issued therein, and the Company shall provide such notice to each Preemptive Rights Holder as soon as reasonably practicable but in any event at least two (2) Business Days prior to the date of such issuance of New Securities; and (iii) the subscription or purchase agreement pursuant to which the Purchasing Holder acquires such New Securities shall require that the Purchasing Holder sell, free and clear of all liens and encumbrances, to each Preemptive Rights Holder who so elects by written notice to the Company in accordance with this paragraph, up to such Preemptive Rights Holder's Pro Rata Share of such New Securities, at the same per-Share price paid by the Purchasing Holder and otherwise on the terms and conditions that would have applied if the Company first complied with the foregoing provisions of this Section 8.04 (including Section 8.04(a)) with respect to such issuance of New Securities. Each Preemptive Rights Holder may elect to exercise all or any portion of its rights under this paragraph by giving written notice to the Company within the later of (i) ten (10) Business Days after its receipt of the notice from the Company of such issuance of New Securities or (ii) three (3) Business Days after the date of the consummation of the issuance of New Securities.

- 36 -

All payments shall be delivered by exercising Preemptive Rights Holders to the Company not later than the date specified by the Company in the New Securities Notice. The parties hereto hereby acknowledge that the intent of this paragraph is to enable each Preemptive Rights Holder to effectively exercise its rights under the foregoing provisions of this Section 8.04, with respect to any issuance of Company Interests pursuant to this paragraph.

8.05   Effect of Prohibited Transfers.   Any Transfer in contravention of any of the provisions of this Agreement shall be void and of no effect, and shall not bind nor be recognized by the Company.

8.06   Records.   In the event of a Transfer of Shares and the admission of any transferee of Shares as a Member of the Company, (a) the Board shall promptly amend the books and records of the Company to reflect such Transfer and admission, (b) in the event that the Transferred Share is represented by a certificate and the transferee thereof requests the same, the Board shall cause the Company to issue a new certificate evidencing such Shares so Transferred to such transferee and (c) if applicable, the Board shall cause the Company to issue one or more new certificates to the transferor Member for that number and class of Shares held by such Member that are not being so Transferred.

8.07   Withdrawal of Members.   No Member shall have the right to withdraw from the Company except on the terms and subject to the conditions set forth in this Agreement.  In the event of a voluntary withdrawal, the withdrawing Member shall provide at least thirty (30) calendar days' prior written notice of withdrawal, and such withdrawal shall become effective upon the last Business Day of the calendar month following the end of such notice period (or, if such date is the last Business Day of a month, then upon such date).  In the event of a withdrawal resulting from a termination of such Member's association with the Company, then the date of termination shall be the effective date of withdrawal.  The effective date of withdrawal for any other reason shall be determined by the consent of the Board, in its discretion.  Notwithstanding the foregoing, nothing in this Section 8.07 shall limit or otherwise affect any rights that a Member may have to transfer Common Shares or other Equity Interests of the Company pursuant to this Agreement (including pursuant to this Article 8).

8.08   Registration Rights.   The Members shall have the registration rights, and Transfers shall be subject to the terms and conditions, set forth on Annex A attached hereto and hereby made part of this Agreement by reference as if it was set forth in full in this Section 8.08.

ARTICLE 9

**ADDITIONAL MEMBERS**

9.01   Admission of Additional Members.

(a)   Additional Members.   Subject to the provisions of Article 8, one or more additional members (each, an "**Additional Member**") may be admitted to the Company as a Member in connection with a Transfer of a Member's Common Shares or other Equity Interests of the Company or upon the exercise of a Warrant.

- 37 -

(b)     Execution of Documents.  Each Additional Member shall execute and deliver a counterpart of this Agreement, whereby such Additional Member becomes a party to this Agreement, as well as any other documents that may be required by the Board.  Upon execution and delivery of a counterpart of this Agreement and subject to prior receipt of all approvals required by this Agreement in respect thereof, such Person shall be admitted as an Additional Member.  Each such Additional Member shall thereafter be entitled to all the rights and subject to all the obligations of Members as set forth herein with respect to the Equity Interests in the Company acquired by such Additional Member and Schedule I shall be updated accordingly.

ARTICLE 10

**DISSOLUTION; LIQUIDATION**

10.01   Dissolution.  This Section 10.01 sets forth the exclusive events which will cause the dissolution of the Company. The provisions of Section 18-801 of the Act that apply unless the limited liability company agreement otherwise provides shall not become operative.  The Company shall be dissolved upon the first to occur of the following events, but the legal existence of the Company shall not terminate until all its property has been distributed and the Certificate of Formation of the Company cancelled in the manner required by the Act:

(a)     upon a vote of at least three-fourths ($3/4^{th}$) of the Board to dissolve the Company; or

(b)     a dissolution is required under Section 18-801(a)(4) of the Act or there is entered a decree of judicial dissolution under Section 18-802 of the Act.

Each Member hereby agrees not to seek a judicial dissolution of the Company.

10.02   Final Accounting.  Upon the dissolution of the Company, a proper accounting shall be made from the date of the previous accounting to the date of dissolution.

10.03   Liquidation.

(a)     Dissolution of the Company shall be effective as of the date on which the event occurs giving rise to the dissolution and all Members shall be given prompt notice thereof in accordance with Section 11.01 hereof, but the Company shall not terminate until the assets of the Company have been distributed as provided for in Section 10.03(c) hereof.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, the business, assets and affairs of the Company shall continue to be governed by this Agreement.

(b)     Upon the dissolution of the Company, a Person or Entity appointed by a vote of at least three-fourths ($3/4^{th}$) of the Board shall act as the liquidator (the "**Liquidator**") of the Company to wind up the Company.  The Liquidator shall have full power and authority to sell, assign and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like

- 38 -

manner. The Liquidator shall have the power to employ, engage and dismiss, on behalf of the Company, any Person to assist in such wind-up and liquidation.

(c)     The Liquidator shall distribute all proceeds from liquidation in the following order of priority:

(i)     first, to creditors of the Company (including creditors who are Members) in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and

(ii)     thereafter, to the Members in accordance with the provisions of Article 6.

(d)     The Liquidator shall determine whether any assets of the Company shall be liquidated through Sale or shall be distributed in kind. A Distribution in kind of an asset to a Member shall be considered, for the purposes of this Article 10, a Distribution in an amount equal to the fair market value of the assets so distributed as determined by the Liquidator in its sole discretion.

10.04  Cancellation of Certificate of Formation. Upon the completion of the Distribution of Company assets as provided in Section 10.03 hereof, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation and shall take such other actions as may be necessary or appropriate to terminate the Company.

ARTICLE 11

**GENERAL PROVISIONS**

11.01  Notices

. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be (a) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (b) delivered by a reputable overnight courier service or (c) transmitted by hand delivery or by facsimile or e-mail addressed as follows:

If to the Company:

Horsehead Holding Corp.
4955 Steubenville Pike, Suite 405
Pittsburgh, PA 15205
Facsimile:     412.788.1812
Attention:     [       ]
E-Mail:     [       ]

with a copy (which shall not constitute notice) to:

[_____]
[_____]

- 39 -

[_____]
Attention:  [_____

If to a Member, to such Member's address as set forth on Schedule I,

or, in each case, such other address as may be specified in writing to the party giving notice in accordance with this Section 11.01.  Such notices, requests, demands and other communications shall be deemed to have been received:

(i)      if mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, on the fifth (5th) Business Day after mailing;

(ii)     if delivered by a reputable overnight courier service, the date actually delivered by such courier service (or, if such date is not a Business Day, on the next subsequent Business Day);

(iii)    if sent by email upon such transmission (so long as written notice of such transmission is sent within three (3) days thereafter by another delivery method hereunder confirming such transmission) (or, if such date of transmission is not a Business Day, on the next subsequent Business Day);

(iv)    if transmitted by hand delivery, (A) on the day of delivery (if delivered on prior to 5:00 p.m. Eastern Time on a day that is a Business Day) or (B) in all other cases, on the next Business Day after the date of such hand delivery; and

(v)     if delivered by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number (or, if such date of transmission is not a Business Day, on the next subsequent Business Day).

11.02  Confidentiality.  While and after ceasing to be a Member, each Member agrees to keep confidential, not to disclose to any Person, and not to use (other than for the benefit of the Company or any of its Subsidiaries) any Confidential Information (other than disclosure to such Member's agents, accountants, legal counsel, advisors or representatives responsible for matters relating to the Company and who need to know such Confidential Information in order to perform such responsibilities in each case on a confidential basis (each such Person being hereinafter referred to as an "**Authorized Representative**")); provided, however, that such Member or any of its Authorized Representatives may make such disclosure to the extent that (i) the Confidential Information is disclosed in connection with the preparation or filing of such Member's tax returns or financial statements, in each case on a confidential basis, (ii) the Confidential Information being disclosed is otherwise generally available to the public, in each case on a confidential basis (except to the extent such disclosure has resulted from a breach of this provision or any other confidentiality restriction), (iii) such disclosure is required by (and only to the extent required by) any governmental body, agency, official or authority having jurisdiction over such Member or Authorized Representative, (iv) such disclosure, based upon

- 40 -

the advice of legal counsel of such Member or Authorized Representative, is otherwise required by law or statute or (v) the Board has given its prior consent thereto.  Prior to making any disclosure described in clause (iv) of this Section 11.02, each Member shall notify the Company of such disclosure and of such advice of counsel.  Each Member shall use all commercially reasonable efforts to cause each of its Authorized Representatives to comply with the obligations of such Member under this Section 11.02.  In connection with any disclosure described in clauses (iii) or (iv) above, the disclosing Member shall use all commercially reasonable efforts to cooperate with the Company in seeking any protective order or other appropriate arrangement as the Board may request.  Notwithstanding the foregoing, nothing in this Section 11.02 will prevent any Member or its Affiliates from (A) complying with their respective accounting or compliance reporting obligations under applicable law or rule of any Governmental Authority, including any reporting obligations arising under the Exchange Act, as amended, or any obligation to comply with ordinary course regulatory exams not targeted specifically at information relating  to the Company or any of its Subsidiaries, (B) from utilizing Confidential Information to enforce their rights under any contract or (C) from communicating with such Member's or its Affiliates' existing or potential investors on a confidential basis solely with respect to (v) the industry and general description of the applicable Member's investment, (w) year of investment by the applicable Member, (x) the amount of any Capital Contributions made by the applicable Member, (y) the amount of any Distributions received by the applicable Member, and (z) the internal rate of return, investment multiple or other similar financial metrics, as calculated by the applicable Member or its Affiliates, with respect to the applicable Member's investment in the Company.

11.03   Fees and Expenses.  Other than as expressly set forth herein, in the UPA, or in the Plan, each of the parties shall pay its own fees and expenses in connection with negotiating, drafting and executing this Agreement.

11.04   Certain Member Representations and Warranties.

(a)      Each Member hereby represents as of the date on which it acquires any Equity Interest in the Company, that, with respect to such Equity Interest: (i) it is acquiring or has acquired such Equity Interest for purposes of investment only, for its own account (or a trust account if such Member is a trustee), and not with a view to resell or distribute the same or any part thereof and (ii) no other Person has any interest in such Equity Interest or in the rights of such Member under this Agreement other than, if applicable, a spouse having community property or similar interest under applicable law. Each Member also represents that it has the business and financial knowledge, sophistication and experience necessary to acquire its Equity Interest in the Company on the terms contemplated herein and that it has the ability to bear the risks of such investment (including the risk of sustaining the complete loss of all its Capital Contributions) without the need for the investor protections provided by the registration requirements of the Securities Act; provided, however, that this sentence shall not have any other effect on any other representations or warranties given or made by any other Person. Each Member further represents that it is an "accredited investor" (as such term is defined by Rule 501 under Regulation D of the Securities Act).

- 41 -

(b)      Each Member hereby represents and covenants that such Member, as applicable, is not subject to any restrictions or prohibitions under any other agreement, understanding, or arrangement, including without, limitation, any non-competition or non-solicitation provision, or under any applicable law, rule, or regulations or judicial or similar ruling that would limit or restrict the ability of such Member to hold an Equity Interest in the Company or serve as an officer or employee of the Company or any of its Subsidiaries.

11.05    Amendments.  Neither this Agreement nor any provision hereof may be amended, modified, waived or supplemented in any manner, whether by course of conduct or otherwise, except with the consent of the Company and the Members who beneficially own at least two-thirds (2/3rd) of the issued and outstanding Common Shares held by the Members.  In addition to the consent required under the foregoing sentence, in order to effect any amendment of, modification of, waiver of or supplement to the provisions of this Agreement that: (i) would adversely affect an individual Member disproportionately as compared to any other Member, shall require the prior written consent of such Member; (ii) would provide any right to any Member not shared proportionally by all Members, shall require the prior written consent of each other Member; (iii) would amend, modify, supplement or rescind, or would have the effect thereof, Section 4.01, Section 4.05, Section 4.06, Section 4.07, Section 4.08, Section 8.01(a), Section 8.02, Section 8.03, or Section 8.04 or, to the extent applying to Section 4.01, Section 4.05, Section 4.06, Section 4.07, Section 4.08, Section 8.01(a), Section 8.02, Section 8.03, or Section 8.04, this Section 11.05, shall require the prior written consent of each Investor Member, or (iv) would amend, modify, supplement or rescind, or would have the effect thereof, Section 8.03 or Section 8.04 or, to the extent applying Section 8.03 or  Section 8.04, this Section 11.05, shall require the prior written consent of Members that are not Investor Members representing at least a majority of the issued and outstanding Common Shares held by such Members.  In addition, in the event the Board determines to create a New Holding Company pursuant to Section 4.01(h)(iii), the certificate of incorporation, by-laws, limited liability company agreement or other similar document providing for the governance of such New Holding Company shall contain provisions providing the holders of Equity Interests of such New Holding Company substantially the same protections as are set forth in Section 4.01, Section 4.05, Section 4.06, Section 4.07, Section 4.08, Section 8.01(a), Section 8.02, Section 8.03, Section 8.04 and Section 11.05 of this Agreement.  No failure or delay by a party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

11.06    Specific Performance.  The parties hereto agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court having jurisdiction pursuant to Section 11.11, in addition to any other remedy to which they are entitled at law or in equity.

11.07    Termination  This Agreement shall terminate upon the first to occur of (a) the closing of an Initial Public Offering and effectiveness of that certain registration rights

- 42 -

agreement referred to in Article 14 of <u>Annex A</u> hereto or (b) the closing of a transaction that would constitute an Exit Transfer.

11.08   <u>Counterparts</u>.   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signature thereto and hereto were upon the same instrument.   This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other parties hereto.

11.09   <u>Construction; Headings</u>.   Whenever the feminine, masculine, neuter, singular or plural shall be used in this Agreement, such construction shall be given to such words or phrases as shall impart to this Agreement a construction consistent with the Equity Interest of the Members entering into this Agreement.   Where used herein, the term "Federal" shall refer to the U.S. Federal government.   As used herein, (a) "or" shall mean "and/or" and (b) "including" or "include" shall mean "including without limitation."   Any reference in this Agreement to $ shall mean U.S. dollars.   The headings and captions herein are inserted for convenience of reference only and are not intended to govern, limit or aid in the construction of any term or provision hereof.   Unless the context otherwise requires, any reference to an "Article," "Section," "Schedule" or "Annex" shall be deemed to refer to an article or section of this Agreement, or a schedule or annex to this Agreement, as applicable.   It is the intention of the parties that every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an Agreement to be strictly construed against the drafting party), it being understood that the parties to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to negotiate the provisions of this Agreement.   All thresholds and percentages of Equity Interests in Company contained herein, whether with respect to the number or value of such Equity Interests, shall be subject to adjustment to give effect to any Equity Interests in the Company issued as a result of any split, dividend paid in Equity Interests of the Company, reclassification, reorganization, merger, consolidation or similar event affecting the Equity Interests of the Company.

11.10   <u>Severability</u>.   Any term or provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity, legality or enforceability of any of the terms or provisions of this Agreement in any other jurisdictions, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.   In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

11.11   <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.   This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware, but not including the choice of law rules thereof.   Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and

obligations arising hereunder, whether in contract, tort or otherwise, brought by the other party(ies) hereto or its successors or assigns shall be brought and determined exclusively in the Delaware Court of Chancery, or in the event that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the District of Delaware, and each party to this Agreement hereby submits to and accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts and appellate courts from any appeal thereof.  Each party to this Agreement further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the delivery of copies thereof in the manner set forth in Section 11.01.  Each party to this Agreement hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum. Nothing in this Section 11.11 shall be deemed to constitute a submission to jurisdiction, consent or waiver with respect to any matter not specifically referred to herein.  No course of dealing between the Company, or its Subsidiaries, and the Member (or any of them) or any delay in exercising any rights hereunder will operate as a waiver of any rights of any party to this Agreement.  The failure of any party to enforce any of the provisions of this Agreement will in no way be construed as a waiver of such provisions and will not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.12  Waiver of Action for Partition.  Each of the Members irrevocably waives during the term of the Company any right that such Member may have to maintain an action for partition with respect to the property of the Company.

11.13  Successors and Assigns.  Subject to Section 9.01 and Article 8, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective Permitted Transferees under this Agreement, if any; provided, that no party hereto may Transfer its Equity Interests in the Company (or any portion thereof or any beneficial interest therein), rights, Shares or obligations hereunder except in accordance with the terms of this Agreement.

11.14  Entire Agreement.  This Agreement, together with the UPA, constitutes the entire agreement among the parties with respect to the subject matter hereof and thereof and supersedes all prior agreements, understandings and negotiations, both written and oral, between the parties with respect to the subject matter hereof and thereof.

11.15  No Third-Party Beneficiaries.  It is understood and agreed among the parties that this Agreement and the covenants made herein are made expressly and solely for the benefit of the parties hereto, and that, other than the Persons specified in Section 4.04 or Section 4.05, no Person shall be entitled or be deemed to be entitled to any benefits or rights hereunder, nor be authorized or entitled to enforce any rights, claims or remedies hereunder or by reason hereof.

11.16    Other Instruments and Acts.  After the date hereof, the Members agree to execute any other instruments or perform any other acts that are or may be necessary or as the Board may reasonably request to effectuate and carry on the Company created by this Agreement; provided, however, that no Member shall be obligated to execute any instruments or perform any acts that conflict with this Agreement, result in the waiver of any of such Member's rights under this Agreement, or alter any of such Member's obligations under this Agreement.

11.17    Binding Agreement.   This Agreement shall be binding upon the transferees, successors, assigns, and legal representatives of the Company and the Members.

11.18    Remedies and Waivers.  No delay or omission on the part of any party to this Agreement in exercising any right, power or remedy provided by law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof.  The single or partial exercise of any right, power or remedy provided by law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy.  The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by law.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

<u>**COMPANY**</u>:

HORSEHEAD HOLDING LLC


By:   _____
Name:
Title:


*[Signature Page to LLC Agreement]*

## Schedule I

### List of Members

| Name and Address of Member | Initial Capital Contribution in respect of Common Shares | Number of Common Shares | Share Percentage Interest |
|---|---|---|---|
| | [●] | [●] | [●]% |
| | [●] | [●] | [●]% |
| | | | |
| **Total:** | **$[●]** | **[●]** | **100%** |

111919414 v24

**Annex A**

**Registration Rights**

ARTICLE 1.
References; Definitions

Unless the context otherwise requires, any reference to a "Article" or "Section" contained in this Annex A shall be deemed to refer to an article or section of this Annex A, as applicable.  Capitalized terms used in this Agreement and not otherwise defined have the meaning set forth in the Limited Liability Company Agreement of Horsehead Holding LLC to which this Annex A is attached.  As used in this Annex A, the following terms have the meanings set forth below:

"**5% Member**" means each Member holding at least five percent (5%) of the outstanding Shares as of the measurement date.

"**Federal Income Tax**" means any Tax imposed under Subtitle A of the Code or any other provision of United States federal income tax law (including the Taxes imposed by Sections 11, 55, 59A, and 1201(a) of the Code), and any interest, additions to Tax or penalties applicable or related to such Tax.

"**FINRA**" means the Financial Industry Regulatory Authority.

"**Piggyback Member**" means (i) the Greywolf Member and its Affiliates who are Members, (ii) the Lantern Member and its Affiliates who are Members, (iii) the MAK Capital Member and its Affiliates who are Members, and (vi) each Member holding at least ten percent (10%) of the then-outstanding Shares, in each case, solely to the extent such Member is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act).

"**Qualified Public Offering**" means a *bona fide* firm commitment underwritten public offering of the equity interests of the Company pursuant to an effective registration statement filed  under the Securities Act in which the net proceeds (after deducting any underwriters' discounts and commissions) received by the Company in such offering are at least $[50,000,000].

"**Registrable Securities**" means all Shares held by the Members whether acquired on or after the date hereof, including (i) the Shares acquired upon the exercise of preemptive rights and (ii) any and all Shares or other equity interests issued or issuable with respect to Registrable Securities by way of shares, stock or other equity interest split, division, dividend or similar transaction or reorganization or in connection with any combination of Shares, stock, or other equity interests, recapitalization, merger, consolidation or other reorganization; provided, however, that Registrable Securities, once issued, shall cease to be Registrable Securities (a) upon the sale or disposal thereof pursuant to an effective Registration Statement, (b) upon the sale thereof to the public pursuant to Rule 144 (or successor rule) under

A-1

the Securities Act, (c) upon the sale thereof in a private transaction in which the transferor's rights under this Agreement are not validly assigned in accordance with the terms of this Agreement or when such Registrable Securities are proposed to be sold or distributed by a Person not entitled to the registration rights under this Agreement or (d) when such Registrable Securities cease to be outstanding.

"**Registration Statement**" means any registration statement filed pursuant to the Securities Act.

"**Securities**" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, such Person's capital stock or other equity interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock.

ARTICLE 2.
Demand Registration Right.

2.01    At any time prior to or after a Qualified Public Offering, each Member or group of Members, collectively holding an aggregate of fifty percent (50%) or more of the outstanding Shares, on a fully diluted basis (collectively, the "**Initiating Members**"), may make a written request (specifying the intended method of disposition and the amount of Registrable Securities (as defined herein) proposed to be sold) that the Company effect, and the Company shall use its reasonable best efforts to effect, a public offering of its Securities (a "**Demand Registration**") consisting of all or a portion of the Registrable Securities collectively held by such Members (subject to Section 5.01).  The Company shall not be obligated to effect a Demand Registration if the Registrable Securities requested by the Initiating Member to be registered have (x) at any time prior to a Qualified Public Offering, an estimated aggregate public offering price (before deduction of any underwriting discounts and commissions) of less than [$75 million] or (y) at any time after a Qualified Public Offering, an estimated aggregate public offering price (before deduction of any underwriting discounts and commissions) of less than $[50 million].  If the Board, in its good faith judgment, determines that any registration of the Registrable Securities should not be made or continued because it would materially interfere with any material financing, acquisition, corporate reorganization or merger or other material transaction involving the Company (a "**Valid Business Reason**"), the Company may (x) postpone filing a Registration Statement relating to a Demand Registration until such Valid Business Reason no longer exists, but in no event for more than one hundred and eighty (180) days, and (y) in case a Registration Statement (as defined herein) has been filed relating to a Demand Registration, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board, acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated; provided, however, that a new Registration Statement is filed within one hundred and eighty (180) days thereafter, or may postpone amending or supplementing such Registration Statement, but in no event for more than one hundred and eighty (180) days; provided, however, that if the registration of Registrable Securities is postponed pursuant to clause (x), the Company shall not be permitted to register under the Securities Act any equity Securities of the Company owned by other Members of the Company during any such postponement. The Company shall give written notice of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid

A-2

Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof. Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing under this ARTICLE 2 more than once in any twelve (12) month period. For the avoidance of doubt, any postponement or withdrawal of a Registration Statement shall not constitute a Demand Registration.

2.02    The Company shall use its reasonable best efforts to cause such Demand Registration to be in the form of a firm commitment underwritten offering and the managing underwriter or underwriter selected for such offering shall be the Company Underwriter (as defined herein). In connection with any Demand Registration under this ARTICLE 2 involving an underwritten offering, none of the Registrable Securities held by an Initiating Member making a request for inclusion of such Registrable Securities shall be included in such underwritten offering unless such Initiating Member accepts the terms of the offering as agreed upon by the Company and the Company Underwriter, such terms to be in an underwriting agreement in customary form, and then only in such quantity as will not, in the opinion of the Company Underwriter, jeopardize the success of such offering.

ARTICLE 3.
Piggyback Registration Right.

3.01    Within ten (10) Business Days following receipt by the Company of a request from the Initiating Members to effect a Demand Registration, the Company shall give written notice of such request to each Piggyback Member (the "**Non-Initiating Members**"), which shall describe the anticipated filing date, the proposed registration and distribution, and offer the Non-Initiating Members the opportunity to register their *pro rata* share of Registrable Securities (an "**Incidental Registration**") in such registration.  Following the receipt of such notice, each Non-Initiating Member shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) Business Days following receipt of notice from the Company, to include all or any portion of their Registrable Securities in such Demand Registration (subject to Section 5.01). The right of each Non-Initiating Member to have Registrable Securities included in a Demand Registration pursuant to this Section 3.01 shall be conditioned upon each Non-Initiating Member entering into (together with the Initiating Member) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Company (the "**Company Underwriter**").  Subject to ARTICLE 5, the Company shall use its reasonable best efforts (within ten (10) Business Days of the notice provided for above) to cause the Company Underwriter to permit the Non-Initiating Member to participate in the Incidental Registration to include its Registrable Securities in such offering on the same terms and conditions as the Registrable Securities being sold for the account of the Initiating Members.

3.02    In connection with an offering by the Company or the Successor Corporation for its own account or for the benefit of any Member (other than a registration statement on Form S-4 or S-8 or any successor thereto), the Company shall give written notice to all of the Members within ten (10) Business Days of the proposed offering.  Following the receipt of such notice, each Member (together with its Affiliates and Permitted Transferees) shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) days following receipt of notice from the Company, to include all or any portion of its Registrable Securities in such offering (subject to Section 5.02). The right of each Member to have Registrable Securities

A-3

included in an offering pursuant to this Section 3.02 shall be conditioned (if an underwritten offering) upon each Member entering into (together with the Company) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Company. Subject to ARTICLE 5, the Company shall use its reasonable best efforts (within ten (10) Business Days of the notice provided for above) to cause the Company Underwriter to permit the Members to participate in a registration pursuant to this Section 3.01 to include its Registrable Securities in such offering on the same terms and conditions as the Registrable Securities being sold for the account of the Company or any other Member.

ARTICLE 4.
Effective Demand Registration.

The Company shall use its reasonable commercial efforts to cause any Demand Registration to become effective not later than ninety (90) days after it receives a request under Section 2.01 hereof and to remain effective for the lesser of (i) the period during which all Shares registered in the Demand Registration are sold and (ii) ninety (90) days, provided, however, that a registration shall not constitute a Demand Registration if (x) after such Demand Registration has become effective, such registration or the related offer, sale or distribution of Registrable Securities thereunder is interfered with by any stop order, injunction or other order or requirement of the Commission or other Governmental Authority for any reason not solely attributable to the Initiating Member and such interference is not thereafter eliminated or (y) the conditions specified in the underwriting agreement, if any, entered into in connection with such Demand Registration are not satisfied or waived, other than by reason of a failure by the Initiating Member.  Subject to the exceptions described in ARTICLE 2 and this ARTICLE 4, the Company shall only be obligated to effect an aggregate of three (3) Demand Registrations under this Agreement.

ARTICLE 5.
Cutback.

5.01    If the Company Underwriter, in connection with a Demand Registration, shall advise the Company in writing on or before the date five (5) days prior to the date then scheduled for such offering that, in its opinion, the amount of Registrable Securities requested to be included in such Demand Registration exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Registrable Securities being offered, then the Company will reduce the Registrable Securities to be included in such offering *pro rata* based on the number of Registrable Securities owned by each such Initiating Member and Non-Initiating Member.

5.02    If the Company Underwriter, in connection with an offering by the Company or the Successor Corporation for its own account or for the benefit of any Member (other than a Demand Registration or a registration statement on Form S-4 or S-8 or any successor thereto) shall advise the Company in writing on or before the date five (5) days prior to the date then scheduled for such offering that, in its opinion, the amount of Registrable Securities requested to be included in such offering exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Registrable Securities being offered, then, the Company will reduce the Registrable Securities to be included in such offering by (i) first only

A-4

including the Registrable Securities (or portion thereof) being sold for the account of the Company as advised can be included by the Company Underwriter and (ii) second, to the extent that all Registrable Securities being sold for the account of the Company can be included, then only including the total number of Registrable Securities of the Members in such offering as advised can be included by the Company Underwriter (in addition to all such Registrable Securities being sold for the account of the Company) with each such Member entitled to include its *pro rata* share based on the number of Registrable Securities owned and proposed to be included by such Member.

ARTICLE 6.
Form S-3 Registration.

6.01    S-3 Registration.  Following a Qualified Public Offering and upon the Successor Corporation becoming eligible for use of Form S-3 (or any successor form thereto) under the Securities Act in connection with a public offering of its securities, in the event that the Successor Corporation shall receive from any 5% Member (together with its Affiliates and Permitted Transferees) (the "**S-3 Initiating Member**") a written request that the Successor Corporation register, under the Securities Act on Form S-3 (or any successor form then in effect) (an "**S-3 Registration**"), all or a portion of the Stock (as defined herein) owned by such S-3 Initiating Member, the Successor Corporation shall give written notice of such request to all of the other Members (other than S-3 Initiating Member) at least ten (10) Business Days before the anticipated filing date of such Form S-3, and such notice shall describe the proposed registration and offer such other Members the opportunity to register the number of shares of Stock as each other Member may request in writing to the Successor Corporation, given within ten (10) Business Days after their receipt from the Successor Corporation of the written notice of such registration. If requested by the S-3 Initiating Member, such S-3 Registration shall be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act.  The Successor Corporation shall use its reasonable best efforts to (x) cause such registration pursuant to this Section 6.01 to become and remain effective as soon as practicable, but in any event not later than forty-five (45) days after it receives a request therefor and (y) include in such offering the Stock of the other Members (other than S-3 Initiating Member) (the "**S-3 Non-Initiating Members**") who have requested in writing to participate in such S-3 Registration on the same terms and conditions as the Stock of the S-3 Initiating Member.

6.02    Delay of S-3 Registration. If the Board has a Valid Business Reason, the Successor Corporation may (x) postpone filing a Registration Statement relating to a S-3 Registration until such Valid Business Reason no longer exists, but in no event for more than ninety (90) days, and (y) in case a Registration Statement has been filed relating to a S-3 Registration, if the Valid Business Reason has not resulted from actions taken by the Successor Corporation, the Successor Corporation, upon the approval of a majority of the Board acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated or may postpone amending or supplementing such Registration Statement. The Successor Corporation shall give written notice to the Members of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof.  Notwithstanding anything to the contrary contained herein, the Successor Corporation may not postpone or withdraw a filing due to a Valid Business Reason more than once in any

A-5

twelve (12) month period.  The Successor Corporation shall not be required to effect any registration pursuant to this ARTICLE 6, (i) within ninety (90) days after the effective date of any other Registration Statement of the Successor Corporation, (ii) if Form S-3 is not available for such offering by the S-3 Initiating Member, (iii) if the Registrable Securities requested by the S-3 Initiating Member to be registered have an estimated aggregate public offering price of less than $[5,000,000], or (iv) the plan of distribution with respect to the Registrable Securities to be included in such S-3 Registration is to be conducted pursuant to an underwritten public offering.

6.03    Cutback.  If the Successor Corporation in connection with any S-3 Registration shall advise the S-3 Initiating Member and S-3 Non-Initiating Member in writing on or before the date five (5) Business Days prior to the date then scheduled for such offering that, in its good-faith opinion, the amount of Stock requested to be included in such S-3 Registration exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Stock being offered, then the Successor Corporation may reduce the Registrable Securities to be included in such S-3 Registration, (i) *pro rata* based on the Percentage Ownership owned by each S-3 Initiating Member and the S-3 Non-Initiating Members or (ii) as otherwise may be agreed upon among the S-3 Initiating Member and the S-3 Non-Initiating Members.

ARTICLE 7.
Holdback Agreements.

7.01    To the extent not inconsistent with applicable law and requested (i) by the Company, the Successor Corporation, the Initiating Member or the S-3 Initiating Member, as the case may be, in the case of a non-underwritten public offering and (ii) by the underwriter, in the case of an underwritten public offering, each Member agrees not to effect any public sale or distribution of any Registrable Securities or of any securities convertible into or exchangeable or exercisable for such Registrable Securities, including a sale pursuant to Rule 144 under the Securities Act, or offer to sell, contract to sell (including any short sale), grant any option to purchase or enter into any hedging or similar transaction with the same economic effect as a sale of Registrable Securities, in each case, during the one-hundred eighty (180) day period (or such lesser period as the underwriter may agree) beginning on the effective date of the registration statement (except as part of such registration) for such public offering (such period of time, the "**Holdback Period**"); provided, however, that the Holdback Period shall be the same with respect to all Members.

7.02    The Company agrees not to effect any public sale or distribution of any of its securities, or any securities convertible into or exchangeable or exercisable for such securities (except pursuant to registrations on Form S-4 or S-8 or any successor thereto), during the period beginning on the effective date of any Registration Statement filed pursuant to ARTICLE 2 in which the Members are participating and ending on the earlier of (i) the date on which all Registrable Securities on such registration statement are sold and (ii) one hundred and eighty (180) days (or such lesser period as the underwriter may agree) after the effective date of such registration statement (except as part of such registration).

ARTICLE 8.
Registration Procedures.

A-6

8.01    Whenever registration of Registrable Securities has been requested pursuant to ARTICLE 2, ARTICLE 3 or ARTICLE 6, the Company or Successor Corporation, as applicable, shall use its reasonable best efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method of distribution thereof as promptly as practicable, and in connection with any such request, the Company shall, as expeditiously as possible (as used in this ARTICLE 8, the term Company shall also include Successor Corporation and Registrable Securities shall also include Stock, as the case may be):

(a)    prepare and file with the Commission a Registration Statement on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate and which form shall be available for the sale of such Registrable Securities in accordance with the intended method of distribution thereof, and cause such Registration Statement to become effective; provided, however, that (x) before filing a Registration Statement or prospectus or any amendments or supplements thereto, the Company shall provide counsel selected by the Members ("**Members' Counsel**") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the Commission, subject to such documents being under the Company's control, and (y) the Company shall promptly notify the Members' Counsel and each seller of Registrable Securities of any stop order issued or threatened by the Commission and promptly take all action required to prevent the entry of such stop order or to remove it if entered;

(b)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the lesser of (x) one hundred and twenty (120) days and (y) such shorter period which will terminate when all Registrable Securities covered by such Registration Statement have been sold; provided, however, that if the S-3 Initiating Member has requested that an S-3 Registration be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act, then the Company shall keep such Registration Statement effective until all Registrable Securities covered by such Registration Statement have been sold; and shall comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

(c)    furnish to each seller of Registrable Securities, prior to filing a Registration Statement, a reasonable number of copies of such Registration Statement as is proposed to be filed, and thereafter such number of copies of such Registration Statement, each amendment and supplement thereto (in each case, including all exhibits thereto), and the prospectus included in such Registration Statement (including each preliminary prospectus) and any prospectus filed under Rule 424 under the Securities Act as each such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(d)    register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as any seller of Registrable Securities may

A-7

request, and to continue such qualification in effect in such jurisdiction for as long as permissible pursuant to the laws of such jurisdiction, or for as long as any such seller requests or until all of such Registrable Securities are sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable any such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller; provided, however, that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 8.01(d), (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process in any such jurisdiction;

(e)     notify each seller of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and the Company shall promptly prepare a supplement or amendment to such prospectus and furnish to each seller of Registrable Securities a reasonable number of copies of such supplement to or an amendment of such prospectus as may be necessary so that, after delivery to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(f)     enter into and perform customary agreements (including an underwriting agreement in customary form with the Company Underwriter) and take such other actions as are prudent and reasonably required in order to expedite or facilitate the disposition of such Registrable Securities, including causing its officers to participate in "road shows" and other information meetings organized by the Company Underwriter;

(g)     upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, which shall be consistent with the due diligence and disclosure obligations under securities laws applicable to the Company and the Members, make available at reasonable times for inspection by any managing underwriter participating in any disposition of such Registrable Securities pursuant to a Registration Statement, Members' Counsel and any attorney, accountant or other agent retained by any managing underwriter, all financial and other records, pertinent corporate documents and properties of the Company and its Subsidiaries (collectively, the "**Records**") as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Company's and its Subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Person in connection with such Registration Statement;

(h)     if such sale is pursuant to an underwritten offering, obtain "cold comfort" letters dated the effective date of the Registration Statement and the date of the closing

A-8

under the underwriting agreement from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by "cold comfort" letters as Members' Counsel or the managing underwriter reasonably requests;

(i)     furnish, at the request of any seller of Registrable Securities on the date such securities are delivered to the underwriters for sale pursuant to such registration or, if such securities are not being sold through underwriters, on the date the Registration Statement with respect to such securities becomes effective, an opinion, dated such date, of counsel representing the Company for the purposes of such registration, addressed to the underwriters, if any, and to the seller making such request, covering such legal matters with respect to the registration in respect of which such opinion is being given as the underwriters, if any, and such seller may reasonably request and are customarily included in such opinions;

(j)     comply with all applicable rules and regulations of the Commission, and make generally available to its security holders, as soon as reasonably practicable but no later than fifteen (15) months after the effective date of the Registration Statement, an earnings statement covering a period of twelve (12) months beginning after the effective date of the Registration Statement, in a manner which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(k)     cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed provided that the applicable listing requirements are satisfied;

(l)     keep Members' Counsel advised as to the initiation and progress of any registration under ARTICLE 2, ARTICLE 3 or ARTICLE 6 under this Annex A;

(m)     cooperate with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA; and

(n)     take all other steps reasonably necessary to effect the registration of the Registrable Securities contemplated hereby.

ARTICLE 9.
Seller Information.

The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such securities as the Company may from time to time reasonably request in writing.

ARTICLE 10.
Notice to Discontinue.

Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 8.01(e), such Member shall forthwith discontinue

A-9

disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until such Members' receipt of the copies of the supplemented or amended prospectus contemplated by Section 8.01(e) and, if so directed by the Company, such Member shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Members' possession, of the prospectus covering such Registrable Securities which is current at the time of receipt of such notice. If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement (including the period referred to in Section 8.01(b)) by the number of days during the period from and including the date of the giving of such notice pursuant to Section 8.01(e) to and including the date when sellers of such Registrable Securities under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by and meeting the requirements of Section 8.01(e).

ARTICLE 11.
Registration Expenses.

The Company shall pay all expenses arising from or incident to its performance of, or compliance with, this Agreement, including (i) Commission, stock exchange and FINRA registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" laws (including reasonable fees, charges and disbursements of counsel to any underwriter incurred in connection with "blue sky" qualifications of the Registrable Securities as may be set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and expenses of counsel to the Company and of its independent public accountants and any other accounting fees, charges and expenses incurred by the Company (including any expenses arising from any "cold comfort" letters or any special audits incident to or required by any registration or qualification) and, in an amount not exceeding $[100,000], the reasonable legal fees, charges and expenses of a single counsel to the Members incurred by such Members participating in any registration as a group, and (v) any liability insurance or other premiums for insurance obtained in connection with any Demand Registration or piggy-back registration thereon, Incidental Registration or S-3 Registration pursuant to the terms of this Agreement, regardless of whether such Registration Statement is declared effective. All of the expenses described in the preceding sentence of this ARTICLE 11 are referred to herein as "**Registration Expenses**" The holder of Registrable Securities sold pursuant to a Registration Statement shall bear the expense of any broker's commission or underwriter's discount or commission relating to registration and sale of such Members' Registrable Securities and, subject to clause (iv) above, shall bear the fees and expenses of their own counsel.

ARTICLE 12.
Indemnification; Contribution.

12.01  Indemnification by the Company.  The Company shall indemnify and hold harmless each Member, its partners, directors, officers, Affiliates and each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) the Member from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending

A-10

against any claim or alleged claim) (each, a "**Liability**" and collectively, "**Liabilities**"), arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, under the circumstances such statements were made), except insofar as such Liability arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning any Member furnished in writing to the Company by such Member expressly for use therein, including the information furnished to the Company pursuant to Section 12.02. The Company shall also provide customary indemnities to any underwriters of the Registrable Securities, their officers, directors and employees and each Person who controls such underwriters (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the same extent as provided above with respect to the indemnification of the Members.

12.02   Indemnification by the Members.  In connection with any Registration Statement in which any Member is participating pursuant to ARTICLE 2, ARTICLE 3 or ARTICLE 6 of this Annex A, each Member shall promptly furnish to the Company in writing such information with respect to such Member as the Company may reasonably request or as may be required by law for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Member not materially misleading or necessary to cause such Registration Statement not to omit a material fact with respect to such Member necessary in order to make the statements therein not misleading. Each Member agrees to indemnify and hold harmless the Company, its partners, directors, officers, Affiliates, any underwriter retained by the Company and each Person who controls the Company or such underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) from and against any and all Liabilities arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, under the circumstances such statements were made), but if and only to the extent that such Liability arises out of or is based upon any untrue statement or alleged omission or alleged untrue statement or omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning such Member furnished in writing by such Member expressly for use therein, provided, however, that the total amount to be indemnified by each Member pursuant to this Section 12.02 shall be limited to such Members' *pro rata* portion of the net proceeds (after deducting the underwriters' discounts and commissions) received by such Member in the offering to which the Registration Statement or prospectus relates.

12.03   Conduct of Indemnification Proceedings.  Any Person entitled to indemnification under this ARTICLE 12 (the "**Registration Statement Indemnified Party**") agrees to give prompt written notice to the indemnifying party (the "**Registration Statement Indemnifying**

A-11

**Party**") after the receipt by the Registration Statement Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which the Registration Statement Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; provided, however, that the failure so to notify the Registration Statement Indemnifying Party shall not relieve the Registration Statement Indemnifying Party of any Liability that it may have to the Registration Statement Indemnified Party hereunder (except to the extent that the Registration Statement Indemnifying Party is prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure).  If notice of commencement of any such action is given to the Registration Statement Indemnifying Party as above provided, the Registration Statement Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Registration Statement Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Registration Statement Indemnified Party.  The Registration Statement Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Registration Statement Indemnified Party unless (i) the Registration Statement Indemnifying Party agrees to pay the same, (ii) the Registration Statement Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Registration Statement Indemnified Party or (iii) the named parties to any such action (including any impleaded parties) include both the Registration Statement Indemnifying Party and the Registration Statement Indemnified Party and the Registration Statement Indemnified Party has been advised by such counsel that either (x) representation of such Registration Statement Indemnified Party and the Registration Statement Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (y) there may be one or more legal defenses available to the Registration Statement Indemnified Party which are different from or additional to those available to the Registration Statement Indemnifying Party.  In any of such cases, the Registration Statement Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Registration Statement Indemnified Party, it being understood, however, that the Registration Statement Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all Registration Statement Indemnified Parties. No Registration Statement Indemnifying Party shall be liable for any settlement entered into without its written consent.  No Registration Statement Indemnifying Party shall, without the consent of such Registration Statement Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Registration Statement Indemnified Party is a party and indemnity has been sought hereunder by such Registration Statement Indemnified Party, unless such settlement includes an unconditional release of such Registration Statement Indemnified Party from all liability for claims that are the subject matter of such proceeding.

12.04   Contribution.  If the indemnification provided for in this ARTICLE 12 from the Registration Statement Indemnifying Party is held by a court of competent jurisdiction to be unavailable to an Registration Statement Indemnified Party hereunder in respect of any Liabilities referred to herein, then the Registration Statement Indemnifying Party, in lieu of indemnifying such Registration Statement Indemnified Party, shall contribute to the amount paid or payable by such Registration Statement Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Registration Statement Indemnifying Party on the one hand and Registration Statement Indemnified Party on the other

in connection with the statements or omissions which resulted in such Liabilities, as well as other relevant equitable considerations.  The relative fault of such Registration Statement Indemnifying Party and Registration Statement Indemnified Party shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such Registration Statement Indemnifying Party or Registration Statement Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in Sections 12.01, 12.02 and 12.03, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; provided, however, that the total amount to be contributed by any Member shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by the Member in the offering.

12.05   Fraud.  The parties hereto agree that it would not be just and equitable if contribution pursuant to Section 12.04 were determined by *pro rata* allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

ARTICLE 13.
Initial Public Offering.

13.01   Notwithstanding any other provision of the Limited Liability Company Agreement of Horsehead Holding LLC to which this Annex A is attached, in connection with an Initial Public Offering of the Company, all Members shall and shall cause their Affiliates to take all necessary or desirable actions in connection with the consummation of such transaction (i) to, as the Board may reasonably request, (x) convert the Company to a corporate form in a Tax-free transaction (except to the extent of taxable income or gain required to be recognized by a Member in an amount that does not exceed the amount of cash or any property or rights (other than stock) received by such Member upon the consummation of such transaction and/or any concurrent transaction) in which the proportionate equity interests of the Members in the successor are the same as their respective interests in the Company, or (y) accomplish the foregoing by effecting a transaction that is treated as the contribution of the Registrable Securities of the Company into a newly formed "shell" corporation pursuant to Section 351 of the Code, with the result that each Member shall hold capital stock of such surviving corporation or business entity (in each case, the "**Successor Corporation**"), and (ii) to cause the Successor Corporation to assume all of the obligations of the Company under this Annex A.

13.02   The Company and the Board will use their respective best efforts to perform any conversion or restructuring contemplated in this ARTICLE 13 in the most Tax efficient manner for the Members, including any Members that are treated as corporations for Federal Income Tax purposes.  Upon the unanimous vote of the Board that such action is necessary to preserve the benefits of "tacking" under Rule 144 of the Securities Act, such conversion or merger may be structured to occur without any action on the part of any Member, and each Member hereby consents in advance to any action that the Board shall deem necessary to accomplish such result.

A-13

A-14

13.03   In connection with an Initial Public Offering, all of the outstanding Shares of the Company shall automatically convert into shares of common stock of the Successor Corporation (the "**Stock**") immediately prior to the consummation of the Initial Public Offering or at such other time as the Board may determine.

13.04   In the event that the Company determines to permit sales of shares of Stock held by Members in connection with an Initial Public Offering, all Members shall have the right to include in such offering a *pro rata* number of such Member's Shares.

ARTICLE 14.
Registration Rights Agreement.

The Company and each of the Members acknowledge and agree that in connection with and effective upon the consummation of a transaction referenced in ARTICLE 13, the Company and each of the Members will enter into a registration rights agreement on substantially the terms and conditions set forth in this Annex A.

**EXHIBIT B-1**

Assumed Executory Contract and Unexpired Lease Schedule

**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES[1]**

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| ACCESS POINT | | | Long distance service | Horsehead Corporation | $7,173.40 |
| ACE | 11/1/2015 | 11/1/2016 | General Liability | Horsehead Corporation | $0 |
| ACE | 11/1/2015 | 11/1/2016 | General Liability | Horsehead Corporation | $0 |
| ADP | 03/18/15 | | Payroll processing | Horsehead Corporation | $ 25,272 |
| AECOM | 2015 | Open Ended | Environmental Services | Horsehead Corporation | $16,145 |
| AFCO | 04/27/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporations | $0 |

---

[1]    As set forth in Article V of the Plan, the Debtors, with the consent of the Requisite Plan Sponsors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease Schedule at any time through and including forty-five (45) days after the Effective Date.  Neither the exclusion nor inclusion of any contract or lease on this schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is an Executory Contract or Unexpired Lease (each as defined in the Plan) or that any of the Debtors has any liability thereunder.

[2]    Certain contracts and leases listed in this schedule may be subject to negotiation.

[3]    The Debtors reserve the right to amend the amounts set forth in this schedule.  For the avoidance of doubt, the rights of parties in interest to object to proposed cure amounts set forth in this schedule are preserved.

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| AIR CENTERS OF SOUTH CAROLINA | 10/14/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ALBARELL ELECTRIC | 09/09/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ALLEN PAVING | 08/13/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ALEX E PARIS | 11/02/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ALI ALAVI | 11/23/11 | Indefinite | Job offer letter | Horsehead Corporation | $0 |
| AMERICAN WASTE | 05/26/11 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ANDERSONS | | 12/31/17 | Rail Car - Lease Rider | Horsehead Corporation | $14,355 |
| ANDRESS ENGINEERING | 12/05/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

2

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| APPTIX | | | Hosted email services for all HH locations | Horsehead Corporation | $1,796.04 |
| ARCELORMITTAL (COATESVILLE) | 02/01/12 | 12/31/18 | EAF dust recycling | Horsehead Corporation | $39.78 |
| ARCELORMITTAL (DOFASCO) | 01/01/15 | 12/31/18 | EAF dust recycling | Horsehead Corporation | $0 |
| ARCELORMITTAL (STEELTON) | 02/01/12 | 12/31/18 | EAF dust recycling | Horsehead Corporation | $870.57 |
| ASTURIANA DE ZINC SA | 09/27/11 | | Technology Package for Zinc Plant | Horsehead Corporation | $0 |
| ATLAS EQUIPMENT RENTAL | 12/30/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ATLAS EQUIPMENT RENTAL | 12/30/13 | Month to Month | Equipment Lease / Rental | Horsehead Corporation | $0 |
| ATMOS ENERGY MARKETING, LLC | 05/01/10 | Month to Month | Utilities | Horsehead Corporation | $5,547 |
| AURORA ENVIRONMENTAL | 10/28/15 | | Environmental | Horsehead Corporation | $0 |
| AURORA ENVIRONMENTAL | 10/28/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

3

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| BANK OF OKLAHOMA, N.A. | 08/24/04 | | Trust Agreement (ODEQ), between Horsehead Corporation & Bank of Oklahoma | Horsehead Corporation | $0 |
| BANK OF OKLAHOMA, N.A. | 10/06/04 | | Trust Agreement (DEQ), between Horsehead Corporation & Bank of Oklahoma | Horsehead Corporation | $0 |
| BARNHART CRANE | 04/08/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| BLAKE AND PENDELTON | 10/01/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| BOTTOMLINE TECHNOLOGIES | 11/27/15 | 11/27/2016 | Create Forms Management system for JD Edwards | Horsehead Corporation | $0 |
| CAROLINA SCALES | 11/09/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| CARDNO | 08/10/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

4

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| CARL GARDNER FAMILY REVOCABLE TRUST (ROCKWOOD) | 03/26/15 | | Amended & Restated Lease Easement Agreement (Rockwood) | Horsehead Corporation | $0 |
| CARMATH, INC. | | 05/31/18 | Rail Car - Lease Rider | Horsehead Corporation | $24,936 |
| CAROLINA PIPING | 09/23/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| CASCO USA | 09/27/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| CEILING BRITE | | | | Horsehead Corporation | $0 |
| CHARTER STEEL (CUYAHOGA HEIGHTS) | 02/01/12 | 02/28/18 | EAF dust recycling | Horsehead Corporation | $0 |
| CHARTER STEEL (SAUKVILLE) | 01/01/10 | 02/28/18 | EAF dust recycling | Horsehead Corporation | $0 |
| CHICAGO RAIL LINK LLC | 01/01/15 | 12/31/17 | Track Lease Agreement #407326 | Horsehead Corporation | $0 |
| CHICAGO RAIL LINK, LLC | 01/01/16 | | Demurrage Agreement | Horsehead Corporation | $55,922 |

5

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| CHICAGO RAIL LINK, LLC | 01/15/16 | 11/31/17 | Track Lease | Horsehead Corporation | $10,741 |
| CICIONI RADIATOR | 01/19/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| CIT GROUP/EQUIP. FINANCING, INC., RA | | 02/28/22 | Rail Car - Lease Rider | Horsehead Corporation | $108,515 |
| CITIGROUP, INC. | 12/23/03 | | (Bartlesville) Escrow Agreement among Horsehead Corporation, Fluor Corporation & Citigroup Global Market Holdings, Inc. | Horsehead Corporation | $0 |
| CLEAN WATER ACTION | 1/6/10 | | CONSENT JUDGMENT | Horsehead Corporation | $0 |
| CLIMATEMP | 12/11/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| CMC (SC ) | 01/01/07 | 12/31/18 | EAF dust recycling | Horsehead Corporation | $0 |
| COMMONWEALTH EDISON | 03/19/93 | Open Ended | Utilities | Horsehead Corporation | $72,121 |

6

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| CONSOLIDATED COMMUNICATIONS | 06/10/14 | 6/10/2017 | Inmetco voice circuit (PRI) and long distance service | Horsehead Corporation | $1,148.50 |
| COWDEN ASSOCIATES, INC. | | Indefinite | Benefits Broker letter | Horsehead Corporation | $0 |
| CRAWFORD DOOR SALES | 09/06/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| DAN MCCOWIN | 09/08/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| DELTA DENTAL | | 12/31/16 | Dental Coverage | Horsehead Corporation | $0 |
| DL KEENEY | 10/08/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| EARL COOK TRUCKING | 08/23/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| EAST TENNESSEE SCALES | 01/17/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

7

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| ECCO COMMUNICATIONS COMPANY | 12/17/03 | | Contract Services | Horsehead Corporation | $0 |
| ELI CONTROLS | 09/19/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ELLWOOD NATIONAL | 04/14/05 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |
| ELLWOOD QUALITY STEELS | 07/01/09 | 10/31/17 | EAF dust recycling | Horsehead Corporation | $0 |
| ENTROPY | | | Zochem Environmental Management System | Horsehead Corporation | $0 |
| ENVIROCLEAN CARDINAL | | Open Ended | Environmental Consulting Agreement | Horsehead Corporation | $0 |
| FENN-VAC | | | Environmental | Horsehead Corporation | $0 |
| FIRST UNION RAIL CORP. | | Multiple Lease Riders | Rail Car - Lease Rider | Horsehead Corporation | $51,205 |

8

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| FLUOR CORPORATION | 12/23/03 | | (Bartlesville) Escrow Agreement among Horsehead Corporation, Fluor Corporation & Citigroup Global Market Holdings, Inc. | Horsehead Corporation | $0 |
| FREEHOLD CARTAGE | | | Environmental | Horsehead Corporation | $17,225 |
| FS SPERRY | 08/26/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| G&R MINERAL | 09/30/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| GATX RAIL LOCOMOTIVE GROUP, LLC | 03/16/15 | 02/19/17 | Contract Services | Horsehead Corporation | $401 |
| GATX RAIL LOCOMOTIVE GROUP, LLC | | 02/18/17 | Equipment Lease / Rental | Horsehead Corporation | $ 16,794 |
| GDF SUEZ ENERGY | 03/26/15 | 12/31/18 | Utilities | Horsehead Corporation | $111,309 |
| GERDAU (BEAUMONT) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |

9

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| GERDAU (CARTERSVILLE) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |
| GERDAU (CHARLOTTE) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $14,326.32 |
| GERDAU (JACKSON, MI) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |
| GERDAU (JACKSON, TN) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |
| GERDAU (KNOXVILLE) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $81.32 |
| GERDAU (MONROE) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $1,773.79 |
| GERDAU (PETERSBURG) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |
| GERDAU (SAYREVILLE) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |
| GERDAU (ST. PAUL) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |
| GERDAU (WILTON) | 01/01/11 | 30 Day Notice | EAF dust recycling | Horsehead Corporation | $0 |
| GREG M. BELLAND | 08/11/15 | Indefinite | Job offer letter | Horsehead Corporation | $0 |
| HAWK MOUNTAIN LABS | | Open Ended | Environmental | Horsehead Corporation | $6,699 |

10

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| HERITAGE ENTERPRISES | 03/01/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| HETRONIC USA | 10/15/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| HIGHMARK BLUE CROSS BLUE SHIELD | | 12/31/17 | Medical, Prescription & Vision Coverage | Horsehead Corporation | $0 |
| HIGHMARK INSURANCE GROUP | | 12/31/16 | Stop Loss (medical) Insurance | Horsehead Corporation | $0 |
| HIGHWAY COMMERCIAL SERVICES | 10/21/15 | 10/21/20 | Equipment Lease / Rental | Horsehead Corporation | $0 |
| HOBGOOD ELECTRIC | 11/01/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| HOEGANAES (TN) | 07/31/12 | 05/31/18 | EAF dust recycling | Horsehead Corporation | $0 |
| INDUSTRIAL PIPING, INC. | 05/07/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

11

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| INDUSTRIAL VACUUM SERVICES | 06/23/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| INFOR | 10/31/15 | 10/31/2016 | BPCS Finance (ERP) System (Inmetco) | Horsehead Corporation | $0 |
| THE INTERNATIONAL METALS RECLAMATION COMPANY, LLC | | | EAF dust recycling | Horsehead Corporation | $18,823.50 |
| INTERSTATE MECHANICAL | 10/14/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| IPSCO KOPPEL TUBULARS | 07/01/15 | 06/30/17 | EAF dust recycling | Horsehead Corporation | $0 |
| J&L PROFESSIONAL SALES | 10/30/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| JBM INC | 09/04/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

12

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| JAM (TWIN TOWERS)LLC AND CCM (TWIN TOWERS) LLC | 02/04/08 | 04/10/17 | Twin Towers Office Lease | Horsehead Corporation | $0 |
| JAMES ROSE | 02/19/15 | Indefinite | Job offer letter | Horsehead Corporation | $0 |
| JBS CRANES & ACCESSORIES, INC | 05/26/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| JOY GLOBAL LONGVIEW | 09/01/12 | 01/31/17 | EAF dust recycling | Horsehead Corporation | $0 |
| JRC COMPANY | 08/21/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| JT THORPE | 09/09/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| KARSKI SECURITY ALARM SYSTEM INC | 10/24/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| KBD TECHNIC | 01/07/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

13

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| KEY ENVIRONMENTAL | | Open Ended | Environmental Consulting Agreement | Horsehead Corporation | $11,692 |
| KT-GRANT INC | 02/24/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| LABOR FINDERS | 10/01/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| LABVANTAGE | 08/03/15 | | Corporate Lab Information Management Sdystem (LIMS) | Horsehead Corporation | $0 |
| LINK COMPUTER CORPORATION | 01/10/15 | | Cisco VoIP phone systems maintenance | Horsehead Corporation | $3,680.19 |
| LINK COMPUTER CORPORATION | 10/01/15 | 10/1/2016 | IBM AS400 hardware maintenance | Horsehead Corporation | $0 |
| LINK COMPUTER CORPORATION | 12/01/15 | 12/1/2016 | Web Hosting | Horsehead Corporation | $0 |
| LINK COMPUTER CORPORATION | Various | | Miscellaneous IT hardware | Horsehead Corporation | $0 |
| LMI (LEE MICHAEL INDUSTRIES INC) | 03/15/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

14

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| LRQA | 2015 | Open Ended | Environmental Services | Horsehead Corporation | $4,301 |
| M & C RAILCAR LEASING | | Month to Month | Rail Car - Lease Rider | Horsehead Corporation | $4,581 |
| MARS | 05/06/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| MARTIN ENGINEERING | 11/08/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| MARTIN MECHANICAL CORPORATION | 11/10/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| MCCURLEY HOUSTON ELECTRIC, INC | 10/25/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| MERRICK & COMPANY | 10/07/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| MERRILL DATASITE | 1/7/15 | | Legal and procurement information repository | Horsehead Corporation | $0 |

15

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| MIDWEST RAILCAR CAPITAL EQUIP. | | 11/30/19 | Rail Car - Lease Rider | Horsehead Corporation | $0 |
| NATIONAL FOOTBALL LEAGUE | 08/13/08 | | Agreement with NFL re Horsehead design (logo) and Denver Broncos Trademarks | Horsehead Corporation | $0 |
| NETXPERTS - TREND MICRO | 09/28/15 | 9/28/2016 | Corporate anti-virus software | Horsehead Corporation | $0 |
| NLMK INDIANA | 12/01/06 | 05/31/17 | EAF dust recycling | Horsehead Corporation | $0 |
| NORTH STAR BLUESCOPE STEEL LLC | 01/01/12 | 12/31/18 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (AUBURN) | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $13,806.71 |
| NUCOR (BERKELEY) | 01/01/08 | 12/31/19 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (CRAWFORDSVILLE) | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (DARLINGTON ) | 01/01/08 | 12/31/19 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (HERTFORD) | 01/01/08 | 12/31/19 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (HICKMAN) | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |

16

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| NUCOR (KANKAKEE) | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (MARION) | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (NEBRASKA) | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (SEATTLE) | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR (UTAH) | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| NUCOR YAMATO STEEL | 07/01/08 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| NUMARA | 02/26/15 | | MIS Helpdesk software - Footprints | Horsehead Corporation | $0 |
| ORACLE | 10/01/15 | 10/1/2016 | JD Edwards Finance (ERP) System | Horsehead Corporation | $0 |
| OVERHEAD DOOR COMPANY OF GREATER PITTSBURGH | 03/26/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| OWENS IRRIGATION SYSTEMS | 11/11/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| PACE ANALYTICAL | | Open Ended | Environmental Services | Horsehead Corporation | $0 |
| PACE ENVIRONMENTAL | 09/13/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| PALMERTON TELEPHONE | 01/01/16 | 1/1/2017 | Palmerton phone and data lines including local service | Horsehead Corporation | $5,234.17 |
| PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION | 5/28/15 | | CONSENT ORDER & AGREEMENT | Horsehead Corporation | $0 |
| POWERS COAL & COKE | 05/25/13 | Open Ended | Chemicals/Raw Materials Agreement | Horsehead Corporation | $787,210 |
| PRINCIPAL FINANCIAL GROUP | | Indefinite | 401(k) | Horsehead Corporation | $0 |
| QUALITY CONTRACT SERVICES | | Open Ended | Contract Services | Horsehead Corporation | $3,045 |
| RAIL MECHANICAL SERVICES | 08/30/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| RAILCAR LEASING SPECIALISTS OF ILL., LLC | | 01/30/22 | Rail Car - Lease Rider | Horsehead Corporation | $30,263 |

18

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| RAIL-TRAK CONSTRUCTION | 08/20/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| RELIABLE FIRE EQUIPMENT | 11/22/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| REUTER HANNEY | 05/16/11 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ROBERT WILLIAMSON | 08/22/14 | Indefinite | Job offer letter | Horsehead Corporation | $0 |
| ROBINSON FANS | 08/15/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| ROCKWOOD WATER & GAS (GAS) | 01/04/16 | 05/31/17 | Utilities | Horsehead Corporation | $10,920 |
| ROTATING EQUIPMENT SPECIALISTS | 11/22/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| RYAN HUTCHISON | 10/01/14 | 12/31/16 | Severance Letter | Horsehead Corporation | $0 |

19

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| RYAN,WHALEY & COLDIRON | | | | Horsehead Corporation | $861 |
| SAFETY KLEEN | | Open Ended | Environmental Services | Horsehead Corporation | $1,195 |
| SAI GLOBAL | 11/01/15 | 11/1/2016 | Safety Management system | Horsehead Corporation | $0 |
| SALESFORCE | 06/12/15 | | Zochem Customer Relationship Management (CRM) software Maintenance | Horsehead Corporation | $0 |
| SAP | 11/07/15 | 11/7/2016 | Budget, Planning and Consolidation finance software maintenance | Horsehead Corporation | $2,704.57 |
| SCB INTERNATIONAL MATERIALS | 08/16/01 | 12/31/16 | IRM | Horsehead Corporation | $40,000.00 |
| SCE & G – ELECTRICAL SERVICE | 04/01/10 | 09/30/19 | Utilities | Horsehead Corporation | $ 181,324 |
| SCE & G – LIGHTING LEASE | 04/15/10 | 04/14/17 | Utilities | Horsehead Corporation | $0 |
| SCE & G - NATURAL GAS | 01/25/10 | Month to Month | Utilities | Horsehead Corporation | $35,423 |

20

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| SCHUST ENGINEERING | 08/07/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| SCHUST ENGINEERING | 2015 | | Environmental | Horsehead Corporation | $6,076 |
| SDI (BUTLER) | 01/01/15 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| SDI (COLUMBIA CITY) | 01/01/15 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| SDI (PITTSBORO) | 01/01/15 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $0 |
| SDI (ROANOKE) | 01/01/15 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $1,323.76 |
| SECURITY BLUE | | 12/31/16 | Retiree (pass through) medical coverage | Horsehead Corporation | $0 |
| SEPS | 11/20/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| SKY INDUSTRIAL | 09/22/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

21

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| SNYDER BROTHERS, INC. | 08/01/15 | 07/31/17 | Utilities | Horsehead Corporation | $0 |
| SNYDER BROTHERS, INC. | 09/01/15 | 07/31/17 | Utilities | Horsehead Corporation | $0 |
| SOUTHERN ARMATURE WORKS | 10/15/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| SOUTHERN INDUSTRIAL | 09/11/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| SPRINT | 08/28/14 | 8/28/2017 | Data and internet circuits | Horsehead Corporation | $17,555.02 |
| SSAB (MONTPELIER) | 07/17/09 | 03/31/17 | EAF dust recycling | Horsehead Corporation | $0 |
| STANDARD STEEL | 11/01/94 | 12/31/17 | EAF dust recycling | Horsehead Corporation | $0 |
| STEEL OF WV | 01/01/15 | 12/31/21 | EAF dust recycling | Horsehead Corporation | $2,103.30 |
| STEEL SERVICES ENTERPRISES | 09/11/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

22

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| STRUCTURAL METAL FABRICATORS | 09/04/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| SUSQUEHANNA COMMERCIAL FINANCE | 10/27/15 | 10/27/17 | Equipment Lease / Rental | Horsehead Corporation | $3,454 |
| SUSQUEHANNA COMMERCIAL FINANCE | 11/10/15 | 11/10/17 | Equipment Lease / Rental | Horsehead Corporation | $3,515 |
| T & M EQUIPMENT COMPANY | 02/21/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| TALEN ENERGY | | 06/30/18 | Utilities | Horsehead Corporation | $0 |
| TEAM INDUSTRIAL SERVICES | 04/19/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| TECNICAS REUNIDAS, SA | 03/18/11 | | Know How License & Supply Agreement in Relation to Modified Zincex Technology | Horsehead Corporation | $358,000 |
| TECNICAS REUNIDAS, SA | 09/01/11 | | Know How License & Supply Agreement in Relation to PLINT | Horsehead Corporation | $0 |

23

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| TENNESSEE DEPARTMENT OF ENVIRONMENTAL CONSERVATION | 5/28/15 | | CONSENT ORDER | Horsehead Corporation | $0 |
| TEREX | 02/04/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| TEST AMERICA - CHICAGO | | | Environmental | Horsehead Corporation | $12,543 |
| TEST AMERICA - PITTSBURGH | | | Environmental Services | Horsehead Corporation | $17,095 |
| THE HARTFORD | | 12/31/17 | Life, AD&D, STD, LTD, Business Travel Insurance | Horsehead Corporation | $0 |
| THOMAS BATTLE | 10/06/15 | 10/06/16 | Consulting Agreement | Horsehead Corporation | $0 |
| TRANSFORMER SERVICE | 03/19/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| TRINITY CONSULTANTS | | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| TWIN EAGLE RESOURCE MANAGER | 06/01/14 | 03/31/17 | Utilities | Horsehead Corporation | $66 |
| TYCO INTEGRATED SECURITY | 05/06/14 | 5/6/2019 | Corporate Server Room security services - Inmetco | Horsehead Corporation | $863.00 |
| UNITECH | TBD | Open Ended | Uniforms Service Agreement | Horsehead Corporation | $13,381 |
| UNITED STATES OF AMERICA AND COMMONWEALTH OF PENNSYLVANIA | | | 1995 CONSENT DECREE BY AND AMONG THE USA AND COMMONWEALTH OF PA (PLAINTIFFS) AND HORSEHEAD INDUSTRIES ET AL. (DEFENDANTS) - CIVIL ACTION NO. 1: CV-92-0008 | Horsehead Corporation | $0 |
| UNITED STATES OF AMERICA | | | 2003 CONSENT DECREE BY AND AMOUNG THE USA (PLAINTIFF), AND HORSEHEAD INDUSTRIES, INC. ET AT AND VIACOM INTERNATIONAL, INC. ET AL (DEFENDANTS) - CIVIL ACTION NO. 3: CV-98-0654 | Horsehead Corporation | $0 |

25

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| US GOLDBRIDGE INFORMATION INC. | 01/26/09 | 12/31/17 | Lead Chloride | Horsehead Corporation | $0 |
| US GOLDBRIDGE INFORMATION INC. | | | | Horsehead Corporation | $0 |
| USW LOCAL 2599-16 | | 04/27/19 | Labor contract at Palmerton plant | Horsehead Corporation | $0 |
| USW LOCAL 7-209 | | 08/04/17 | Labor contract at Calumet Plant | Horsehead Corporation | $0 |
| USW LOCAL 9-990 | | 07/01/19 | Labor contract at Rockwood plant | Horsehead Corporation | $0 |
| VALLOUREC STAR LP | 03/01/08 | 12/31/17 | EAF dust recycling | Horsehead Corporation | $0 |
| VIACOM INTERNATIONAL, INC. | 12/23/03 | | Assignment Agreement by and among Viacom International Inc, Horsehead Industries, In et al and Horsehead Corp. | Horsehead Corporation | $0 |
| VOEGELE CO., INC | 10/26/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| VOIGHT & SCHWEITZER LLC | 11/10/15 | 12/31/16 | Zinc Metal | Horsehead Corporation | $0 |

26

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| VOIGHT & SCHWEITZER LLC | 08/25/15 | 12/31/16 | Zinc Metal | Horsehead Corporation | $0 |
| VOIGHT & SCHWEITZER LLC | 08/25/15 | 12/31/16 | Zinc Metal | Horsehead Corporation | $0 |
| VOIGHT & SCHWEITZER LLC | 08/07/15 | 12/31/16 | Zinc Metal | Horsehead Corporation | $0 |
| WACHS | 04/14/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |
| WAGE WORKS | | 12/31/16 | Flexible Spending Accounts | Horsehead Corporation | $0 |
| WASTE MANAGEMENT | | 06/20/19 | Environmental Services | Horsehead Corporation | $0 |
| WELLS FARGO (FORMERLY GE RAILCAR SERVICES) | | | Rail Car - Lease Rider | Horsehead Corporation | $251,075 |
| WILLIAMS COMPANY - TRANSCONTINENTAL GAS PIPELINE CORP | 07/15/08 | 06/01/17 | Utilities | Horsehead Corporation | $37,847 |
| WOODARD AND CURRAN | 08/31/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation | $0 |

27

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| ACE | 11/1/2015 | 11/1/2016 | Workers Comp and Employers Liability | Horsehead Holding Corp. | $0 |
| ACE | 11/1/2015 | 11/1/2016 | Umbrella/Excess Liability | Horsehead Holding Corp. | $0 |
| AMERICAN FINANCIAL NETWORK | 09/17/14 | 06/20/17 | Equipment Lease / Rental | Horsehead Holding Corp. | $5,095 |
| AMERICAN FINANCIAL NETWORK | 06/20/14 | 09/17/16 | Equipment Lease / Rental | Horsehead Holding Corp. | $5,976 |
| ATLANTIC SPECIALTY INSURANCE COMPANY | 4/1/2015 | 4/1/2017 | Wharfingers' Liability | Horsehead Holding Corp. | $0 |
| DILIGENT | 10/17/15 | 10/17/2016 | Boardbooks software for Board meetings | Horsehead Holding Corp. | $0 |
| LEXINGTON INSURANCE CO. | 11/1/2015 | 11/1/2016 | Property insurance | Horsehead Holding Corp. | $0 |
| MARKEL INSURANCE | 11/1/2015 | | Railroad Rolling Stock Insurance | Horsehead Holding Corp. | $0 |
| MARSH USA INC. | 11/1/2015 | 10/31/2016 | Premium Financing Agreements | Horsehead Holding Corp. | $0 |

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| SMITH MANUS SURETY BONDS | 08/15/17 | | PA DEP. Bond #0180004-4, Permit #PAF087561015 Inmetco, 92 Acres, Lawrence County | Horsehead Holding Corp. | $0 |
| SMITH MANUS SURETY BONDS | 02/03/15 | | PA DEP, Bond #01062265-5, Permit #301097, Monaca Plant, 51 Acres Beaver County | Horsehead Holding Corp. | $0 |
| SMITH MANUS SURETY BONDS | 06/15/15 | | PA DEP, Bond #01059227-6, Permit #PAD002395887, Palmerton Plant, 97 acres, Carbon County | Horsehead Holding Corp. | $0 |
| WESTPORT INSURANCE CORPORATION | 11/1/2015 | 11/1/2016 | Property Insurance | Horsehead Holding Corp. | $0 |
| XL INSURANCE | 5/15/2015 | 10/15/2016 | Pollution Legal Liability Insurance | Horsehead Holding Corp. | $0 |
| CARMEUSE LIME, INC. - TRUCK | 11/04/13 | 08/31/16 | Chemicals/Raw Materials Agreement | Horsehead Metal Products, LLC | $0 |
| GENERAL SMELTING OF CANADA | 07/30/15 | Open Ended | | Horsehead Metal Products, LLC | $109,944 |

29

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| IMPERIAL ZINC | | | Thirty Ox Purchase Agreements; Sales Agreements; Construction & Management Agreement | Horsehead Metal Products, LLC | $0 |
| MAYCO INDUSTRIES | | | | Horsehead Metal Products, LLC | $180,000 |
| QUEMETCO METALS LIMITED,SUB OF RSR | | | Supply Agreement | Horsehead Metal Products, LLC | $0 |
| SIEMENS INDUSTRY, INC. | 03/01/10 | | Software license from Siemens AG for equipment at Mooresboro | Horsehead Metal Products, LLC | $0 |
| THIRTY OX | | | Thirty Ox LLC Operating Agreement | Horsehead Metal Products, LLC | $0 |
| AGMET | 1/1/2016 | 12/31/16 | Chemicals/Raw Materials Agreement | The International Metals Reclamation Company, LLC | $0 |
| ALLEGHENY LUDLUM LLC | 01/01/15 | 12/31/19 | Material Tolling Agreement | The International Metals Reclamation Company, LLC | $0 |
| AMSTON SUPPLY | 06/30/14 | Month to Month | Equipment Lease / Rental | The International Metals Reclamation Company, LLC | $8,806 |

30

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| BOROUGH OF ELLWOOD CITY | 01/01/08 | 12/31/16 | Host Municipality Benefit Fee Agreement | The International Metals Reclamation Company, LLC | $7,068.00 |
| BUTLER GAS PRODUCTS | 09/01/13 | 09/01/18 | Supply Agreement | The International Metals Reclamation Company, LLC | $7,830 |
| CALL2RECYCLE, INC. | 01/12/16 | 01/12/19 | Sorting Agreement (batteries) | The International Metals Reclamation Company, LLC | $0 |
| CALL2RECYCLE, INC. | 01/12/16 | 01/12/19 | Processing Agreement (batteries) | The International Metals Reclamation Company, LLC | $0 |
| CIVIL ENVIRONMENTAL CONSULTANTS | 2015 | | Environmental Services | The International Metals Reclamation Company, LLC | $0 |
| COLUMBIA GAS | 01/01/11 | 06/01/21 | Utilities | The International Metals Reclamation Company, LLC | $30,922 |
| CULLIGAN | 01/22/16 | Open Ended | Equipment Lease / Rental | The International Metals Reclamation Company, LLC | $1,389 |
| DAIDO STEEL CO., LTD, URBANNET NAGOYA | 03/20/96 | 03/31/18 | Technology License Agreement | The International Metals Reclamation Company, LLC | $0 |
| DEAR JOHN | 11/09/15 | Month to Month | Equipment Lease / Rental | The International Metals Reclamation Company, LLC | $5,376 |

31

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| ENERNOC, INC | 03/01/14 | 05/31/18 | Utilities | The International Metals Reclamation Company, LLC | $0 |
| HAUCK MANUFACTURING | 08/19/13 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC | $0 |
| ONEX REFRECTORIES, INC | 10/14/15 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC | $0 |
| OUTOKUMPU STAINLESS USA | 01/31/13 | 12/31/16 | Waste Stream Material Processing, Disposal & Metal Recovery Agreement | The International Metals Reclamation Company, LLC | $0 |
| PENN POWER CORP | 06/05/86 | Month to Month | Utilities | The International Metals Reclamation Company, LLC | $21,130 |
| PI ENGINEERING | 04/08/14 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC | $0 |
| PITNEY BOWES GLOBAL FINANCIAL | 05/14/13 | 11/10/19 | Equipment Lease / Rental | The International Metals Reclamation Company, LLC | $44 |
| PMF RENTALS | 12/30/12 | Open Ended | Equipment Lease / Rental | The International Metals Reclamation Company, LLC | $9,645 |

32

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| PREMIER SAFETY & SERVICE INC | 03/01/15 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation, LLC | $0 |
| PROCHEMTECH INTERNATIONAL INC | 04/12/15 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC | $0 |
| RECHARGEABLE BATTERY RECYCLING CORP | | 12/31/16 | Chemicals/Raw Materials Agreement | The International Metals Reclamation Company, LLC | $0 |
| RECYCLE EQUIPMENT RENTAL | 11/20/15 | Open Ended | Equipment Lease / Rental | The International Metals Reclamation Company, LLC | $0 |
| SAFT AMERICA, INC. | 01/01/16 | 12/31/16 | Battery Recycling Agreement | The International Metals Reclamation Company, LLC | $114,706.29 |
| SNYDER BROTHERS, INC. | 01/01/16 | 12/31/16 | Utilities | The International Metals Reclamation Company, LLC | $0 |
| TEAMSTERS LOCAL 261 | 11/01/13 | 10/31/16 | Labor contract at INMETCO | The International Metals Reclamation Company, LLC | $0 |
| THE TEAMSTERS LOCAL 261 | | 12/31/16 | Inmetco Hourly medical & prescription coverage | The International Metals Reclamation Company, LLC | $0 |

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| 3E SDS HOLDING | 11/11/2015 | 11/10/2016 | Maintain and update the SDS for hazardous chemicals used in the lab and the plant | Zochem Inc. | $0 |
| ACE | 11/1/2015 | 11/1/2016 | General Liability Canada | Zochem Inc. | $0 |
| ACE | 11/1/2015 | 11/1/2016 | Auto Liability Canada | Zochem Inc. | $0 |
| A.R SERVICES | 01/01/16 | 12/31/16 | Quarterly Scale calibration | Zochem Inc. | $0 |
| AFTON | 10/01/15 | 09/30/17 | Zinc Oxide | Zochem Inc. | $0 |
| AKROCHEM | 01/07/15 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| ASSOCIATED COMBUSTION | 01/01/16 | 12/31/16 | Quarterly Furnace PM | Zochem Inc. | $0 |
| ATLAS COPCO | 09/04/14 | 09/04/19 | Bi-weekly compressor PM | Zochem Inc. | $0 |
| AUTOMAX | 02/03/15 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| BAERLOCHER | 01/01/16 | 12/31/16 | Zinc Oxide | Zochem Inc. | $0 |
| BASF | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| BRENNTAG SPECIALTIES INC. | | | Distributor - Zinc Oxide | Zochem Inc. | $0 |

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| BRIDGESTONE | 1/1/2016 | 12/13/2016 | Zinc Oxide | Zochem Inc. | $0 |
| C. STEINWEG | | | Fiscal Representative - Netherlands | Zochem Inc. | $0 |
| C.H. ROBINSON | | | Freight Brokerage | Zochem Inc. | $0 |
| CHEMICAL DISTRIBUTORS | 07/14/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| CHEMICAL DISTRIBUTORS | 08/07/15 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| CHEMICAL SOLUTIONS | 05/12/15 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| CHEMSON | 02/01/16 | 09/30/16 | Zinc Oxide | Zochem Inc. | $0 |
| CHEVRON | 9/30/2014 | 12/13/2017 | Zinc Oxide | Zochem Inc. | $0 |
| CHICAGOLAND WAREHOUSE | 02/01/11 | | Warehousing - Chicago | Zochem Inc. | $0 |
| CINTAS UNIFORM | 04/27/12 | 04/26/17 | PPE Uniform | Zochem Inc. | $0 |
| CLARIANT | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| CONTINENTAL | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| CONTROL FIRE | 01/01/16 | 12/31/16 | Monthly/Annual fire PM | Zochem Inc. | $0 |
| COOPER TIRE | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |

35

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| CORPORATE BENEFIT ANALYSIS, INC. | | Indefinite | Canada Actuaries & Benefit Brokers | Zochem Inc. | $0 |
| DATAMYNE | 04/07/15 | | Import export data and trade statistics database | Zochem Inc. | $0 |
| DEEKS & CO | 03/15/15 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| EASTERN INDUSTRIAL COMPANY | 11/26/15 | 12/31/16 | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| EATON / COOPER POWER | 01/01/16 | 12/31/16 | Zinc Oxide | Zochem Inc. | $0 |
| EICO | 01/01/16 | 12/31/16 | Zinc Oxide | Zochem Inc. | $0 |
| ESNA WAREHOUSE | 05/01/15 | | Warehousing - Los Angeles | Zochem Inc. | $0 |
| GAVTT PRECISION BALANCES LIMITED | 1/1/2016 | 12/13/2016 | calibrate scales | Zochem Inc. | $0 |
| GOODYEAR | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| GULF COAST CHEMICAL | 08/04/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| HETEROCHEM | 02/10/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| HEXPOL | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |

36

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| HL BLACHFORD | 09/01/15 | 08/31/17 | Zinc Oxide | Zochem Inc. | $0 |
| HM ROYAL | 01/29/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| HO CHAR | 04/16/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| HUBBELL | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| HUDBAY MINERALS | 01/01/16 | 12/31/16 | Zinc supply - annual | Zochem Inc. | $0 |
| HYDRITE | 01/01/14 | 03/31/17 | Zinc Oxide | Zochem Inc. | $0 |
| HYDRO ONE BRAMPTON | 05/16/14 | | Utilities | Zochem Inc. | $0 |
| ICL/HALOX | 01/01/16 | 12/31/16 | Zinc Oxide | Zochem Inc. | $0 |
| JM HUBER | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| JM HUBER | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| JOSEF GASES | 09/28/15 | | Propane Gas delivery/supply | Zochem Inc. | $0 |
| KALMIA | 06/13/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| LIFTOW | 01/22/16 | 01/26/17 | 6 week repeat Forklift PM | Zochem Inc. | $0 |
| M.F. CACHAT | 09/02/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| MANULIFE | | Indefinite | Retirement plan & pension plan administrator | Zochem Inc. | $0 |
| MANULIFE | | Annual Renewal | Benefits provider | Zochem Inc. | $0 |
| MAYS CHEMICAL | 01/20/15 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| MEYERS CHEMICALS | 06/02/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| MODERN CHEMICAL | 07/17/15 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| MURRAY WAREHOUSE | N/A | N/A | Warehousing - Kentucky | Zochem Inc. | $0 |
| NEW WAVE SECURITY | 01/01/16 | 12/31/16 | Weekly IT PM/Monthly Alarm | Zochem Inc. | $0 |
| NEXEO | 02/10/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| PERKINELMER HEALTH SCIENCES, CANADA | 12/1/2015 | 11/30/2016 | PM service | Zochem Inc. | $0 |
| PPG | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| PPG | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| PRIOR | 07/08/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |

38

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| RE CARROLL | 05/03/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| ROCKWOOD | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| SAFETY KLEEN | 01/01/16 | 12/31/16 | Hazardous waste disposal | Zochem Inc. | $0 |
| SHERWAY/RCC | 05/26/14 | 05/31/17 | Warehousing/Shunt Truck | Zochem Inc. | $0 |
| TECK RESOURCES | 05/26/14 | 05/31/17 | Zinc supply - annual | Zochem Inc. | $0 |
| THE HALL STAR | 08/08/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| TOROMONT | 01/01/16 | 12/31/16 | Quarterly/Annual PM | Zochem Inc. | $0 |
| TOYO TIRE | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| UNICHEM | 12/04/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| UNIFOR, LOCAL 591G | 07/01/12 | 06/30/20 | Labor contract | Zochem Inc. | $0 |
| UNIVAR UK | 12/02/15 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| UNIVAR USA INC. / UNIVAR CANADA LTD. | 10/17/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| US BORAX | 04/01/15 | 03/31/17 | Zinc Oxide | Zochem Inc. | $0 |

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| VEYANCE | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem Inc. | $0 |
| WALSH & ASSOCIATE | 10/31/14 | | Distributor - Zinc Oxide | Zochem Inc. | $0 |
| WASTECO | | | Waste management | Zochem | $0 |
| YOKOHAMA | 1/1/2016 | 12/31/2016 | Zinc Oxide | Zochem | $0 |
| ZINPRO | 12/01/15 | 12/31/16 | Zinc Oxide | Zochem | $0 |
| KANAWHA SCALES & SYSTEMS | 01/25/16 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation & The International Metals Reclamation Company, LLC | $0 |
| LEWISGOETZ AND COMPANY, INC | 02/13/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation & Horsehead Metal Products, LLC | $0 |
| BMI REFRACTORY SERVICES, INC. | 10/01/15 | | Contract Services - General Terms And Conditions for On-Site Services | | $0 |
| BUCKEYE MECHANICAL CONTRACTING INC | 04/01/16 | | Contract Services - General Terms And Conditions for On-Site Services | | $0 |
| COMPUTERSHARE, INC. | | Monthly | Transfer agent fees | | $5,735.68 |

KE 42634336

| Counterparty | Contract Date | Contract Termination Date | Contract Description[2] | Debtor Name | Cure Cost[3] |
|---|---|---|---|---|---|
| GREAT AMERICAN | 11/1/2015 | 11/1/2016 | Umbrella/Excess Liability | | $0 |
| JLT SPECIALTY INSURANCE SERVICES | 11/27/15 | 10/15/2016 | Directors and Officers Insurance | | $0 |
| MILCAM | 10/26/15 | | Contract Services - General Terms And Conditions for On-Site Services | | $0 |
| PRINCIPAL | Nov 20, 2015 | | Employment Benefits | | $0 |
| WELLS FARGO | 2013 | | Employment Benefits | | $0 |

41

KE 42634336

## EXHIBIT B-2

Rejected Executory Contract and Unexpired Lease Schedule

## REJECTED EXECUTORY CONTRACTS AND UNEXPIRED LEASES[1]

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| ADVANCE INDUSTRIAL | 11/13/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| ALL-TRADE CONSTRUCTION | 09/06/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| BEEMSTERBOER | 03/28/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| BERGER'S HOME AND LAND DEVELOPMENT | 08/13/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| C.P.E. FILTERS | 09/13/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| CAMBELT | 06/04/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| CARROLL'S WELDING | 08/21/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |

---

[1] The Debtors, with the consent of the Requisite Plan Sponsors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease Schedule.

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| CDMG | 03/04/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| CENTURY 3 | 03/11/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| CH2M HILL | 01/30/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| CHEROKEE MILLWRIGHT | 08/26/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| CLASSIC INDUSTRIAL SERVICES, INC. | 10/16/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| CRANEMASTERS | 10/29/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| D&Z ENGINEERING SERVICES | 05/14/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| DIVANE BROTHERS | 04/28/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| GARY BAKER ELECTRICAL, INC. | 09/23/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |

2

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| INDUSTRIAL CONVEYOR BELT SYSTEMS | 04/04/12 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| INDUSTRY SERVICES CO., INC. | 07/25/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| INFRATECH | 08/11/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| LMB INDUSTRIAL SERVICES, INC | 09/06/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| METZ INC | 11/12/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| OBI LININGS | 01/26/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| QUERY PRITCHARD | 02/23/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| RAS CONSTRUCTION | 11/17/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| RECORE | 08/15/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |

3

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| RENFROW BROTHERS | 02/14/14 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| AMLON RESOURCES GROUP LLC | 11/22/2014 | 11/22/2017 | Confidentiality Agreement | Horsehead Corporation |
| ANTHONY K. STALEY | 1/3/2012 | Indefinite | Performance Bonus Agreement | Horsehead Corporation |
| BEST LINE EQUIPMENT | | | Equipment Lease / Rental | Horsehead Corporation |
| BETTER MANAGEMENT CORP. | 9/18/2015 | 12/31/2018 | Transportation Ground | Horsehead Corporation |
| BETTER MANAGEMENT CORP. | 8/1/2013 | 7/31/2016 | Transportation Ground | Horsehead Corporation |
| CH ROBINSON WORLDWIDE, INC. | 1/20/2006 | Evergreen | Transportation Ground | Horsehead Corporation |
| CINTAS | 11/01/15 | Month to Month | Uniforms Service Agreement | Horsehead Corporation |
| CLEARWATER TECHNOLOGIES | 08/08/06 | Month to Month | Contract Services | Horsehead Corporation |
| DEFENDER SERVICES | 02/10/13 | 04/13/20 | Equipment Lease / Rental | Horsehead Corporation |
| ENSAFE | | | Environmental Consulting Agreement | Horsehead Corporation |

4

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| ENVIROSAFE RESOURCES MANAGEMENT LTD. | 4/20/2009 | | Asset Purchase Agreement among Envirosafe Services of Ohio, Inc., Envirosafe Resources Management ltd, and Fairlane Management Corporation | Horsehead Corporation |
| ENVIROSAFE SERVICES OF OHIO, INC. | 8/25/2015 | 08/25/16 | Environmental Services | Horsehead Corporation |
| FASTENAL CO. | | Open Ended | Supply Agreement | Horsehead Corporation |
| GATX RAIL LOCOMOTIVE GROUP, LLC | 03/16/15 | 05/16/17 | Contract Services | Horsehead Corporation |
| GATX RAIL LOCOMOTIVE GROUP, LLC | 05/30/12 | 05/30/17 | Equipment Lease / Rental | Horsehead Corporation |
| GEORGE'S P & H, INC. | | | Supply Agreement | Horsehead Corporation |
| HERTZ EQUIPMENT RENTAL | 10/01/12 | Month to Month | Equipment Lease / Rental | Horsehead Corporation |
| HILLS MACHINERY COMPANY | 02/08/16 | Month to Month | Equipment Lease / Rental | Horsehead Corporation |
| JEFF COBB TRUCKING | | | Transportation Ground | Horsehead Corporation |
| JEFFREY C. RIHN | 1/3/2012 | Indefinite | Performance Bonus Agreement | Horsehead Corporation |
| JOHN F. PUSATERI | 1/3/2012 | Indefinite | Performance Bonus Agreement | Horsehead Corporation |

5

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| PORTABLE JOHN, INC. | | | Equipment Lease / Rental | Horsehead Corporation |
| RAFFIN CONSTRUCTION | | | Contract Services | Horsehead Corporation |
| REORG | 11/22/2014 | 11/22/2017 | Confidentiality Agreement | Horsehead Corporation |
| RICOH | 05/11/12 | 08/31/16 | IT Agreement | Horsehead Corporation |
| ROLAND MACHINERY | 03/03/15 | Month to Month | Equipment Lease / Rental | Horsehead Corporation |
| ROLAND MACHINERY | 11/24/15 | Month to Month | Equipment Lease / Rental | Horsehead Corporation |
| SARGENT | 10/31/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| SMALL CONSTRUCTION | 10/19/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| SMILEY TRUCKING | 03/18/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| SNYDER BROTHERS, INC. | 09/01/15 | 07/31/17 | Utilities | Horsehead Corporation |
| SNYDER BROTHERS, INC. | 09/01/15 | 07/31/17 | Utilities | Horsehead Corporation |
| STEVE CORBIN | 11/22/2014 | 11/22/2017 | Confidentiality Agreement | Horsehead Corporation |

6

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| TECNICAS REUNIDAS, SA | 01/04/16 | | Global Settlement Agreement & Mutual Release Agreement | Horsehead Corporation |
| THOMPSON INDUSTRIAL SERVICES, LLC | 10/01/15 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| TRUE-LINE CORING | 08/21/13 | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Corporation |
| US SECURITY | | | Contract Services | Horsehead Corporation |
| WELLS FARGO (FORMERLY GE CAPITAL) | | | Equipment Lease / Rental (20 units) | Horsehead Corporation |
| JOHN CARTWRIGHT | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| ALI ALAVI | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| ANTHONY K. STALEY | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| BARRY FITZGERALD | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| BRAD MCMINN | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| BRAD SUTEK | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| BRUCE CENITI | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| DEBBIE LHERBIER | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| ERIC SCHORR | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| ERIC SMITH | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| ERIC STROOM | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| FRANK VALLELUNGA | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| GARY R. WHITAKER | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |

8

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| GEORGE SCHREIBER | | 1/4/2017 | Director Restricted Stock Unit Agreement | Horsehead Holding Corp. |
| GRANT JOHN | | 1/4/2017 | Director Restricted Stock Unit Agreement | Horsehead Holding Corp. |
| GREG BALLMER | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| GREG M. BELLAND | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| JACK SHILLING | | 1/4/2017 | Director Restricted Stock Unit Agreement | Horsehead Holding Corp. |
| JACOBUS DE WET | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| JAMES A. TOTERA | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| JAMES M. HENSLER | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| JEFFREY C. RIHN | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |

9

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| JOHN F. PUSATERI | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| JOHN VAN RODEN | | 1/4/2017 | Director Restricted Stock Unit Agreement | Horsehead Holding Corp. |
| JOSH BELCZYK | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| LEE BURKETT | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| MARK DROBKA | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| MARK TOMASZEWSKI | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| MIKE FOSTER | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| MOHIT SHARMA | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| R. BRUCE MORGAN | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| ROBERT D. SCHERICH | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| ROBERT WILLIAMSON | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| RYAN HUTCHISON | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| SCOTT HOENEKE | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| TIM BASILONE | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| TOM JOHNSTON | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| TOM KAKASCIK | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| TONY SCURCI | | Various | Restricted Stock Unit Agreements (multiple time & performance based) | Horsehead Holding Corp. |
| AIRGAS | 07/15/13 | 07/15/18 | Supply Agreement | Horsehead Metal Products, LLC |

11

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| AQUATECH INTERNATIONAL CORPORATION | 09/01/15 | 08/31/18 | Contract Services | Horsehead Metal Products, LLC |
| CARMEUSE LIME, INC. - RAIL | 11/04/13 | 08/31/16 | Chemicals/Raw Materials Agreement | Horsehead Metal Products, LLC |
| CHEMALLOY COMPANY, INC. | 11/30/15 | Open Ended | Chemicals/Raw Materials Agreement | Horsehead Metal Products, LLC |
| JAMES D. HARRIS | 7/8/2015 | 12/31/2016 | Retention Agreement | Horsehead Metal Products, LLC |
| LEWIS GOETZ (PREV ACTION) | 08/30/13 | 08/30/18 | Supply Agreement | Horsehead Metal Products, LLC |
| NALCO COMPANY | 01/31/14 | 12/31/16 | Equipment Rental and Chemical Storage | Horsehead Metal Products, LLC |
| REXEL | | | Contract Services - General Terms And Conditions for On-Site Services | Horsehead Metal Products, LLC |
| SOUTHERN STATES CHEMICAL | 08/01/13 | 07/31/18 | Chemicals/Raw Materials Agreement | Horsehead Metal Products, LLC |
| UNIFIRST | 07/04/13 | 11/08/18 | Uniforms Service Agreement | Horsehead Metal Products, LLC |
| UNIVAR | 07/01/15 | 06/30/16 | Chemicals/Raw Materials Agreement | Horsehead Metal Products, LLC |
| VEOLIA WATER TECHNOLOGIES, INC | 05/05/15 | 01/07/17 | Equipment Lease / Rental | Horsehead Metal Products, LLC |

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| AMLON | | 12/31/16 | Chemicals/Raw Materials Agreement | The International Metals Reclamation Company, LLC |
| BRUCE & MERRILEES ELECTRIC | 03/09/15 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC |
| CALLOS RESOURCE | 11/09/15 | 12/31/16 | Contract Services | The International Metals Reclamation Company, LLC |
| CINTAS | 05/29/07 | 08/01/17 | Uniforms Service Agreement | The International Metals Reclamation Company, LLC |
| CLEVELAND BROTHERS | 08/31/15 | 09/01/17 | Contract Services | The International Metals Reclamation Company, LLC |
| CONSTELLATION ENERGY | 10/29/14 | 02/28/18 | Utilities | The International Metals Reclamation Company, LLC |
| GREGG STAFFING (INDUSTRIAL EMPLOYEES) | 02/24/16 | 12/31/16 | Contract Services | The International Metals Reclamation Company, LLC |
| HALAMA BROTHERS ELECTRIC, INC | 09/14/15 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC |

13

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| JARED MCCOWIN | 04/05/15 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC |
| LIKEN STAFFING | 01/01/16 | | Staffing | The International Metals Reclamation Company, LLC |
| LINDE LLC | 03/01/12 | 01/01/18 | Supply Agreement (Addendum) | The International Metals Reclamation Company, LLC |
| LINDE LLC | 09/23/95 | 02/28/22 | Licensing Agreement | The International Metals Reclamation Company, LLC |
| LINDE LLC | 06/09/14 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC |
| OHIO SECURITY SERVICE | 10/31/13 | 11/01/16 | Contract Services | The International Metals Reclamation Company, LLC |
| PROCHEMTECH | 04/16/13 | 12/31/17 | Water Management | The International Metals Reclamation Company, LLC |
| RUTHRAUFF | 01/11/16 | 02/09/19 | Contract Services | The International Metals Reclamation Company, LLC |

14

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| SNYDER BROTHERS, INC. | 05/17/10 | 12/31/17 | Utilities | The International Metals Reclamation Company, LLC |
| VOGEL DISPOSAL SERVICE, INC | 12/14/15 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC |
| YOUNGBLOOD PAVING, INC | 01/24/16 | | Contract Services - General Terms And Conditions for On-Site Services | The International Metals Reclamation Company, LLC |
| CALLOS RESOURCE LLC | 02/26/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| CLEVELAND BROTHERS EQUIPMENT CO. | 06/10/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| INDUSTRIAL EMPLOYEES, INC | 04/21/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| NATIONAL FIRE SAFETY CO. | 02/19/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| OHIO SECURITY SERVICE, INC | 10/26/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| OMI REFRACTORIES LLC (DBA BISCO) | 07/16/15 | | Contract Services - General Terms And Conditions for On-Site Services | |

15

KE 42634344

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| PAUL DAVIS RESTORATION | 07/31/14 | | Contract Services - General Terms And Conditions for On-Site Services | |
| PENNWEST | 04/14/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| PHOENIX BUILDING SERVICES, INC | 02/18/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| PNC BANK NATIONAL ASSOCIATION | 6/30/2015 | | Letter re Termination of Credit Agreement from PNC Bank National Association to Horsehead Corporation, Horsehead Holding Corp., Chestnut Ridge Railway, Horsehead Metal Products, Inc. and Horsehead Zinc Powders LLC dated 6/30/15 | |
| RUTHRAUFF SERVICE LLC | 02/25/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| SHYCHUCK, INC | 11/08/15 | | Contract Services - General Terms And Conditions for On-Site Services | |
| T. BRUCE CAMPBELL CONSTRUCTION CO. | 08/05/15 | | Contract Services - General Terms And Conditions for On-Site Services | |

16

| Counterparty Name | Contract Date | Contract Termination Date | Contract Description | Debtor Name |
|---|---|---|---|---|
| VALLEY WASTE SERVICE INC. | 03/16/15 | | Contract Services - General Terms And Conditions for On-Site Services | |

17

# **EXHIBIT C**

Schedule of Retained Causes of Action

KE 42570951

**Schedule of Retained Causes of Action[1]**

Article IV.U of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including pursuant to the Debtor Release and the Third Party Release), the Debtors and the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Debtors' and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors and the Reorganized Debtors will not pursue any and all available Causes of Action against such Entity. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action, including with respect to rejected Executory Contracts and Unexpired Leases, against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court Final Order, the Debtors and the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Notwithstanding and without limiting the generality of Article IV.U of the Plan, the following **Schedule C-1** through **Schedule C-9** include specific types of Causes of Actions expressly preserved by the Debtors and the Reorganized Debtors, as applicable, including: (a) claims related to contracts and leases; (b) claims related to insurance policies; (c) claims related to deposits, adequate assurance postings, and other collateral postings; (d) claims related to liens; (e) claims, defenses, cross-claims, and counter-claims related to litigation and possible litigation; (f) claims related to accounts receivable and accounts payable; and (g) claims related to tax refunds; which are attached hereto as **Schedule C-1**, **Schedule C-2**, **Schedule C-3**, **Schedule C-4**, **Schedule C-5**, **Schedule C-6**, **Schedule C-7**, and **Schedule C-8**, respectively.[2]

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* dated as July 12, 2016 of [Docket No. 1309] (as amended, supplemented, or modified from time to time, the "Plan").

[2]   **Schedule C-1**, **Schedule C-2**, **Schedule C-3**, **Schedule C-4**, **Schedule C-5**, **Schedule C-6**, **Schedule C-7**, and **Schedule C-8**, attached hereto and each of the other documents filed as part of the Plan Supplement remain subject to continuing review and revision by the Debtors.

1

Each of **Schedule C-1**, **Schedule C-2**, **Schedule C-3**, **Schedule C-4**, **Schedule C-5**, **Schedule C-6**, **Schedule C-7**, and **Schedule C-8** is subject to the information provided in this **Exhibit C**.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## Schedule C-1

### Claims Related to Contracts and Leases

The following **Schedule C-1** includes contracts and leases to which one or more Debtors are a party.  Unless otherwise specifically released by the Plan, the Debtors expressly reserve the Causes of Actions, based in whole or in part upon any and all contracts and leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or lease is included on **Schedule C-1**, including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors.  The claims and Causes of Actions reserved include, without limitation, Causes of Action against vendors, suppliers of goods or services, customers, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors:  (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) for environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.  Each Schedule G of the Schedules filed by the Debtors in these Chapter 11 Cases, as the same may be amended from time to time, is hereby incorporated by reference in this **Schedule C-1** as if fully set forth herein.[3]

---

[3]    See [Docket Nos. 303, 305, 307, 309, and 311].

3

**RETAINED CAUSES OF ACTION**
**SCHEDULE C-1 – CLAIMS RELATED TO CONTRACTS AND LEASES**

| CONTRACTS AND LEASES | | | |
|---|---|---|---|
| **DEBTOR** | **COUNTERPARTY** | **ADDRESS** | **DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST** |
| Horsehead Metal Products, LLC | Glencore Ltd.; Glencore Canada Corp.; Glencore, AG; General Smelting of Canada | 100 King Street West Suite, 6900, P.O. Box 405 Toronto, Ontario M5X 1E3 | Anode recycling agreement; Debtors' interest in recycled anodes and misc. metal. |
| Horsehead Corporation | Mayco Industries | 18 W. Oxmoor Road Birmingham, AL 35209 | Anode recycling agreement; Debtors' interest in recycled anodes and misc. metal. |
| Horsehead Corporation | Tecnicas Reunidas, SA | Attn: Juan Lladó Arburua Arapiles, 14 28015 Madrid Espana | Claims and causes of action related to or described in the Global Settlement Agreement and Mutual Release dated January 4, 2016; claims and causes of action related to Know How License & Supply Agreement in Relation to Modified Zincex Technology and Know How License & Supply Agreement in Relation to PLINT |
| Horsehead Corporation | V.J. Mattson Company | 713 Jennifer Court New Lenox, IL 60451 | Claims related to indemnification agreement. |
| Horsehead Corporation | Carnegie Strategic Design Engineers, LLC | 1000 Omega Dr #1570 Pittsburgh, PA 15205-5001 and Attn:  Jeff Lewis 4955 Steubenville Pike, Suite 115 Pittsburgh, PA 15205 | Claims related to contract to provide engineering services. |

4

| CONTRACTS AND LEASES | | | |
|---|---|---|---|
| **DEBTOR** | **COUNTERPARTY** | **ADDRESS** | **DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST** |
| Horsehead Corporation | Omni Services, Inc. | Pamela V. Collins, Esq. Walsh, Barnes, Collis & Zumpella, P.C. Gulf Tower, Suite 1400 707 Grant St. Pittsburgh, PA 15219 | Claims related to contract to provide services and materials. |
| Horsehead Corporation | Topcor LLC | Richard S. Canciello Poerio & Walter, Inc. 1119 Penn Ave., Suite 303 Pittsburgh, PA 15222 | Claims related to contract to provide services. |
| Horsehead Corporation | Productos Plasticos Anticorrosivos, S.A. | C/O James S. Malloy & Brian R. Davidson Dingess Foster Luciana Davidson & Chlebo PNC Center 20 Stanwix St., 3rd Fl. Pittsburgh, PA 15222 | Claims related to contract to provide services and materials. |

## Schedule C-2

### Claims Related to Insurance Policies

The following **Schedule C-2** includes insurance contracts and policies to which one or more Debtors are a party.  Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is included on **Schedule C-2**, including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

**RETAINED CAUSES OF ACTION**
**SCHEDULE C-2 – CLAIMS RELATED TO INSURANCE POLICIES**

| Insurance Policies | | | |
|---|---|---|---|
| **DEBTOR** | **COUNTERPARTY** | **ADDRESS** | **DESCRIPTION OF INSURANCE POLICY** |
| Horsehead Corporation | ACE American Insurance Company | C/O DUANE MORRIS LLP ATTN WENDY M SIMKULAK 30 S 17TH STREET PHILADELPHIA, PA 19103 | Auto Liability |
| Horsehead Corporation | ACE INA Insurance Company | C/O DUANE MORRIS LLP ATTN WENDY M SIMKULAK 30 S 17TH STREET PHILADELPHIA, PA 19103 | Auto Liability - Canada |
| Horsehead Holding Corp. | National Union Fire Insurance Company of Pittsburgh, PA (AIG) | C/O AIG, INC.; ATTN: RYAN G. FOLEY 175 WATER STREET, 15TH FLOOR NEW YORK, NY 10038 | Crime |
| Horsehead Holding Corp. | National Union Fire Insurance Company of Pittsburgh, Pa. (AIG) | C/O AIG, INC.; ATTN: RYAN G. FOLEY 175 WATER STREET, 15TH FLOOR NEW YORK, NY 10038 | Directors and Officers Liability |
| Horsehead Holding Corp. | Federal Insurance Company | C/O DUANE MORRIS LLP ATTN WENDY M SIMKULAK 30 S 17TH ST PHILADELPHIA, PA 19103 | Directors and Officers Liability |
| Horsehead Holding Corp. | Zurich American Insurance Company | 1400 American Lane Tower 2, Floor 5 Schaumburg, IL 60196 | Directors and Officers Liability |

| Insurance Policies | | | |
|---|---|---|---|
| **DEBTOR** | **COUNTERPARTY** | **ADDRESS** | **DESCRIPTION OF INSURANCE POLICY** |
| Horsehead Holding Corp. | Endurance American Insurance Company | 750 Third Avenue, 2nd Floor New York, NY 10017 | Directors and Officers Liability |
| Horsehead Holding Corp. | XL Specialty Insurance Company | 8 St. Stephens Green Dublin, Ireland | Directors and Officers Liability |
| Horsehead Holding Corp. | National Union Fire Insurance Company of Pittsburgh, Pa. (AIG) | C/O AIG, INC.; ATTN: RYAN G. FOLEY 175 WATER STREET, 15TH FLOOR NEW YORK, NY 10038 | Directors and Officers Liability |
| Horsehead Holding Corp. | National Union Fire Insurance Company of Pittsburgh, PA (AIG) | C/O AIG, INC. ATTN: RYAN G. FOLEY 175 WATER STREET, 15TH FLOOR NEW YORK, NY 10038 | Employment Practices Liability |
| Horsehead Holding Corp. | Greenwich Insurance Company | Seaview House 70 Seaview Avenue Stamford, CT 06902 | Environmental Liability |
| Horsehead Holding Corp. | Great American Spirit Insurance Co. of New York | 301 E. Fourth St. Cincinnati, OH 45202 | Excess Liability |
| Horsehead Holding Corp. | National Union Fire Insurance Company of Pittsburgh, PA (AIG) | C/O AIG, INC.; ATTN: RYAN G. FOLEY 175 WATER STREET, 15TH FLOOR NEW YORK, NY 10038 | Fiduciary Liability |
| Horsehead Corporation | ACE American Insurance Company | C/O DUANE MORRIS LLP ATTN WENDY M SIMKULAK 30 S 17TH STREET PHILADELPHIA, PA 19103 | General Liability |

| Insurance Policies | | | |
|---|---|---|---|
| **DEBTOR** | **COUNTERPARTY** | **ADDRESS** | **DESCRIPTION OF INSURANCE POLICY** |
| Horsehead Corporation | ACE INA Insurance Company | C/O DUANE MORRIS LLP ATTN WENDY M SIMKULAK 30 S 17TH STREET PHILADELPHIA, PA 19103 | General Liability - Canada |
| Horsehead Holding Corp. | Lexington Insurance Co. (AIG) (70%) | 99 High Street, Floor 23 Boston, MA 02110-2378 | Property |
| Horsehead Holding Corp. | Westport Insurance Corporation  (Swiss Re) (30%) | 5200 Metcalf Ave. Overland Park, KS 66202 | Property |
| Horsehead Holding Corp. | Essex Insurance Company (Markel) | 4521 Highwoods Parkway Glen Allen, VA 23060 | Property - Railroad Rolling Stock |
| Horsehead Holding Corp. | ACE Property and Casualty Insurance Company | C/O DUANE MORRIS LLP ATTN WENDY M SIMKULAK 30 S 17TH STREET PHILADELPHIA, PA 19103 | Umbrella/Excess Liability |
| Horsehead Holding Corp. | Atlantic Specialty Insurance Company | 900 Stony Point Parkway Suite 450 Richmond, VA 23235 | Wharfinger's Liability |
| Horsehead Holding Corp. | ACE American Insurance Company | C/O DUANE MORRIS LLP ATTN WENDY M SIMKULAK 30 S 17TH STREET PHILADELPHIA, PA 19103 | Workers' Compensation and Employers Liability |

9

## Schedule C-3

## Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings

The following **Schedule C-3** includes Entities to whom the Debtors have paid or given a security deposit, adequate assurance payment, or any other type of deposit or collateral. Unless otherwise released by the Plan or the Debtors, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of deposits, security deposits, adequate assurance postings, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit or collateral is included on **Schedule C-3**.[4] Each Part 2 of each Debtor's Schedule A/B of the Schedules filed in these Chapter 11 Cases, as may be amended from time to time, is hereby incorporated by reference in this **Exhibit C-3** as if fully set forth herein.[5]

---

[4]  For the avoidance of doubt, the Debtors reserve all rights with respect to any deposit provided in accordance with the *Final Order (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief* entered at [Docket No. 239] or otherwise provided as "adequate assurance of payment" (as that term is used by Section 366 of the Bankruptcy Code).

[5]  See [Docket Nos. 303, 305, 307, 309, and 311].

10

**RETAINED CAUSES OF ACTION**
**SCHEDULE C-3 – CLAIMS RELATED TO DEPOSITS**

| DEPOSITS | | | |
|---|---|---|---|
| **DEBTOR** | **THIRD PARTY** | **ADDRESS** | **DESCRIPTION** |
| The International Metals Reclamation Company, LLC | Constellation NewEnergy, Inc. | 550 S. Tryon St. Mail Code DEC45A Law Department Charlotte, NC 28202 | Adequate assurance deposit. |
| The International Metals Reclamation Company, LLC | Columbia Gas of Pennsylvania, Inc. | 200 Civic  Center Dr., 11th Floor Columbus, OH 43215 | Adequate assurance deposit. |
| Horsehead Corporation | Commonweath Edison Company | Exelon Corporation 2301 Market Street, S23-l Philadelphia, PA 19103 | Adequate assurance deposit. |
| Horsehead Metal Products, LLC | Duke Energy Carolinas | C/O Duke Energy Corporation 526 South Church St. Charlotte, NC 28202 | Adequate assurance deposit. |
| Horsehead Corporation | First Energy Solutions, Corp. | P.O. Box 3622 Akron, OH 44309-3622 | Adequate assurance deposit. |
| Horsehead Corporation; Horsehead Metal Products, LLC | Waste Management, Inc. | 1001 Fannin St. Houston, TX 77002 | Adequate assurance deposit. |
| Horsehead Corporation | Barnwell South Carolina Board of Public Works | 130 Main Street P.O. Box 776 Barnwell, SC 29812 | Adequate assurance deposit. |

| DEPOSITS | | | |
|---|---|---|---|
| **DEBTOR** | **THIRD PARTY** | **ADDRESS** | **DESCRIPTION** |
| Horsehead Corporation | Borough of Palmerton | 443 Delaware Ave. Palmerton, PA 18071 | Adequate assurance deposit. |
| Zochem Inc. | Enbridge Gas Distribution | 200 Fifth Avenue Pl. 425-First Street S.W. Calgary, Alberta Canada T2P 3L8 | Adequate assurance deposit. |
| Horsehead Corporation | GDF Suez Energy Resources NA | 1990 Post Oak Blvd Suite 1900 Houston, TX 77056-383 | Adequate assurance deposit. |
| Zochem Inc. | HydroOne Brampton | 483 Bay Street South Tower, 8th Floor Reception Toronto, ON Canada  M5G 2P5 | Adequate assurance deposit. |
| The International Metals Reclamation Company, LLC | PA American Water | 1025 Laurel Oak Rd. Coorhees, NJ 08043 | Adequate assurance deposit. |
| The International Metals Reclamation Company, LLC | PPL Electric Utilities Corp. | 827 Hausman Road Allentown, PA 18104-9392 | Adequate assurance deposit. |
| Horsehead Metal Products, LLC | PSNC Energy | 220 Operation Way Cayce, SC 29033-3701 | Adequate assurance deposit. |
| Horsehead Corporation | Rockwood Electric Utility | 341 W. Rockwood St. PO Box 108 Rockwood, TN 37854 | Adequate assurance deposit. |

| DEPOSITS | | | |
|---|---|---|---|
| **DEBTOR** | **THIRD PARTY** | **ADDRESS** | **DESCRIPTION** |
| Horsehead Corporation | Rockwood Water & Gas | 110 N. Chamberlain Ave. Rockwood, TN 37854 | Adequate assurance deposit. |
| Horsehead Corporation; The International Metals Reclamation Company, LLC | Snyder Brothers, Inc. | 90 Glade Dr. Kittanning, PA 16201 | Adequate assurance deposit. |
| Horsehead Corporation | South Carolina Electric and Gas | P.O. Box 100255 Columbia, SC 29202 | Adequate assurance deposit. |
| Horsehead Corporation | Talen/PPL Electricity | 835 Hamilton St. Allentown, PA 18101 | Adequate assurance deposit. |
| Horsehead Corporation | Twin Eagle Resource Manager | 8847 West Sam Houston Pkwy. N. Houston, TX 77040 | Adequate assurance deposit. |
| Horsehead Corporation | UGI Central Penn | 5877 Pennsylvania 349 Westfield, PA 16950 | Adequate assurance deposit. |
| Horsehead Corporation | Transcontinental Gas Pipe Line Corp. | 2800 Post Oak Blvd. Houston, TX 77056 | Adequate assurance deposit. |
| Horsehead Corporation | Town of Forest City | City Manager 128 N. Powell St. Forest City, NC 28043 | Adequate assurance deposit. |

| DEPOSITS | | | |
|---|---|---|---|
| **DEBTOR** | **THIRD PARTY** | **ADDRESS** | **DESCRIPTION** |
| Horsehead Corporation | Verizon Wireless | P.O. Box 25505<br>LeHigh Valley, PA 18002-5505 | Adequate assurance deposit. |
| Horsehead Corporation | Sprint | 6200 Sprint Pkway<br>Overland Park, KS 66251 | Adequate assurance deposit. |
| Horsehead Corporation | Access Point, Inc. | 1100 Crescent Greeen<br>Suite109<br>Cary, NC 27518 | Adequate assurance deposit. |
| Horsehead Corporation | City of Chicago Department of Finance - Water Division | 121 N. LaSalle Street<br>Chicago, IL 60602 | Adequate assurance deposit. |
| Horsehead Corporation | Duquesne Light Company | 411 Seventh Ave. (16-1)<br>Pittsburgh, PA 15219 | Adequate assurance deposit. |
| Horsehead Corporation | Spectrotel | 3535 NJ-66<br>NEPTUNE CITY, NJ 07753 | Adequate assurance deposit. |
| Horsehead Corporation | Comcast | One Comcast Center<br>Philadelphia, PA 19103 | Adequate assurance deposit. |
| Horsehead Corporation | AT&T | 1876 Data Drive<br>5th Floor North<br>Hoover, AL 35244 | Adequate assurance deposit. |

| DEPOSITS | | | |
|---|---|---|---|
| **DEBTOR** | **THIRD PARTY** | **ADDRESS** | **DESCRIPTION** |
| Horsehead Corporation | City of Bartlesville | 401 S Johnstone Ave.<br>Bartlesville, OK 74003 | Adequate assurance deposit. |
| Horsehead Corporation | Blue Ridge Communications | 524 Delaware Ave.<br>Palmerton, PA 18071 | Adequate assurance deposit. |
| Horsehead Corporation | U.S. Cellular | 8410 W Bryn Mawr Ave.<br>Chicago, IL 60631 | Adequate assurance deposit. |
| Horsehead Corporation | Daniel Morgan Water District | P.O. Box 116<br>Chesnee, SC 29323 | Adequate assurance deposit. |
| Horsehead Corporation | Apptix, Inc. | Dept. CH 17826<br>Palatine, IL 60055-7826 | Adequate assurance deposit. |
| The International Metals Reclamation Company, LLC | Ellwood City | 525 Lawrence Ave.<br>Ellwood City, PA 16117 | Adequate assurance deposit. |
| The International Metals Reclamation Company, LLC | Lexon Insurance Company | 10002 Shelbyville Road<br>Suite 100<br>Louisville, KY 40223 | Surety bond for waste storage facility closure (Ellwood City, PA). Bond # 1080004 |
| Horsehead Corporation | Lexon Insurance Company | 10002 Shelbyville Road<br>Suite 100<br>Louisville, KY 40223 | Surety bond for waste storage facility closure (Palmerton, PA). Bond # 1059227 |

| DEPOSITS | | | |
|---|---|---|---|
| **DEBTOR** | **THIRD PARTY** | **ADDRESS** | **DESCRIPTION** |
| Horsehead Corporation | Lexon Insurance Company | 10002 Shelbyville Road Suite 100 Louisville, KY 40223 | Surety bond for waste storage facility closure (Monaca, PA). Bond # 1062265 |

## Schedule C-4

### Causes of Action Related to Liens

The following **Schedule C-4** includes Entities who have asserted a lien against the Debtors. Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is included on **Schedule C-4**.

## RETAINED CAUSES OF ACTION
## SCHEDULE C-4 – CAUSES OF ACTION RELATED TO LIENS

| LIENS | | | |
|---|---|---|---|
| **DEBTOR** | **LIEN CLAIMANT** | **ADDRESS** | **DESCRIPTION** |
| HORSEHEAD HOLDING CORP.; THE INTERNATIONAL METALS RECLAMATION COMPANY, INC. | AMERICAN FINANCIAL NETWORK, INC. | 21403 CHAGRIN BLVD, SUITE 230 NONE CLEVELAND, OH  44122 | Lease of specific equipment.   20142484533 |
| HORSEHEAD HOLDING CORP. | HAGEMEYER NORTH AMERICA, INC. | 1460 TOBIAS GADSON BLVD. CHARLESTON, SC 29407 | Consigned goods. |
| HORSEHEAD HOLDING CORP.; HORSEHEAD CORP. | AMERICAN FINANCIAL NETWORK, INC. | 21403 CHAGRIN BLVD. SUITE 230 CLEVELAND, OH  44122 | Lease of specific equipment.  20143572708 |
| HORSEHEAD CORPORATION | UNITED RENTALS (NORTH AMERICA), INC. | 2000 BATEMAN ROAD OAKDALE, PA  15071 | Specific equipment. |
| HORSEHEAD CORPORATION | RUDD EQUIPMENT COMPANY | 4344 POPLAR LEVEL ROAD LOUISVILLE, KY  40213 | Specific equipment. |
| HORSEHEAD CORPORATION | WELLS FARGO EQUIPMENT FINANCE, INC. | 733 MARQUETTE AVENUE SUITE 700 MINNEAPOLIS, MN  55402 | Specific equipment. |
| | AMERICAN FINANCIAL NETWORK, INC. | 21403 CHAGRIN BLVD, SUITE 230 NONE CLEVELAND, OH  44122 | Lease of specific equipment.   20142484533 |

18

| LIENS | | | |
|---|---|---|---|
| **DEBTOR** | **LIEN CLAIMANT** | **ADDRESS** | **DESCRIPTION** |
| Horsehead Corporation | SUSQUEHANNA COMMERCIAL FINANCE, INC. | 2 COUNTRY VIEW ROAD, SUITE 300 MALVERN, PA  19355 | Lease of specific equipment. |
| HORSEHEAD CORPORATION | KOMATSU FINANCIAL LIMITED PARTNERSHIP | 1701 W. GOLF RD., STE 1-300 ROLLING MEADOWS, IL  60008 | Specific equipment. |
| HORSEHEAD METAL PRODUCTS, INC. | UNION BANK | 200 PRINGLE AVENUE, SUITE 500 WALNUT CREEK, CA  94596 | Lease of specific equipment. |
| HORSEHEAD METAL PRODUCTS, INC. | AMERICAN FINANCIAL NETWORK, INC. | 21403 CHAGRIN BLVD., SUITE 230 CLEVELAND, OH  44122 | Lease of specific equipment. |
| The International Metals Reclamation Company, LLC | Summit Funding Group, Inc. | 4680 Parkway Drive, Suite 300 Mason, OH  45040 | Lease of specific equipment. |
| ZOCHEM INC. | LIFTCAPITAL CORPORATION | 300 THE EAST MALL SUITE 401 TORONTO, CN  M9B6B7 | Equipment. |
| ZOCHEM INC | LIFTOW LIMITED | 3150 AMERICAN DRIVE MISSISSAUGA, ON  L4V1B4 | Equipment. |

| LIENS | | | |
|---|---|---|---|
| **DEBTOR** | **LIEN CLAIMANT** | **ADDRESS** | **DESCRIPTION** |
| Horsehead Metal Products, LLC | Western Oilfields Supply Co. (Rain For Rent) | c/o McCarter & English LLP<br>Katharine L. Mayer (DE# 3758)<br>Matthew J. Rifino (DE# 4749)<br>Renaissance Centre<br>405 N. King Street, Suite 800<br>Wilmington, Delaware 19801<br>Telephone: (302) 984-6300 | Mechanic's lien. |
| Horsehead Metal Products, LLC | Western Oilfields Supply Co. (Rain For Rent - Supp. Filing) | c/o McCarter & English LLP<br>Katharine L. Mayer (DE# 3758)<br>Matthew J. Rifino (DE# 4749)<br>Renaissance Centre<br>405 N. King Street, Suite 800<br>Wilmington, Delaware 19801<br>Telephone: (302) 984-6300 | Mechanic's lien. |
| Horsehead  Corporation | Industrial Piping, Inc. | c/o Morris James LLP<br>Brett D. Fallon<br>Douglas Candeub<br>500 Delaware Ave., Suite 1500<br>Wilmington, DE 19899 | Mechanic's lien. |
| Horsehead Metal Products, LLC & HH Corporation | Classic Industrial Services, Inc. | c/o White & Williams LLP<br>Marc S. Casarino, Esquire (#3613)<br>824 North Market Street, Suite 902<br>P. O. Box 709<br>Wilmington, DE 19899-0709<br>Telephone: 302.467.4520<br>Facsimile: 302.467.4550 | Mechanic's lien. |
| Horsehead Metal Products, LLC | Query-Pritchard | C/O Manion Gaynor & Manning LLP<br>Attn: Marc J. Phillips<br>1007 N. Orange Street, 10th Floor<br>Wilmington, DE 19801 | Mechanic's lien. |

| LIENS | | | |
|---|---|---|---|
| **DEBTOR** | **LIEN CLAIMANT** | **ADDRESS** | **DESCRIPTION** |
| Horsehead Metal Products, LLC | Specialized Riggers & Erectors, Inc. (Listed as SRE, Inc) | C/O James M Martin<br>Po Box 488<br>Gastonia, NC28053-0488<br>and<br><br>Womble Caryle Sandridge & Rice<br>Attn:  Thomas M. Horan<br>222 Delaware Ave., Suite 1501<br>Wilmington, DE 19801 | Mechanic's lien. |
| Horsehead  Corporation | J.T. Thorpe & Son, Inc. | Attn: Janine Ogando<br>1060 Hensley Street<br>Richmond, Ca 94801 | Mechanics' lien. |
| Horsehead Metal Products, LLC and Horsehead Corporation | Eldeco, Inc. | C/O Hamilton Stephens<br>201 South College Street, Suite 2020<br>Charlotte, NC 28244 | Mechanic's lien. |
| Horsehead  Corporation and Horsehead Metal Products, LLC | Press Rentals, Inc | C/O Kilpatrick Townsend & Stockton LLP<br>Attn: Gianfranco Finizio, Esq.<br>1114 Avenue Of The Americas<br>New York, NY 10036-7703 | Mechanic's lien. |
| Horsehead  Corporation | F.S. Sperry, Co., Inc. | C/O Gellert Scali Busenkell & Brown LLC<br>Attn Brya M Keilson, Esq<br>1201 N Orange Street, Suite 300<br>Wilmington, DE 19801 | Mechanic's lien. |
| Horsehead  Corporation | F.S. Sperry, Co., Inc. | C/O Gellert Scali Busenkell & Brown LLC<br>Attn Brya M Keilson, Esq<br>1201 N Orange Street, Suite 300<br>Wilmington, DE 19801 | Mechanic's lien. |

| LIENS | | | |
|---|---|---|---|
| **DEBTOR** | **LIEN CLAIMANT** | **ADDRESS** | **DESCRIPTION** |
| Horsehead  Corporation | Tindall Corp. | 2273 Hayne Street<br>Spartanburg, SC 29301 | Mechanic's lien. |
| Horsehead  Corporation | NAK Kiln Dryer Services | C/O Berman Fink van Horn P.C.<br>Attn:  Thomas Austin<br>3475 Piedmont Road, N.E. Suite 1100<br>Atlanta, GA 30305 | Mechanic's lien. |
| Horsehead Metal Products, LLC | F.S. Sperry, Co., Inc. | C/O Gellert Scali Busenkell & Brown LLC<br>Attn Brya M Keilson, Esq<br>1201 N Orange Street, Suite 300<br>Wilmington, DE 19801 | Mechanic's lien. |
| Horsehead Metal Products, LLC and Horsehead Corporation | Electrical Equipment Company | Attn: Donna Michell<br>1440 Diggs Drive<br>Raleigh, NC 27603 | Mechanic's lien. |
| Horsehead Metal Products, LLC | Insulating Services, Inc. | C/O Hannah Sheridan Loughridge & Cochran<br>Attn: Nan Hannah<br>5400 Glenwood Ave. Ste. 410<br>Raleigh, NC 27612 | Mechanic's lien. |
| Horsehead Metal Products, LLC | Century III, Inc. | 112 S. Main St, Suite C<br>Greer, SC 29650<br><br>and<br><br>c/o Brian A. Martin, LLC<br>Attorney for Century III, Inc.<br>212 Greer Street<br>Greer, SC 29650 | Mechanic's lien. |

| LIENS | | | |
|---|---|---|---|
| **DEBTOR** | **LIEN CLAIMANT** | **ADDRESS** | **DESCRIPTION** |
| Horsehead  Corporation | Mechanical Supply Company | 1001 Crews Road<br>P.O. Box 709<br>Matthews, NC 28106<br><br>and<br><br>C/O Hogan McDaniel<br>Attn:  Daniel K. Hogan<br>1311 Delaware Ave.<br>Wilmington, DE 19806 | Mechanic's lien. |
| Horsehead Metal Products, LLC | Harrington Industrial Plastics, LLC | Attn: Bryan P. Kelley<br>55 Beattie Place, Suite 1050<br>Greenville, SC 29601<br><br>and<br><br>c/o Elmore Goldsmith, PA<br>Attn:  Mason A. Goldsmith<br>55 Beattie Place Suite 1050<br>P.O Box 1887<br>Greenville, SC 29602 | Mechanic's lien. |
| Horsehead Metal Products, LLC | HD Supply Waterworks, Ltd. | 10000 Metromont Industrial Parkway<br>Charlotte, NC 28269<br><br>and<br><br>c/o Poyner Spruill LLP<br>Attn:  Thomas L. Ogburn, Sarah DiFranco<br>301 South College Street, Suite 2300 | Mechanic's lien. |

| LIENS | | | |
|---|---|---|---|
| **DEBTOR** | **LIEN CLAIMANT** | **ADDRESS** | **DESCRIPTION** |
| | | Charlotte, NC 28202 | |
| Horsehead  Corporation | Kanawha Scales and Systems, Inc. | C/O Kay Casto & Chaney PLLC<br>Attn: Steven L. Thomas, Esq.<br>Po Box 2031<br>Charleston, WV 25327 | Mechanic's lien. |
| Horsehead Metal Products, LLC | Brahma Group, Inc. | Attn: David Zimmerman<br>1132 South 500 West<br>Salt Lake City, UT 84101<br><br>and<br><br>c/o Elmore Goldsmith, PA<br>Attn:  Bryan P. Kelley<br>55 Beattie Place Suite 1050<br>P.O Box 1887<br>Greenville, SC 29602 | Mechanic's lien. |
| Horsehead Metal Products, LLC | Robert E. Mason & Associates, Inc. | C/O Johnston Allison & Hord Pa<br>Attn: David V. Brennan<br>1065 East Morehead St<br>Charlotte, NC 28204 | Mechanic's lien. |

## Schedule C-5

### Claims, Defenses, Cross-Claims and Counter-Claims
### Related to Litigation and Potential Litigation

The following **Schedule C-5** sets forth Entities that are party to or that the Debtors believe may become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial.  Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is included on **Schedule C-5**.

**RETAINED CAUSES OF ACTION**
**SCHEDULE C-5 – CLAIMS, DEFENSES, AND COUNTERCLAIMS**
**RELATED TO LITIGATION AND POTENTIAL LITIGATION**

| DEBTOR | LITIGATION PARTY | ADDRESS | CAPTION OF SUIT, CASE NUMBER, AND JURISDICTION (IF APPLICABLE) | DESCRIPTION AND NATURE OF PROCEEDING |
|---|---|---|---|---|
| | | **LITIGATION** | | |
| Horsehead Corporation | Carnegie Strategic Design Engineers, LLC | 1000 Omega Dr #1570 Pittsburgh, PA 15205-5001<br><br>and<br><br>Attn:  Jeff Lewis 4955 Steubenville Pike, Suite 115 Pittsburgh, PA 15205 | Horsehead Corporation v. Carnegie Strategic Design Engineers, LLC, Court of Common Pleas, Allegheny County, PA GD14-006663 | Breach of contract. |
| Horsehead Corporation | Omni Services, Inc. | Pamela V. Collins, Esq. Walsh, Barnes, Collis & Zumpella, P.C. Gulf Tower, Suite 1400 707 Grant St. Pittsburgh, PA 15219 | Horsehead Corporation v. Omni Services, Inc., 2:15 cv00220-AJS, W.D. Pa. | Breach of contract; breach of warranty; indemnification. |
| Horsehead Corporation | Topcor LLC | Richard S. Canciello Poerio & Walter, Inc. 1119 Penn Ave., Suite 303 Pittsburgh, PA 15222 | Horsehead Corporation v. Topcor LLC, WD PA – civil action 15-00198-DSC | Breach of contract; breach of warranty; indemnification. |
| Horsehead Corporation | Joel Adams | Jeffrey S. Taylor Spesia & Ayers 1415 Black Road Joliet, IL 60435 | Adams v. Horsehead Corporation, Circuit Court of Cook County, IL, County Department Law division - 2014 L 3242 | Personal injury claim. |

26

| LITIGATION | | | | |
|---|---|---|---|---|
| **DEBTOR** | **LITIGATION PARTY** | **ADDRESS** | **CAPTION OF SUIT, CASE NUMBER, AND JURISDICTION (IF APPLICABLE)** | **DESCRIPTION AND NATURE OF PROCEEDING** |
| Zochem, Inc., Horsehead Holding Corp., Horsehead Corporation | Melissa Doyle | C/O Angela Assuras, P.C. 20 Queen Street West, Suite 3310 Toronto, ON M5H 3R3 | Doyle v. Zochem, Inc., Horsehead Holding Corp., Horsehead Corporation and Stephanie Wrench, Ontario Superior Court of Justice, 794/12 Canada | Claims related to termination of employment. |
| Zochem Inc. | Brian Cross | C/O Michael Walter Pereira Walter Lawyers LLP 201 City Centre Drive Suite 500 Mississagua, ON L5B 2T4 | Brian Cross Claim v. Zochem, Inc | Claims for severance, bonus payments, salary, and other payments. |
| Horsehead Corporation | Illinois Department of Revenue | Bankruptcy Administration Unit 100 W. Randolph #7-400 Chicago, IL 60601 | Horsehead Corporation v. Illinois Department of Revenue | Sales tax audit. |
| Horsehead Corporation | Productos Plasticos Anticorrosivos, S.A. | C/O James S. Malloy & Brian R. Davidson Dingess Foster Luciana Davidson & Chlebo PNC Center 20 Stanwix St., 3rd Fl. Pittsburgh, PA 15222 | Horsehead Corporation v. Productos Plasticos Anticorrosivos, S.A., Court of Common Pleas of Allegheny County, Pennsylvania | Breach of contract. |
| Horsehead Corporation | Carbon County Board of Assessment Appeals and Palmerton Area School District | Attn:  Chief Assessor Carbon County Courthouse Annex P.O. Box 250 Jim Thorpe, PA 18229 | Horsehead Corporation v. Carbon County Board of Assessment Appeals and Palmerton Area School District | Property tax assessment. |

## Schedule C-6

### Causes of Action Related to Accounts Receivable and Accounts Payable

The following **Schedule C-6** includes Entities that have recently or that currently owe money to the Debtors.  Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is included on **Schedule C-6**.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them, including, without limitation, all Entities listed on Schedules D, E, and F of each of the Schedules filed by the Debtors in these Chapter 11 Cases, which are hereby incorporated by reference to this **Schedule C-6** as if fully set forth herein.[6]  There is no further schedule to this **Schedule C-6**.

---

6   See [Docket Nos. 303, 305, 307, 309, and 311].

28

## Schedule C-7

### Causes of Action Related to Tax Refunds

The following **Schedule C-7** includes Entities that have recently or that currently owe money to the Debtors for, or related, to taxes paid.  Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or Reorganized Debtors, regardless of whether such Entity is included on **Schedule C-7**.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe taxes to them.

29

**RETAINED CAUSES OF ACTION**
**SCHEDULE C-7 – CLAIMS RELATED TO TAX REFUNDS**

| TAX REFUNDS | | |
|---|---|---|
| **DEBTOR** | **TAXING AUTHORITY** | **ADDRESS** |
| Horsehead Corporation | Illinois Department of Revenue | Bankruptcy Administration Unit 100 W. Randolph #7-400 Chicago, IL 60601 |
| Horsehead Corporation | Carbon County Board of Assessment Appeals and Palmerton Area School District | Attn:  Chief Assessor Carbon County Courthouse Annex P.O. Box 250 Jim Thorpe, PA 18229 |

30

## Schedule C-8

### Causes of Action Related to Potential Preferences and Fraudulent Conveyances

Unless otherwise released by the Plan, including but not limited to Article VIII.C (Debtor Release) and Article IV.V (Release of Avoidance Actions) of the Plan, or a separate written agreement executed by the Debtors, the Debtors expressly reserve all Causes of Action, including Avoidance Actions, against or related to all former creditors that owe or may in the future owe money to the Debtors, including for potential Causes of Action the Debtors could assert under sections 544, 547, or 548 of the Bankruptcy Code or other applicable law.  Items 3 and 4 of the Statement of Financial Affairs filed by each Debtor in these Chapter 11 Cases[7], as may be amended from time to time, are hereby incorporated by reference in this **Schedule C-8** as if fully set forth herein. There is no schedule to this **Schedule C-8**.

---

[7]   See [Docket Nos. 304, 306, 308, 310, and 312].

## EXHIBIT D

Identity of New Board for Reorganized Horsehead

## EXHIBIT D

MEMBERS OF THE NEW BOARD FOR REORGANIZED HORSEHEAD[1]

The Board of Directors of Reorganized Horsehead shall initially be composed as follows:

- Three (3) individuals designated by the Greywolf Member

- Two (2) individuals designated by the Lantern Member

- One (1) individual designated by the MAK Capital Member

\* \* \* \* \*

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of July 12, 2016 [Docket No. 1309] or the New Organizational Documents filed as **Exhibit A** to the Plan Supplement, as applicable.  In the event of any inconsistency between the disclosures set forth herein and the New Organizational Documents, the terms of the New Organizational Documents shall control in all respects.

KE 42575297

## EXHIBIT E

The Unit Purchase Agreement

*EXECUTION COPY*

UNIT PURCHASE AND SUPPORT AGREEMENT

BY AND AMONG

HORSEHEAD HOLDING CORP.

AND

THE PLAN SPONSORS PARTY HERETO

Dated as of July 11, 2016

112016848 v9

TABLE OF CONTENTS

                                                                                            Page

ARTICLE I DEFINITIONS ...................................................................................................2

    Section 1.1    Definitions ........................................................................................2

    Section 1.2    Construction......................................................................................15

    Section 1.3    Cross References to Other Defined Terms .......................................16

ARTICLE II UNIT PURCHASE .............................................................................................18

    Section 2.1    Additional Capital Commitment......................................................18

    Section 2.2    Emergence Equity Purchase ............................................................19

    Section 2.3    Plan Sponsor Default. ......................................................................19

    Section 2.4    Subscription Escrow Account Funding. ...........................................20

    Section 2.5    Closing. ............................................................................................21

    Section 2.6    Designation and Assignment Rights.................................................21

ARTICLE III EXPENSE REIMBURSEMENT ........................................................................22

    Section 3.1    Expense Reimbursement...................................................................22

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY ...............23

    Section 4.1    Organization and Qualification.........................................................23

    Section 4.2    Corporate Power and Authority. .......................................................23

    Section 4.3    Execution and Delivery; Enforceability............................................24

    Section 4.4    Authorized and Issued Units.............................................................25

    Section 4.5    Issuance............................................................................................25

    Section 4.6    No Conflict .......................................................................................26

    Section 4.7    Consents and Approvals ...................................................................26

    Section 4.8    Arm's-Length....................................................................................26

    Section 4.9    Financial Statements ........................................................................26

    Section 4.10    Company SEC Documents and Disclosure Statement.......................27

    Section 4.11    Absence of Certain Changes.............................................................27

    Section 4.12    No Violation; Compliance with Laws ...............................................27

    Section 4.13    Legal Proceedings............................................................................27

    Section 4.14    Labor Relations................................................................................28

    Section 4.15    Intellectual Property.........................................................................28

    Section 4.16    Title to Real and Personal Property. .................................................29

    Section 4.17    No Undisclosed Relationships ..........................................................29

    Section 4.18    Licenses and Permits .......................................................................30

    Section 4.19    Environmental..................................................................................30

i

Section 4.20    Tax Returns and Payments; Withholding ...........................................................31

Section 4.21    Compliance with ERISA. ...................................................................................31

Section 4.22    Disclosure Controls and Procedures ..................................................................32

Section 4.23    Material Contracts.............................................................................................32

Section 4.24    No Unlawful Payments.....................................................................................32

Section 4.25    Compliance with Money Laundering Laws.......................................................33

Section 4.26    Compliance with Sanctions Laws .....................................................................33

Section 4.27    No Broker's Fees ..............................................................................................33

Section 4.28    Takeover Statutes.............................................................................................33

Section 4.29    Investment Company Act ..................................................................................33

Section 4.30    Insurance ..........................................................................................................33

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PLAN SPONSORS.....................34

Section 5.1    Incorporation.....................................................................................................34

Section 5.2    Corporate Power and Authority .........................................................................34

Section 5.3    Execution and Delivery .....................................................................................34

Section 5.4    No Conflict ........................................................................................................34

Section 5.5    Consents and Approvals ....................................................................................35

Section 5.6    Legal Proceedings..............................................................................................35

Section 5.7    No Registration ..................................................................................................35

Section 5.8    Purchasing Intent ...............................................................................................35

Section 5.9    Sophistication; Investigation..............................................................................35

Section 5.10    No Broker's Fees ..............................................................................................35

Section 5.11    Arm's-Length....................................................................................................36

Section 5.12    Financial Capability .........................................................................................36

Section 5.13    Votable Claims and Additional Claims .............................................................36

ARTICLE VI ADDITIONAL COVENANTS .......................................................................................36

Section 6.1    Restructuring Support Obligations. ...................................................................36

Section 6.2    Reasonable Best Efforts.....................................................................................40

Section 6.3    Conduct of Business. .........................................................................................41

Section 6.4    Access to Information; Confidentiality................................................................43

Section 6.5    Transfers and Acquisitions of Claims.................................................................44

Section 6.6    New Board of Directors .....................................................................................44

Section 6.7    Reorganized Holdings Corporate Documents .....................................................45

Section 6.8    Form D and Blue Sky ........................................................................................45

Section 6.9    No Integration; No General Solicitation..............................................................45

112016848 v9

Section 6.10    DTC Eligibility ................................................................................................45

Section 6.11    Use of Proceeds .............................................................................................46

Section 6.12    Unit Legend ...................................................................................................46

Section 6.13    Alternative Transactions; Fiduciary Duties. ...................................................46

Section 6.14    Administrative Claims, Priority Tax Claims, Other Priority Claims, and
                Other Secured Claims ....................................................................................48

ARTICLE VII CONDITIONS TO THE CLOSING ................................................................48

Section 7.1    Conditions to the Obligation of the Plan Sponsors ...........................................48

Section 7.2    Waiver of Conditions to Obligation of Plan Sponsors......................................50

Section 7.3    Conditions to the Obligation of the Company ...................................................50

Section 7.4    Frustration of Closing Conditions....................................................................51

Section 7.5    Waiver of Conditions ......................................................................................51

ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION ..............................................51

Section 8.1    Indemnification Obligations ............................................................................51

Section 8.2    Indemnification Procedure...............................................................................52

Section 8.3    Settlement of Indemnified Claims ...................................................................53

Section 8.4    Contribution....................................................................................................53

Section 8.5    Treatment of Indemnification Payments ..........................................................53

Section 8.6    No Survival .....................................................................................................54

ARTICLE IX TERMINATION................................................................................................54

Section 9.1    Termination Rights .........................................................................................54

Section 9.2    Effect of Termination......................................................................................57

ARTICLE X GENERAL PROVISIONS...................................................................................58

Section 10.1    No Zochem Liability........................................................................................58

Section 10.2    No Survival .....................................................................................................58

Section 10.3    No Outside Reliance .......................................................................................58

Section 10.4    Notices ...........................................................................................................59

Section 10.5    Assignment; Third Party Beneficiaries............................................................59

Section 10.6    Prior Negotiations; Entire Agreement. ............................................................59

Section 10.7    Governing Law; Venue....................................................................................60

Section 10.8    Waiver of Jury Trial ........................................................................................60

Section 10.9    Counterparts....................................................................................................60

Section 10.10    Waivers and Amendments; Rights Cumulative; Consent..................................60

Section 10.11    Headings .........................................................................................................61

Section 10.12    Specific Performance.......................................................................................61

iii

Section 10.13   Damages ........................................................................................................61

Section 10.14   No Reliance ....................................................................................................62

Section 10.15   Publicity .........................................................................................................62

Section 10.16   Settlement Discussions ..................................................................................63

Section 10.17   Reservation of Rights.....................................................................................63

Section 10.18   Further Assurances .........................................................................................63

Section 10.19   Severability ....................................................................................................63

Section 10.20   Representation by Counsel .............................................................................63

Section 10.21   No Fiduciary Duties; No Commitment To Finance..........................................64

Section 10.22   No Solicitation ...............................................................................................64

Section 10.23   UPA Approval Order.......................................................................................64

## SCHEDULES AND EXHIBITS

Schedule 1        Plan Sponsors

Schedule 2        Purchase Percentages and Emergence Equity Units

Schedule 3-A      Votable Claims

Schedule 3-B      Additional Claims

Schedule 4        Consents

Schedule 5        Notice Addresses for Plan Sponsors


Company Disclosure Schedules


Exhibit A         Debtors' Joint Plan of Reorganization

Exhibit B         Disclosure Statement

Exhibit C         Form of Joinder Agreement

Exhibit D         Form of New Limited Liability Company Agreement

iv

## UNIT PURCHASE AND SUPPORT AGREEMENT

THIS UNIT PURCHASE AND SUPPORT AGREEMENT (this "*Agreement*"), dated as of July 11, 2016, is made by and among Horsehead Holding Corp. (as a debtor in possession and a reorganized debtor, as applicable, the "*Company*"), on behalf of itself and, subject to Section 10.1, each of the other Debtors, on the one hand, and the parties listed as "Plan Sponsors" on Schedule 1 hereto and as otherwise provided by this Agreement (each referred to herein, individually, as a "*Plan Sponsor*" and, collectively, as the "*Plan Sponsors*"), on the other hand. The Company and each Plan Sponsor is referred to herein, individually, as a "*Party*" and, collectively, as the "*Parties*".

## RECITALS

**WHEREAS**, as of the date hereof, the Plan Sponsors or their Affiliates collectively hold or control, in the aggregate, in excess of ninety-five percent (95.00%) of the aggregate outstanding principal amount of those certain 10.50% Senior Secured Notes due June 2017 (the "*Prepetition Senior Secured Notes*" and the holders of such Prepetition Senior Secured Notes, the "*Prepetition Senior Secured Noteholders*") issued by the Company pursuant to that certain Indenture for the 10.50% Senior Secured Notes due June 2017, dated as of July 26, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "*Prepetition Senior Secured Notes Indenture*"), by and among the Company, the subsidiary guarantors from time to time party thereto, and U.S. Bank National Association, as trustee (the "*Prepetition Senior Secured Notes Indenture Trustee*") and as collateral agent (claims of the Prepetition Senior Secured Noteholders under the Prepetition Senior Secured Notes Indenture, the "*Votable Claims*");

WHEREAS, the Plan Sponsors further beneficially hold or control certain additional Unsecured Notes Claims and Convertible Notes Claims (each as defined in the Plan) and other Claims, in each case, as required to be disclosed by Rule 2019 of the Federal Rules of Bankruptcy Procedure, against the Debtors as set forth on Schedule 3-B attached hereto (the "*Additional Claims*").

**WHEREAS**, (a) on February 2, 2016, the Company and certain of its debtor affiliates (each, individually, a "*Debtor*" and, collectively, the "*Debtors*") commenced jointly administered proceedings (the "*Chapter 11 Proceedings*"), styled *In re Horsehead Holding Corp. et al.*, Case No. 16-10287 (CSS) (the date on which the Chapter 11 Proceedings commenced, the "*Petition Date*") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., as amended, the "*Bankruptcy Code*") with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") and (b) on February 5, 2016, the Ontario Superior Court of Justice (Commercial List) (the "*Canadian Court*") recognized the Chapter 11 Proceedings as foreign main proceedings (the "*Recognition Proceedings*") in proceedings commenced under Part IV of the Companies' Creditors Arrangement Act (the "*CCAA*");

**WHEREAS**, on March 3, 2016, the Bankruptcy Court entered the Final Order (as defined in the DIP Loan Debt Documents) and, on March 3, 2016, the Canadian Court entered the Final DIP Recognition Order (as defined in the DIP Loan Debt Documents);

**WHEREAS**, prior to the date hereof and in connection with the Chapter 11 Proceedings, the Debtors have engaged in good faith negotiations with certain parties in interest regarding the terms of a comprehensive restructuring (such restructuring as set forth in the Plan and as further agreed to by the Parties pursuant to the terms of this Agreement, the "*Restructuring*") of the Debtors' outstanding obligations, including those under each of the Prepetition Debt Documents and the DIP Loan Debt Documents, and the Parties now desire to implement the Restructuring in accordance with and subject to the terms and conditions set forth in this Agreement and the Plan;

1

**WHEREAS**, the Debtors intend to seek entry of one or more orders of the Bankruptcy Court and the Canadian Court, as applicable, in each case, which shall be in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company, (a) confirming the Plan pursuant to Section 1129 of the Bankruptcy Code (the "*Confirmation Order*"), (b) authorizing the consummation of the transactions contemplated hereby, which order may take the form of, and be incorporated into, the Confirmation Order (the "*UPA Consummation Approval Order*"), and (c) recognizing and enforcing in Canada the Confirmation Order and UPA Consummation Approval Order;

**WHEREAS**, subject to the terms and conditions contained in this Agreement and the Plan, (a) Reorganized Holdings will issue the Emergence Equity Units in the Emergence Equity Amount to the Plan Sponsors set forth on Schedule 2 and (b) the Eligible Holders will have the right to elect to commit to purchase Additional Capital Commitment Units; and

**WHEREAS**, pursuant to the Plan and subject to the terms and conditions contained in this Agreement, each Plan Sponsor set forth on Schedule 2 has agreed to purchase (on a several and neither joint nor joint and several basis), such Plan Sponsor's respective Purchase Percentage of the Emergence Equity Units as set forth next to such Plan Sponsor's name on Schedule 2.

**NOW**, **THEREFORE**, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the Parties hereby agrees as follows:

ARTICLE I

**DEFINITIONS**

Section 1.1    Definitions.  Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"*ACC Purchase Percentage*" means, with respect to each Plan Sponsor, a percentage equal to such Plan Sponsor's respective total Votable Claims, as of the Expiration Time, divided by all Votable Claims of the Plan Sponsors as of the Expiration Time; provided, however, that for purposes of this definition, each Plan Sponsor shall be deemed to hold the Votable Claims held by such Plan Sponsor's Related Purchasers.

"*Additional Capital Commitment*" means the agreement and commitment pursuant to which Eligible Holders have elected to commit to purchase the Additional Capital Commitment Units, in each case, pursuant to and subject to the terms and conditions hereof.

"*Additional Capital Commitment Amount*" means cash in an aggregate amount equal to the lesser of (i) $100,000,000 and (ii) the aggregate amount committed by all of the Additional Capital Commitment Participants.

"*Additional Capital Commitment Units*" means the units of New Common Equity committed to be purchased in the Additional Capital Commitment pursuant to and subject to the terms and conditions hereof.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Affiliated Funds of such Person); *provided*, *however*, that for purposes of this Agreement, no Plan Sponsor shall be

2

deemed an Affiliate of the Company or any of its Subsidiaries.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"*Alternative Transaction*" means any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on one or more asset sales under Section 363 of the Bankruptcy Code or pursuant to a plan) other than the Restructuring, including (a) any chapter 11 plan, reorganization, restructuring, liquidation, or alternative proceeding under the Bankruptcy Code, CCAA or BIA involving the Company or any of the other Debtors, (b) the issuance, sale, or other disposition, in each case, by the Company or any of the other Debtors, of any Equity Interests, debt interests, or any material assets of the Company or any of the other Debtors, or (c) a merger, sale, consolidation, business combination, recapitalization, refinancing, share exchange, rights offering, debt offering, equity investment, or similar transaction involving all or a significant portion of the assets, business or equity of the Debtors whether through one or more transactions) involving the Company or any of the other Debtors.

"*Antitrust Authorities*" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws.

"*Antitrust Laws*" mean the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct.

"*Applicable Privacy Laws*" means (a) any Laws that regulate the collection, use and disclosure of information about an identifiable individual and all policies and guidelines of any federal, state or provincial privacy commissioner, that are applicable to the Company and its Subsidiaries; and (b) any Laws governing spam or electronic communications that are applicable to the Company and its Subsidiaries, including "CASL", an act to promote the efficiency and adaptability of the Canadian economy by regulating certain activities that discourage reliance on electronic means of carrying out commercial activities, and to amend the Canadian Radio-television and Telecommunications Commission Act, the Competition Act, the Personal Information Protection and Electronic Documents Act and the Telecommunications Act (Canada) (S.C. 2010, c.23) and the regulations made thereunder.

"*Available Units*" means any Emergence Equity Units that any Plan Sponsor fails to purchase as a result of a Plan Sponsor Default by such Plan Sponsor.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Proceedings.

"*Banco Bilbao Note*" means that certain unsecured note payable by Reorganized Holdings to  Banco Bilbao Vizcaya Argentaria, S.A. ("*BBVA*") on the Effective Date in accordance with the Plan, at an interest rate of LIBOR plus 1.50% per annum and maturing on the seven (7) year anniversary of the Closing Date.

3

"*BBVA Note Documents*" means Banco Bilbao Note, together with all agreements and all other documentation executed in connection with such unsecured note, each as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

"*BIA*" means the *Bankruptcy and Insolvency Act* (Canada).

"*Business Day*" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"*Canadian Pension Plans*" means the Zochem Inc. Hourly Employees Retirement Income Plan and the Zochem Inc. Salaried Employees Retirement Income Plan.

"*Certificate of Conversion*" means the certificate of conversion of Horsehead Holding Corp. into a limited liability company as of the Closing Date, which shall be consistent with the terms set forth in the Plan and otherwise in form and substance satisfactory to the Requisite Plan Sponsors.

"*Claim*" shall have the meaning given that term in Section 101(5) of the Bankruptcy Code.

"*Code*" means the Internal Revenue Code of 1986.

"*Collective Bargaining Agreements*" means any and all written Contracts, letters, side letters and contractual obligations of any kind, nature and description, that have been entered into between, or that involve or apply to, any employer and any Employee Representative.

"*Company Disclosure Schedule*" means the disclosure schedules delivered by the Company to the Plan Sponsors on the date hereof.

"*Company Plan*" means any employee benefit plan as defined in Section 3(3) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Company or any Subsidiary of the Company, and each such plan for which any such entity has any Liability, other than any plan sponsored, maintained or required by a Governmental Entity.

"*Company SEC Documents*" means all of the reports and forms (including exhibits, schedules and information incorporated therein) filed with the SEC by the Company.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time, in each case, in consultation with the Requisite Plan Sponsors.

"*Contract*" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments or modifications thereto or restatements thereof, whether written or oral, but excluding the Plan.

"*Defaulting Plan Sponsor*" means, at any time, any Plan Sponsor that caused a Plan Sponsor Default that is continuing at such time.

"*DIP Agent*" means Cantor Fitzgerald Securities, as administrative agent under the DIP Loan.

4

112016848 v9

"***DIP Loan***" means that certain Senior Secured Superpriority Debtor-In-Possession Credit, Security and Guaranty Agreement, dated as of February 8, 2016, by and among the Debtors party thereto, the lenders from time to time party thereto (such lenders, the "***DIP Lenders***"), and the DIP Agent (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof).

"***DIP Loan Claims***" means any and all Claims of the DIP Lenders under the DIP Loan Debt Documents.

"***DIP Loan Debt Documents***" means the DIP Loan, together with all security, pledge, mortgage, and guaranty agreements and all other documentation executed in connection with the DIP Loan, each as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

"***DIP Loan Event of Default***" means an "Event of Default" under, and as defined in, the DIP Loan.

"***Disclosure Statement***" means the Disclosure Statement for the Plan approved pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto) and the corresponding Recognition Order, which Disclosure Statement shall be substantially in the form attached hereto as Exhibit B and otherwise mutually satisfactory to the Requisite Plan Sponsors and the Company and as may be further amended, supplemented or otherwise modified from time to time pursuant to the terms of this Agreement.

"***Effective Date***" means the effective date under and as defined in the Plan.

"***Eligible Holder***" means each Plan Sponsor that is a holder of a Votable Claim that is an "accredited investor" as such term is defined by Rule 501 of Regulation D, promulgated under the Securities Act of 1933 as determined by the Company pursuant to the terms hereof.

"***Emergence Equity Amount***" means cash in an aggregate amount equal to $160,000,000.

"***Emergence Equity Units***" means the New Common Equity to be issued pursuant to Section 2.2 in an amount equal to sixty-two and seven hundred sixty-two thousandths percent (62.762%) of the Total Outstanding Units as of the Effective Date, subject to dilution by any units of New Common Equity to be issued (a) pursuant to the Warrants, (b) pursuant to the terms of the MEIP, or (c) on account of the Additional Capital Commitment Units at any time on or after the Closing Date.

"***Employee Representatives***" means any of the Company's or any of its Subsidiaries' respective employees or such employees' labor organization, works council, workers' committee, union representatives or any other type of employees' representatives for collective bargaining purposes.

"***Environmental Claims***" means any and all Legal Proceedings relating in any way to any Environmental Law or any Permit issued, or any approval given, under any such Environmental Law, including (a) any and all Legal Proceedings by any Governmental Entity for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Legal Proceedings by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence or release of, or exposure to, any Hazardous Materials.

5

"*Environmental Law*" means any applicable international, regional, federal, state, provincial, foreign or local Law, treaties, directives, protocols, codes, binding and enforceable guidelines or standards, binding and enforceable written policy, and rule of common law, in each case having the force and effect of Law and as amended and in effect as of, prior to or through the Closing Date, and any judicial or administrative interpretation thereof, including any Order, to the extent binding on the Company or any of its Subsidiaries, relating to the environment (including ambient air, surface water, ground water, navigable waters, waters of the contiguous zone, coastal water, ocean waters and international waters), worker or public health and safety (to the extent related to exposure to Hazardous Materials), and/or Hazardous Materials (including the emission, discharge, release or threatened release of any Hazardous Materials into ambient air, surface water, ground water, navigable waters, waters of the contiguous zone, coastal water, ocean waters, international waters or lands or otherwise and the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials), including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 9601 et seq. ("*RCRA*"); the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. §§ 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; Regulation (EC) No 1907/2006 of the European Parliament and of the Council of 18 December 2006 concerning the Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH); and any applicable federal, state, provincial, local or foreign counterparts or equivalents, in each case, as amended from time to time.

"*ERISA*" means the Employee Retirement Income Security Act of 1974.

"*ERISA Affiliate*" means each person (as defined in Section 3(9) of ERISA) which together with the Company or a Subsidiary of the Company would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"*ERISA Event*" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any ERISA Plan (excluding those for which the provision for thirty (30) days' notice to the PBGC has been waived by regulation); (b) the failure of any ERISA Plan to meet the minimum funding standard of Section 412 or Section 430 of the Code or Section 302 or 303 of ERISA, in each case, whether or not waived, or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any ERISA Plan or the failure of the Company or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any ERISA Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Company or any of its ERISA Affiliates from any Multiemployer Plan or the termination of any such Multiemployer Plan resulting in liability to the Company pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any ERISA Plan, or the occurrence of any event or condition which would reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any ERISA Plan; (f) the imposition of liability on the Company pursuant to Section 4062 or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal of the Company or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential withdrawal liability imposed on the Company therefor, or the receipt by the Company of notice from any Multiemployer Plan that it is insolvent pursuant to Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (h) the occurrence of an act or omission which would reasonably be expected to give rise to the imposition on the Company of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Sections 502(c), (i) or (l), or Section 4071 of ERISA in respect of any

6

Company Plan; (i) the assertion of a material claim (other than routine claims for benefits) against any Company Plan other than a Multiemployer Plan or the assets thereof, or against the Company or any of its respective ERISA Affiliates in connection with any Company Plan, that, in each case, would reasonably be expected to result in a liability to the Company; (j) the imposition of a Lien on the assets of the Company pursuant to Section 430(k) of the Code or pursuant to Section 303(k) of ERISA with respect to any ERISA Plan; (k) a determination that any ERISA Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); or (l) a determination that any Multiemployer Plan is, or is expected to be, in "critical" "endangered" status under Section 432 of the Code or Section 305 of ERISA.

"*ERISA Plan*" means any pension plan as defined in Section 3(2) of ERISA subject to Title IV of ERISA (other than a Multiemployer Plan), which is maintained or contributed to by (or to which there is an obligation to contribute of) the Company or a Subsidiary of the Company, and each such plan for which any such entity has any Liability (including on account of an ERISA Affiliate).

"*Event*" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"*Exchange Act*" means the Securities Exchange Act of 1934.

"*Exclusivity Order*" means that certain Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief, to be entered by the Bankruptcy Court on or about July 11, 2016.

"*Expiration Time*" means 5:00 pm prevailing Eastern time on July 29, 2016.

"*Final Order*" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek leave to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, motion for leave to appeal or petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken, motion for leave to appeal, or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which leave was sought or from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; *provided*, *however*, that the possibility that a motion under Rule 60 of the *Federal Rules of Civil Procedure*, or any analogous rule under the Bankruptcy Rules, the Local Bankruptcy Rules of the Bankruptcy Court or any analogous rules under the CCAA or *Ontario Rules of Civil Procedure* may be filed relating to such order shall not prevent such order from being a Final Order.

"*Foreign Company Plan*" means any employee benefit, savings or retirement plans, of any nature or kind whatsoever, including any Foreign Pension Plans and any:  (a) compensation, bonus, deferred compensation, profit sharing and incentive compensation plans; (b) share purchase, share appreciation and share option plans; (c) severance or termination pay and vacation pay plans; (d) hospitalization or other medical, dental, eye care or other health and welfare benefit plans; (e) life or other insurance plans; (f) disability, salary continuation, supplemental unemployment benefit plans; (g) mortgage assistance, employee loan, employee discount, employee assistance or counseling plans; (h) supplemental, multi-employer, defined benefit or defined contribution pension plans, group registered retirement savings plans and deferred profit sharing plans; or (i) other similar employee benefit plans,

7

arrangements or agreements, whether oral or written, formal or informal, funded or unfunded (including all policies with respect to holidays, sick leave, long-term disability, vacations, expense reimbursements and automobile allowances and rights to company-provided automobiles) that are administered or maintained for employees or former employees of any Debtor or any of its Subsidiaries residing outside the United States, contributed to or required to be contributed to by any Debtor or any of its Subsidiaries or for which any Debtor or any of its Subsidiaries has any obligations, rights or liabilities, contingent or otherwise (except for any statutory plans with which such Debtor or any of its Subsidiaries is required to comply, including the Canada/Quebec Pension Plan, and plans administered pursuant to applicable governmental health tax, workers' compensation and workers' safety and employment insurance legislation).

"***Foreign Pension Plan***" means any plan or other similar program established or maintained outside the United States by any Debtor or any of its Subsidiaries primarily for the benefit of employees of any Debtor or any of its Subsidiaries residing outside the United States, which provides for defined benefit pension benefits, and which plan is not subject to ERISA or the Code, which, for the avoidance of doubt includes any Canadian Pension Plans.

"***Governmental Entity***" means any U.S., Canadian or other non-U.S. international, regional, federal, state, provincial, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court, or tribunal of competent jurisdiction (including any branch, department or official thereof).

"***Hazardous Materials***" means:  (a) any flammable explosives, petroleum or petroleum products, methane, radioactive materials, asbestos in any form that is friable, urea formaldehyde foam insulation, polychlorinated biphenyls, D4, D5, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of, or judicially interpreted as included in the definition of, "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Entity under Environmental Laws due to its dangerous or deleterious properties or characteristics.

"***HSR Act***" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"***Indebtedness***" of any Person means, without duplication, (a) the principal, accrued and unpaid interest, prepayment and redemption premiums or penalties (if any), unpaid fees or expenses and other monetary obligations in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (b) all vendor financing arrangements; (c) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement; (d) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (e) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance, surety bond, performance bond or similar credit transaction; (f) all obligations of such Person under interest rate or currency swap transactions or commodity hedges (valued at the termination value thereof); (g) the liquidation value, accrued and unpaid dividends, prepayment or redemption premiums and penalties (if any), unpaid fees or expenses and other monetary obligations in respect of any redeemable preferred stock (or other equity) of such Person; (h) all obligations of the type referred to in clauses (a) through (g) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (i) all obligations of the type referred to in clauses (a) through (h) of other Persons secured by (or for which the holder of such

8

obligations has an existing right, contingent or otherwise, to be secured by) any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"*Intellectual Property*" means all U.S. or foreign intellectual or industrial property or proprietary rights, including any: (a) trademarks, service marks, trade dress, domain names, social media identifiers, corporate and trade names, logos and all other indicia of source or origin, together with all associated goodwill, (b) patents, inventions, invention disclosures, technology, know-how, processes and methods, (c) copyrights and copyrighted works, (including software, applications, source and object code, databases and compilations, online, advertising and promotional materials, mobile and social media content and documentation), (d) trade secrets and confidential or proprietary information or content, and (e) all registrations, applications, renewals, re-issues, continuations, continuations-in-part, divisions, extensions, re- examinations and foreign counterparts of any of the foregoing.

"*IRS*" means the United States Internal Revenue Service.

"*ITA*" means the *Income Tax Act* (Canada), as amended from time to time, and any successor statute and all rules and regulations promulgated thereunder.

"*Knowledge of the Company*" means the actual knowledge, after a reasonable inquiry, of James M. Hensler, Robert D. Scherich, Gary R. Whitaker, Ali Alavi, Bruce Morgan, and Joshua Belezyk.

"*Law*" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

"*Liability*" means any debt, loss, damage, adverse claim, fine, penalty, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), and including all costs and expenses relating thereto (including all fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation).

"*Lien*" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in Sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"*Material Adverse Effect*" means any Event, which, individually or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Company and its Subsidiaries (or Reorganized Holdings and its Subsidiaries), taken as a whole, or (b) the ability of the Company and the Debtors to perform their respective obligations under, or to consummate the transactions contemplated by, this Agreement and the Transaction Agreements, including the Additional Capital Commitment, the Emergence Equity Purchase, and the issuance and sale of the Emergence Equity Units and the Additional Capital Commitment Units; *provided*, *however*, that, in each case, none of the following, either alone or taken together with other Events, shall constitute or be taken into account in determining whether there has been a Material Adverse Effect: (i) any changes after the date hereof in global, national or regional political conditions (including acts of terrorism or acts or escalations of war) or in the general business, market and economic conditions generally affecting the industries and regions in which the Company and its Subsidiaries operate; (ii) any changes after the date hereof in financial, banking, commodities or securities markets, (iii) any changes after the date hereof in applicable Law or GAAP; (iv) the execution, announcement or performance of, or compliance with, this

9

112016848 v9

Agreement or the transactions contemplated hereby; (v) changes in the market price or trading volume of the Claims or securities of the Company (but not the underlying facts giving rise to such changes); (vi) the departure of officers or directors of the Company after the date hereof (but not the underlying facts giving rise to such departure); (vii)(A) the filing of the Chapter 11 Proceedings or the Recognition Proceedings and any adversary proceedings or contested motions commenced in connection therewith, (B) any objection to the Restructuring (or the transactions contemplated hereby), the Plan (or the transactions contemplated thereby), any disclosure statement related thereto or the DIP Loan Debt Documents and the financing contemplated thereby (C) any objections to the assumption or rejection of any Contract or (D) any Order of the Bankruptcy Court or any actions or omissions of the Debtors in compliance therewith; or (viii) any action taken by the Debtors at the request of, or with the consent of, the Requisite Plan Sponsors; *provided*, *further*, *however*, that the exceptions set forth in clauses (i) and (ii) shall not apply to the extent that such Event is disproportionately adverse to the Company and any of its Subsidiaries, taken as a whole, as compared to other companies in the industries in which the Company and its Subsidiaries operate.

"*MEIP*" means that certain management equity incentive plan of Reorganized Holdings, which shall be in form and substance mutually satisfactory to the Requisite Plan Sponsors and approved by the board of directors of Reorganized Holdings, adopted as of the Effective Date and reserving a number of units of New Common Equity equal to ten percent (10%) of the number of Total Outstanding Units for distribution thereunder calculated as of the Effective Date.

"*Multiemployer Plan*" means a plan subject to Title IV of ERISA which is defined in Section 3(37) of ERISA and which is contributed to by (or to which there is an obligation to contribute of) the Company or a Subsidiary of the Company, and each such plan for which any such entity has liability (including on account of an ERISA Affiliate).

"*New Certificate of Formation*" means the certificate of formation of Reorganized Holdings as of the Closing Date, which shall be consistent with the terms set forth in the Plan and otherwise in form and substance satisfactory to the Requisite Plan Sponsors.

"*New Common Equity*" means the limited liability company interests of Reorganized Holdings.

"*New Limited Liability Company Agreement*" means the limited liability company agreement of Reorganized Holdings as of the Closing Date, which shall be in the form attached hereto as Exhibit D subject to confirmation and completion of bracketed items and schedules in accordance with the terms of this Agreement.

"*Order*" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"*Owned Real Property*" means all real property and interests in real property owned, in whole or in part, directly or indirectly by the Company and its Subsidiaries, together with all buildings, fixtures and improvements now or subsequently located thereon, and all appurtenances thereto.

"*PBA*" means the Pension Benefits Act (Ontario) as amended from time to time, and any successor statute and all rules and regulations promulgated thereunder, or any similar law of another province in Canada governing the Canadian Pension Plans.

"*PBGC*" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

10

"*Permitted Liens*" means (a) Liens for Taxes that (i) are not yet due and payable or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) mechanics or construction Liens and similar Liens for labor, materials or supplies provided with respect to any Owned Real Property or personal property of the Company or any of its Subsidiaries incurred in the ordinary course of business consistent with past practice and for amounts that do not materially detract from the value of, or materially impair the use of, any of the Owned Real Property or personal property of the Company or any of its Subsidiaries; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Owned Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such real property and that do not prohibit the current or currently proposed use or occupancy of such Owned Real Property; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to any Owned Real Property and other title defects that do not or would not reasonably be expected to materially impair the use or occupancy of such real property in the current or currently proposed operation of the Company's or any of its Subsidiaries' business; and (e) Liens that, pursuant to the Confirmation Order or corresponding Recognition Order, will not survive beyond the Effective Date.

"*Person*" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Entity or other entity or organization.

"*Plan*" means the Debtors' First Amended Joint Plan of Reorganization substantially in the form attached hereto as Exhibit A and otherwise mutually satisfactory Requisite Plan Sponsors and the Company, as may be amended, supplemented or otherwise modified from time to time pursuant to the terms of this Agreement.

"*Plan Solicitation Motion*" means the Debtors' Motion for an Order, which may be the UPA Approval Order, in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company and among other things, (a) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by Section 1125 of the Bankruptcy Code)); (b) establishing a voting record date for the Plan; (c) approving solicitation packages and procedures for the distribution thereof; (d) approving the forms of ballots; (e) establishing procedures for voting on the Plan; (f) establishing notice and objection procedures for the confirmation of the Plan; and (g) establishing procedures for the assumption and/or assignment of executory Contracts and unexpired leases under the Plan, to be filed with the Bankruptcy Court on or about the date hereof.

"*Plan Solicitation Order*" means an Order entered by the Bankruptcy Court, which may be the UPA Approval Order, substantially in the form attached to the Plan Solicitation Motion, which Order (a) shall, among other things, approve the relief sought in the Plan Solicitation Motion, including (i) the Disclosure Statement; and (ii) the commencement of a solicitation of votes to accept or reject the Plan, and (b) shall be in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company.

"*Plan Sponsor Default*" means, with respect to any Plan Sponsor, the failure by such Plan Sponsor to purchase such Plan Sponsor's Emergence Equity Units pursuant to and in accordance with the Plan and this Agreement.

"*Prepetition BBVA Debt Documents*" means the Prepetition BBVA Facility together with all security, pledge, mortgage, and guaranty agreements and all other documentation executed in connection with the Prepetition BBVA Facility, each as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

11

"*Prepetition BBVA Facility*" means that certain Credit Agreement, dated as of August 28, 2012, by and between the Company, Horsehead Corporation, and BBVA as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

"*Prepetition BBVA Debt Facility Claims*" means any and all Claims of BBVA under the Prepetition BBVA Debt Documents.

"*Prepetition Convertible Senior Notes Indenture*" means that certain Indenture for the 3.80% Convertible Senior Notes due July 2017, dated as of July 27, 2011, by and among the Company and U.S. Bank National Association, as trustee, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, pursuant to which the Company issued those certain 3.80% Convertible Senior Notes due July 2017 to the holders thereof (such notes, the "*Prepetition Convertible Senior Notes*", the holders thereof, the "*Prepetition Convertible Senior Noteholders*" and, such claims of the Prepetition Convertible Senior Noteholders under the Prepetition Convertible Senior Notes Indenture, the "*Prepetition Convertible Senior Note Claims*").

"*Prepetition Debt Documents*" means the Prepetition Macquarie Debt Documents, the Prepetition Convertible Senior Notes Indenture, the Prepetition Senior Secured Notes Indenture, the Prepetition Senior Unsecured Notes Indenture, and the Prepetition BBVA Debt Documents.

"*Prepetition Macquarie Debt Documents*" means the Prepetition Macquarie Facility together with all security, pledge, mortgage, and guaranty agreements and all other documentation executed in connection with the Prepetition Macquarie Facility, each as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

"*Prepetition Macquarie Facility*" means that certain Credit Agreement, dated as of June 30, 2015, by and among Horsehead Corporation, a Debtor and Subsidiary of the Company, the borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto (the "*Prepetition Macquarie Lenders*"), and Macquarie Bank Limited, as administrative agent, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof.

"*Prepetition Macquarie Facility Claims*" means any and all Claims of the Prepetition Macquarie Lenders under the Prepetition Macquarie Debt Documents.

"*Prepetition Senior Unsecured Notes Indenture*" means that certain Indenture for the 9.00% Senior Notes due 2017, dated as of July 29, 2014, by and among the Company, the subsidiary guarantors from time to time party thereto, and U.S. Bank National Association, as trustee, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, pursuant to which the Company issued those certain 9.00% Senior Unsecured Notes due June 2017 to the holders thereof (such notes, the "*Prepetition Senior Unsecured Notes*", the holders thereof, the "*Prepetition Senior Unsecured Noteholders*", and, such claims of the Prepetition Senior Unsecured Noteholders under the Prepetition Senior Unsecured Notes Indenture, the "*Prepetition Senior Unsecured Note Claims*").

"*Prepetition Senior Unsecured Notes Emergence Equity Units*" means the New Common Equity to be issued pursuant to the Plan in an amount equal to two and one-half percent (2.5%) of the Total Outstanding Units as of the Effective Date, subject to dilution by any units of New Common Equity to be issued (a) pursuant to the Warrants, (b) pursuant to the terms of the MEIP, or (c) on account of the Additional Capital Commitment Units at any time on or after the Closing Date

12

"*Purchase Percentage*" means, with respect to a Plan Sponsor, such Plan Sponsor's percentage of the Emergence Equity Units as set forth opposite such Plan Sponsor's name under the column titled "Purchase Percentage" on Schedule 2 (as it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement).

"*Purchase Price*" means a price per Emergence Equity Unit equal to (a) $160,000,000, divided by (b) 627,620.00.

"*Real Property Leases*" means those leases, subleases, licenses, concessions and other Contracts, as amended, modified or restated, pursuant to which the Company or one of its Subsidiaries holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, any land, buildings, structures, improvements, fixtures or other interest in real property used in the Company's or its Subsidiaries' business.

"*Recognition Order*" means, as applicable, an Order of the Canadian Court, in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company, recognizing and enforcing in Canada the Confirmation Order, UPA Approval Order, UPA Consummation Approval Order, Plan Solicitation Order, or any other Order of the Bankruptcy Court.

"*Related Party*" means, with respect to any Person, (a) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (b) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

"*Reorganized Holdings*" means Horsehead Holding LLC, as converted to a Delaware limited liability company and otherwise reorganized pursuant to the Plan.

"*Reorganized Holdings Corporate Documents*" means the New Limited Liability Company Agreement, the New Certificate of Formation and the Certificate of Conversion.

"*Representatives*" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"*Requisite Plan Sponsors*" means Plan Sponsors holding at least a majority of the aggregate Votable Claims of all Plan Sponsors as of the date on which the consent or approval of such Plan Sponsors is solicited; *provided*, *however*, that for purposes of this definition, each Plan Sponsor shall be deemed to hold the Votable Claims held by such Plan Sponsor's Related Purchasers.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933.

"*Subscription Agent*" means Epiq Bankruptcy Solutions, LLC.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other Subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body or (c) has the power to direct the business and policies.

13

"*Superior Proposal*" means a *bona fide* written proposal to consummate an Alternative Transaction made by a third party on terms which the Board of Directors of the Company determines in good faith by a vote of a majority of the entire board of directors (after consultation with the Debtors' legal and financial advisors), taking into account all legal, financial, regulatory and other aspects of the proposal and the party making such proposal, that such proposal (A) (i) would, if consummated in accordance with its terms, be more favorable, from a financial point of view, to the relevant stakeholders of the Debtors than the transactions contemplated by the Plan, (ii) contains conditions which are all reasonably capable of being satisfied in a timely manner and (iii) is not subject to any "diligence outs", "financing outs", "financing contingencies" or similar contingencies and, to the extent financing for such proposal is required, that such financing is then committed; and (B) provides (i) that all allowed Claims be treated no less favorably than as provided by the Plan and this Agreement on the Effective Date, (ii) a recovery to holders of Prepetition Senior Secured Notes Claims at least as favorable as the recovery set forth in the Plan and this Agreement and, in any event, resulting in the indefeasible repayment of all Prepetition Senior Secured Notes Claims and DIP Loan Claims, in cash, on the effective date (or consummation of) of such Superior Proposal and (iii) a higher and better recovery for the other creditors of the Debtors, taking into account all aspects of such proposal and the Alternative Transaction contemplated thereby.

"*Takeover Statute*" means any restrictions contained in any "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation.

"*Taxes*" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all federal, provincial, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding, goods and services and harmonized sales and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any Liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.

"*Total Outstanding Units*" means the total number of units of New Common Equity issued and outstanding as of the Closing Date and as provided in the Plan, including the Emergence Equity Units and the Prepetition Senior Unsecured Notes Emergence Equity Units and excluding any units of New Common Equity to be issued (a) pursuant to the Warrants, (b) pursuant to the terms of the MEIP, or (c) on account of the Additional Capital Commitment at any time on or after the Closing Date.

"*Transfer*" means sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly.

"*Unfunded Current Liability*" means, with respect to any ERISA Plan, the amount, if any, by which the value of the accumulated plan benefits under the ERISA Plan determined in accordance with actuarial assumptions used in the most recent actuarial report for such ERISA Plan, exceeds the fair market value of all plan assets.

"*UPA Approval Obligations*" means the obligations of the Company under this Agreement, including the obligations with respect to and the terms of the Expense Reimbursement, and any and all other fees and expenses to be paid pursuant to this Agreement.

14

"***UPA Approval Order***" means an Order entered by the Bankruptcy Court authorizing the Debtors' performance of the UPA Approval Obligations, in the form mutually satisfactory to the Requisite Plan Sponsors and the Company.

"***Warrant Agreement***" has the meaning set forth in the Plan.

"***Warrants***" means those certain warrants to acquire 70,213 units of the New Common Equity (which will be equal to six percent (6%) of the outstanding and reserved units of New Common Equity as of the Effective Date), which warrants (a) shall be exercisable, as of the Effective Date, at a price per unit equal to $737,500,000.00 divided by 1,170,213, (b) shall expire on the six (6) year anniversary of the Closing Date, (c) shall otherwise be in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company and negotiated in good faith with the Creditors' Committee (as defined in the Plan), and (d) shall be subject to dilution by any units of New Common Equity to be issued on account of the Additional Capital Commitment Units at any time on or after the Closing Date.

Section 1.2     Construction.  In this Agreement, unless the context otherwise requires:

(a)     references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)     the descriptive headings of the Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(c)     references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(d)     words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(e)     the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(f)     the term this "Agreement" shall be construed as a reference to this Agreement, including the Exhibits and Schedules hereto, as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented in accordance with its terms;

(g)     "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(h)     references to "day" or "days" are to calendar days;

(i)     time is of the essence in the performance of the obligations of each of the Parties;

(j)     references to "the date hereof" means as of the date of this Agreement;

(k)     unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided*, *however*, that, for the purposes of the representations and warranties set forth

15

herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Law, the reference to such Law means such Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance;

(l)        any disclosure made by a party in any Schedule with reference to any Section or Schedule of this Agreement shall be deemed to be a disclosure with respect to any other Section or Schedule to which such disclosure may apply to the extent the applicability of such additional disclosure is reasonably apparent on its face and any disclosure in the Disclosure Statement will be deemed to qualify a representation or warranty to the extent that the relevance of such disclosure to such representation or warranty reasonably apparent on its face.  The information contained in this Agreement, in the Schedule and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any Person of any matter whatsoever, including any violation of Law or breach of Contract;

(m)       all references to votes or voting in this Agreement include votes or voting on a plan of reorganization under the Bankruptcy Code, including with respect to the Plan; and

(n)        references to "U.S. dollars", "dollars" or "$" are to the legal currency of the United States of America, in United States dollars.

Section 1.3      Cross References to Other Defined Terms.  Each capitalized term listed below is defined on the corresponding page of this Agreement:

| Term | Page No. |
|---|---|
| *ACC Call Notice* | 18 |
| *ACC Closing Date* | 18 |
| *ACC Pro Rata Share* | 18 |
| *Additional Capital Commitment Participant* | 18 |
| *Additional Claims* | 1 |
| *Affiliated Fund* | 22 |
| *Agreement* | 1 |
| *Alternative Transaction Agreement* | 56 |
| *Alternative Transaction Proposal* | 46 |
| *Bankruptcy Code* | 1 |
| *Bankruptcy Court* | 1 |
| *BBVA* | 3 |
| *Canadian Court* | 1 |
| *CCAA* | 1 |
| *Chapter 11 Proceedings* | 1 |
| *Closing* | 21 |
| *Closing Date* | 21 |
| *Company* | 1 |
| *Company Board* | 46 |
| *Company Intellectual Property* | 28 |
| *Confirmation Order* | 2 |
| *Debtors* | 1 |
| *DIP Lenders* | 5 |
| *Emergence Equity Purchase* | 19 |
| *Equity Interests* | 42 |
| *Estimate of Allowed Specified Claims* | 48 |

16

*Expense Reimbursement* ................................................................................................23
*Financial Statements* ....................................................................................................26
*Funding Notice* .............................................................................................................20
*GAAP* ...........................................................................................................................27
*Governance Documents* ...............................................................................................37
*Indemnified Claim* .......................................................................................................52
*Indemnified Person* ......................................................................................................52
*Indemnifying Party* ......................................................................................................51
*Infringed* .......................................................................................................................29
*Joinder Agreement* .......................................................................................................22
*Latest Balance Sheet Date* ..........................................................................................26
*Legal Proceedings* ........................................................................................................28
*Legend* ..........................................................................................................................46
*List of Assumed Contracts* ..........................................................................................37
*Losses* ...........................................................................................................................52
*Material Contract* .........................................................................................................32
*Money Laundering Laws* .............................................................................................33
*Outside Date* .................................................................................................................56
*Party* ...............................................................................................................................1
*Permits* ..........................................................................................................................30
*Petition Date* ...................................................................................................................1
*Plan Sponsor Replacement* ..........................................................................................19
*Plan Sponsor Replacement Period* ..............................................................................19
*Plan Sponsors* ................................................................................................................1
*Plan-Related Documents* ..............................................................................................36
*Pre-Closing Period* .......................................................................................................36
*Prepetition Convertible Senior Note Claims* ..............................................................12
*Prepetition Convertible Senior Noteholders* ...............................................................12
*Prepetition Convertible Senior Notes* .........................................................................12
*Prepetition Macquarie Lenders* ...................................................................................12
*Prepetition Senior Secured Noteholders* .......................................................................1
*Prepetition Senior Secured Notes* ..................................................................................1
*Prepetition Senior Secured Notes Indenture* .................................................................1
*Prepetition Senior Secured Notes Indenture Trustee* ....................................................1
*Prepetition Senior Unsecured Note Claims* .................................................................12
*Prepetition Senior Unsecured Noteholders* .................................................................12
*Prepetition Senior Unsecured Notes* ...........................................................................12
*RCRA* ..............................................................................................................................6
*Recognition Proceedings* ...............................................................................................1
*Related Purchaser* ........................................................................................................21
*Replacing Plan Sponsors* .............................................................................................19
*Restructuring* ..................................................................................................................1
*Returns* .........................................................................................................................31
*Solicitation* ...................................................................................................................36
*Subscription Escrow Account* ......................................................................................20
*Subscription Escrow Agreement* ..................................................................................21
*Subscription Escrow Funding Date* .............................................................................20
*Termination Date* .........................................................................................................57
*Termination Fee* ...........................................................................................................57
*Transaction Agreements* ..............................................................................................24
*Transferee Plan Sponsor* ..............................................................................................44

17

*Transferring Plan Sponsor* ...........................................................................................44
*Ultimate Purchaser* ......................................................................................................22
*Unlegended Units* .........................................................................................................45
*UPA Consummation Approval Order* ............................................................................2
*Votable Claims* .............................................................................................................1
*willful or intentional breach* ........................................................................................57

## ARTICLE II

## UNIT PURCHASE

Section 2.1    Additional Capital Commitment.

(a)    On and subject to the terms and conditions hereof, including entry of the UPA Approval Order by the Bankruptcy Court and corresponding Recognition Order of the Canadian Court, each Eligible Holder shall have the right to elect to commit, by providing written notice to the parties hereto pursuant to Section 10.4, on or prior to the Expiration Time, to purchase its respective ACC Purchase Percentage (and not less than or more than its ACC Purchase Percentage) of the Additional Capital Commitment Units (each Eligible Holder who duly commits to purchase its ACC Purchase Percentage of Additional Capital Commitment Units in accordance with the terms hereof, an "*Additional Capital Commitment Participant*").

(b)    Pursuant to and subject to the terms and conditions hereof, from and after the Closing until the six (6) month anniversary of the Closing (but only so long as each of the conditions set forth in Section 2.1(d) shall have been satisfied or waived in accordance with this Agreement), Reorganized Holdings may elect to call, on a *pro rata* basis (as calculated by each Additional Capital Commitment Participant's share of the Additional Capital Commitment Amount, such Additional Capital Commitment Participant's "*ACC Pro Rata Share"*), all or any portion of the Additional Capital Commitment of the Additional Capital Commitment Participants by providing written notice to each Additional Capital Commitment Participant (the "*ACC Call Notice*"), which ACC Call Notice shall (i) be distributed to each Additional Commitment Participant, (ii) specify the applicable purchase price and ACC Pro Rata Share of Additional Capital Commitment Units to be purchased by such Additional Capital Commitment Participant pursuant to such ACC Call Notice, (iii) provide instructions for the payment of the applicable purchase price, including Reorganized Holdings' wire instructions, for the Additional Capital Commitment Units to be purchased, and (iv) specify the date on which the purchase and issuance of the Additional Capital Commitment Units shall take place (which date shall be at least thirty (30) days following the date of such ACC Call Notice (any such applicable date, an "*ACC Closing Date*").

(c)    On any ACC Closing Date and in each case, pursuant to and subject to the terms and conditions hereof, each Additional Capital Commitment Participant agrees, severally and neither jointly nor jointly and severally, to purchase, and the Company agrees to issue, on such applicable ACC Closing Date, for the applicable purchase price per Additional Capital Commitment Unit, such Additional Capital Commitment Participant's ACC Pro Rata Share of the aggregate number of Additional Capital Commitment Units, rounded among the Additional Capital Commitment Participants solely to avoid fractional units as the Requisite Plan Sponsors may determine in their sole discretion. Each Additional Capital Commitment Participant will be irrevocably committing, severally and neither jointly nor jointly and severally, to purchase its respective ACC Pro Rata Share of the Additional Capital Commitment Units when and as called by Reorganized Horsehead pursuant to and subject to the terms and conditions hereof, including this Section 2.1. On the ACC Closing Date, each Additional Capital Commitment Participant shall enter into a customary and reasonable subscription agreement evidencing their purchase

18

and providing the same representations and warranties such Additional Capital Commitment Participant set forth in Sections 5.1 through 5.12 (inclusive).

(d)    Each Additional Capital Commitment Participant will have, severally and neither jointly nor jointly and severally, the obligation to purchase such Additional Capital Commitment Participant's ACC Pro Rata Share of the aggregate number of Additional Capital Commitment Units when and as called by Reorganized Holdings after the Closing on the ACC Closing Date, subject to the terms hereof and the satisfaction of each of the following conditions:

(i)    the approval of three quarters (3/4) of all directors of Reorganized Holdings;

(ii)    the Additional Capital Commitment Units will be issued (if at all) at a price per unit equal to the lower of (x) a value per unit implied by a total equity value of Reorganized Holdings and its Subsidiaries equal to $235,450,000; and (y) if, and only if, the spot price of zinc listed on the London Metals Exchange ("LME") has been below $0.80/lb for ten (10) consecutive Business Days prior to the date of issuance of the applicable ACC Call Notice, the fair market value of such units at the time of issuance (as determined by a nationally recognized independent valuation firm selected in good faith by the board of directors of Reorganized Holdings); *provided*, *however*, that such fair market value shall in no event be less than seventy-five percent (75%) of $277,000,000; and

(iii)    Reorganized Holdings shall not have spent, or committed to spend, any money on operating or improving its Mooresboro facility unless and until it has first called all of the Additional Capital Commitment Units for such purpose, and the Additional Capital Commitment Units shall only be called and shall be used exclusively for such purpose.

Section 2.2    Emergence Equity Purchase.  On and subject to the terms and conditions hereof, including entry of the UPA Approval Order by the Bankruptcy Court and corresponding Recognition Orders of the Canadian Court, each Plan Sponsor agrees, severally and neither jointly nor jointly and severally, to purchase, and the Company agrees to issue, on the Closing Date, for the Purchase Price per Emergence Equity Unit, such Plan Sponsor's Purchase Percentage of the aggregate number of Emergence Equity Units, rounded among the Plan Sponsors solely to avoid fractional units as the Requisite Plan Sponsors may determine in their sole discretion (such obligation to purchase such Emergence Equity Units, the "***Emergence Equity Purchase***").  Schedule 2 sets forth (i) each Plan Sponsor participating in the Emergence Equity Purchase and (ii) such Plan Sponsor's respective Purchase Percentage and Emergence Equity Units, in each case, as of the date hereof and prior to any amendments, restatements, or allocations as contemplated and permitted hereby.

Section 2.3    Plan Sponsor Default.

(a)    Upon the occurrence of a Plan Sponsor Default, each Plan Sponsor (together, but, in each case, excluding any Defaulting Plan Sponsor, the "***Replacing Plan Sponsors***") shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to such Replacing Plan Sponsors of such Plan Sponsor Default, which notice shall be given promptly following the occurrence of such Plan Sponsor Default and to all Replacing Plan Sponsors at the same time (such five (5) Business Day period, the "***Plan Sponsor Replacement Period***"), to make arrangements for one or more of the Replacing Plan Sponsors to purchase all or any portion of the Available Units (such purchase, a "***Plan Sponsor Replacement***") on the terms and subject to the conditions set forth in this Agreement and in such amounts based upon the applicable Purchase Percentage of any such Replacing Plan Sponsors as compared to all Replacing Plan Sponsors or as may

19

otherwise be agreed upon by each of the Replacing Plan Sponsors electing to commit to purchase all or any portion of the Available Units and notified in writing to the Company prior to the expiration of the Plan Sponsor Replacement Period.  Any such Available Units purchased by a Replacing Plan Sponsor shall be included, among other things, in the determination of (i) the Emergence Equity Units of such Replacing Plan Sponsor for all purposes hereunder and (ii) the Emergence Equity Purchase of such Replacing Plan Sponsors for purposes of the definition of Requisite Plan Sponsors. If a Plan Sponsor Default occurs, the Outside Date shall be delayed only to the extent necessary to allow for the Plan Sponsor Replacement to be completed within the Plan Sponsor Replacement Period.

(b)     Notwithstanding anything to the contrary in this Agreement, (i) nothing in this Agreement shall be deemed to require a Plan Sponsor to (A) purchase more than its respective Purchase Percentage of Emergence Equity Units set forth on Schedule 2 or otherwise be liable in any way for any other Plan Sponsor's Purchase Percentage of the Emergence Equity Units, or (B) purchase any Additional Capital Commitment Units or otherwise be liable in any way for any other Plan Sponsor's purchase of the Additional Capital Commitment Units; (ii) the representations, warranties, agreements, and obligations of each Plan Sponsor under this Agreement are, in all respects, several and neither joint nor joint and several, and (iii) except as contemplated by the provisions of Section 2.6 or Section 6.5 with respect to a Transfer in accordance with such Section(s), in no event shall a Plan Sponsor have any liability for any representation, warranty, agreement or obligation of any other Party.  For the avoidance of doubt, notwithstanding anything to the contrary set forth in Section 9.2, but subject to Section 10.13, no provision of this Agreement shall relieve any Defaulting Plan Sponsor from liability hereunder, or limit the availability of the remedies set forth in Section 10.12, in connection with such Defaulting Plan Sponsor's Plan Sponsor Default.

Section 2.4     Subscription Escrow Account Funding.

(a)     Funding Notice.  No later than the fifth (5th) Business Day following the Expiration Time and at least five (5) Business Days prior to the anticipated Closing Date, the Company shall deliver to each Plan Sponsor set forth on Schedule 2 a written notice (the "*Funding Notice*") of (i) an amended and restated Schedule 2 to reflect any revisions for a Plan Sponsor Default, as contemplated by and pursuant to Section 2.3; (ii) the aggregate number of Emergence Equity Units, and the aggregate Purchase Price implied thereby; (iii) the account to which such Plan Sponsor shall deliver and pay the aggregate Purchase Price for such Plan Sponsor's Purchase Percentage of the Emergence Equity Units (the "*Subscription Escrow Account*") pursuant to Section 2.2 (in each case, as may be adjusted pursuant to Section 2.3); and (iv) the number of Additional Capital Commitment Units which the Plan Sponsors have subscribed for and committed to purchase.  The Company shall promptly provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Plan Sponsor may reasonably request.

(b)     Subscription Escrow Account Funding.  No later than the second (2nd) Business Day following receipt of the Funding Notice (such date, the "*Subscription Escrow Funding Date*"), each Plan Sponsor shall deliver and pay an amount equal to (i) the Purchase Price, multiplied by (ii) such Plan Sponsor's Purchase Percentage of the Emergence Equity Units as set forth on Schedule 2 (as amended and restated to reflect any revisions for a Plan Sponsor Default, in each case, as contemplated by and pursuant to Section 2.3), by wire transfer in immediately available funds in U.S. dollars into the Subscription Escrow Account in satisfaction of such Plan Sponsor's Emergence Equity Purchase; *provided*, *however*, that each Plan Sponsor may elect, in its sole and absolute discretion and by written notice to the DIP Agent and the Company, and the Subscription Agent, to fund any portion of its respective Emergence Equity Purchase by agreeing to cause the DIP Agent, and directing the DIP Agent, to pay any amounts to be paid to such Plan Sponsor under the terms of the DIP Loan to Subscription Escrow Account and, upon such direction, any such amounts shall be deemed paid by such Plan Sponsor

20

to the Subscription Escrow Account and shall be held pursuant to the terms hereof and the Subscription Escrow Agreement. The Subscription Escrow Account shall be established with the Subscription Agent, pursuant to an escrow agreement in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company (the "***Subscription Escrow Agreement***"). The funds held in the Subscription Escrow Account shall be released, and each Plan Sponsor shall receive from the Subscription Escrow Account the cash amount actually funded to the Subscription Escrow Account by such Plan Sponsor, plus any interest accrued thereon, promptly following the earlier to occur of (i) the termination of this Agreement in accordance with its terms and (ii) the Outside Date if, by such date, the Closing has not occurred.

Section 2.5    Closing.

(a)    Subject to ARTICLE VIII, unless otherwise mutually agreed in writing between the Company and the Requisite Plan Sponsors, the closing of the Emergence Equity Purchase (the "***Closing***") shall take place by electronic exchange of documents (or, if the parties agree to hold a physical closing, at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036-6745, at 10:00 a.m., prevailing Eastern time, on the date on which all of the conditions set forth in Sections 7.1 and 7.3 shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The date on which the Closing actually occurs shall be referred to herein as the "***Closing Date***".

(b)    At the Closing, the funds held in the Subscription Escrow Account shall be released and utilized as set forth in, and in accordance with, the Plan and the Subscription Escrow Agreement.

(c)    At the Closing, Reorganized Holdings shall issue the Emergence Equity Units, in each case, free and clear of any and all Liens, to each Plan Sponsor (or to its designee in accordance with Section 2.6(a)) against payment of the aggregate Purchase Price for the Emergence Equity Units by such Plan Sponsor pursuant to the terms of Sections 2.2 and 2.4(b). Unless a Plan Sponsor requests delivery of a physical unit certificate, the entry of any Emergence Equity Units to be delivered pursuant to this Section 2.5(c) into the account of a Plan Sponsor pursuant to Reorganized Holdings' book entry procedures and delivery to such Plan Sponsor of an account statement reflecting the book entry of such Emergence Equity Units shall be deemed delivery of such Emergence Equity Units for purposes of this Agreement. Notwithstanding anything to the contrary in this Agreement, all Emergence Equity Units will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by Reorganized Holdings.

Section 2.6    Designation and Assignment Rights.

(a)    Each Plan Sponsor shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the Closing Date that some or all of its Emergence Equity Units be issued in the name of, and delivered to, one or more of its Affiliates or Affiliated Funds (other than any portfolio company of such Plan Sponsor or its Affiliates) (each a "***Related Purchaser***") upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Plan Sponsor and each such Related Purchaser, (ii) specify the number of Emergence Equity Units, as applicable, to be delivered to or issued in the name of such Related Purchaser and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations set forth in Section 5.1 through Section 5.10 as applied to such Related Purchaser; *provided*, *however*, that no such designation pursuant to this Section 2.6(a) shall relieve such Plan Sponsor from its obligations under this Agreement.

21

(b)       Each Plan Sponsor shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the closing of the Additional Capital Commitment that some or all of its Additional Capital Commitment Units be issued in the name of, and delivered to, a Related Purchaser upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Plan Sponsor and each such Related Purchaser, (ii) specify the number of Additional Capital Commitment Units to be delivered to or issued in the name of such Related Purchaser and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations set forth in Section 5.1 through Section 5.10 as applied to such Related Purchaser; *provided*, *however*, that no such designation pursuant to this Section 2.6(b) shall relieve such Plan Sponsor from its obligations under this Agreement.

(c)       No Plan Sponsor shall have the right to Transfer all or any portion of its Emergence Equity Purchase rights hereunder other than to (i) another Plan Sponsor, (ii) any party that signs a joinder hereto ("***Joinder Agreement***"), in the form of Exhibit C, pursuant to which such party agrees to be bound by the terms, conditions and obligations of such transferring Plan Sponsor in the same manner and subject to the same terms, conditions and obligations as such transferring Plan Sponsor was bound hereunder, (iii) any investment fund (A) the primary investment advisor to which is such Plan Sponsor or an Affiliate thereof or (B) that is a bona fide holder of the majority of the limited partnership or similar interests of a Plan Sponsor (collectively, an "***Affiliated Fund***") or (iv) any special purpose vehicle that is, and only for so long as it continues to be, wholly-owned by such Plan Sponsor or its Affiliated Funds, created for the purpose of holding such Emergence Equity Units, or holding debt or equity of the Debtors, and with respect to which such Plan Sponsor either (A) has provided an adequate equity support letter or a guarantee of such special purpose vehicle's Emergence Equity Units, in either case, that is reasonably satisfactory to the Company or (B) otherwise remains obligated to fund the Emergence Equity Units, to be Transferred until the Closing (each such Person, an "***Ultimate Purchaser***"), and that, in each case, agrees in a writing addressed to the Company (x) to purchase such portion of such Plan Sponsor's Emergence Equity Units, and (y) to be fully bound by, and subject to, this Agreement as, and with the rights and obligations of, a Plan Sponsor hereto; *provided*, *however*, that no sale or Transfer pursuant to this Section 2.6(c) shall relieve such Plan Sponsor from its obligations under this Agreement. Any Transferee of Emergence Equity Purchase rights in accordance with this Section 2.6(c) shall be deemed to be a Plan Sponsor, and shall have the rights and obligations of a Plan Sponsor, to the extent of the interests so Transferred thereto.  Any purported Transfer of all or any portion of any Emergence Equity Units not in accordance with this Section 2.6(c) will be void *ab initio*.

(d)       Each Plan Sponsor, severally and neither jointly nor jointly and severally, agrees that it will not Transfer, at any time during the Pre-Closing Period, any of its rights and obligations under this Agreement to any Person other than in accordance with Sections 2.3, 2.6 or 6.5.  After the Closing Date, nothing in this Agreement shall limit or restrict in any way any Plan Sponsor's ability to Transfer any of its Emergence Equity Units or any interest therein; *provided*, *however*, that any such Transfer shall be made pursuant to (i) an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable securities Laws and (ii) the terms of any applicable Reorganized Holdings Corporate Documents.

## ARTICLE III

## EXPENSE REIMBURSEMENT

Section 3.1       Expense Reimbursement.

(a)       Until the earlier to occur of (i) the Closing and (ii) the Termination Date, the Debtors agree to pay in accordance with Section 3.1(b) the reasonable and documented fees and expenses

22

of counsel, financial advisors, consultants, and other professionals (including any personnel search firms used by the Plan Sponsors in connection with a search for the directors or managers contemplated by the Reorganized Holdings Corporate Documents) for specialized areas of expertise as circumstances warrant retained by the Plan Sponsors, including such fees and expenses of Akin Gump Strauss Hauer & Feld LLP, Cassels Brock & Blackwell LLP, Ashby & Geddes, Dechert LLP, Tenova Bateman Sub-Saharan Africa, Womble Carlyle Sandridge & Rice, LLP, Ropes & Gray LLP, and Moelis & Company, in each case, that have been and are incurred in connection with (x) the negotiation, preparation and implementation of this Agreement (including the Emergence Equity Purchase), the Plan, the Transaction Agreements and the other agreements and transactions contemplated hereby and thereby or (y) the Restructuring, the Chapter 11 Proceedings and the Recognition Proceedings (such payment obligations, collectively, the "*Expense Reimbursement*").

(b)    The Expense Reimbursement accrued through the date on which the UPA Approval Order is entered shall be paid within one (1) Business Day of such date.  The Expense Reimbursement shall thereafter be payable by the Debtors promptly after receipt of monthly invoices therefor; *provided*, *however*, that the Debtors' shall pay any and all then outstanding Expense Reimbursements simultaneously with the Closing or simultaneous with the termination of this Agreement in accordance with applicable provisions of ARTICLE IX.  The Plan Sponsors shall promptly provide copies of such invoices (redacted to protect privileges) to the Debtors and to the Office of the United States Trustee for the District of Delaware.

ARTICLE IV

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except as set forth in the corresponding section of the Company Disclosure Schedule (subject to Section 1.2(l)), the Company hereby represents and warrants to the Plan Sponsors (unless otherwise set forth herein, as of the date hereof and as of the Closing Date) as set forth below.

Section 4.1    Organization and Qualification.    The Company and each of its Subsidiaries (a) is a duly organized and validly existing corporation, limited liability company or limited partnership, as the case may be, in good standing (or equivalent thereof) under the Laws of the jurisdiction of its incorporation or formation, (b) has the corporate or other applicable power and authority to own its properties and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, except, in the case of this clause (c), where the failure to be so qualified or authorized would not reasonably be expected to have a Material Adverse Effect.

Section 4.2    Corporate Power and Authority.

(a)    The Company has the requisite corporate power and authority (i) subject to entry of the UPA Approval Order and, with respect to property in Canada, the corresponding Recognition Order, to enter into, execute and deliver this Agreement and to perform the UPA Approval Obligations and (ii) subject to entry of the UPA Consummation Approval Order, the Confirmation Order, and the corresponding Recognition Orders, to consummate the transactions contemplated herein and in the Plan, to perform each of its other obligations hereunder, to enter into, execute and deliver each Plan-Related Document, each Rights Offering Document, each Reorganized Holdings Corporate Document and all other documents, agreements, certificates, supplements, and instruments referred to or contemplated herein or therein or hereunder or thereunder to which it will be a party as contemplated by this Agreement and the Plan (this Agreement, the Plan, the Disclosure Statement, the Plan-Related Documents, the

23

Reorganized Holdings Corporate Documents, and such other documents, agreements, certificates, supplements, and instruments referred to or contemplated herein or therein or hereunder or thereunder, collectively, the "*Transaction Agreements*") and to perform its obligations under each of the Transaction Agreements (other than this Agreement).  Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(b)      Subject to entry of the UPA Consummation Approval Order, the Confirmation Order, and, with respect to property in Canada, the corresponding Recognition Orders, each of the other Debtors has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver each Transaction Agreement to which such other Debtor is a party and to perform its obligations thereunder.  Subject to entry of the UPA Consummation Approval Order, the Confirmation Order, and the corresponding Recognition Orders, the execution and delivery of this Agreement and each of the other Transaction Agreements to which such other Debtor is a party and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite action (corporate or otherwise) on behalf of each other Debtor party thereto, and no other proceedings on the part of any other Debtor party thereto are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(c)      Subject to entry of the UPA Consummation Approval Order, the Confirmation Order, and, with respect to property in Canada, the corresponding Recognition Orders, each of the Company and the other Debtors has the requisite corporate power and authority to perform its obligations under the Plan, and has taken all necessary corporate actions required for the due consummation of the Plan in accordance with its terms.

Section 4.3      Execution and Delivery; Enforceability.

(a)      Subject to entry of the UPA Consummation Approval Order, and, with respect to property in Canada, the corresponding Recognition Order, this Agreement will have been, and subject to the entry of the UPA Consummation Approval Order, the Confirmation Order, and the corresponding Recognition Orders, each other Transaction Agreement will be, duly executed and delivered by the Company and each of the other Debtors party thereto.

(b)      Upon entry of the UPA Approval Order and, with respect to property in Canada, the corresponding Recognition Order, and assuming due and valid execution and delivery hereof by the Plan Sponsors, the UPA Approval Obligations will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors, in accordance with their respective terms.

(c)      Upon entry of the UPA Consummation Approval Order and, with respect to property in Canada, the corresponding Recognition Order, and assuming due and valid execution and delivery of this Agreement and the other Transaction Agreements by the Plan Sponsors, each of the obligations hereunder (with respect to the Debtors only, and other than the UPA Approval Obligations, which are the subject of Section 4.3(b)) and thereunder will constitute the valid and legally binding obligations of the Company and, to the extent the other Debtors are party to the other Transaction Agreements, the other Debtors, enforceable against the Company and, to the extent the other Debtors are party to the other Transaction Agreements, the other Debtors, in accordance with their respective terms.

24

Section 4.4    Authorized and Issued Units.

(a)    Subject to entry of the Confirmation Order and the corresponding Recognition Order and assuming satisfaction of the conditions to Closing set forth in ARTICLE VII, as of the Closing, (i) the membership interests of Reorganized Holdings will consist of one class of New Common Equity, (ii) the outstanding membership interests of Reorganized Holdings as of Closing will consist of 1,000,000 issued and outstanding units of New Common Equity, (iii) no units of New Common Equity will be held by Reorganized Holdings in its treasury, (iv) 100,000 units of New Common Equity will be reserved for issuance upon exercise of options and other rights to purchase or acquire units of New Common Equity granted in connection with the MEIP, (v) 70,213 units of New Common Equity will be reserved for issuance upon exercise of, and subject to adjustment pursuant to the terms of, the Warrants as provided under the Plan and (vi) no warrants to purchase units of New Common Equity will be issued and outstanding other than the Warrants as provided under the Plan.

(b)    Neither the Company nor any of its Subsidiaries owns or holds the right to acquire any stock, partnership interest or joint venture interest or other equity ownership interest in any other Person.

(c)    Subject to entry of the Confirmation Order and the corresponding Recognition Order and assuming satisfaction of the conditions to Closing set forth in ARTICLE VII, except as set forth in this Section 4.4, as of the Closing, no units of membership interests or other equity securities or voting interest in Reorganized Holdings will have been issued, reserved for issuance or outstanding.

(d)    Subject to entry of the Confirmation Order and the corresponding Recognition Order and assuming satisfaction of the conditions to Closing set forth in ARTICLE VII, except as described in this Section 4.4 and except as set forth in the Reorganized Holdings Corporate Documents, as of the Closing, neither Reorganized Holdings nor any of its Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates Reorganized Holdings or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any units of the membership interests of, or other equity or voting interests in, Reorganized Holdings or any of its Subsidiaries or any security convertible or exercisable for or exchangeable into any membership interests of, or other equity or voting interest in, Reorganized Holdings or any of its Subsidiaries, (ii) obligates Reorganized Holdings or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any units of membership interests of Reorganized Holdings or any of its Subsidiaries or (iv) relates to the voting of any units of membership interests of Reorganized Holdings.

Section 4.5    Issuance. The units of New Common Equity to be issued pursuant to the Plan, including the units of New Common Equity to be issued pursuant to the terms of this Agreement and pursuant to the Additional Capital Commitment, will, when issued and delivered on the Closing Date with respect to the Emergence Equity Units and on the closing date of the Additional Capital Commitment in accordance with and against delivery of the consideration therefor pursuant to the Plan and this Agreement and the other Transaction Agreements, be duly and validly authorized, issued and delivered and shall be fully paid, and free and clear of any and all Taxes, Liens (other than Transfer restrictions imposed hereunder or under the Reorganized Holdings Corporate Documents or by applicable Law), preemptive rights, subscription and similar rights, other than any rights set forth in the Reorganized Holdings Corporate Documents.

25

Section 4.6    No Conflict.  Assuming the consents described in clauses (a) through (e) of Section 4.7 are obtained, the execution and delivery by the Company and, if applicable, its Subsidiaries of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, its Subsidiaries with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) materially conflict with, or result in a material breach, modification or violation of, any of the terms or provisions of, or constitute a material default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any material payment or consent to be required under any Contract to which the Company or any of its Subsidiaries will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of the Company or any of its Subsidiaries will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of the Reorganized Holdings Corporate Documents or any of the organization documents of any of the Company's Subsidiaries or (c) result in any violation of any Law or Order applicable to the Company or any of its Subsidiaries or any of their properties, except, in each of the cases described in clauses (a) or (c), for any conflict, breach, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Company's performance of its obligations under this Agreement.

Section 4.7    Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over the Company or any of its Subsidiaries or any of their properties is required for the execution and delivery by the Company and, to the extent relevant, its Subsidiaries of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, to the extent relevant, its Subsidiaries with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the UPA Approval Order authorizing the Company to execute and deliver this Agreement and perform the UPA Approval Obligations, (b) the entry of the UPA Consummation Approval Order authorizing the Company to perform each of its other obligations hereunder, (c) the entry of the Confirmation Order, (d) the entry of the applicable Recognition Orders with respect to the Orders described in the foregoing clauses (a), (b) and (c) of this Section 4.7, and (e) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws or Antitrust Laws in connection with the issuance of the Emergence Equity Units and the Additional Capital Commitment Units pursuant to the exercise of the Subscription Rights, except any consent, approval, authorization, order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Company's performance of its obligations under this Agreement or any Debtor's operation of the business or current or currently proposed use, occupancy or operation of any Debtor's assets or properties.

Section 4.8    Arm's-Length.  The Company acknowledges and agrees that (a) each of the Plan Sponsors is acting solely in the capacity of an arm's-length contractual counterparty to the Company with respect to the transactions contemplated hereby and not as a financial advisor or a fiduciary to, or an agent of, the Company or any of its Subsidiaries and (b) no Plan Sponsor is advising the Company or any of its Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.9    Financial Statements.  The audited consolidated balance sheets of the Company as at December 31, 2015 (the "*Latest Balance Sheet Date*") and the related consolidated statements of operations and of cash flows for the fiscal year ended on such dates, reported on by and accompanied by an unqualified report from BDO USA LLP, (collectively, the "*Financial Statements*"), present fairly, in all material respects, the consolidated financial condition of the Company as at such dates, and the consolidated results of its operations and its consolidated cash flows for the respective

26

fiscal period or quarter, as the case may be, then ended. All such Financial Statements, including the related schedules and notes thereto, have been prepared in accordance with U.S. generally accepted accounting principles ("*GAAP*") applied consistently throughout the periods involved (except as disclosed therein and, in the case of unaudited Financial Statements, except for the absence of footnote disclosures and year-end adjustments). The Company and its Subsidiaries do not have any material Liabilities required to be disclosed in a balance sheet prepared in accordance with GAAP that are unimpaired pursuant to the Plan, except (a) those that are reflected or reserved against in the Financial Statements as of the Latest Balance Sheet Date, (b) those that have been incurred in the ordinary course of business consistent with past practice since the Latest Balance Sheet Date or pursuant to the DIP Loan or under the Prepetition Debt Documents or (c) those that are set forth in the Debtors schedules of assets and liabilities and statements of financial affairs filed with the Bankruptcy Court.

Section 4.10    Company SEC Documents and Disclosure Statement. Except as set forth in the Company SEC Documents filed since December 31, 2014 but prior to the date hereof, from December 31, 2014 to the Petition Date, the Company has filed all reports, schedules, forms and statements required to be filed with the SEC under the Securities Act or the Exchange Act. As of their respective dates, and giving effect to any amendments or supplements thereto filed since December 31, 2014 and prior to the Petition Date, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act applicable to such Company SEC Documents. From December 31, 2014 to the Petition Date, the Company has filed with the SEC (or incorporated by reference to an earlier filing) all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that were required to be filed as exhibits to the Company SEC Documents during such period. No Company SEC Document filed since December 31, 2014 and prior to the Petition Date, as of their respective dates and after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The representation in the preceding sentence does not apply to any projections, forecasts, estimates and forward looking information included in the Company SEC Documents. Disclosure Statement as approved by the Bankruptcy Court will conform in all material respects with Section 1125 of the Bankruptcy Code.

Section 4.11    Absence of Certain Changes. Since the date of the Latest Balance Sheet, (a) there has been no Material Adverse Effect and (b) neither the Company nor any of its Subsidiaries have undertaken any of the actions that would require the consent of the Requisite Plan Sponsors pursuant to Section 6.3(b) of this Agreement if undertaken after the date hereof, except to the extent such actions are disclosed in items 1.01, 1.02, 2.03, 2.04, 4.01 or 5.02 of the Forms 8-K filed by the Company since the date of the Latest Balance Sheet but prior to the date hereof.

Section 4.12    No Violation; Compliance with Laws. (i) The Company is not in violation of its articles of incorporation or bylaws, and (ii) no Subsidiary of the Company is in violation of its respective articles of incorporation or bylaws or similar organizational document in any material respect. Neither the Company nor any of its Subsidiaries is or has been at any time since December 31, 2014 in violation of any Law or Order, except as would not reasonably be expected to be material, or result in material liability, to the Company and its Subsidiaries taken as a whole. There is and since December 31, 2014 has been no failure on the part of the Company to comply in all material respects with the Sarbanes-Oxley Act of 2002.

Section 4.13    Legal Proceedings. Other than the Chapter 11 Proceedings, the Recognition Proceedings and any adversary proceedings or contested motions commenced in connection therewith, there are no material legal, governmental, administrative, judicial or regulatory investigations,

27

audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("*Legal Proceedings*") pending or threatened to which the Company or any of its Subsidiaries is a party or to which any property of the Company or any of its Subsidiaries is the subject which in any manner draws into question the validity or enforceability of this Agreement, the Plan or the Transaction Agreements.

Section 4.14    Labor Relations.

(a)    Neither the Company nor any of its Subsidiaries is engaged in any unfair labor practice and there is (i) no unfair labor practice complaint pending against the Company or any of its Subsidiaries or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries before any Governmental Entity (ii) no grievance or arbitration proceeding pending against the Company or any of its Subsidiaries or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries and (iii) no strike, labor dispute, slowdown or stoppage pending against the Company or any of its Subsidiaries or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries which, in the case of clauses (i), (ii) and (iii) above, individually or in the aggregate, would reasonably be expected to result in material liability to the Company or any of its Subsidiaries.

(b)    Section 4.14(b)(i) of the Company Disclosure Schedule lists all Collective Bargaining Agreements the Company or any of its Subsidiaries is party to or subject to as of the date hereof and the status of any related negotiations, in each case, as of the date hereof.  Section 4.14(b)(ii) of the Company Disclosure Schedule lists any jurisdiction in which the employees of the Company or any of its Subsidiaries are represented by an Employee Representative.  To the Knowledge of the Company, no organizing activity, or Employee Representatives' certification, petition or election is pending or, to the Knowledge of the Company, threatened with respect to employees of the Company or any of its Subsidiaries.  Except as set forth in Section 4.14(b)(iii) of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries is subject to any obligation (whether pursuant to Law or Contract) to notify, inform and/or consult with, or obtain consent from, any Employee Representative regarding the transactions contemplated by this Agreement prior to entering into this Agreement.

(c)    The Company and its Subsidiaries are in compliance, in all material respects, with all Laws respecting employment and employment practices, terms and conditions of employment, collective bargaining, disability, immigration, background checks, health and safety, wages, classification of employees, hours and benefits, non-discrimination and harassment in employment, workers' compensation and the collection and payment of withholding and/or payroll Taxes and similar Taxes. Since December 31, 2014, the Company and each of its Subsidiaries has complied in all material respects with its payment obligations to all employees of the Company and any of its Subsidiaries in respect of all wages, salaries, fees, commissions, bonuses, overtime pay, holiday pay, sick pay, benefits and all other compensation, remuneration and emoluments due and payable to such employees under any Company Plan or any applicable Collective Bargaining Agreement or Law, except, for the avoidance of doubt, for any payments that are not permitted by the Bankruptcy Court, the Bankruptcy Code, the Canadian Court or the CCAA, as applicable.

Section 4.15    Intellectual Property.  (a) The Company and its Subsidiaries exclusively own, free and clear of all Liens (except for  Permitted Liens), all of their (A) patents and registered Intellectual Property (and all applications therefor) and (B) proprietary unregistered Intellectual Property, in each case, that is material to the businesses of the Company and its Subsidiaries ("*Company Intellectual Property*"), and all of the Company Intellectual Property is subsisting, unexpired, valid and enforceable; (b) the Company and its Subsidiaries own, or have valid rights to use, all of the Intellectual Property used or held for use in, or necessary for the conduct of, the businesses of the Company and its

28

Subsidiaries as currently conducted; (c) no material Intellectual Property owned by the Company or its Subsidiaries is being infringed, misappropriated or violated ("*Infringed*") by any other Person; (d) the conduct of the businesses of the Company and its Subsidiaries as presently conducted does not Infringe any Intellectual Property of any other Person and during the three (3) years prior to the date hereof, no Person has alleged same in writing, except for allegations that have since been resolved or in connection with the Chapter 11 Proceedings, the Recognition Proceedings and any adversary proceedings or contested motions commenced in connection therewith; (e) the Company and its Subsidiaries take commercially reasonable actions to maintain and protect (1) the confidentiality of their trade secrets and confidential information and (2) the security and substantially continuous operation of their material software, systems, websites and networks (and all data therein) and (f) the Company and its Subsidiaries are in compliance with all Applicable Privacy Laws, except in the case of clauses (b) through (f), as would not reasonably be expected to result in material liability to the Company or any of its Subsidiaries taken as a whole.

Section 4.16   Title to Real and Personal Property.

(a)   Real Property.   The Company or one of its Subsidiaries, as the case may be, has good and valid title in fee simple to each material Owned Real Property, free and clear of all Liens, except for (i) Liens that are described in (A) the Company SEC Documents filed since December 31, 2014 but prior to the date hereof, (B) the Plan or (C) the Disclosure Statement, or (ii) Permitted Liens.

(b)   Leased Real Property.   Subject to entry of the Confirmation Order and the corresponding Recognition Order and assumption of the same by the applicable Debtor in accordance with applicable Law (including satisfaction of any applicable cure amounts), all material Real Property Leases necessary for the operation of the business are valid, binding and enforceable by and against the Company or its relevant Subsidiary, and, to the Knowledge of the Company, the other parties thereto, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity, and no written notice to terminate, in whole or part, any of such leases has been delivered to the Company or any of its Subsidiaries (nor, to the Knowledge of the Company, has there been any indication that any such notice of termination will be served), except for any motions, notice or objections, to the assumption or rejection of any Real Property Lease or otherwise, in the Chapter 11 Proceedings.   Other than as a result of the filing of the Chapter 11 Proceedings or the Recognition Proceedings, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any material Real Property Lease necessary for the operation of the business is in material default or breach under the terms thereof.

(c)   Personal Property.   The Company or one of its Subsidiaries has good title or, in the case of leased assets, a valid leasehold interest, to all of the material tangible personal property and assets reflected on the balance sheet included in the Financial Statements as of the Latest Balance Sheet Date, free and clear of all Liens, except for (i) Liens that are described in (A) the Company SEC Documents filed since December 31, 2014 but prior to the date hereof, (B) the Plan or (C) the Disclosure Statement or (ii) Permitted Liens.

Section 4.17   No Undisclosed Relationships.   No relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and any Related Party, customers or suppliers of the Company or any of its Subsidiaries, on the other hand, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described in the Company SEC Documents filed since December 31, 2014 but prior to the date hereof, except for the transactions contemplated by this Agreement, the Plan or the other Transaction Agreements.

29

Section 4.18   <u>Licenses and Permits</u>.  The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate Governmental Entities that are necessary for or material to the ownership or lease of their respective properties and the conduct of the business, in each case, except as would not reasonably be expected to be material to the Company or its Subsidiaries, individually or taken as a whole.  Neither the Company nor any of its Subsidiaries (i) has received notice of any revocation or modification of any such license, certificate, permit or authorization or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except as would not reasonably be expected to be material to the Company or its Subsidiaries, individually or taken as a whole.

Section 4.19   <u>Environmental.</u>

(a)   (i) Each of the Company and its Subsidiaries, and each of their facilities, businesses, assets, properties and leaseholds is, and at all times during the past five (5) years has been, in compliance with all applicable Environmental Laws, and (ii) none of the Company, its Subsidiaries, or any of their facilities, businesses, assets, properties or leaseholds, (A) is, or at any time during the past five (5) years has been, liable for any penalties, fines, or forfeitures for failure to comply with any applicable Environmental Laws or (B) is subject to any outstanding citations, notices or Orders of non-compliance with respect to any applicable Environmental Laws, in each case of (i) and (ii), except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b)   (i) All licenses, filings, permits, registrations or approvals of Governmental Entities required for the business of the Company and each of its Subsidiaries under any Environmental Law (collectively, "***Permits***") (A) have been secured and are in the possession of the Company and each of its Subsidiaries, as applicable, and (B) are currently in full force and effect, and (ii) each of the Company and each of its Subsidiaries is in compliance therewith, in each case of (i) and (ii), except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(c)   The Company and each of its Subsidiaries have obtained all financial assurances required for the business of the Company and each of its Subsidiaries in the amounts and forms required pursuant to applicable Environmental Law or by a Governmental Entity, except as would not reasonably be expected, individually or in the aggregate, to materially and adversely impact any Debtor's operation of the business or current or currently proposed use, occupancy or operation of any Debtor's assets or properties.

(d)   There has been no generation, manufacture, use, storage, treatment or release of Hazardous Materials by the Company or any of its Subsidiaries or on any property currently or, to the Knowledge of the Company, formerly owned or leased by the Company or any of its Subsidiaries, except such generation, manufacturing, use, storage, treatment or release that would not be reasonably expected to give rise to or result in any material liability to the Company or any of its Subsidiaries.

(e)   (i) There are no visible signs of releases, spills, discharges, leaks or disposals of Hazardous Materials at, upon, or within any Owned Real Property or any premises leased by the Company or any of its Subsidiaries; (ii) neither the Owned Real Property nor any premises leased by the Company or any of its Subsidiaries, has ever been used by the Company, any of its Subsidiaries, or, to the Knowledge of the Company, any other Person as a RCRA Subpart C treatment or disposal facility of any Hazardous Waste; and (iii) no Hazardous Wastes are present on the Owned Real Property or any premises

30

lease by the Company or any of its Subsidiaries, in each case of (i), (ii) and (iii), except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(f)    There are no Environmental Claims pending or, to the Knowledge of the Company, threatened against, or that have been brought by, the Company or any of its Subsidiaries, and within the past five (5) years there have not been any such Environmental Claims, in each case, except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  There are no facts, circumstances, conditions or occurrences on any asset, property, business, leasehold or facility currently or formerly owned or operated by the Company or any of its Subsidiaries that is reasonably likely (i) to form the basis of an Environmental Claim against the Company, any of its Subsidiaries or any asset, property, business, leasehold or facility owned or operated by the Company or any of its Subsidiaries, or (ii) to cause such assets, properties, businesses, leaseholds or facilities to be subject to any restrictions on its ownership, occupancy, use or transferability under any Environmental Law, in each case of (i) and (ii), except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Section 4.20    Tax Returns and Payments; Withholding.  Each of the Company and each of its Subsidiaries has timely filed all returns, statements, forms and reports for or relating to Taxes with respect to the income, or material Taxes with respect to properties or operations, in each case, of the Company and/or any of its Subsidiaries (the "*Returns*").  The Returns accurately reflect in all material respects all liability for Taxes of the Company and its Subsidiaries for the periods covered thereby.  The Company and each of its Subsidiaries have at all times paid, all material Taxes payable by them.  There is no Legal Proceeding now pending or, to the Knowledge of the Company, threatened by any authority regarding any Taxes relating to the Company or any of its Subsidiaries.  Neither the Company nor any of its Subsidiaries has entered into a Contract or waiver or been requested to enter into a Contract or waiver extending any statute of limitations relating to the payment or collection of Taxes of the Company or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Company or any of its Subsidiaries not to be subject to the normally applicable statute of limitations.  During the past seven (7) years, the Company and each of its Subsidiaries has complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes (including withholding and reporting requirements under Code Sections 1441 through 1464, 3401 through 3406, 6041 and 6049 and similar provisions under any other Laws) and each has, within the time and in the manner prescribed by law, paid over to the proper Governmental Entities all required amounts with respect to Taxes, except, for the avoidance of doubt, for any payments that are not permitted by the Bankruptcy Court, the Bankruptcy Code, the Canadian Court or the CCAA, as applicable.  Neither the Company nor any Subsidiary of the Company is a United States real property holding corporation or "USRPHC" for U.S. federal income tax purposes, including within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

Section 4.21    Compliance with ERISA.

(a)    Section 4.21(a) of the Company Disclosure Schedule sets forth each material Company Plan.  Each Company Plan, other than any Multiemployer Plan (and each related trust, insurance Contract or fund), is in material compliance with its terms and with all applicable Laws, including ERISA and the Code. Each Company Plan, other than any Multiemployer Plan (and each related trust, if any), which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code;  no ERISA Event has occurred or is reasonably expected to occur; no ERISA Plan has an Unfunded Current Liability in an amount that exceeds $1,000,000 with respect to any single ERISA Plan and that exceeds $1,500,000 with respect to all ERISA Plans in the aggregate; all contributions required to be made with respect to a Company Plan have been or will be timely made

31

(except as disclosed on Section 4.21(a) of the Company Disclosure Schedule); using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the Company and its Subsidiaries and ERISA Affiliates would have no material liabilities to any Multiemployer Plans in the event of a complete withdrawal therefrom; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) that covers or has covered employees or former employees of the Company, any of its Subsidiaries, or any ERISA Affiliate has at all times during the past three years been operated in material compliance with the provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code. The Company and its Subsidiaries do not maintain or have any Liability with respect to any employee welfare plan (as defined in Section 3(1) of ERISA) which provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA).

(b)      Each Foreign Company Plan (and each related trust, insurance Contract or fund), if any, is, and has been maintained and funded, in material compliance with its terms and with the requirements of any and all applicable Laws and Orders, including the PBA and the ITA, and has been maintained, where required, in good standing with applicable Governmental Entities.  All material contributions required to be made with respect to a Foreign Pension Plan have been or will be timely made.  Neither the Company nor any of its Subsidiaries has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Pension Plan.  Neither the Company nor any of its Subsidiaries maintains or contributes to any Foreign Pension Plan the obligations with respect to which would in the aggregate reasonably be expected to have a Material Adverse Effect.

Section 4.22      Disclosure Controls and Procedures.   Based upon the most recent evaluation by the Chief Executive Officer and Chief Financial Officer of the Company of the Company's internal control over financial reporting, there are no (a) significant deficiencies or material weaknesses in the design or operation of the Company's internal control over financial reporting which are reasonably likely to adversely affect its ability to record, process, summarize and report financial data or (b) fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Section 4.23      Material Contracts.   Section 4.23 of the Company Disclosure Schedule sets forth Material Contracts to which the Company or any of its Subsidiaries is a party as of the date hereof.  Subject to entry of the Confirmation Order and the corresponding Recognition Order and assumption of the same by the applicable Debtor in accordance with applicable Law (including satisfaction of any applicable cure amounts), all Material Contracts are valid, binding and enforceable by and against the Company or its relevant Subsidiary, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity, and no written notice to terminate, in whole or part, any  Material Contract has been delivered to the Company or any of its Subsidiaries, except for any motions, notices or objections in connection with the Chapter 11 Proceedings.  Other than as a result of the filing of the Chapter 11 Proceedings or the Recognition Proceedings, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof.  The Company has provided or made available to the Plan Sponsors true, correct and complete copies of each Material Contract as of the date hereof.  For purposes of this Agreement, "*Material Contract*" means any Contract to which the Company or any of its Subsidiaries is a party that is material to the conduct and operations of the business of the Company and its Subsidiaries, taken as a whole.

Section 4.24      No Unlawful Payments.  Neither the Company nor any of its Subsidiaries nor any of their respective directors, officers or employees nor, to the Knowledge of the Company, any other Representative acting on behalf of the Company or any of its Subsidiaries, has in any material

32

respect:  (a) used any funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case, relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 4.25    Compliance with Money Laundering Laws.    The operations of the Company and its Subsidiaries are and have been at all times conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions (and the rules and regulations promulgated thereunder) to which the Debtors are subject and any related or similar applicable Laws (collectively, the "***Money Laundering Laws***") and no material Legal Proceeding by or before any Governmental Entity or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

Section 4.26    Compliance with Sanctions Laws.    Neither the Company nor any of its Subsidiaries nor any of their respective directors, officers or employees nor, to the Knowledge of the Company, any agent or other Person acting on behalf of the Company or any of its Subsidiaries, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the United States Treasury Department.  The Company will not directly or indirectly use the proceeds from this Agreement (including the Emergence Equity Purchase, the Additional Capital Commitment or the sale of the Additional Capital Commitment Units), or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the United States Treasury Department.

Section 4.27    No Broker's Fees.    Neither the Company nor any of its Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Plan Sponsors for a brokerage commission, finder's fee or like payment in connection with the Emergence Equity Purchase, the Additional Capital Commitment or the sale of the Emergence Equity Units or the Additional Capital Commitment Units or the transactions contemplated hereby or thereby.

Section 4.28    Takeover Statutes.    Subject to entry of the UPA Consummation Approval Order, the Confirmation Order, and the corresponding Recognition Orders, no Takeover Statute is applicable to this Agreement, the Emergence Equity Purchase and the other transactions contemplated by this Agreement.

Section 4.29    Investment Company Act.    None of the Company or any of its Subsidiaries is an "investment company" or, to the Knowledge of the Company, an "affiliated person" of, or a "promoter" or "principal underwriter" for or a company "controlled" by an "investment company" required to be registered as such under the Investment Company Act of 1940 and  neither the entry into of this Agreement, the Plan or the Transaction Agreements, nor the application of the proceeds nor the consummation of the other transactions contemplated hereby or thereby, will violate any provision of such act or any rule, regulation or order of the SEC thereunder.

Section 4.30    Insurance.    The Company and its Subsidiaries have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses.  All premiums due and payable in respect of material insurance policies maintained by the Company and its Subsidiaries have been paid.  The Company reasonably believes that the insurance maintained by or on behalf of the Company and its Subsidiaries is adequate in all material respects.  As of the date hereof, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has

33

received notice from any insurer or agent of such insurer with respect to any material insurance policies of the Company and its Subsidiaries of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

ARTICLE V

**REPRESENTATIONS AND WARRANTIES OF THE PLAN SPONSORS**

Each Plan Sponsor represents and warrants as to itself only and not any other Plan Sponsor (unless otherwise set forth herein, as of the date hereof and as of the Closing Date) as set forth below.

Section 5.1     Incorporation.   Such Plan Sponsor is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or formation.

Section 5.2     Corporate Power and Authority.   Such Plan Sponsor has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Transaction Agreement to which such Plan Sponsor is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements to which such Plan Sponsor is a party and the consummation of the transactions contemplated hereby and thereby.

Section 5.3     Execution and Delivery.   This Agreement and each other Transaction Agreement to which such Plan Sponsor is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Plan Sponsor and (b) assuming due and valid execution and delivery hereof and thereof by the Company and the other Debtors (as applicable), does, or upon its execution by such Plan Sponsor will, constitute valid and legally binding obligations of such Plan Sponsor, enforceable against such Plan Sponsor in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity.

Section 5.4     No Conflict.   The execution and delivery by such Plan Sponsor of this Agreement and, to the extent applicable, the other Transaction Agreements, the compliance by such Plan Sponsor with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under, any Contract to which such Plan Sponsor is a party or by which such Plan Sponsor is bound or to which any of the properties or assets of such Plan Sponsor are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Plan Sponsor and (c) will not result in any material violation of any Law or Order applicable to such Plan Sponsor or any of its properties, except, in each of the cases described in clauses (a) or (c), for any conflict, breach, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Plan Sponsor's performance of its obligations under this Agreement.

34

Section 5.5    <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over such Plan Sponsor or any of its properties is required for the execution and delivery by such Plan Sponsor of this Agreement and, to the extent applicable, the Transaction Agreements, the compliance by such Plan Sponsor with all of the provisions hereof and thereof and the consummation of the transactions (including the purchase by each Plan Sponsor of its Emergence Equity Units, if any) contemplated herein and therein, except any consent, approval, authorization, order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Plan Sponsor's performance of its obligations under this Agreement.

Section 5.6    <u>Legal Proceedings</u>.    There is no pending, outstanding or, to the knowledge of such Plan Sponsor, threatened Legal Proceedings against such Plan Sponsor that challenge any of the transactions contemplated by the Transaction Agreements or that, if adversely determined, would reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Plan Sponsor's performance of its obligations under this Agreement

Section 5.7    <u>No Registration</u>.  Such Plan Sponsor acknowledges that the Emergence Equity Units and the Additional Capital Commitment Units have not been registered and will not be registered pursuant to the Securities Act and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available. Such Plan Sponsor understands that the Emergence Equity Units and the Additional Capital Commitment Units are being offered and sold in reliance upon a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the *bona fide* nature of the investment intent and the accuracy of such Plan Sponsor's representations as expressed herein or otherwise made pursuant hereto.

Section 5.8    <u>Purchasing Intent</u>.  Such Plan Sponsor is acquiring the Emergence Equity Units and the Additional Capital Commitment Units for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Plan Sponsor has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 5.9    <u>Sophistication; Investigation</u>.  Such Plan Sponsor has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Emergence Equity Units  and the Additional Capital Commitment Units being acquired hereunder.  Such Plan Sponsor is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.  Such Plan Sponsor understands and is able to bear any economic risks associated with such investment (including the necessity of holding the Emergence Equity Units and the Additional Capital Commitment Units for an indefinite period of time).  Such Plan Sponsor has conducted and relied on its own independent investigation of, and judgment with respect to, the Company and its Subsidiaries and the advice of its own legal, tax, economic, and other advisors.  Such Plan Sponsor has considered the suitability of the Emergence Equity Units and the Additional Capital Commitment Units as an investment in light of its own circumstances and financial condition.  Such Plan Sponsor agrees to furnish any additional information reasonably requested by the Company or any of its Affiliates, to the extent necessary to assure compliance with applicable securities Laws in connection with such Plan Sponsor's purchase of the Emergence Equity Units and the Additional Capital Commitment Units hereunder.

Section 5.10    <u>No Broker's Fees</u>. Such Plan Sponsor is not a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Company, for a brokerage commission, finder's fee or like payment in connection with the Emergence Equity Units or the

112016848 v9

Additional Capital Commitment Units, or the Plan or any other transaction contemplated by the Transaction Agreements.

Section 5.11    Arm's-Length.    Such Plan Sponsor acknowledges and agrees that (a) each of the Debtors is acting solely in the capacity of an arm's-length contractual counterparty to the Plan Sponsors with respect to the transactions contemplated hereby (including in connection with determining the terms of the Emergence Equity Purchase and the Additional Capital Commitment) and not as a financial advisor or a fiduciary to, or an agent of, such Plan Sponsor or any of its Affiliates and (b) the Company is not advising such Plan Sponsor or any of its Affiliates as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 5.12    Financial Capability.    Such Plan Sponsor will have at the Closing, sufficient immediately available funds to pay the aggregate Purchase Price for all Emergence Equity Units to be purchased by such Plan Sponsor hereunder and to make all other payments required to be made by such Plan Sponsor under this Agreement and the transactions contemplated hereby and to otherwise consummate the transactions contemplated hereby in accordance with the terms hereof.

Section 5.13    Votable Claims and Additional Claims.

(a)    As of the date hereof, such Plan Sponsor is the beneficial owner of, or the investment advisor or manager for the beneficial owner of, the aggregate principal amount of (i) Votable Claims as set forth opposite such Plan Sponsor's name under the column titled "Votable Claims" on Schedule 3-A attached hereto and (ii) Additional Claims as set forth opposite such Plan Sponsor's name on Schedule 3-B attached hereto.

(b)    As of the date hereof, such Plan Sponsor (together with its applicable Affiliates) has the full power to vote, dispose of and compromise the aggregate principal amount of such Votable Claims and such Additional Claims.

(c)    Other than this Agreement, such Plan Sponsor has not entered into any other agreement to Transfer, in whole or in part, any portion of its right, title or interest in such Votable Claims or such Additional Claims, in each case, where such Transfer, if consummated, would result in such Plan Sponsor not complying with the terms of this Agreement.

ARTICLE VI

**ADDITIONAL COVENANTS**

Section 6.1    Restructuring Support Obligations.

(a)    From the date hereof until the earlier of the Termination Date and the Closing Date (the "*Pre-Closing Period*"), each of the Debtors shall negotiate in good faith with the Plan Sponsors any and all documents, agreements, certificates and instruments to be executed, filed, or entered into in connection with or pursuant to this Agreement, the Plan, the Disclosure Statement, the Chapter 11 Proceedings or the Recognition Proceedings (the "*Plan-Related Documents*"), including:

(i)    the materials related to the solicitation of votes for the Plan pursuant to sections 1125, 1126 and 1145 of the Bankruptcy Code (the "*Solicitation*");

(ii)    the UPA Approval Order, Plan Solicitation Order, Confirmation Order, UPA Consummation Approval Order, any corresponding Recognition Order and any other Orders

36

112016848 v9

in connection with or pursuant to this Agreement, the Plan, the Disclosure Statement, the Chapter 11 Proceedings or the Recognition Proceedings;

(iii)    any briefs, pleadings, motions, appendices, amendments, modifications, supplements, exhibits and schedules relating to this Agreement, the Plan, the Disclosure Statement, the Chapter 11 Proceedings or the Recognition Proceedings;

(iv)    the BBVA Note Documents and their respective terms;

(v)    any settlement agreement with respect to the holders of allowed General Unsecured Claims, excluding any Zochem General Unsecured Claims, and its respective terms, including any and all documentation with respect thereto;

(vi)    the Reorganized Holdings Corporate Documents and any other organizational and governance documents for the reorganized Debtors, including certificates of incorporation, certificate of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements or limited partnership agreements (or equivalent governing documents), identity of proposed members of Reorganized Holdings' and any other Debtor's boards of directors, boards of managers, and general partners and registration rights agreements (collectively, the "***Governance Documents***");

(vii)    the Warrant Agreements, the Warrants, and their respective terms;

(viii)    a list of Contracts (the "***List of Assumed Contracts***") to be assumed pursuant to Section 365 of the Bankruptcy Code, including the amount necessary to cure any monetary default required to be cured under Section 365(b)(1) of the Bankruptcy Code with respect to such Contracts; and

(ix)    such other definitive documentation relating to a recapitalization of the Debtors as is reasonably necessary to consummate the Restructuring;

*provided*, *however*, that each of the Plan-Related Documents (A) shall contain the same terms as, and be otherwise consistent with, this Agreement and the Plan, in all respects (in each case, as this Agreement and the Plan may be amended from time to time in accordance with the terms hereof), and (B) to the extent the terms of such Plan-Related Document are not set forth in this Agreement or the Plan, shall be in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company; *provided*, *further*, *however*, that (1) the List of Assumed Contracts shall be in form and substance satisfactory solely to the Requisite Plan Sponsors, in their sole and absolute discretion and (2) the Governance Documents shall be in form and substance satisfactory solely to the Requisite Plan Sponsors, in their sole and absolute discretion, to the extent the terms of such Governance Documents are not set forth in this Agreement or the Plan.

(b)    During the Pre-Closing Period, the Company shall provide to Akin Gump Strauss Hauer & Feld LLP, on behalf of the Plan Sponsors, a copy of any Plan-Related Document (together with copies of any briefs, pleadings and motions related thereto) and a reasonable opportunity to review and comment on such Plan-Related Document (together with copies of any briefs, pleadings and motions related thereto) prior to such Plan-Related Documents, briefs, pleadings and motions being filed with the Bankruptcy Court or the Canadian Court (as applicable), including copies of the proposed motion seeking entry of the UPA Approval Order, Plan Solicitation Order, Confirmation Order and UPA Consummation Approval Order and a copy of the proposed Plan Solicitation Order or motion materials seeking any Recognition Orders by the Canadian Court, and a reasonable opportunity to review and comment on such

37

motions and such Orders prior to such motions and such Orders being filed with the Bankruptcy Court or the Canadian Court, as applicable, and such motions and such Orders must be in form and substance consistent with the terms of this Agreement and the Plan and otherwise mutually satisfactory to the Requisite Plan Sponsors and the Company; *provided*, *however*, that neither the Company nor the Plan Sponsors are required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  Any amendments, modifications, changes or supplements to, any Plan-Related Documents, including any of the UPA Approval Order, Plan Solicitation Order, Confirmation Order, UPA Consummation Approval Order and any corresponding Recognition Orders, and any of the motions seeking entry of such Orders, shall, in each case, be in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company.

(c)      During the Pre-Closing Period, the Debtors jointly and severally (subject to Section 10.1) each agree to take any and all necessary and appropriate actions, in each case, in accordance with this Agreement and the Plan, to support and further the Restructuring, including taking any and all necessary and appropriate actions to and using its respective reasonable best efforts to:

(i)      obtain the entry of the Plan Solicitation Order on or prior to July 11, 2016 and cause the Plan Solicitation Order to become a Final Order (and request that such Order be effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Rules 3020 and 6004(h) of the Bankruptcy Rules, as applicable), in each case, as soon as reasonably practicable following the filing of the motion seeking entry of such Order;

(ii)      obtain a Recognition Order with respect to the Plan Solicitation Order on or prior to July 12, 2016;

(iii)      as promptly as practicable following obtaining the Bankruptcy Court's approval described in Section 6.1(c)(i) and the Canadian Court's recognition described in Section 6.1(c)(ii), solicit votes from each holder of Votable Claims, Prepetition BBVA Debt Facility Claims, Prepetition Senior Unsecured Note Claims, Prepetition Convertible Senior Note Claims, and Prepetition BBVA Debt Facility Claims, in conjunction with the distribution of the Disclosure Statement, to accept the Plan;

(iv)      obtain the entry of the UPA Approval Order on or prior to August 31, 2016 and cause the UPA Approval Order to become a Final Order (and request that such Order be effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Rules 3020 and 6004(h) of the Bankruptcy Rules, as applicable), as soon as reasonably practicable following the filing of the motion seeking entry of such Order;

(v)      obtain a Recognition Order with respect to the UPA Approval Order Order on or prior to September 2, 2016;

(vi)      obtain the entry of the Confirmation Order and UPA Consummation Approval Order on or prior to August 31, 2016 and cause the Confirmation Order and UPA Consummation Approval Order to each become a Final Order (and request that such Orders be effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Rules 3020 and 6004(h) of the Bankruptcy Rules, as applicable), in each case, as soon as reasonably practicable following the filing of the motion seeking entry of such Orders (for the avoidance of doubt, entry of the UPA Consummation Approval Order will be sought at the Confirmation Hearing);

38

(vii)    obtain Recognition Orders with respect to the Confirmation Order and the UPA Consummation Approval Order on or prior to September 2, 2016;

(viii)    obtain any and all required regulatory approvals and third-party approvals for the Restructuring, except where the failure to obtain such approval would not reasonably be expected to materially and adversely impair the consummation of the Restructuring or any Debtor's operation of the business or current or currently proposed use, occupying or operation of any Debtor's assets or properties;

(ix)    subject to Section 6.13(a), not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any plan of reorganization or liquidation in the Chapter 11 Proceedings or otherwise other than in accordance with and in furtherance of the Plan;

(x)    subject to Section 6.13(a), not file or amend any Plan-Related Documents or other Transaction Agreements, in each case, except as permitted in the forms pursuant to Section 6.1; and

(xi)    consummate and cause the Effective Date to occur on or prior to September 19, 2016 in accordance with the terms of this Agreement and the Plan.

(d)    Subject to the terms and conditions of this Agreement and the Plan and except as the Requisite Plan Sponsors may expressly release the Company in writing from any of the following obligations (which release may be withheld, conditioned or delayed at each such Requisite Plan Sponsor's sole and absolute discretion) during the Pre-Closing Period, each of the Debtors:

(i)    agrees to timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (A) directing the appointment of an examiner or a trustee, (B) converting any Chapter 11 Proceedings to a case under chapter 7 of the Bankruptcy Code or (C) dismissing any of the Chapter 11 Proceedings; and

(ii)    agrees to timely file a formal objection to any motion filed with the Canadian Court by any Person seeking to lift the stay in the Recognition Proceedings or to convert the Recognition Proceedings to other proceedings under the CCAA or the BIA.

(e)    During the Pre-Closing Period, each of the Debtors shall not, directly or indirectly, do, or permit on their behalf, the following without the consent of the Requisite Plan Sponsors:

(i)    any (A) amendment, supplement, modification or waiver of any term, condition or provision under the Plan or any of the other Plan-Related Documents, in whole or in part; (B) public announcement of its intention not to pursue the Restructuring; (C) suspension or revocation of the Restructuring; or (D) execution, filing, or agreement to file any Plan-Related Document (including any modifications or amendments thereof) that, in whole or in part, is not consistent in any respect with this Agreement and the Plan;

(ii)    any motion for an order from the Bankruptcy Court or Canadian Court authorizing or directing the assumption or rejection of an executory contract (including, without limitation, any Material Contract, any employment agreement or any employee benefit plan) or unexpired lease, other than in accordance with this Agreement and the Plan;

39

(iii)    any commencement of an avoidance action or other legal proceeding that challenges the validity, enforceability or priority of the DIP Loan Debt Documents or the Prepetition Senior Secured Notes Indenture or the Prepetition Senior Secured Notes, or any Votable Claims or any other Claims held by the Plan Sponsors, except, in all cases, to the extent expressly permitted by the DIP Loan Debt Documents;

(iv)    any entry into any settlement, compromise or agreement with any authorized representative of retirees or employees or a retiree committee, if any, unless such settlement, compromise or agreement is in form and substance acceptable to the Plan Sponsors; or

(v)    any entry into any new agreement, contract or other arrangement, amend, supplement or otherwise modify any existing agreement, contract or other arrangement, effect any transaction or commit to enter into or otherwise effect any of the foregoing, in any such case with any affiliate of the Debtors, in each case, that involves payment of more than $250,000 in the aggregate on an annual basis.

(f)    During the Pre-Closing Period, each Plan Sponsor, severally and neither jointly nor jointly and severally, (i) agrees to vote (when solicited to do so after receipt of a Disclosure Statement approved by the Bankruptcy Court and recognized by the Canadian Court and by the applicable deadline for doing so) its Votable Claims and Additional Claims in favor of the Plan (and contemporaneously with such vote, such Plan Sponsor shall not elect or opt out of any releases to be given by such Plan Sponsor in connection with its Votable Claims or Additional Claims pursuant to the terms of the Plan and the Plan-Related Documents); *provided*, *however*, that such vote (and any corresponding election) may be revoked (and, upon such revocation, deemed void *ab initio*) by such Plan Sponsor at any time following the Termination Date (it being understood by the Parties that any modification of the Plan that results in a termination of this Agreement pursuant to ARTICLE IX shall entitle such a Sponsor Party the opportunity to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and all Plan-Related Documents with respect to the Plan shall be consistent with this proviso); and (ii) shall not object to, or vote any of its Votable Claims or Additional Claims to reject or impede the Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of the Plan or any Plan-Related Documents.

Section 6.2    Reasonable Best Efforts.

(a)    Without in any way limiting any other obligation in this Agreement, during the Pre-Closing Period, the Debtors shall use (and shall cause their Subsidiaries and Affiliates to use), reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan.

(b)    Without in any way limiting any other respective obligation of the Debtors or any Plan Sponsor in this Agreement, during the Pre-Closing Period, the Debtors shall use (and shall cause its Subsidiaries to use), and each Plan Sponsor shall use, reasonable best efforts in:

(i)    timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Party and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

40

(ii)    defending any Legal Proceedings in any way challenging (A) this Agreement, the Plan or any other Transaction Agreement, (B) the UPA Approval Order, Plan Solicitation Order, Confirmation Order, UPA Consummation Approval Order or any corresponding Recognition Orders, or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii)    working together in good faith to finalize the Reorganized Holdings Corporate Documents, Transaction Agreements and all other documents relating thereto for timely inclusion in the Plan and filing with the Bankruptcy Court and the Canadian Court.

(c)    Subject to applicable Laws relating to the exchange of information and appropriate assurance of confidential treatment (and any confidentiality agreements heretofore executed among any of the Parties), the Plan Sponsors and the Company shall have the right, during the Pre-Closing Period, to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Plan Sponsors or the Company, respectively, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; *provided*, *however*, that neither the Company nor the Plan Sponsors are required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.

(d)    Nothing contained in this Section 6.2 shall limit the approval rights of the Plan Sponsors, including the approval rights with respect to the Plan-Related Documents provided in Section 6.1.  Nothing in this Agreement shall limit the ability of any Plan Sponsor to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Proceedings or the Recognition Proceedings to the extent not inconsistent with this Agreement and the Plan.

Section 6.3    Conduct of Business.

(a)    Except (i) as set forth in this Agreement or Section 6.3 of the Company Disclosure Schedule, (ii) as limited or restricted by the DIP Loan Debt Documents, (iii) as ordered by the Bankruptcy Court or prohibited by restrictions or limitations under the Bankruptcy Code on Chapter 11 debtors or (iv) with the prior written consent of Requisite Plan Sponsors, during Pre-Closing Period, each Debtor shall, and shall cause each of its Subsidiaries to carry on its business in the ordinary course in compliance with applicable Laws and use its reasonable best efforts to (A) preserve intact its business, (B) keep available the services of its officers and employees and (C) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with such Debtor or its Subsidiaries in connection with their business, in each case, in all material respects.

(b)    Except (X) as set forth in this Agreement or Section 6.3 of the Company Disclosure Schedule, (Y) as ordered by the Bankruptcy Court or prohibited by restrictions or limitations under the Bankruptcy Code on Chapter 11 debtors or (Z) with the prior written consent of Requisite Plan Sponsors, during Pre-Closing Period, each Debtor shall not, and shall not permit any of its Subsidiaries to, take any of the following actions:

(i)    entry into, or any amendment, modification, termination waiver, supplement or other change to, any employment agreement to which the Company or any of its Subsidiaries is a party or any assumption of any such employment agreement in connection with the Chapter 11 Proceedings;

41

(ii)     other than as required by this Agreement or the Plan, any amendment or proposal to amend of its respective certificates or articles of incorporation, bylaws or comparable organizational documents;

(iii)     enter into any Contract which would constitute a Material Contract (other than in the ordinary course of business), or violate, amend or otherwise modify or waive (other than in the ordinary course of business) any of the terms of any Material Contract;

(iv)     any split, combination or reclassification of any of its respective capital stock, limited liability company interests, partnership interests or other equity, ownership or profits interests, and any options, warrants, conversion privileges or rights of any kind to acquire any capital stock, limited liability company interests, partnership interests or other equity, ownership or profits interests (collectively, "*Equity Interests*"), or any declaration, set aside or payment of any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of their respective Equity Interests;

(v)     any redemption, purchase or acquisition or any offer to acquire any of the respective Equity Interests;

(vi)     any sale (including, but not limited to, any sale leaseback transaction), lease, mortgage, pledge, grant or incurrence of any encumbrance on, or otherwise transfer of, any properties or asset, including any Equity Interests, other than sales or disposals of properties or assets having an aggregate fair market value with all other sales of the properties and assets not in excess of $250,000 or in the ordinary course of business;

(vii)     any purchase, lease or other acquisition (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) of any assets or properties, other than assets or properties having an aggregate fair market value with all other sales of the properties and assets not in excess of $250,000 in the ordinary course of business;

(viii)     any (A) purchase or acquisition of any indebtedness, debt securities or equity securities of any Person, or (B) loan or advance to, or investments in, any Person, other than in the ordinary course of business;

(ix)     any merger with or into, or consolidation or amalgamation with, any other Person, (in one transaction or a series of transactions and regardless of the survivor or merging party);

(x)     any material change in its respective financial or tax accounting methods, except insofar as may be required by GAAP or applicable Law;

(xi)     any entry into any commitment or agreement with respect to debtor-in-possession financing, cash collateral and/or exit financing, other than the DIP Loan Debt Documents or any of the other credit facilities contemplated by this Agreement and, in each case, other than in connection with the DIP Loan being, or after the DIP Loan has been, repaid in cash in full in accordance with the terms of the DIP Loan Debt Documents and in accordance with the terms of the Final DIP Order (as defined in the Plan);

(xii)     any (A) hiring, after the date hereof, of any officer or employee whose aggregate annual compensation will exceed $100,000, (B) entry into, adoption or amendment of any collective bargaining agreements, works council or similar agreement with any labor union or

42

labor organization representing employees; or (C) entry into, adoption or amendment of any management compensation or incentive plans, or increase in any manner the compensation or benefits (including severance) of any director, officer or management level employee;

(xiii)   any incurrence or assumption or permitting or suffering to exist any Indebtedness, except (A) Indebtedness and guarantees of Indebtedness outstanding on the date hereof, (B) trade payables and operating liabilities arising and incurred in the ordinary course of business consistent with past practices, and (C) as permitted by the DIP Loan Debt Documents;

(xiv)   the creation of any liens or security interests in or on any of their respective assets or properties (tangible or intangible), except (A) liens or security interests in existence on the date hereof, and (B) Liens or security interests that secure obligations under the DIP Loan or as otherwise permitted by the DIP Loan Debt Documents;

(xv)   any settlement or agreement to settle or compromise any litigation or other action pending or threatened that would require a party to pay an amount in excess of $250,000 or that would reasonably be expected to result in material restrictions upon the business or operations; or

(xvi)   any entry into any new agreement, contract or other arrangement; amend, supplement or otherwise modify any existing agreement, contract or other arrangement; effect any transaction; or commit to enter into or otherwise effect any of the foregoing, in each case, with respect to any of the actions contemplated by the foregoing clauses (i) through (xv).

(c)   Except as otherwise provided in this Agreement, nothing in this Agreement shall give the Plan Sponsors, directly or indirectly, any right to control or direct the operations of the Company and its Subsidiaries prior to the Closing Date.   Prior to the Closing Date, the Company and its Subsidiaries shall exercise, subject to the terms and conditions of this Agreement, complete control and supervision of the business of the Company and its Subsidiaries.

Section 6.4       Access to Information; Confidentiality.

(a)   Subject to applicable Law and appropriate assurance of confidential treatment (including Section 6.4(b) and any confidentiality agreements heretofore executed among any of the Parties), upon reasonable notice prior to the Closing Date, the Company shall (and shall cause its Subsidiaries to) afford the Plan Sponsors and their Representatives upon request reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's and its Subsidiaries' business or operations, to the Company's and its Subsidiaries' employees, properties, books, Contracts and records and, prior to the Closing Date, the Company shall (and shall cause its Subsidiaries to) furnish promptly to such parties all reasonable information concerning the Company's and its Subsidiaries' business, properties and personnel as may reasonably be requested by any such party; *provided*, *however*, that the foregoing shall not require the Company (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company or any of its Subsidiaries to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its reasonable best efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (b) to disclose any legally privileged information of the Company or any of its Subsidiaries, or (c) to violate any applicable Laws; *provided*, *further*, *however*, that the Company shall deliver to the Plan Sponsors a schedule setting forth a description of any requested information not provided to the Plan Sponsors pursuant to clauses (a) through (c) above (in each case, to the extent the provision of such description would not itself conflict with the matters contemplated by clauses (a) through (c)).   All requests for information and

43

112016848 v9

access made in accordance with this Section 6.4 shall be directed to the Company's Chief Restructuring Officer, Lazard Middle Market LLC or Kirkland &Ellis LLP or such Person as may be designated by the Company's Chief Restructuring Officer, Lazard Middle Market LLC or Kirkland &Ellis LLP.

(b)      Each Plan Sponsor acknowledges that, by virtue of its right of access hereunder, such Plan Sponsor may become privy to confidential and other information of the Debtors and any such confidential information shall be held confidential by, and not disclosed or used by, such Plan Sponsor and its Representatives in accordance with, and solely to the extent constituting confidential information (or a similar term) under, such Plan Sponsor's existing confidentiality agreements with any of the Debtors (including the DIP Loan Debt Documents and any applicable Prepetition Debt Documents).

Section 6.5      Transfers and Acquisitions of Claims.

(a)      No Plan Sponsor may Transfer any of its Votable Claims or Additional Claims other than (i) to another Plan Sponsor, (ii) to any party that signs a Joinder Agreement, (iii) to any Affiliated Fund or (iv) to an Ultimate Purchaser (in each case, the "***Transferee Plan Sponsor***"); *provided*, *however*, that the Plan Sponsor (the "***Transferring Plan Sponsor***") Transferring such Claims must also Transfer a *pro rata* portion of its Emergence Equity Purchase to such Transferee Plan Sponsor and such Transferee Plan Sponsor shall agree in writing to be responsible for such Transferred portion of the Emergence Equity Purchase; *provided*, *further*, *however*, that no such Transfer shall relieve such Transferring Plan Sponsor of its obligations under this Agreement, in the event that the Transferee Plan Sponsor fails to purchase its applicable Purchase Percentage of the Emergence Equity Units.  Any purported Transfer of Votable Claims or Additional Claims not in accordance with this Section 6.5 will be void *ab initio*.

(b)      In the event a Plan Sponsor set forth on Schedule 1 as of the date hereof Transfers any of its Votable Claims on or prior to July 22, 2016, to a Plan Sponsor set forth on Schedule 2 as of the date hereof (or any Affiliate or investor or limited partner with respect to such Plan Sponsor or Affiliate) and such Transferring Plan Sponsor was not set forth on Schedule 2 as of the date hereof then each of the Plan Sponsors agrees to reallocate their Purchase Percentages and resulting Emergence Equity Units set forth on Schedule 2 such that their Purchase Percentages and resulting Emergence Equity Units are calculated pro rata (calculated based on the percentage resulting from each Plan Sponsor's (collectively with its Affiliates and any investors or limited partners with respect to such Plan Sponsor or Affiliates) respective Votable Claims divided by the total amount of all Votable Claims of all Plan Sponsors set forth on Schedule 2).  Any such reallocation shall not require any consent or approval of any Party.

(c)      This Agreement shall in no way be construed to preclude any Plan Sponsor from acquiring additional Claims under the Prepetition Debt Documents, including any Prepetition Macquarie Facility Claims, Prepetition Convertible Senior Note Claims, Votable Claims, Prepetition Senior Unsecured Note Claims, or Prepetition BBVA Facility Claims; *provided*, *however*, that any such additional Claims shall automatically be deemed to be subject to all of the applicable terms of this Agreement, including Section 6.1.  Each Plan Sponsor agrees to provide to counsel for the Debtors notice of the acquisition of any such additional claims within two (2) Business Days of the consummation of the transaction acquiring such additional Claims, in addition to any notices or other documents required under each of the Prepetition Debt Documents and the DIP Loan Debt Documents.

Section 6.6      New Board of Directors.  On the Closing Date, the composition of the board of directors of Reorganized Holdings shall be as described in the Plan.

44

112016848 v9

Section 6.7    Reorganized Holdings Corporate Documents.    The Plan will provide that, on the Closing Date, Reorganized Holdings and each holder of New Common Equity shall become a party to the New Limited Liability Company Agreement, which New Limited Liability Company Agreement shall be the form attached hereto as Exhibit D and shall be executed by each of the Plan Sponsors.  No Plan Sponsor shall be required to execute the signature page to any applicable Reorganized Holdings Corporate Document or similar agreement and any Plan Sponsor who does not execute such applicable Reorganized Holdings Corporate Document or similar agreement shall be automatically deemed to have accepted the terms of such applicable Reorganized Holdings Corporate Document or similar agreement (in their capacity as parties to such applicable Reorganized Holdings Corporate Document or similar agreement, as applicable) and to be parties thereto without further action.  Any such applicable Reorganized Holdings Corporate Document or similar agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding and enforceable in accordance with its terms, and each Plan Sponsor shall be bound thereby.  The Company shall file the form of New Limited Liability Company Agreement with the Bankruptcy Court as part of the Plan.

Section 6.8    Form D and Blue Sky.    The Company shall timely file a Form D with the SEC with respect to the Emergence Equity Units issued hereunder to the extent required under Regulation D of the Securities Act and shall provide, upon request, a copy thereof to each Plan Sponsor.  The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Emergence Equity Units issued hereunder for, sale to the Plan Sponsors at the Closing Date pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable jurisdictions in Canada, and shall provide evidence of any such action so taken to the Plan Sponsors on or prior to the Closing Date.  The Company shall timely make all filings and reports relating to the offer and sale of the Emergence Equity Units issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing Date.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 6.8.

Section 6.9    No Integration; No General Solicitation.    Neither the Company nor any of its "affiliates" (as defined in Rule 501(b) of Regulation D promulgated under the Securities Act) will, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act), that is or will be integrated with the sale of the Emergence Equity Units or the Additional Capital Commitment Units in a manner that would require registration of the New Common Equity to be issued by the Company on the Closing Date under the Securities Act.  None of the Company or any of its affiliates (as defined in Rule 501(b) of Regulation D promulgated under the Securities Act) or any other Person acting on its or their behalf will solicit offers for, or offer or sell, any Emergence Equity Units or Additional Capital Commitment Units by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D promulgated under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

Section 6.10    DTC Eligibility.    The Company shall use reasonable best efforts to promptly make, when applicable from time to time after the Closing, all Unlegended Units eligible for deposit with The Depository Trust Company.  "*Unlegended Units*" means any units of New Common Equity acquired by the Plan Sponsors (including any Related Purchaser or Ultimate Purchaser) pursuant to this Agreement and the Plan, including all units issued to the Plan Sponsors pursuant to this Agreement, that do not require, or are no longer subject to, the Legend.

45

Section 6.11    Use of Proceeds. The Debtors will apply the proceeds from the exercise of the Subscription Rights and the sale of the Emergence Equity Units for the purposes identified in the Disclosure Statement and the Plan.

Section 6.12    Unit Legend. Each certificate evidencing Emergence Equity Units that are issued hereunder, and each certificate issued in exchange for or upon the Transfer of any such units, shall be stamped or otherwise imprinted with a legend (the "*Legend*") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such Emergence Equity Units are uncertificated, such units shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by the Company or agent and the term "Legend" shall include such restrictive notation. The Company shall remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such Emergence Equity Units (or the Company's stock records, in the case of uncertified units) at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such units may be sold under Rule 144. The Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply.

Section 6.13    Alternative Transactions; Fiduciary Duties.

(a)    From the date of this Agreement until the earlier of the Closing and the termination of this Agreement in accordance with its terms (i) each Debtor and each of their respective directors, officers, and members, each in its capacity as a director, officer, or member of such Debtor, as applicable, shall immediately cease and terminate any ongoing solicitations, discussions and negotiations with any Person (including any Plan Sponsor) with respect to any Alternative Transaction and (ii) no Debtor nor any of their respective directors, officers, or members, each in its capacity as a director, officer, or member of such Debtor, as applicable, shall, directly or indirectly, initiate or solicit any inquiries or the making of any proposal or offer relating to an Alternative Transaction, engage or participate in any discussions or negotiations, or provide any non-public information to any Person (including any Plan Sponsor), with respect to an Alternative Transaction. Notwithstanding the foregoing sentence, from the date of this Agreement until the earlier of the Closing and the termination of this Agreement in accordance with its terms, (A) the Company and its Subsidiaries shall comply with, and shall be permitted to comply with, the terms of the Exclusivity Order and nothing in this Section 6.13 shall restrict or prohibit such compliance and (B) if (1) the Company or any of its Subsidiaries receives a *bona fide*, written unsolicited proposal or offer for an Alternative Transaction (an "*Alternative Transaction Proposal*") from any Person (including any Plan Sponsor) that did not result from a breach of the obligations of this Section 6.13(a) and (2) the Board of Directors of the Company (the "*Company Board*") has determined in good faith, after consultation with its outside counsel and independent financial advisor, that such Alternative Transaction Proposal constitutes, or is reasonably likely to lead to or result in, a Superior Proposal, the Company and its Subsidiaries may, in response to such Alternative Transaction Proposal: (x) furnish non-public information in response to a request therefor by such Person if such Person has executed and delivered to the Company a confidentiality agreement on customary terms if the Company also promptly (and in any event within twenty-four (24) hours after the time such information is provided to such Person) makes such information available to the Plan Sponsors, to the

46

extent not previously provided to the Plan Sponsors; and (y) engage or participate, or instruct and direct their respective representatives to engage or participate, in discussions and negotiations with such Person regarding such Alternative Transaction Proposal.

(b)     The Debtors shall notify the Plan Sponsors promptly (and, in any event, within twenty-four (24) hours) if any Alternative Transaction is received by and in connection therewith any non-public information is requested from, or any discussions or negotiations are sought to be initiated or continued with, the Company or its Subsidiaries or their respective representatives, which notice shall indicate the identity of the parties and the material terms and conditions of such Alternative Transaction Proposal (including, if applicable, copies of any written inquiries, requests, proposals or offers, including any proposed agreements) and, thereafter, the Company shall keep the Plan Sponsors reasonably informed of the status and material terms of such Alternative Transaction Proposal (including any material amendments thereto) and the status of any such discussions or negotiations, including any change in the Company's or its Subsidiaries' intentions as previously notified.  None of the Debtors or any of their Subsidiaries shall, after the date of this Agreement, enter into any confidentiality or similar agreement that would prohibit it from providing such information to the Plan Sponsors.

(c)     Subject to the Debtors' compliance with this Section 6.13, prior to the earlier of the occurrence of the Closing and the termination of this Agreement in accordance with its terms, the Company Board may approve an Alternative Transaction Proposal that was not the result of a breach of this Section 6.13 that the Company Board has determined in good faith, after consultation with its outside legal counsel and its independent financial advisor, constitutes a Superior Proposal, if and only if, (i) prior to taking such action the Company Board determines in good faith, after consultation with its outside legal counsel, that failure to take such action would be inconsistent with the directors' fiduciary or other duties under applicable Law and (ii) the Company Board notifies the Plan Sponsors in writing at least forty-eight (48) hours in advance and prior to taking such action that it intends to take such action or that the Company intends to terminate this Agreement pursuant to Section 9.1(f), which notice shall specify the identity of the Person making such Alternative Transaction Proposal and all of the material terms and conditions of such Alternative Transaction Proposal and attach the most current version of any proposed transaction agreement (and any related agreements) providing for such Alternative Transaction Proposal); *provided*, *however*, that such forty-eight (48) hours' notice shall be given again in the event of any revision to the financial terms or any other material terms of such Alternative Transaction Proposal and (iii) on the date of such termination pursuant to Section 9.1(f), the Debtors shall pay the Termination Fee and repay the DIP Loan in full in cash.

(d)     With respect to any Alternative Transaction that is premised, whether directly or indirectly, on one or more asset sales under Section 363 of the Bankruptcy Code or pursuant to a chapter 11 plan, each Plan Sponsor and/or the respective agents under the Prepetition Senior Secured Notes Indenture (including the Collateral Agent under and as defined in the Prepetition Senior Secured Notes Indenture) shall (in the manner provided for in the Prepetition Senior Secured Notes Indenture and the Prepetition Senior Secured Notes) have the right to "credit bid" (whether pursuant to Section 363(k) of the Bankruptcy Code or otherwise) all (or such lesser portion as they may determine under the Prepetition Senior Secured Notes Indenture and the Prepetition Senior Secured Note) of the obligations under the Prepetition Senior Secured Notes Indenture (including all principal, premium, interest (at the default rate to the extent applicable under the Prepetition Senior Secured Notes Indenture and Prepetition Senior Secured Notes and irrespective of whether permissible under the Bankruptcy Code), penalties, fees, charges, expenses, indemnifications, reimbursements, damages, and all other amounts and liabilities payable under the Prepetition Senior Secured Notes Indenture and the Prepetition Senior Secured Notes), the principal amount of which shall be no less than $205,000,000 as of the Petition Date, notwithstanding any provision of the Bankruptcy Code or any applicable Law (including Section 363(k) of the Bankruptcy Code to the extent permitted by the terms of the DIP Loan Debt Documents and in accordance with the

47

terms of the Final DIP Order (as defined in the Plan)) to the contrary, subject only to any applicable term or condition of the Prepetition Senior Secured Notes Indenture, to the extent that such term or condition is found to be enforceable.  The UPA Approval Order shall provide for the foregoing.

Section 6.14    Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims.  The Debtors shall deliver an estimate of the amount of Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims (each as defined in the Plan and which shall include any liabilities under or with respect to any Company Plan or any Foreign Company Plan), in each case, excluding any DIP Claims (as defined in the Plan) or any fees, expenses or indemnities due or payable pursuant to this Agreement or the DIP Loan Debt Documents (other than any Expense Reimbursement) on or before ten (10) Business Days before the anticipated Closing, which estimate will be prepared in good faith and require the consent of the Requisite Plan Sponsors (such estimate, the "*Estimate of Allowed Specified Claims*").

ARTICLE VII

**CONDITIONS TO THE CLOSING**

Section 7.1    Conditions to the Obligation of the Plan Sponsors.  The obligations of each Plan Sponsor to consummate the Closing shall be subject to (unless waived in accordance with Section 7.2) the satisfaction of the following conditions:

(a)    UPA Approval Order.  The Bankruptcy Court shall have entered the UPA Approval Order, and such Order shall be a Final Order.

(b)    Recognition of UPA Approval Order. The Canadian Court shall have granted Recognition Orders with respect to the UPA Approval Order, and such Order shall be a Final Order.

(c)    Plan Solicitation Order.  The Bankruptcy Court shall have entered the Plan Solicitation Order, and such Order shall be in full force and effect.

(d)    Recognition of Plan Solicitation Order.  The Canadian Court shall have granted a Recognition Order with respect to the Plan Solicitation Order, and such Order shall be in full force and effect.

(e)    UPA Consummation Approval Order.  The Bankruptcy Court shall have entered the UPA Consummation Approval Order (which may be the Confirmation Order), and such Order shall be a Final Order.

(f)    Recognition of UPA Consummation Approval Order.  The Canadian Court shall have granted a Recognition Order with respect to the UPA Consummation Approval Order, and such Order shall be a Final Order.

(g)    Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order, and such Order shall be a Final Order.

(h)    Recognition of Confirmation Order.  The Canadian Court shall have granted a Recognition Order with respect to the Confirmation Order, and such Order shall be a Final Order.

48

112016848 v9

(i)    Plan.  The Company and all of the other Debtors shall have complied, in all respects, with the terms of the Plan that are to be performed by the Company and the other Debtors on or prior to the Effective Date.

(j)    Additional Capital Commitment.  The Additional Capital Commitment shall have been conducted, in all material respects, in accordance with the terms of this Agreement, and the Expiration Time shall have occurred.

(k)    Conditions to the Plan.  The conditions to the occurrence of the Effective Date of the Plan set forth in the Plan and the Confirmation Order shall have been satisfied or, with the prior written consent of the Requisite Plan Sponsors, waived in accordance with the terms thereof and the Plan and the Confirmation Order and the Effective Date of the Plan shall have occurred.

(l)    Reorganized Holdings Corporate Documents.  The Reorganized Holdings Corporate Documents shall duly have become in full force and effect in accordance with the Plan.

(m)    Expense Reimbursement.  The Debtors shall have paid all Expense Reimbursement accrued through the Closing Date pursuant to Section 3.1.

(n)    DIP Loan Event of Default.  No DIP Loan Event of Default shall exist and be continuing.

(o)    Consents.  All governmental and third-party notifications, filings, consents, waivers and approvals set forth on Schedule 4 and required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received.

(p)    No Legal Impediment to Issuance.  No Law or Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement nor shall any Governmental Entity have alleged or asserted that the transactions contemplated by this Agreement are subject to any waiting periods pursuant to or under, or require any filings with or review by any Antitrust Authorities pursuant to or under, any Antitrust Laws (nor shall any Order have been enacted, adopted or issued by any Governmental Entity confirming such an allegation or assertion or otherwise imposing any such waiting periods or review).

(q)    Representations and Warranties.

(i)    The representations and warranties of the Debtors contained in Sections 4.2, 4.3, 4.4, 4.5, 4.6(b), and 4.28 shall be true and correct in all respects at and as of the date hereof and as of the Closing Date after giving effect to the Plan with the same effect as if made at and as of such date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(ii)    The other representations and warranties of the Debtors contained in ARTICLE IV shall be true and correct in all material respects (disregarding all materiality or Material Adverse Effect qualifiers) at and as of the date hereof and as of the Closing Date with the same effect as if made at and as of such date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

49

(r)    Covenants.  The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(s)    Material Adverse Effect.   Since September 30, 2015, there shall not have occurred, and there shall not exist, a Material Adverse Effect.

(t)    Officer's Certificate.  The Plan Sponsors shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of the Company confirming that the conditions set forth in Sections 7.1(q), (r) and (s) have been satisfied.

(u)    Amount of Claims.  The Debtors shall have delivered the Estimate of Allowed Specified Claims on or before ten (10) Business Days before the anticipated Closing and the amount of Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims (each as defined in the Plan and which shall include any liabilities under or with respect to any Company Plan or any Foreign Company Plan) reasonably estimated to be Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Tax Claims, and Allowed Other Secured Claims (each as defined in the Plan and which shall include any liabilities under or with respect to any Company Plan or any Foreign Company Plan), but excluding any DIP Claims or any fees, expenses or indemnities due or payable pursuant to this Agreement or the DIP Loan Debt Documents (other than any Expense Reimbursement), by the Company and as set forth in the Estimate of Allowed Specified Claims shall be less than $65,500,000.00, in the aggregate.

Section 7.2    Waiver of Conditions to Obligation of Plan Sponsors.  All or any of the conditions set forth in Section 7.1 may only be waived in whole or in part with respect to all Plan Sponsors by a written instrument executed by the Requisite Plan Sponsors in their sole discretion and if so waived, all Plan Sponsors shall be bound by such waiver.

Section 7.3    Conditions to the Obligation of the Company.  The obligation of the Company to consummate the Closing is subject to (unless waived by the Company) the satisfaction of each of the following conditions:

(a)    UPA Approval Order.  The Bankruptcy Court shall have entered the UPA Approval Order.

(b)    Recognition of UPA Approval Order. The Canadian Court shall have granted a Recognition Order with respect to the UPA Approval Order, and such Order shall be a Final Order.

(c)    Plan Solicitation Order.  The Bankruptcy Court shall have entered the Plan Solicitation Order, and such Order shall be in full force and effect.

(d)    Recognition of Plan Solicitation Order.  The Canadian Court shall have granted a Recognition Order with respect to the Plan Solicitation Order, and such Order shall be in full force and effect.

(e)    UPA Consummation Approval Order.  The Bankruptcy Court shall have entered the UPA Consummation Approval Order (which may be the Confirmation Order).

(f)    Recognition of UPA Consummation Approval Order.  The Canadian Court shall have granted a Recognition Order with respect to the UPA Consummation Approval Order, and such Order shall be in full force and effect.

50

(g)      Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order.

(h)      Recognition of Confirmation Order.  The Canadian Court shall have granted a Recognition Order with respect to the Confirmation Order, and such Order shall be in full force and effect.

(i)      Conditions to the Plan.  The conditions to the occurrence of the Effective Date of the Plan set forth in the Plan and the Confirmation Order shall have been satisfied or, with the prior written consent of the Requisite Plan Sponsors, waived in accordance with the terms thereof and the Plan and the Confirmation Order and the Effective Date of the Plan shall have occurred.

(j)      No Legal Impediment to Issuance.  No Law or Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement nor shall any Governmental Entity have alleged or asserted that the transactions contemplated by this Agreement are subject to any waiting periods pursuant to or under, or require any filings with or review by any Antitrust Authorities pursuant to or under, any Antitrust Laws (nor shall any Order have been enacted, adopted or issued by any Governmental Entity confirming such an allegation or assertion or otherwise imposing any such waiting periods or review).

(k)      Representations and Warranties.  The representations and warranties of each Plan Sponsor contained in this Agreement shall be true and correct in all material respects at and as of the date hereof and as of the Closing Date with the same effect as if made at and as of such date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(l)      Covenants.  The applicable Plan Sponsor shall have performed and complied, in all material respects, with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement.

(m)      Subscription Escrow Account.  The Subscription Escrow Account shall be funded in accordance with this Agreement in cash in an amount equal to the full Purchase Price for all Emergence Equity Units.

Section 7.4      Frustration of Closing Conditions.  Neither any of the Plan Sponsors nor the Company may rely on the failure of any condition set forth in this ARTICLE VII to be satisfied to prevent the Closing from occurring, if such failure was caused by such Party's failure to comply with the terms of this Agreement.

Section 7.5      Waiver of Conditions.  Following the occurrence of the Closing, any condition set forth in this ARTICLE VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing, in each case, absent fraud.

ARTICLE VIII

**INDEMNIFICATION AND CONTRIBUTION**

Section 8.1      Indemnification Obligations.  Following the entry of the UPA Approval Order and the Recognition Order applicable thereto, the Company and the other Debtors (the "***Indemnifying Parties***" and each an "***Indemnifying Party***") shall, jointly and severally (subject to

51

112016848 v9

Section 10.1), indemnify and hold harmless each Plan Sponsor, its Affiliates, shareholders, members, partners and other equity holders, general partners, managers and its and their respective Representatives, agents and controlling persons (each, an "*Indemnified Person*") from and against any and all losses, claims, damages, Liabilities and costs and expenses (other than Taxes of the Plan Sponsors except to the extent otherwise provided for in this Agreement) (collectively, "*Losses*") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding relating to this Agreement, the Plan, the Chapter 11 Proceedings, the Recognition Proceedings, and the transactions contemplated hereby and thereby, including, the Emergence Equity Purchase, the Additional Capital Commitment or the use of the proceeds of the sale of the Emergence Equity Units or the Additional Capital Commitment Units, or any breach by the Debtors of this Agreement, or the negotiation and documentation of the Plan regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable (subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; *provided*, *however*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Plan Sponsor and its Related Parties, caused by a Plan Sponsor Default by such Plan Sponsor (as found by a final, non-appealable judgment of a court of competent jurisdiction), or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Section 8.2    Indemnification Procedure.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "*Indemnified Claim*"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; *provided*, *however*, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this ARTICLE VIII.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel acceptable to such Indemnified Person; *provided*, *however*, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate

52

counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required) and that all such expenses shall be reimbursed as they occur), (ii) the Indemnifying Party shall not have employed counsel acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Indemnified Claims, (iii) the Indemnifying Party shall have failed or is failing to defend such claim, and is provided written notice of such failure by the Indemnified Person and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.  Notwithstanding anything herein to the contrary, the Company and its Subsidiaries shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company and its Subsidiaries.

Section 8.3    Settlement of Indemnified Claims.  The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected without its written consent (which consent shall not be unreasonably withheld).  If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, the provisions of this ARTICLE VIII.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4    Contribution.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons with respect to any Plan Sponsor, on the other hand, shall be deemed to be in the same proportion as the total value received or proposed to be received by the Company pursuant to the issuance and sale of the Emergence Equity Units contemplated by this Agreement and the Plan bears to such Plan Sponsor's Purchase Percentage of the aggregate Purchase Price.  The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim except to the extent (a) as to a Defaulting Plan Sponsor and its Related Parties, caused by a Plan Sponsor Default by such Plan Sponsor (as found by a final, non-appealable judgment of a court of competent jurisdiction), or (b) found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Section 8.5    Treatment of Indemnification Payments.  All amounts paid by the Indemnifying Party to an Indemnified Person under this ARTICLE VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the Purchase Price for all Tax purposes.  The provisions of

53

this ARTICLE VIII are an integral part of the transactions contemplated by this Agreement and without these provisions the Plan Sponsors would not have entered into this Agreement, and the obligations of the Company under this ARTICLE VIII shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and the Company may comply with the requirements of this ARTICLE VIII without further Order of the Bankruptcy Court.

Section 8.6    No Survival.  All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

ARTICLE IX

**TERMINATION**

Section 9.1    Termination Rights.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)    by mutual written consent of the Company and the Requisite Plan Sponsors;

(b)    by the Company by written notice to counsel to the Plan Sponsors or by the Requisite Plan Sponsors by written notice to the Company if any Law or Order shall have been enacted, adopted or issued by any Governmental Entity and remains in effect that prohibits the implementation of the Plan or the transactions contemplated by this Agreement or the other Transaction Agreements;

(c)    by the Requisite Plan Sponsors upon written notice to the Company if:

(i)    the Bankruptcy Court has not entered the Plan Solicitation Order on or prior to 5:00 p.m., New York City time on July 11, 2016, in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company;

(ii)    the Canadian Court has not granted a Recognition Order with respect to the Plan Solicitation Order on or prior to 5:00 p.m., New York City time on July 12, 2016

(iii)    the Bankruptcy Court has not entered the UPA Approval Order on or prior to 5:00 p.m., New York City time on August 31, 2016, in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company;

(iv)    the Canadian Court has not granted a Recognition Order with respect to the UPA Approval Order on or prior to 5:00 p.m., New York City time on September 2, 2016;

(v)    the Bankruptcy Court has not entered the Confirmation Order and UPA Consummation Approval Order on or prior to 5:00 p.m., New York City time on August 31, 2016, in each case, in form and substance mutually satisfactory to the Requisite Plan Sponsors and the Company;

(vi)    the Canadian Court has not granted the Recognition Order with respect to the Confirmation Order and granted the UPA Recognition Order on or prior to 5:00 p.m., New York City time on September 2, 2016;

112016848 v9

(vii)     if the Effective Date has not occurred on or prior to 5:00 p.m., New York City time on September 19, 2016 in accordance with the terms of this Agreement and the Plan;

(viii)     any of the UPA Approval Order, UPA Consummation Approval Order, Plan Solicitation Order, Confirmation Order, any corresponding Recognition Order or any Order of the Bankruptcy Court or the Canadian Court approving the DIP Loan is reversed, stayed, dismissed, vacated, reconsidered or is modified or amended after entry without the prior written consent of the Requisite Plan Sponsors and the Company;

(ix)     any of this Agreement, DIP Loan Debt Documents, Disclosure Statement, Plan or any documents related to the Plan, including notices, exhibits or appendices, or any of the other Plan-Related Documents is amended or modified without the prior written consent of the Requisite Plan Sponsors and the Company; or

(x)     either (A) the Requisite Plan Sponsors determine in good faith and in consultation with the Debtors, that the amount of Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims (each as defined in the Plan and which shall include any liabilities under or with respect to any Company Plan or any Foreign Company Plan), but excluding any DIP Claims or any fees, expenses or indemnities due or payable pursuant to this Agreement or the DIP Loan Debt Documents (other than any Expense Reimbursement), exceed $65,500,000.00, in the aggregate, or (B) the amount of Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims (each as defined in the Plan and which shall include any liabilities under or with respect to any Company Plan or any Foreign Company Plan), but excluding any DIP Claims or any fees, expenses or indemnities due or payable pursuant to this Agreement or the DIP Loan Debt Documents (other than any Expense Reimbursement), set forth in the Estimate of Allowed Specified Claims exceed $65,500,000.00, in the aggregate;

(d)     by the Requisite Plan Sponsors upon written notice to the Company if:

(i)     the Company or any of the other Debtors file any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the Liens securing the obligations referred to in the Prepetition Senior Secured Notes Indenture or the documents related thereto or any other cause of action against and/or seeking to restrict the rights of holders of Prepetition Senior Secured Notes in their capacity as such, or the prepetition Liens securing the Prepetition Senior Secured Notes (or if the Company or any of the Debtors support any such motion, application or adversary proceeding commenced by any third party or consents to the standing of any such third party), in all cases, other than as expressly permitted under the DIP Loan Debt Documents;

(ii)     the Company or the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or the other Debtors in this Agreement, or any such representation and warranty shall have become inaccurate after the date hereof, and, in each case, such breach or inaccuracy would, individually or in the aggregate with other such breaches or inaccuracies, if continuing on the Closing Date, result in a failure of any condition set forth in Sections 7.1(q), 7.1(r) or 7.1(s) being satisfied and such breach or inaccuracy is not cured by the Company or the other Debtors by the earlier of (A) the tenth (10th) Business Day after the giving of notice thereof to the Company by the Requisite Plan Sponsors and (B) the third (3rd) Business Day prior to the Outside Date;

55

(iii)    the Company or the Debtors shall have filed or entered into any Transaction Agreement, including any Plan-Related Document, without the required approval of the Requisite Plan Sponsors pursuant hereto;

(iv)    (A) a DIP Loan Event of Default has occurred and is continuing unwaived, (B) an acceleration of the obligations or termination of the DIP Loan, including the commitments thereunder, has occurred, (C) the termination or revocation of any interim or final debtor in possession financing Order and/or cash collateral Order entered in the Chapter 11 Proceedings with respect to the DIP Loan has occurred or (D) a modification or amendment of any interim or final debtor in possession financing Order and/or cash collateral Order entered in the Chapter 11 Proceedings or the Recognition Proceedings with respect to the DIP Loan that is not satisfactory to the Requisite Plan Sponsors, in their sole and absolute discretion, in each case of (A), (B), (C) and (D), other than in connection with the DIP Loan being, or after the DIP Loan has been, repaid in cash in full in accordance with its terms;

(v)    (A) any of the Chapter 11 Proceedings shall have been dismissed or converted to a chapter 7 case; (B) a chapter 11 trustee with plenary powers or an examiner with enlarged powers relating to the operation of the businesses of the Debtors beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Proceedings or the Debtors shall file a motion or other request for such relief or (C) the Recognition Proceedings shall have been dismissed or the stay granted therein shall be lifted or the proceedings shall be continued as proceedings under the BIA or other proceedings under the CCAA;

(vi)    there shall have occurred a Material Adverse Effect; or

(vii)    (A) the Bankruptcy Court approves or authorizes an Alternative Transaction at the request of any party in interest, (B) the Debtors or any of their Subsidiaries approve or enter into any Contract or written agreement in principle providing for the consummation of any Alternative Transaction (such Contract or written agreement in principle, an "***Alternative Transaction Agreement***") or (C) any Debtor or any of its Subsidiaries breaches Section 6.13.

(e)    automatically without further action or notice by any Party if the Closing Date has not occurred by 5:00 p.m., New York City time on September 19, 2016, unless prior thereto the Effective Date occurs (the "***Outside Date***"); *provided*, *however*, that the Outside Date may be waived or extended pursuant to Section 10.10 and Section 10.12; or

(f)    by the Company upon written notice to counsel to the Plan Sponsors if:

(i)    subject to the right of the Plan Sponsors to arrange an Plan Sponsor Replacement in accordance with Section 2.3(a), if any Plan Sponsor Default shall have occurred; or

(ii)    any Plan Sponsor shall have breached any representation, warranty, covenant or other agreement made by such Plan Sponsor in this Agreement (other than a Plan Sponsor Default) or any such representation and warranty shall have become inaccurate after the date hereof, and, in each case, such breach or inaccuracy would, individually or in the aggregate with other such breaches or inaccuracies, if continuing on the Closing Date, result in a failure of a condition set forth in Section 7.3(k) or Section 7.3(l) being satisfied and such breach or inaccuracy is not cured by such Plan Sponsor by the earlier of (A) the tenth (10th) Business Day

56

after the giving of notice thereof to such Plan Sponsor by the Company and (B) the third (3rd) Business Day prior to the Outside Date;

(iii)    any Debtor or any of their Subsidiaries enters into any Alternative Transaction Agreement or the Bankruptcy Court approves or authorizes an Alternative Transaction at the request of the Debtors or any of its Subsidiaries or the Company Board approves an Alternative Transaction Proposal in accordance with Section 6.13(c); *provided*, *however*, that the Debtors may only terminate this Agreement pursuant to this Section 9.1(f)(iii) if the Debtors and the Subsidiaries have not breached any of their obligations under Section 6.13 and, concurrently with such termination, the Company pays the Termination Fee and repays the DIP Loan in full in cash to the Plan Sponsors pursuant to Section 9.2(b)(ii);

*provided*, *however*, that neither the Company nor the Requisite Plan Sponsors shall have the right to terminate this Agreement pursuant to Sections 9.1(c), 9.1(d) (other than Sections 9.1(d)(v), 9.1(d)(vi) and 9.1(d)(vii)) or 9.1(f)(i)) if the Company or any Plan Sponsor, respectively, is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in, or has been a cause of, the failure of any condition set forth in Section 7.1 or Section 7.3, respectively, being satisfied.

Section 9.2    Effect of Termination.

(a)    Upon termination of this Agreement pursuant to Section 9.1 (such date of termination, the "**Termination Date**"), this Agreement shall forthwith become void *ab initio* and there shall be no further obligations or liabilities on the part of the Debtors or the Plan Sponsors; *provided*, *however*, that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to ARTICLE III (other than in the case of termination pursuant to Section 9.1(f)(i), in which case such obligations to pay the Expense Reimbursement will not survive), to satisfy their indemnification obligations pursuant to ARTICLE VIII and to pay the Termination Fee pursuant to this ARTICLE IX shall survive the termination of this Agreement indefinitely and shall remain in full force and effect to the extent applicable by the terms of this Agreement; (ii) ARTICLE X shall survive the termination of this Agreement in accordance with its terms and (iii) subject to Section 10.13, nothing in this Section 9.2 shall relieve any Party from liability for its willful or intentional breach of this Agreement.  For purposes of this Agreement, "**willful or intentional breach**" shall mean a breach of this Agreement that is a consequence of an act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)    The Debtors shall make payments to the Plan Sponsors or their designees based upon their respective Purchase Percentages, by wire transfer of immediately available funds to such accounts as the Requisite Plan Sponsors may designate, if this Agreement is terminated as follows:

(i)    if this Agreement is terminated pursuant to Section 9.1(b), Section 9.1(c) or Section 9.1(d) prior to the Closing Date, then the Debtors shall pay the sum of $7,500,000 and the amount of any Expense Reimbursement then outstanding (collectively, the "**Termination Fee**") on or prior to the second (2nd) Business Day following such termination in cash;

(ii)    if this Agreement shall be terminated pursuant to Section 9.1(f)(iii), then the Debtors shall pay the Termination Fee and shall repay the DIP Loan in full in cash simultaneously with such termination;

(iii)    if this Agreement shall be terminated prior to the Closing Date pursuant to Section 9.1(e), and, within twelve (12) months after the date of such termination, any of the Debtors executes a definitive agreement with respect to, or consummates, an Alternative

Transaction, then the Company shall pay the Termination Fee in cash on or prior to the second (2nd) Business Day following such execution or consummation; or

(iv)    the Company acknowledges and agrees that upon any termination of this Agreement, pursuant to Sections 9.1(a) or 9.1(e) (subject to any additional payments contemplated by Section 9.2(b)(iii)), the Company shall be required to pay any and all unpaid Expense Reimbursement incurred prior to such termination in cash simultaneously with such termination.

Furthermore, in the event of any breach of this Agreement by the Company, subject to the rights of the Plan Sponsors pursuant to Section 10.12, the sole and exclusive remedies of the Plan Sponsors will be, if applicable, to terminate this Agreement pursuant to Section 9.1 and receive, if applicable, any payments payable pursuant to this Section 9.2(b).    Subject to the rights of the Plan Sponsors pursuant to Section 10.12, in no event will the Company or any of its Affiliates be liable for any monetary damages for any breach of this Agreement, other than (i) for such payments or liability for willful or intentional breach of the Agreement or (ii) any payments payable pursuant to this Section 9.2(b).

(c)    The Company acknowledges and agrees that (i) the provisions for the payment of the Termination Fee and of the Expense Reimbursement are an integral part of the transactions contemplated by this Agreement and without these provisions the Plan Sponsors would not have entered into this Agreement, and the Termination Fee and the Expense Reimbursement shall, pursuant to the UPA Approval Order, constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code. To the extent that all amounts due in respect of the Termination Fee and the Expense Reimbursement pursuant to this Section 9.2 have actually been paid by the Debtors to the Plan Sponsors, the Plan Sponsors shall not have any additional recourse against the Debtors for any obligations or liabilities relating to or arising from this Agreement, except for liability for willful or intentional breach of this Agreement pursuant to Section 9.2.

ARTICLE X

**GENERAL PROVISIONS**

Section 10.1    No Zochem Liability.    Notwithstanding anything to the contrary herein, Zochem Inc. will not have any Liability to any Person under or relating to this Agreement.

Section 10.2    No Survival.    All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.3    No Outside Reliance.    Each Plan Sponsor acknowledges that, in making its determination to proceed with the transactions contemplated by this Agreement, such Plan Sponsor has relied solely on the results of its own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, the Company, any of its Subsidiaries or any of their Representatives or any information, statements, disclosures, documents, projections, forecasts or other material provided or otherwise made available to the Plan Sponsors or any of their Affiliates or Representatives, in each case, whether written or oral, or any failure of any of the foregoing to disclose or contain any information, except for the express representations, warranties, covenants and agreements of the Debtors set forth in this Agreement and the other Transaction Agreements.

58

Section 10.4    Notices.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given when delivered personally, when sent via electronic facsimile or electronic mail (in either case, with confirmation), on the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or on the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the Parties at the following addresses (or at such other address for a Party as will be specified by like notice).

(a)    If to the Company:

Horsehead Holding Corp.
4955 Steubenville Pike, Suite 405
Pittsburgh, PA 15205
Facsimile:    (412) 788-1812
Attention:    Timothy D. Boates, Chief Restructuring Officer

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Facsimile:    (312) 862-2200
Attention:    Patrick J. Nash, Jr., P.C.
Steve Toth
Ryan Preston Dahl

(b)    If to the Plan Sponsors (or to any of them), to the address set forth opposite each such Plan Sponsor's name on Schedule 5 hereto.

Section 10.5    Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Company and the Requisite Plan Sponsors, other than an assignment by a Plan Sponsor expressly permitted by Sections 2.3, 2.6, 6.5 or 10.10 or any other provision of this Agreement and any purported assignment in violation of this Section 10.5 shall be void *ab initio*.  Except as provided in ARTICLE VIII with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties.

Section 10.6    Prior Negotiations; Entire Agreement.

(a)    This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among any of the Parties will continue in full force and effect.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Plan Sponsor, nothing

112016848 v9

contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Plan Sponsors under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.10.

Section 10.7    Governing Law; Venue.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD FOR ANY CONFLICTS OF LAW PRINCIPLES THAT WOULD APPLY THE LAWS OF ANY OTHER JURISDICTION, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.    THE PARTIES CONSENT AND AGREE THAT ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTES ARISE IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT (OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DECLINES JURISDICTION OVER SUCH ACTION OR DISPUTE, IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY).    THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DECLINES JURISDICTION OVER SUCH ACTION OR DISPUTE, THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY). EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, (II) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY THE BANKRUPTCY COURT OR (III) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN THE BANKRUPTCY COURT IS BROUGHT IN AN INCONVENIENT FORUM.    THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER AND TO AN ADDRESS PROVIDED IN SECTION 10.4, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.8    Waiver of Jury Trial.    EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.9    Counterparts.    This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.10    Waivers and Amendments; Rights Cumulative; Consent.    This Agreement may be amended, restated, modified, or changed only by a written instrument signed by the Company and the Requisite Plan Sponsors; *provided*, *however*, that each Plan Sponsor's prior written consent shall be required for any amendment that would have the effect of:  (a) increasing the Purchase Price to be paid in respect of the Emergence Equity Units , (b) modifying such Plan Sponsor's Purchase Percentage (unless such Plan Sponsor is a Defaulting Plan Sponsor), (c) modifying any terms or

60

provisions of the New Limited Liability Company Agreement, or (d) extending the Outside Date beyond an additional ninety (90) days (other than in accordance with Section 2.3(a) or Section 10.12, if applicable); *provided*, *further*, *however*, that Schedules 1 and 2 may be amended and restated (i) to reflect any Plan Sponsor Default and reallocation for such a Plan Sponsor Default, in each case, as contemplated by and pursuant to Section 2.3 without the consent of any Party other than such consents required by and as contemplated by Section 2.3 or (ii) to reflect any Transfers and reallocations contemplated by the provisions of Section 2.6 or Section 6.5 with respect to a Transfer or reallocation in accordance with such Section(s).  The terms and conditions of this Agreement (other than the conditions set forth in Section 7.1 and Section 7.3, the waiver of which shall be governed solely by ARTICLE VII and the termination right set forth in Section 9.1(e), the waiver of which shall require each Plan Sponsor's prior written consent) may be waived (y) by the Debtors only by a written instrument executed by the Company and (z) by the Plan Sponsors only by a written instrument executed by the Requisite Plan Sponsors on behalf of, and which waiver shall be binding on all, Plan Sponsors.  Notwithstanding anything to the contrary contained in this Agreement, the Plan Sponsors set forth on Schedule 2 may agree, among themselves, with the prior written consent of the Company (not to be unreasonably withheld), to reallocate their Purchase Percentages, without any consent or approval of any other Party; *provided*, *however*, for the avoidance of doubt, any such agreement among such Plan Sponsors shall require the consent or approval of all Plan Sponsors affected by such reallocation.  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  Except as otherwise provided in this Agreement, the rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity.

Section 10.11    Headings.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.12    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement, and that the Parties shall be entitled to seek an injunction or injunctions without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.  The right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Company nor the Plan Sponsors would have entered into this Agreement.  If, prior to the Outside Date, any Party brings any action to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (a) for the period during which such action is pending, plus ten (10) Business Days or (b) by such other time period established by the court presiding over such action, as the case may be. Notwithstanding anything herein to the contrary, in no event will this Section 10.12 be used to require the Company to remedy any breach of any representation or warranty of the Company made herein.

Section 10.13    Damages.  The Parties agree that no Party will be liable for, and none of the Parties shall claim or seek to recover, any special or punitive damages, lost revenue, profits or income, diminution in value, loss of business reputation or opportunity or similar damages, costs or losses.

61

Section 10.14    No Reliance.  No Plan Sponsor or any of its Related Parties shall have any duties or obligations to the other Plan Sponsors in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Plan Sponsor or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Plan Sponsors, (b) no Plan Sponsor or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Plan Sponsor, (c) (i) no Plan Sponsor or any of its Related Parties shall have any duty to the other Plan Sponsors to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Plan Sponsors any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Plan Sponsor or any of its Affiliates in any capacity and (ii) no Plan Sponsor may rely, and confirms that it has not relied, on any due diligence investigation that any other Plan Sponsor or any Person acting on behalf of such other Plan Sponsor may have conducted with respect to the Company or any of its Affiliates or any of their respective securities and (d) each Plan Sponsor acknowledges that no other Plan Sponsor is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Purchase Percentage of its Emergence Equity Purchase.

Section 10.15    Publicity.  At all times prior to the Closing Date, the Company and the other Debtors shall not, and shall cause  each of their Subsidiaries to not, (a) use the name of any Plan Sponsor in any press release without such Plan Sponsor's prior written consent  or (b) disclose to any person, other than legal, accounting, financial and other advisors to the Company, the other Debtors, or their Subsidiaries, the principal amount or percentage of Votable Claims, Additional Claims, DIP Loan Claims, or any other claims held by any Plan Sponsor or any of its respective subsidiaries or affiliates, except to the extent such Claims and the information in such disclosure related thereto that is prohibited by this sentence have otherwise been publicly disclosed (including through any filing made pursuant to Rule 2019 of the Bankruptcy Rules); *provided*, *however*, that the Company, the other Debtors, and their Subsidiaries shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, the Prepetition Senior Secured Note Claims and DIP Loan Claims held by the Plan Sponsors as a group.  Notwithstanding the foregoing, the Plan Sponsors hereby consent to the disclosure by the Company, the other Debtors, and their Subsidiaries in the Plan-Related Documents or the Plan, as applicable, or as otherwise required by Law or regulation, of the execution, terms and contents of this Agreement (but not the signature pages, Schedule 1, Schedule 2, Schedule 3-A, Schedule 3-B or Schedule 5 hereto or any information set forth thereon which information, unless otherwise required by the Bankruptcy Court or the Canadian Court or applicable Law, will be redacted to the extent this Agreement is filed or the docket maintained in the Chapter 11 Proceedings or otherwise made publicly available).  Notwithstanding the foregoing, the Company and the other Debtors will, and will cause their Subsidiaries to, submit to Akin Gump Strauss Hauer & Feld LLP, on behalf of the Plan Sponsors, all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company, the other Debtors, and their Subsidiaries relating to this Agreement or the transactions contemplated hereby and any amendments thereof for review, consultation and prior approval by Akin Gump Strauss Hauer & Feld LLP on behalf of the Requisite Plan Sponsors.  The Company, the other Debtors, and their Subsidiaries will submit to the Requisite Plan Sponsors in advance all communications with dealers, customers and employees relating to the transactions contemplated by this Agreement, and will take the Requisite Plan Sponsors' views with respect to such communications into account.  The Plan Sponsors will submit to counsel for the Company, the other Debtors, and their Subsidiaries all press releases, public filings, public announcements or other communications with any news media relating to this Agreement or the transactions contemplated hereby and any amendments thereof for review, consultation and prior approval by the Company.  The Plan Sponsors shall not use the name of the Company, the other Debtors, and their Subsidiaries in any press release without the Company's prior written consent.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between of the Company, the other Debtors,

and their Subsidiaries and any Plan Sponsor, including the confidentiality and non-disclosure provisions contained in the Prepetition Debt Documents and the DIP Loan Debt Documents.

Section 10.16    Settlement Discussions.    This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Section 408 of the U.S. Federal Rule of Evidence and any applicable federal, foreign, state or provincial rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Proceedings or as required by the Canadian Court in connection with the Recognition Proceedings (other than a Legal Proceeding to approve or enforce the terms of this Agreement).

Section 10.17    Reservation of Rights. Except as expressly provided in this Agreement or in the Plan, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict (a) the ability of each Party to protect and preserve its rights, remedies and interests, including the Claims, and any other claims against or interests in any of the Debtors or any other parties, or its full participation in any bankruptcy proceeding, (b) any right of any party under (i) any Prepetition Debt Documents or any DIP Loan Debt Documents, or constitute a waiver or amendment of any provision of any Prepetition Debt Documents or any DIP Loan Debt Documents, as applicable, and (ii) any other applicable agreement, instrument or document that gives rise to a party's Claims, or constitute a waiver or amendment of any provision of any such agreement, instrument or document, (c) the ability of a party to consult with other parties, any Debtor, or any other party, or (d) the ability of a party to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any Transaction Agreement (including any Plan-Related Documents).  Without limiting the foregoing sentence in any way, after the termination of this Agreement pursuant to ARTICLE IX, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests, subject to ARTICLE IX, in the case of any claim for breach of this Agreement.  Further, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Proceedings, so long as such appearance and the positions advocated in connection therewith are consistent with the obligations of such Party set forth in, or otherwise permitted by, this Agreement and the Plan and, unless otherwise permitted by this Agreement, are not for the purpose of, and would not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring pursuant to the terms of this Agreement.  Except as expressly provided in this Agreement, if the transactions contemplated by the Restructuring are not consummated, or if this Agreement is terminated for any reason, each Party fully reserves any and all of its rights, remedies, claims and interests.

Section 10.18    Further Assurances.  Each of the Plan Sponsors and the Company shall, and the Company shall cause each of its Subsidiaries to, use their respective reasonable best efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

Section 10.19    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

Section 10.20    Representation by Counsel.  Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions

112016848 v9

contemplated by this Agreement and the Plan.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

Section 10.21    No Fiduciary Duties; No Commitment To Finance.  None of the Plan Sponsors shall have any fiduciary duty or other duties or responsibilities to each other, any Prepetition Macquarie Facility Lender, any Prepetition Convertible Senior Noteholders, any Prepetition Senior Secured Noteholder, any Prepetition Senior Unsecured Noteholders, BBVA, any DIP Lender, the Company, any other Debtor, or any equity holders, creditors or other stakeholders of any of the Company or any other Debtor.  Further, the Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate any of the Parties to, provide any new financing or credit support, except as expressly provided in ARTICLE III.

Section 10.22    No Solicitation.  This Agreement, the Plan, the Plan-Related Documents and transactions contemplated herein and therein are the product of negotiations among the Parties, together with their respective Representatives.  Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of Sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and none of the Company, the other Debtors, and their Subsidiaries will solicit acceptances of the Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by Section 1125 of the Bankruptcy Code.

Section 10.23    UPA Approval Order.  Notwithstanding anything herein to the contrary, if the UPA Approval Order is not entered by 5:00 p.m., prevailing Eastern time on August 31, 2016, then this Agreement shall be automatically void *ab initio*, without the necessity of any Person taking any action or giving of any notice.

[*Signature Pages Follow*]

112016848 v9

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

> HORSEHEAD HOLDING CORP., on behalf of itself and each of the other Debtors
>
> By: _____
> Name:
> Title:

*[Signature Page to Unit Purchase and Support Agreement]*

# EXHIBIT F

Form of the Banco Bilbao Note

KE 42570951

<u>**PROMISSORY NOTE**</u>

$**3,000,000.00**                                                                                                    **[•], 2016**

**FOR VALUE RECEIVED**, Horsehead Corporation, a Delaware corporation (the "*Maker*"), hereby unconditionally promises to pay to the order of Banco Bilbao Vizcaya Argentaria, S.A., incorporated according to Spanish laws (the "*Payee*") or its assignees, in lawful money of the United States of America, in immediately available funds, the principal amount of $3,000,000.00 (THREE MILLION DOLLARS) (together with interest thereon, as hereinafter provided, the "*Loan*"), together with interest on the outstanding amount thereof, from the date hereof until such principal amount is paid in full, at the rate payable and at the times set forth in Section 2.1 below.

**WHEREAS**, (a) on February 2, 2016, Horsehead Holding Corp. and certain of its debtor affiliates (each, individually, a "*Debtor*" and, collectively, the "*Debtors*") commenced jointly administered proceedings (the "*Chapter 11 Proceedings*"), styled *In re Horsehead Holding Corp. et al.*, Case No. 16-10287 (CSS) by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., as amended, the "*Bankruptcy Code*") with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") and (b) on February 5, 2016, the Ontario Superior Court of Justice (Commercial List) (the "*Canadian Court*") recognized the Chapter 11 Proceedings as foreign main proceedings in proceedings commenced under Part IV of the Companies' Creditors Arrangement Act (the "*CCAA*");

**WHEREAS**, on July 15, 2016, the Debtors filed that certain *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* ("*Plan of Reorganization*"); and

**WHEREAS**, in connection with the Plan of Reorganization that was confirmed by an order of the Bankruptcy Court on [___], 2016 and recognized by an order of the Canadian Court on [___], 2016, the Maker has issued this Note to the Payee.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Maker, Guarantor (as defined below) and Payee hereby agree as follows:

1.      **DEFINITIONS**

As used in this Note, the following terms shall have the following meaning:

"*Business Day*" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the State of New York, and, if such day is related to any Loan, means any such day that is also a London Banking Day.

"*Closing Date*" means the Effective Date (as defined in the Plan of Reorganization).

"*Dollar*" and "*$*" means lawful money of the United States.

"*Eurocurrency Rate*" means the rate per annum equal to the London Interbank Offered Rate with a three-month maturity ("*LIBOR*") or a comparable or successor rate, which rate is designated by the Maker and approved by the Payee, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the

Maker and approved by the Payee from time to time) at approximately 11:00 a.m., London time, on the date that an Interest Period (as defined herein) commences, for Dollar deposits (for delivery on the first day of such Interest Period).

"*Guaranteed Obligations*" means all principal, interest and other amounts owing by the Maker to the Payee pursuant to this Note.

"*Guarantor*" means Horsehead Holding LLC, a Delaware limited liability company.

"*Interest Payment Date*" means [___] of each year, subject to Section 2.3.

"*Interest Period*" means (i) the first period commencing on (and including) the Closing Date and ending on (but excluding) the date which is the first anniversary of the Closing Date and (ii) for each subsequent period, resetting and beginning on (and including) the last day of the prior period and ending on (but excluding) [___] of each year; *provided* that any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day.

"*London Banking Day*" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"*Note*" means this Promissory Note, by and among the Maker, the Guarantor, the Payee, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

## 2.   PAYMENTS

**2.1   Principal and Interest.**   To the extent not previously paid, the outstanding principal amount of the Loan made to the Maker and evidenced by this Note, together with any accrued and unpaid interest thereon, shall be due and payable by the Maker on [_____], 2023[1] (the "*Maturity Date*").   The Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Eurocurrency Rate *plus* 1.50% per annum. Interest shall be computed on the basis of a year comprised of 365 (or where appropriate 366) days and the actual number of days elapsed.   Interest on the Loans shall be paid in cash or in kind as determined pursuant to this Section 2.1.   The Maker may elect the form of interest payment due on each Interest Payment Date by delivering an irrevocable written notice to the Payee no later than one (1) Business Day prior to the applicable Interest Payment Date.   In the absence of such election prior to an Interest Payment Date, interest on the Loans shall be payable in kind.   Notwithstanding anything to the contrary in this Section 2.1, (x) interest payable on the Maturity Date shall be paid in cash and (y) accrued and unpaid interest with respect to any Loans prepaid pursuant to Section 2.2 shall be paid, with respect to the Loans so prepaid, in cash on the date of prepayment.   Interest payable in kind shall be paid by the Maker by increasing the principal amount of the Loan on the Register (as defined herein).

---

[1] Seven years from the Closing Date.

   **2.2**  **Optional Prepayment**.  The Maker may prepay all or any portion of the unpaid principal balance of this Note, at any time, together with accrued and unpaid interest on the principal amount being repaid, without premium or penalty.  Any prepayment of less than all of the unpaid principal balance of this Note shall be in an integral multiple of $100,000 or, if less, the entire principal amount then outstanding.

   **2.3**  **Manner of Payment.**  Principal, interest, and all other amounts due under this Note will be payable, in Dollars, to the Payee to such account or at such address as designated from time to time by the Payee in writing to the Maker.  If any payment of principal or interest on this Note is due on a day that is not a Business Day, such payment will be due on the next succeeding Business Day, and such extension of time will be taken into account in calculating the amount of interest payable under this Note.

   **3.**  **DEFAULTS**

   **3.1**  **Events of Default.**  The occurrence of any one or more of the following events will constitute an event of default hereunder with respect to the Maker (***"Event of Default"***):

   (a)  If the Maker fails to pay when due any principal of or any interest on this Note or Guarantor shall fail to pay any other amount payable hereunder when due, and any such failure continues for thirty (30) days;

   (b)  Maker or Guarantor becomes insolvent or is unable to pay its debts as they become due, consents to the appointment of a trustee, receiver, assignee, liquidator or similar official, makes a general assignment for the benefit of its creditors or files a voluntary proceeding under Chapter 7 or 11 of the Bankruptcy Code or any other Federal, state or foreign bankruptcy or insolvency law (a "***Bankruptcy Proceeding***"); or

   (c)  the filing against the Maker or Guarantor of an involuntary Bankruptcy Proceeding that is not discharged or dismissed within 45 days.

   **3.2**  **Remedies.**  Upon the occurrence of any Event of Default described in Section 3.1(b) or 3.1(c), the unpaid principal balance of this Note and all other amounts owing under this Note shall immediately become due and payable without any action on the part of the Payee.  Upon the occurrence of any other Event of Default (unless waived in writing by the Payee) and at any time thereafter as long as any such Event of Default shall be continuing, the Payee may, at its option, by written notice to the Maker (a) declare the entire unpaid principal amount of this Note comprising the Loan made to the Maker, together with all accrued interest thereon and all other amounts payable hereunder, immediately due and payable and/or (b) exercise any or all of its rights or remedies under applicable law.

   **4.**  **GUARANTEE**

   **4.1**  For valuable consideration, receipt and sufficiency whereof being hereby acknowledged, the Guarantor hereby guarantees and binds itself in favor of the Payee, for the prompt and complete payment and performance by the Maker when due and payable of all the Guaranteed Obligations.  As a result of the foregoing, the Guarantor and the Maker may be compelled separately to pay or fulfill all of the Guaranteed Obligations.  The Guarantor hereby

3

confirms that the Payee will not be obliged, before dealing with this guarantee set forth in this Section 4, to exercise or exhaust its recourses against the Maker or against any other party, the Guarantor hereby waiving the benefits of division and discussion.  The Guarantor further acknowledges that it will not be entitled to subrogation until the Guaranteed Obligations are performed and paid in full.  The obligations of the Guarantor under this Section 4 shall be continuing and shall remain in full force and effect so long as any Guaranteed Obligations remain in effect under this Note and until all the Guaranteed Obligations have been indefeasibly paid and satisfied in full and the Note has been terminated.  The obligations of the Guarantor hereunder shall not be satisfied, reduced, affected or discharged by any intermediate payment, settlement or satisfaction of any part of the principal, interest, fees and other money or amounts which may at any time be or become owing or payable under or by virtue of or in connection with the Guaranteed Obligations or this Note.

## 5.    MISCELLANEOUS

**5.1    Assignment.**  The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Note without the consent of the other party hereto.

**5.2    Register**.  Maker shall maintain at one of its offices a register (the "*Register*") for the recordation in book entry form of the name and address of Payee and the principal amount (and stated interest) of the Note owing to Payee pursuant to the terms hereof from time to time.  The entries in the Register shall be conclusive absent manifest error.

**5.3    Notices.**  All notices, requests, demands, claims, and other communications hereunder shall be in writing (including electronic transmission).  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if and when (a) delivered personally, (b) mailed by first class registered or certified mail, return receipt requested, postage prepaid, on the date received by the addressee, (c) sent by electronic mail, or (d) sent by a nationally recognized overnight express courier service, on the date certified by such courier service to have been received by the recipient, in each case as follows:

If to the Maker:

Horsehead Corporation
4955 Steubenville Pike, Suite 405
Pittsburgh, Pennsylvania 15205
Attn:  [•]
Fax: [•]
Telephone:  [•]
E-mail: [•]

If to the Guarantor:

Horsehead Holding LLC
4955 Steubenville Pike, Suite 405
Pittsburgh, Pennsylvania 15205
Attn:  [•]

4

Fax: [•]
Telephone:  [•]
E-mail: [•]

If to the Payee:

Banco Bilbao Vizcaya Argentaria, S.A.
[Calle Via de los Poblados, s/n  4th floor – 28033 Madrid (Spain)
Attn:  [Antonio Simon/Oscar Castro]
Fax: [(34) 91.537.78.11]
E-mail: [antonio.simon@bbva.com / oscar.castro@bbva.com]

Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the others notice in the manner herein set forth.

**5.4    Headings.**  The article and section headings contained in this Note are inserted for convenience only and will not affect in any way the meaning or interpretation of this Note.

**5.5    Governing Law.**  This Note and the performance of the obligations of the Maker hereunder will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles.

**5.6    Amendments and Waivers.**  No amendment, modification, waiver, replacement, termination, or cancellation of any provision of this Note will be valid, unless the same shall be in writing and signed by the party against whom such amendment, modification, waiver, replacement, termination or cancellation is sought to be enforced.  No waiver by the Payee of any default, misrepresentation, or breach of warranty hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.

**5.7    Severability.**  The provisions of this Note shall be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.

**5.8    Submission of Jurisdiction; Waivers.** Each of the Maker and the Payee hereby irrevocably and unconditionally (a) submits for itself and its property in any legal action or proceeding relating to this Note, or for recognition and enforcement of any judgment in respect thereof, to the nonexclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof and  (b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same.

**5.9    Waiver of Jury Trial**.   EACH PARTY HERETO BY ITS ACCEPTANCE HEREOF, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT ANY OF

5

THEM MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS NOTE OR THE TRANSACTIONS CONTEMPLATED BY THIS NOTE (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO BY ITS ACCEPTANCE HEREOF, ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS SET FORTH IN THIS SECTION 5.9.

       **5.10**    **Entire Agreement; Counterparts.**  This Note constitute the entire agreement and understanding of the Maker, Guarantor and Payee in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the Maker, Guarantor and Payee, written or oral, to the extent they relate in any way with respect thereto. This Note and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument.  Delivery of any executed counterpart of a signature page of this Note by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Note.

**[SIGNATURE PAGES TO FOLLOW]**

6

**IN WITNESS WHEREOF**, the Maker has executed and delivered this Note as of _____, 2016.

**HORSEHEAD CORPORATION**,
as Maker


By: _____
    Name:
    Title:

[Signature Page to Promissory Note]

**IN WITNESS WHEREOF**, the Guarantor hereby intervenes to this Note in order to be bound by the provisions of Section 4.

**HORSEHEAD HOLDING LLC**

By: _____

      Name:

      Title:

[Signature Page to Promissory Note]

**Agreed and Acknowledged:**

**BANCO BILBAO VIZCAYA ARGENTARIA, S.A.**,
as Payee


By: _____
    Name:
    Title:

[Signature Page to Promissory Note]