## EXHIBIT G

Warrant to Purchase Common Shares

EXECUTION VERSION

THIS WARRANT HAS BEEN, AND THE WARRANT SHARES WHICH MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT WILL BE, ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"). THIS WARRANT AND SUCH WARRANT SHARES MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE.  IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE WARRANT AND THE WARRANT SHARES MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UPON REGISTRATION UNDER THE SECURITIES ACT OR RECEIPT OF AN OPINION OF COUNSEL SATISFACTORY TO HORSEHEAD HOLDING LLC (THE "COMPANY") AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE WARRANT SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY AND NO REGISTRATION OR TRANSFER OF SUCH WARRANT SHARES WILL BE RECORDED ON THE BOOKS OF THE COMPANY WITHOUT COMPLIANCE THEREWITH. THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF THE WARRANT SHARES WHICH MAY BE PURCHASED PURSUANT TO THE EXERCISE OF THIS WARRANT A COPY OF SUCH LIMITED LIABILITY COMPANY AGREEMENT OF HORSEHEAD HOLDING LLC, CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF COMMON SHARES, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

HORSEHEAD HOLDING LLC

WARRANT TO PURCHASE COMMON SHARES

Date of Issuance: _____, 2016[1]      Cert. No.:  W-_____

FOR VALUE RECEIVED, HORSEHEAD HOLDING LLC, a Delaware limited liability company (referred to herein as the "Company"), hereby certifies that _____, or its registered transferees, successors or assigns (each such Person registered as holding all or part of this Warrant being referred to as a "Holder"), is the registered holder of warrants (this "Warrant") to subscribe for and purchase up to _____[2] Common Shares (as may be adjusted pursuant to Articles 3 and/or 4) at the Exercise Price per Warrant Share, prior to 5:00 p.m. (New York City local time), on the six (6) year anniversary of the Effective Date (the "Expiration Date"), subject to the provisions and upon the terms and conditions hereinafter set forth.  As used in this Warrant, the term "Business Day" means any day other than a Saturday or Sunday on which commercial banks located in New York, New York are open for the general transaction of business.  All capitalized terms used but not defined in Article 11 or elsewhere herein shall have the meanings ascribed thereto in the LLC Agreement (as defined in Article 11) as in effect as of the date hereof.  This Warrant is one of the warrants initially representing an aggregate of 70,213 Common

---

[1]  Effective Date of Plan of Reorganization.
[2]  Aggregate of 70,213 Common Shares.

Shares (the "Aggregate Plan Warrants") that are being issued pursuant to that certain Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code of Horsehead Holding Corp. and certain of its direct and indirect Subsidiaries, dated July 12, 2016 (the "Plan of Reorganization"), filed on July 15, 2016 in the United States Bankruptcy Court for the District of Delaware ("Court"), Case No. 16-10287 [Docket No. 1309], which Plan of Reorganization became effective as of the date hereof and are subject to the terms thereof. Such Aggregate Plan Warrants represent, collectively and calculated as of the Effective Date, the right to purchase an aggregate of six percent (6%) of the Equity Interests of the Company, in each case calculated prior to giving effect to any anti-dilution adjustments under the terms hereof, but subject to dilution in connection with the Additional Capital Commitment.

**Article 1.        Exercise.**

   1.1      Method of Exercise; Payment; Issuance of New Warrant.

              (a)      Subject to the provisions hereof, the Holder may exercise this Warrant prior to 5:00 pm (New York City local time) on the Expiration Date, in whole or in part in any whole number of Warrant Shares, by, and subject to each of the following, (i) the surrender and delivery to the Company of this Warrant, (ii) the delivery to the Company of a Notice of Exercise, in the form attached hereto as Appendix A (the "Notice of Exercise"), duly executed and completed by the Holder, (iii) the delivery to the Company of a Joinder to the LLC Agreement, in the form attached hereto as Appendix B (the "Joinder"), duly executed and completed by the Holder and (iv) payment to the Company by the Holder of the total Exercise Price for the number of Warrant Shares as to which this Warrant is being exercised (which may take the form of a "cashless exercise" if so indicated in the Notice of Exercise and permitted pursuant to the terms hereof), in each case (except for any payment effected by a wire transfer pursuant to clause (C) below), at the principal office of the Company, or such other office or agency of the Company as it may reasonably designate by written notice to the Holder (the "Principal Office"), during normal business hours on any Business Day (the date of surrender, delivery, and payment is hereinafter referred to as an "Exercise Date"). The payment to the Company by the Holder of the total Exercise Price for the number of Warrant Shares as to which this Warrant is being exercised (to the extent not a "cashless exercise" pursuant to the terms hereof) shall be paid, at the Holder's election, in any combination of the following: (A) cash delivered to the Company at the Principal Office, during normal business hours on any Business Day, (B) certified bank check or official bank check in [*New York Clearing House funds*] payable to the order of the Company and delivered to the Company at the Principal Office, during normal business hours on any Business Day, or (C) wire transfer in immediately available funds, to the account (No. _____; ABA No. _____; Reference: _____; Attention: _____) of the Company or such other account of the Company at such banking institution as the Company shall have given notice to the Holder in accordance with Article 12. The Holder (or such other person or persons as directed by the Holder) shall be treated for all purposes as a Member of the Company and the holder of record of such Warrant Shares as of the close of business on the date on which the Holder shall have surrendered and delivered this Warrant and delivered the payment of the total Exercise Price for the number of Warrant Shares as to which the Warrant is being exercised (or deemed payment in the case of a "cashless exercise"), together with the Notice of Exercise and the Joinder to the Company, in each case, pursuant to the terms of this Warrant, including this Section 1.1.

              (b)      In the event of any exercise of the rights represented by this Warrant pursuant to its terms, the Company shall (i) certify to the Holder that Schedule I of the LLC Agreement has been updated and reflects the whole number of Warrant Shares so purchased and (ii) deliver a countersigned copy of the Joinder to the Holder (or such other person or persons as directed by the Holder) within five (5) Business Days after the applicable Exercise Date, at the Company's expense, and, unless this Warrant has been fully exercised or the Expiration Date has occurred, a new Warrant (in the same form as this

Warrant) representing the number of Warrant Shares, if any, with respect to which this Warrant shall not then have been exercised shall also be issued and delivered to the Holder.

(c)     To the extent this Warrant (or any portion thereof) is not exercised (or deemed exercised) prior to 5:00 pm (New York City local time) on the Expiration Date, this Warrant, effective as of 5:01 pm (New York City local time) on the Expiration Date, shall (i) become void and all rights of the Holder, and any beneficial owners of this Warrant, under this Warrant shall cease; (ii) become permanently and irrevocably null and void and all rights thereunder and all rights in respect thereof under this Warrant shall cease and terminate, and (iii) no longer entitle the Holder, or any beneficial owners of this Warrant, to any Equity Interest, distribution, payment or other amount or consideration on or in respect thereof.

(d)     If a Sale of the Company is consummated prior to the Expiration Date and the Sale Price is greater than the Exercise Price on the date of consummation of the Sale of the Company (the "Sale Date"), each Warrant shall be automatically exercised on a "cashless exercise" basis as of immediately prior to the Sale of the Company and the Holder shall automatically be deemed to have elected to exercise this Warrant pursuant to a "cashless exercise" pursuant to Section 1.2 and shall participate in the Sale of the Company as a holder of Warrant Shares. If a Sale of the Company is consummated prior to the Expiration Date and the Sale Price is less than or equal to the Exercise Price on the Sale Date, and this Warrant is not exercised at or before the Sale Date, this Warrant shall become void and all rights of the Holder and any beneficial owners of this Warrant shall cease from and after the Sale Date and the Expiration Date shall be adjusted to be the Sale Date. Any solicitation, negotiation or closing of a Sale of the Company shall be subject to the sole and absolute discretion of the Company and the Members and the Company and/or the Members will determine, in their sole and absolute discretion, whether to effect or consummate a Sale of the Company.

(e)     All questions as to the validity, form and sufficiency (including time of receipt) of any Notice of Exercise and Joinder (if applicable) will be determined by the Company in good faith and, absent manifest error, shall be final and binding on the Holder. The Company reserves the absolute right to reject any and all Notices of Exercise not in proper form, not accompanied by a Joinder in proper form and not duly executed by the Person in whose name the Warrant Shares are to be issued. Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants. The Company shall give notice to the Holder of any such determinations with respect to such Holder.

1.2     Cashless Exercise.

(a)     Notwithstanding any provisions herein to the contrary, if the Fair Market Value of one Warrant Share is greater than the applicable Exercise Price (at the date of calculation as set forth below), in lieu of exercising this Warrant by payment of cash, the Holder may elect to receive Warrant Shares equal to the value (as determined below) of this Warrant (or the portion thereof being exercised) by surrender of this Warrant at the Principal Office together with a duly executed and completed Notice of Exercise marked to reflect "cashless exercise" in which event the Company shall issue to the Holder a number of Warrant Shares computed using the following formula:

$$X = (Y (A-B)) \div A$$

Where   X =     the number of Warrant Shares to be issued to the Holder

Y =     the number of Warrant Shares purchasable under the Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant Shares purchasable

under this Warrant as to which this Warrant is being exercised (at the date of such calculation)

A = the applicable Fair Market Value of one Warrant Share (at the date of such calculation)

B = the applicable Exercise Price (as adjusted to the date of such calculation)

(b)  If on the Expiration Date the Warrant is still outstanding and the Fair Market Value of one Warrant Share (determined in accordance with Section 14.3) is greater than the applicable Exercise Price, then the Warrant shall be deemed to have been automatically exercised on such date on a cashless basis pursuant to Section 1.2(a) above.  Evidence of ownership of the Warrant Shares (which may take the form of a certification made by the Company) shall be delivered to the Holder promptly following the Expiration Date, and the Joinder shall be executed and exchanged by both parties, in each case pursuant to the terms of Section 1.1.

**Article 2.   Common Shares Valid.**  The Company represents that as of the Effective Date, the only securities of the Company that are outstanding or issuable by the Company are the 1,000,000 Common Shares issued or issuable under the Plan of Reorganization, Equity Interests of the Company consisting of, or convertible into, no more than 100,000 Common Shares under the MEIP, the Aggregate Plan Warrants and Common Shares issuable upon exercise thereof, and Common Shares that may be issued in connection with the Additional Capital Commitment.  The Company has or will have only one class of Common Shares issued or issuable under the Plan of Reorganization.  All Warrant Shares issued upon exercise of this Warrant shall be, at the time of issuance and upon payment in full of the total Exercise Price, if any, therefor in accordance with the terms of this Warrant, validly issued, fully paid and non-assessable Common Shares, free and clear from any restrictions or encumbrances (except those under the LLC Agreement or, if the Holder is an underwriter, arising under securities laws).  The Company will take all actions as may be necessary to assure that such Warrant Shares may be issued as provided herein without violation of any applicable law or regulations, or of any requirements of any National Securities Exchange upon which the Common Shares may be listed, nor in breach of the applicable governing documents of the Company, nor in breach of any contractual obligations.

**Article 3.   Adjustments.**  The Exercise Price and the number and kind of securities purchasable upon the exercise of this Warrant shall be subject to adjustment from time to time upon the occurrence of certain events, solely as follows:

3.1  Splits, Dividends and Subdivisions.  If the Company shall at any time or from time to time while this Warrant is outstanding, make a distribution on its Common Shares with additional Common Shares, subdivide its outstanding Common Shares into a greater number of Common Shares or combine its outstanding Common Shares into a smaller number of Common Shares, then the number of Warrant Shares purchasable upon exercise of this Warrant in effect immediately prior to the date upon which such change shall become effective shall be proportionally adjusted by the Company so that the Holder thereafter exercising this Warrant shall be entitled to receive the number of Common Shares which the Holder would have held immediately after such distribution, subdivision or combination if this Warrant had been fully exercised immediately prior to the record date for such dividend or the effective date of such subdivision or combination, as applicable.  Upon such adjustments, the Exercise Price per Common Share shall also be proportionally adjusted, as applicable.  Such adjustments shall become effective at the open of business on the day after the record date for such dividend or of such subdivision or combination, as applicable, and shall be made successively whenever any event listed above shall occur.  If any distribution, subdivision or combination of the type described in this Section 3.1 is declared or authorized but not so paid or effected, the number of Warrant Shares shall again be adjusted to the

number of Warrant Shares that would then be in effect if such subdivision or combination had not been so declared or authorized.

3.2     Recapitalization, Reclassification or Reorganization. If any Fundamental Transaction involving the Company or a conversion of the Company into a "C-Corporation" shall be effected in such a manner (including, without limitation, in connection with a consolidation or merger in which the Company is the continuing corporation), that the previously outstanding Common Shares shall be cancelled, reclassified or converted or changed into or exchanged for Securities or other assets or property or any combination of the foregoing (a "Reorganization"), then, as a condition of such Reorganization, lawful and adequate provisions shall be made by the Company whereby (x) the Holder hereof shall thereafter have the right to purchase and receive (in lieu of the Common Shares immediately theretofore purchasable and receivable upon the exercise of this Warrant) upon exercise of this Warrant such Securities or other assets or property ("Substituted Property") as would have been receivable upon such Reorganization by a holder of the number of outstanding Common Shares equal to the number of Common Shares immediately theretofore purchasable and receivable upon the exercise of this Warrant (assuming such holder failed to exercise his rights of election, if any, as to the kind or amount of Securities or other assets or property receivable upon such Reorganization); and (y) the rights and obligations of the Company (or, in the event the Company is not the surviving or resulting Person from such Reorganization, such other Person) and the Holder in respect of Substituted Property shall be as nearly equivalent as may be practicable to the rights and obligations of the Company and the Holder in respect of Common Shares hereunder as set forth herein.  Such provisions shall provide for adjustments which, for events subsequent to such Reorganization, shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 3.  Such adjustments shall be made successively whenever any Reorganization shall occur.

3.3     Other Dilutive Issuances.

(a)     In the event that the Company, at any time after the Effective Date but prior to the Expiration Date, shall issue Additional Common Shares (including Additional Common Shares deemed to be issued pursuant to Section 3.3(d)) in an Interested Transaction and without consideration or for consideration per Share less than both (i) the Fair Market Value of the Common Shares on the date of, and immediately prior to, such issuance (or, pursuant to Section 3.3(d), deemed issuance) and (ii) the Exercise Price in effect on the date of, and immediately prior to, such issuance (or, pursuant to Section 3.3(d), deemed issuance), in each case, as such Fair Market Value and consideration per Share are determined pursuant to Section 3.3(e), then the number of Warrant Shares that are issuable upon the full exercise of this Warrant as of immediately prior to such issuance (or, pursuant to Section 3.3(d), deemed issuance) of Additional Common Shares so issued (or, pursuant to Section 3.3(d)), deemed to be issued) will be increased by multiplying such number of Warrant Shares that are so issuable by a fraction, (x) the numerator of which is the sum of (A) the number of the Additional Common Shares so issued, plus (B) the number of Common Shares outstanding on a Fully Diluted basis as of immediately prior to the issuance (or, pursuant to Section 3.3(d), deemed issuance) of such Additional Common Shares so issued (or, pursuant to Section 3.3(d), so deemed to be issued) and (y) the denominator of which is the sum of (A) the number of Common Shares which the aggregate consideration received by or payable to the Company for the total number of Additional Common Shares so issued (or, pursuant to Section 3.3(d), deemed to be issued) would purchase at the Fair Market Value of the Common Shares on the date of, and immediately prior to, such issuance (or, pursuant to Section 3.3(d), deemed issuance), plus (B) the number of Common Shares outstanding and on a Fully Diluted basis as of immediately prior to the issuance (or, pursuant to Section 3.3(d), deemed issuance) of such Additional Common Shares so issued (or, pursuant to Section 3.3(d), deemed to be issued); provided, however, that any of the Company Common Shares, Convertible Securities, Options or other Equity Securities owned or held by or for the

account of the Company or any of its direct or indirect Subsidiaries shall not be included in such calculation.

(b)     For purposes of this Section 3.3, the "Additional Common Shares" shall mean any and all Common Shares, whether now authorized or not, issued (or, pursuant to Section 3.3(d), deemed to be issued) by the Company after the Effective Date, other than:

(i)     Common Shares issued or issuable pursuant to this Warrant or any of the other Aggregate Plan Warrants, including upon exercise of this Warrant or any of the Aggregate Plan Warrants;

(ii)    Common Shares issued or issuable in connection with a transaction to which Sections 3.1 or 3.2 apply, including in any dividend, distribution, subdivision, split, reclassification, recapitalization, conversion or other Fundamental Transaction to which such sections apply;

(iii)   any Additional Capital Commitment Units constituting Common Shares or any other Common Shares issued or issuable in connection with the Additional Capital Commitment, in each case, to the extent issued or issuable pursuant to the terms of the Additional Capital Commitment, including Section 4.01(h)(iii) of the LLC Agreement;

(iv)    Common Shares issued or issuable pursuant to the MEIP, but only to the extent that such Equity Interests, when taken together with all other Equity Interests of the Company previously issued on or after the Effective Date pursuant to the MEIP, do not exceed 100,000 Common Shares on an as converted basis; or

(v)     Common Shares issued or issuable in an issuance for which adjustment has previously been made pursuant to this Section 3.3.

(c)     Notwithstanding any provision herein to the contrary, no adjustment shall be made in respect of the issuance of Additional Common Shares unless the consideration per Share (determined pursuant to Section 3.3(e)) for an Additional Common Share issued or deemed to be issued by the Company is less than both (x) the Fair Market Value of the Common Shares on the date of such issuance (determined pursuant to Section 3.3(e)) and (y) the Exercise Price in effect on the date of, and immediately prior to, such issuance.

(d)     In the event the Company at any time or from time to time after the Effective Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of Securities then entitled to receive any such Options or Convertible Securities, then the maximum number of Equity Interests of the Company (as set forth in the instrument relating thereto without regard to any provisions contained therein designed to protect against dilution) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities shall be deemed to be Additional Common Shares issued (x) as of the time of such issuance or, in case such a record date shall have been fixed, as of the close of business on such record date and (y) to the Persons to which such Options or Convertible Securities are issued or, in case such a record date shall have been fixed, such holders of record; provided, however, that in any such case in which Additional Common Shares are deemed to be issued:

(i)     no further adjustments in the number of Warrants shall be made upon the subsequent issue of Common Shares upon the exercise of such Options or conversion or exchange of such Convertible Securities (or, in the case of Options for the purchase of Convertible Securities, the subsequent issue of the Convertible Securities or the Common Shares issuable upon conversion or exchange thereof);

(ii)      if such Options or Convertible Securities by their terms (other than terms designed to protect against dilution) provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the Company, or increase or decrease in the number of Common Shares issuable, upon the exercise, conversion or exchange thereof, the Warrant Shares computed upon the original issuance thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities; provided, however, that no such adjustment of the Warrant Shares shall apply to Common Shares previously issued upon exercise of any Warrants or Aggregate Plan Warrants;

(iii)      on the expiration, termination or surrender of any such Options or Convertible Securities, any previous adjustment to the number of Warrant Shares shall be rescinded and annulled and the number of Warrant Shares shall be readjusted to the number of Warrant Shares that would have been obtained had the adjustment made upon the issuance of such Options or Convertible Securities (or upon the occurrence of a record date with respect thereto) been made upon the basis of the issuance of only the number of Common Shares actually issued upon the exercise, conversion or exchange of such Options or Convertible Securities; provided, however, that no such adjustment of the number of Warrant Shares shall apply to Common Shares previously issued upon exercise of any Warrants or Aggregate Plan Warrants; and

(iv)      no readjustment pursuant to clause (ii) or clause (iii) above shall have the effect of decreasing the Warrant Shares to an amount that is less than the initial number of Warrant Shares on the Effective Date.

(e)      For purposes of determining the Fair Market Value of Additional Common Shares (including Additional Common Shares deemed to be issued pursuant to Section 3.3(d)) in an Interested Transaction in connection with this Section 3.3, such Fair Market Value shall be determined in good faith by the Board and following such determination the Company shall provide notice of such Fair Market Value to the Holder; provided, however, that, in the event that current holders of Aggregate Plan Warrants who hold, collectively, Aggregate Plan Warrants exercisable for five percent (5%) or more of the Common Shares for which all then outstanding Aggregate Plan Warrants could be exercised dispute such Fair Market Value determined by the Board by written notice delivered to the Company within thirty (30) days of the date of the Company's notice of the Fair Market Value, the Company shall direct the Valuation Firm, at the Company's expense and pursuant to Section 14.3, to determine the Fair Market Value of the Company and the corresponding Fair Market Value of the Additional Common Shares as of the date of issuance of the Additional Common Shares (such date, the "Interested Party Issuance Date") and in such event the Valuation Firm's determination of the Fair Market Value shall be the Fair Market Value for purposes of this Section 3.3.  For the avoidance of doubt, the Company shall only be required to direct the Valuation Firm to prepare one determination of Fair Market Value for each applicable transaction or issuance, or series of related transactions or issuances, and such determination by the Valuation Firm may be conducted following the issuance of the Additional Common Shares.  For purposes of this Section 3.3(e), the consideration received by or payable with respect to any Additional Shares of the Company in connection with the issuance of Additional Common Shares shall be computed as follows:

(i)      Such consideration shall:

(A)      insofar as it consists of cash, be computed at the aggregate amount of cash received by or payable to or on behalf of the Company (including, if applicable the payment of any indebtedness, the reduction of fees or payments otherwise payable by the Company) prior to deducting therefrom any

discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with the issuance and sale thereof;

(B)     insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issuance, as determined in good faith by the Board, except where such consideration consists of Securities for which there exists a public market, in which case the amount of consideration received by or payable to the Company shall be the average of the closing bid and asked prices of such applicable Equity Interests quoted by the OTC Markets Group, Inc. or the last reported sale price of such applicable Equity Interests of the Company or the closing price quoted on a United States National Securities Exchange on which such applicable Equity Interests are listed, whichever is applicable, for the ten (10) trading days prior to the date of determination of fair market value; and

(C)     in the event Additional Shares of New Common Stock are issued together with other Securities or property of the Company for consideration which covers both the Additional Shares of New Common Stock and such other Securities or property, be the proportion of such consideration so received in respect of the Additional Shares of New Common Stock, computed as provided in clauses (A) and (B) above, as determined in good faith by the Board.

(ii)     The consideration per Share received by or payable to or on behalf of the Company for Additional Shares of New Common Stock deemed to have been issued pursuant to Section 3.3(d) relating to Options and Convertible Securities shall be determined by dividing:

(A)     the total amount, if any, received by or payable to the Company as consideration for the issuance of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against dilution) received by or payable to or on behalf of the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(B)     the maximum number of Common Shares (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against dilution) issuable upon the exercise of such Options or conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

3.4     When Adjustments Are to be Made. The adjustments required by this Article 3, shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no

adjustment of the number of Common Shares purchasable under this Warrant that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the number of Common Shares purchasable under this Warrant immediately prior to the making of such adjustment by at least 1%. Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by this Article 3 (and not previously made), would result in such minimum adjustment.

3.5    Fractional Interests. In computing adjustments under this Article 3, fractional interests in Common Shares shall be taken into account to the nearest one-thousandth of a share.

3.6    Statement on this Warrant. Irrespective of any adjustment in the amount or kind of Warrant Shares into which this Warrant is exercisable, this Warrant may continue to express the same amount or kind of Warrant Shares initially issuable upon exercise of this Warrant.

3.7    Optional Tax Adjustment. The Company may at its option, at any time prior to the Expiration Date, increase the number of Common Shares, or decrease the Exercise Price, in addition to those other changes required by this Article 3, as deemed advisable by the Board, in order that any event treated for Federal income tax purposes as a dividend of stock or stock rights shall not be taxable to the recipients.

3.8    Distributions of Assets. If the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of its Shares, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (each, a "Distribution") at any time after the issuance of this Warrant and prior to the Expiration Date, then, in each such case, the Exercise Price in effect immediately prior to the close of business on the record date fixed for the determination of holders of Shares entitled to receive the Distribution shall be reduced, effective as of the close of business on such record date, by an amount (rounded to the nearest $.01) equal to the fair market value per Share of the Distribution (calculated on a Fully Diluted Basis) received by Members of the Company, but to not less than $.01. If the adjustments caused by the Distribution under this section would reduce the Exercise Price to $.01, and the fair market value of the Distribution less the dollar amount of the Exercise Price reduction required to reduce such Exercise Price to $.01 is still a positive amount (such amount, the "Remaining Distribution Amount"), then the Warrant shall be deemed to have been automatically exercised on a cashless basis pursuant to Section 1.2 hereof, as of immediately prior to the close of business on the record date fixed for the determination of holders of Shares entitled to receive the Distribution, and the Holder shall participate in the Distribution in respect of any Warrant Shares issued upon such cashless exercise with respect to, and only with respect to, the Remaining Distribution Amount. Notwithstanding any of the foregoing, in no event shall the term "Distribution" include, nor shall there be any adjustment pursuant to this Section 3.8 for, any ordinary course cash dividend or distribution if payable out of, without duplication, (x) the net profits of the Company for the fiscal year in which or the fiscal year prior to the year in which such dividend or distribution is made or (y) the retained earnings of the Company (an "Ordinary Course Cash Distribution").

3.9    Other Events. If any event occurs of the type contemplated by the provisions of this Article 3 but not expressly provided for by such provisions, then the Board will make an appropriate adjustment in the Exercise Price and the number of Warrant Shares so as to protect the rights and prevent dilution of the Holder; provided, that no such adjustment pursuant to this Section 3.9 will increase the Exercise Price or decrease the number of Warrant Shares as otherwise determined pursuant to Article 3 hereof.

3.10   Notice of Adjustments. Upon each adjustment pursuant to this Article 3, the Company shall deliver a certificate signed by an executive officer of the Company setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated and the number of Warrant Shares purchasable hereunder after giving effect to such adjustment.

**Article 4.       Purchase Rights; Fundamental Transactions.**

4.1   Purchase Rights. In addition to any adjustments and notices required pursuant to Article 3, if at any time prior to the Expiration Date the Company grants, issues or sells any Equity Interests, Options, Convertible Securities or rights to purchase Equity Interests of the Company or other property (the "Purchase Rights"), then:

(a)   to the extent such Purchase Rights are distributed pro rata to all Members, (i) the Company shall provide written notice to the Holder in advance of granting such Purchase Rights; (ii) the Holder will be entitled to exercise the Warrant in accordance with the terms hereof by providing a Notice of Exercise, Joinder and Payment (as required pursuant to Article 1) within five (5) Business Days of the date of the Company's notice; and (iii) if the Holder timely provides such a Notice of Exercise, Joinder, and payment, the Holder shall be deemed to have exercised this Warrant for the Warrant Shares set forth in the Holder's Notice of Exercise as of immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Equity Interests of the Company are to be determined for the grant, issue or sale of such Purchase Rights; and

(b)   to the extent, and solely to the extent, such Purchase Rights are in connection with the issuance of Additional Common Shares (including Additional Common Shares deemed to be issued pursuant to Section 3.3(d)) in an Interested Transaction, the Holder will be entitled to acquire without exercising the Warrant, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of Warrant Shares acquirable upon complete exercise of this Warrant immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights with respect to such Additional Common Shares to be issued in such Interested Transaction, or, if no such record is taken, the date as of which the record holders of Equity Interests of the Company are to be determined for the grant, issue or sale of such Purchase Rights with respect to such Additional Common Shares to be issued in such Interest Transaction;

provided, however, that such Purchase Rights shall not include, and the foregoing Section 4.1 shall not apply to, any Additional Capital Commitment Units or any other Equity Interests of the Company issued or issuable in connection with the Additional Capital Commitment, in each case, to the extent issued or issuable pursuant to the terms of the Additional Capital Commitment, including Section 4.01(h)(iii) of the LLC Agreement.

4.2   Fundamental Transactions. Upon the occurrence of any Fundamental Transaction not constituting a Sale of the Company, (a) the Successor Entity, if applicable, shall succeed to, and be substituted for the Company (so that from and after the date of consummation of such Fundamental Transaction, the provisions of this Warrant referring to the "Company" shall refer instead to the Successor Entity), and shall assume all of the obligations of the Company under this Warrant with the same effect as if such Successor Entity had been named as the Company herein and (b) the Successor Entity shall deliver to the Holder confirmation that there shall be issued upon exercise of this Warrant pursuant to its terms at any time after the consummation of the Fundamental Transaction, in lieu of the Common Shares, the Substituted Property as specified in Section 3.2.

**Article 5.**      **Transfer Taxes.** The Company will pay any documentary stamp taxes attributable to the initial issuance of Warrant Shares issuable upon the exercise of this Warrant; provided, however, that the Company shall not be required to pay any documentary, stamp or other tax or other charge required to be paid in connection with the issuance of the Warrant Shares in a name other than the name in which the Warrants are registered as of the Exercise Date, and in the event that any Warrant Shares are to be issued in a name other than the name in which the Warrants are registered, the Company shall not be required to issue or deliver any Warrant Share until it has been established to the Company's reasonable satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

**Article 6.**      **Mutilated or Missing Warrants.** In case this Warrant shall be mutilated, lost, stolen, or destroyed, the Company shall issue in exchange and substitution of and upon cancellation of the mutilated Warrant, or in lieu of and substitution for the Warrant lost, stolen or destroyed, a new Warrant of like tenor and for the purchase of a like number of Warrant Shares, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction of the Warrant, and with respect to a lost, stolen or destroyed Warrant, reasonable indemnity with respect thereto, if requested by the Company; in each case, such indemnity to be in form and substance reasonably satisfactory to the Company.

**Article 7.**      **Fractions of Common Shares.** The Holder shall exercise this Warrant in part only as to a whole number of Warrant Shares. The Company may, but shall not be required to, issue a fraction of a Common Share upon the exercise of this Warrant in whole. As to any fraction of a Common Share which the Company elects not to issue, the Company shall make a cash payment in respect of such fraction in an amount equal to the same fraction of the Fair Market Value of a Common Share on the date of such exercise. In computing any fractional Common Shares, including any adjustments under this Warrant, fractional interests in Common Shares shall be taken into account to the nearest one-thousandth of a Common Share.

**Article 8.**      **No Rights as a Member.** Except as expressly provided in this Warrant or in the LLC Agreement, no Holder, as such, or any beneficial owner thereof, shall be entitled to vote or receive any allocations or distributions or be deemed the holder or beneficial owner of Common Shares or any other Entity Interests (including any Options or Convertible Securities) of the Company, which may at any time be issuable on the exercise hereof for any purpose, nor shall anything contained herein be construed to confer upon the Holder, as such, or any beneficial owner thereof, any of the rights of a Member of the Company (whether under the LLC Agreement, at law or otherwise), including any registration rights, preemptive rights, tag-along rights, or any right to vote upon or consent to any matter or action of the Company, including any matter or action submitted to the Members (whether at any meeting thereof, pursuant to any written consent, or otherwise), or to receive notice of or attend meetings, any proceedings, or any other actions, or to receive allocations, distributions, dividends, or otherwise, until this Warrant shall have been exercised and the Warrant Shares purchasable upon the exercise hereof shall have become deliverable, in each case, in accordance with the terms hereof and as provided herein.

**Article 9.**      **Modification and Waiver.** This Warrant and any provision hereof may be amended, changed, modified, waived, discharged or terminated only by an instrument in writing signed by the Company and the then current holders of Aggregate Plan Warrants who hold, collectively, Aggregate Plan Warrants exercisable for a majority of the Common Shares for which all then outstanding Aggregate Plan Warrants could be exercised (such holders, the "Required Holders"), and such amendment, change, modification, waiver, discharge or termination, whether or not approved by the Holder, effected pursuant to and in accordance with the provisions of this Article 9 shall be binding on this Warrant and all other Aggregate Plan Warrants and all current and future holders thereof, and the Company. No course of dealing between the Company, or its Subsidiaries, and the Holder (or any of them) or any delay in exercising any rights hereunder will operate as a waiver of any rights of any party to this Warrant. The

-11-

failure of any party to enforce any of the provisions of this Warrant will in no way be construed as a waiver of such provisions and will not affect the right of such party thereafter to enforce each and every provision of this Warrant in accordance with its terms.

**Article 10.**    **Noncircumvention**.  The Company hereby covenants and agrees that the Company will not, by amendment of its LLC Agreement or through any reorganization, transfer of assets, consolidation, merger, scheme or arrangement, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant or dilute the value of this Warrant (or the percentage interest in the Company represented thereby except as permitted herein), and will at all times in good faith carry out all the provisions of this Warrant.

**Article 11.**    **Certain Definitions.**  For purposes of this Warrant, the following terms shall have the following meanings:

11.1    "**Company**" shall have the meaning set forth in the first paragraph hereof until a successor Person shall have become such pursuant to the applicable provisions hereof and thereafter "Company" shall mean such successor Person.

11.2    "**Convertible Securities**" means any stock or securities directly or indirectly convertible into or exercisable or exchangeable for Common Shares, but excluding Options.

11.3    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

11.4    "**Exercise Price**" means a purchase price per Warrant Share equal to [\$630.227][3], subject to adjustment pursuant to Article 3 and/or 4.

11.5    "**Fair Market Value**" shall mean, with respect to the Company as a whole or any Equity Interest of the Company, on any date, the fair market value that a willing buyer and willing seller, with neither acting under compulsion, would agree upon for the purchase and sale of all of the Equity Interests in the Company as a whole, or any Equity Interest of the Company, in an arms-length transaction, without any discounts (including without limitation for any minority interest, illiquidity, voting or transfer restrictions) and on a debt-free basis, as determined under Section 14.3 hereof (as adjusted, if applicable, pursuant to Articles 3 and/or 4).  Notwithstanding the foregoing, (a) to the extent at the time of determination of the Fair Market Value there exists a public market for the applicable Equity Interests of the Company, the Fair Market Value per such applicable Equity Interests of the Company shall be the average of the closing bid and asked prices of such applicable Equity Interests of the Company quoted by the OTC Markets Group Inc. or the last reported sale price of such applicable Equity Interests of the Company or the closing price quoted on a National Securities Exchange on which such applicable Equity Interests are listed, whichever is applicable, for the ten (10) trading days prior to the date of determination of fair market value; (b) to the extent this Warrant is exercised in connection with the Company's initial public offering of Common Shares, the Fair Market Value per Common Share shall be the applicable per Common Share offering price to the public in such initial public offering of Common Shares, (c) to the extent this Warrant is exercised in connection with a Sale of the Company, the Fair Market Value per Equity Interest shall be the applicable Sale Price of each Equity Interest being paid in the Sale of the Company, and (d) to the extent this Warrant is exercised in connection with a Fundamental Transaction or Majority Stock Transfer, the Fair Market Value per Equity Interest shall be the fair market value per Equity Interest of the consideration paid to the holders of Equity Interests participating in the Fundamental Transaction or Majority Stock Transfer, or to the Company, as the case may be, determined

---

[3] \$737.5 million equity value divided by 1,170,213.

according to the same procedures as are applicable for determining the Fair Market Value of Additional Common Shares under Section 3.3(e) hereof.

11.6    **"fair market value"** shall mean, with respect to any security, property or asset, in each case, other than the Company as a whole or any Equity Interest of the Company, on any date, the fair market value that a willing buyer and willing seller, with neither acting under compulsion, would agree upon for the purchase and sale of such security, property or asset, in each case as determined by the Board in good faith.

11.7    **"Fully Diluted"** means the number of Common Shares outstanding on the applicable date, computed pursuant to the treasury stock method under GAAP.

11.8    **"Fundamental Transaction"** means one or more related transactions in which the Company shall, directly or indirectly, (a) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person, or (b) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company to another Person, or (c) reorganize, recapitalize or reclassify the Equity Interests of the Company.

11.9    **"LLC Agreement"** means that certain Limited Liability Company Agreement of the Company, dated as of the Effective Date (as the same may be amended and/or restated from time to time, by and among the Company and those members of the Company party thereto.

11.10    **"Majority Stock Transfer"** means one or more related transactions with a third party (which third party is not a Subsidiary of the Company) in which the Company shall, directly or indirectly, (a) allow another Person to make a purchase, tender offer or exchange offer that is accepted by the holders of 50% or more of the outstanding Equity Interests of the Company (not including any Equity Interests of the Company held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender offer or exchange offer), or (b) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than 50% or more of the outstanding Equity Interests of the Company (not including any Equity Interests held by such other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock purchase agreement or other business combination prior to entry into such stock purchase agreement or other business combination with the Company); provided, however, that a "Majority Stock Transfer" shall exclude any transaction or transactions with Members of the Company that hold in excess of ten percent (10%) of the Equity as of such date of the transactions and which Members following the consummation of the transactions would, together with their Affiliates, hold 50% or more of the outstanding Equity Interests of the Company or any Successor Entity.

11.11    **"National Securities Exchange"** shall mean any national securities exchange that is registered with the United States Securities and Exchange Commission under Section 6(a) of the Exchange Act.

11.12    **"Options"** means any rights, warrants or options to subscribe for or purchase Common Shares or Convertible Securities.

11.13    **"Parent Entity"** of a Person means an entity that, directly or indirectly, controls such Person.

11.14    "**Sale of the Company**" means any one or more related transactions in which both (a) the Company shall, directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person that is not an Affiliate of the Company; or (ii) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person that is not an Affiliate of the Company whereby such other Person acquires more than 85% or more of the outstanding Equity Interests of the Company (not including any Equity Interests of the Company held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock purchase agreement or other business combination), and (b) 100% of the consideration paid to or received by non-employee holders of Equity Interests of the Company in such transaction or related transactions consists of cash.

11.15    "**Sale Price**" means, with respect to a Sale of the Company, the fair market value of the consideration paid in respect of one (1) Common Share in such Sale of the Company (calculated on a Fully Diluted basis).   The Company is not required, and no Holder may demand, any appraisal in connection with the determination of the Sale Price.

11.16    "**Securities**" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, such Person's capital stock or other Equity Interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock or Equity Interests.

11.17    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

11.18    "**Successor Entity**" means the Person (or, if so elected by the Holder, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Holder, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

11.19    "**Valuation Date**" means each of (a) the last day of each fiscal year of the Company ending in 2019 and 2020 (each, an "Annual Valuation Date"), (b) the 60th day prior to the Expiration Date (the "Final Valuation Date"), (c) the Interested Party Issuance Date, (d) the date of any Fundamental Transaction described in clause (b) of the definition of Fundamental Transaction and (e) any other date requested by any Holder or the Company, in the case of this clause (e), at the sole expense of the requesting party (other than any expenses of the Company in cooperating with a requesting Holder to obtain such valuation, which shall be borne by the Company).

11.20    "**Valuation Firm**" means [Goldin Associates, LLC] or its successors and assigns, or if such firm is not able or willing to perform the valuation services pursuant to this Warrant, a nationally recognized independent valuation firm with experience in valuing companies in the same industry as the Company selected by the Board with the consent of the Required Holders.

11.21    "**Valuation Report**" means the report of the Valuation Firm determining the Fair Market Value of the Company as a whole as of the Valuation Date, together with the per Share valuation calculated on a Fully Diluted basis based upon the Fair Market Value of the Company as of the Valuation Date, including any interim updates by the Valuation Firm thereto.

11.22    "**Warrant Shares**" shall mean Common Shares or such other Securities or other assets or property as shall be purchasable upon exercise of this Warrant, including as provided in Section 3.2.

**Article 12.**     <u>**Notices.**</u>  All notices, deliveries, requests, demands and other communications which are required or may be given under this Warrant shall be in writing and shall be deemed to have been duly given if delivered personally, if sent by facsimile, if sent by FedEx or other national overnight delivery service or mailed, first class mail, postage prepaid, return receipt requested, as follows:

if to Company:

> Horsehead Holdings Corp.
> 4955 Steubenville Pike, Suite 405
> Pittsburgh, PA 15205
> Facsimile:        412.788.1812
> Attention:        [_____]
> E-Mail:           [_____]

with a copy (which shall not constitute notice) to:

> [_____]
> [_____]
> [_____]
> [_____]
> Attention:        [_____]
> E-Mail:           [_____]

If to the Holder, to such Holder's address as set forth on the signature page hereto, or to such other address as either party shall have specified by notice in writing to the other party.  All such notices, deliveries, requests, demands and communications shall be deemed to have been received on the date of personal delivery or telecopy or on the date after mailing by FedEx or other delivery service or on the third Business Day after the mailing thereof.

**Article 13.**     <u>**Transfer of Warrant.**</u>

13.1   <u>Transferability</u>.  This Warrant and all rights hereunder are transferable, in whole or in part, in any whole number of Warrant Shares, upon surrender of this Warrant at the Principal Office, together with a written assignment of this Warrant substantially in the form attached hereto as <u>Appendix C</u> duly executed by the Holder or its agents or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer; <u>provided</u>, <u>however</u>, that no Holder shall Transfer all or any part of the economic or other rights that comprise this Warrant if:

(a)      such Transfer, if consummated, would result in any violation of the Securities Act or any state securities laws or regulations, or any violation by the Company of other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Company or of the LLC Agreement; or

(b)      such Transfer would, if consummated, require the Company to register its Common Shares or any other Equity Securities of the Company under the Exchange Act (as a result of stockholders or otherwise), unless at the time of such Transfer, the Company is already subject to the reporting obligations under Sections 13 or 15(d) of the Exchange Act.

Upon such surrender and if required, such payment, to the extent the transfer of the Warrant is permitted, the Company, time being of essence, shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations (consisting of whole

numbers of Warrant Shares) specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled. The Warrant, if properly assigned in accordance herewith, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued. Any purported transfer of Warrants in violation of this Section 13.1 shall be void *ab initio* and shall not be recognized by the Company or the Warrant Agent.

13.2    New Warrants. This Warrant may be combined with other Aggregate Plan Warrants or divided into multiple Warrants (each (or all but one) of which Warrants shall be as to whole numbers of Warrant Shares) upon presentation hereof at the aforesaid office of the Company, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the Holder or its agent or attorney. Subject to compliance with Section 13.1, as to any Transfer which may be involved in such division or combination, the Company shall execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants to be divided or combined in accordance with such notice. All Warrants issued on Transfers or exchanges shall be dated as of the original issue date and shall be identical to this Warrant except as to the number of Warrant Shares issuable pursuant thereto.

13.3    Warrant Register. The Company shall register this Warrant, upon records to be maintained by the Company for that purpose (the "Warrant Register"), in the name of the record Holder hereof from time to time. The Holder, by accepting this Warrant, accepts and acknowledge that, until the Transfer of such Warrants is registered on the Warrant Register by the Company, the Company may deem and treat the registered Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof or any distribution to the Holder, and for all other purposes, notwithstanding notice to the contrary.

**Article 14.    Notice of Proposed Actions and Information Rights.**

14.1    In case the Company shall propose at any time or from time to time (a) to declare or pay any dividend or distribution to the holders of Common Shares or to make any other dividend or distribution to the holders of Common Shares (including any Distribution or any Ordinary Course Cash Distribution), (b) to put any matter to a vote of the holders of Common Shares, (c) to effect any reorganization, reclassification or modification of its Common Shares, (d) to effect any Fundamental Transaction, any Sale of the Company, any Majority Stock Transfer, or any other transaction that would require an adjustment to be made under Articles 3 and/or 4 hereof, (e) to effect the liquidation, dissolution or winding up of the Company, (f) to effect an offering of the Equity Interests of the Company (or, any successor thereto), pursuant to a registration statement under the Securities Act or any other event that upon completion would require that any such entity file reports under the United States Securities and Exchange Act of 1934, as amended, or (g) to take any other action that would require a vote of the holders of the Company's Common Shares, then, in each such case, the Company shall give to the Holder, in accordance with Article 12, a written notice of such proposed action, which shall specify (i) the record date for the purposes of such dividend or distribution to or vote of the holders of the Company's Common Shares, or if a record is not to be taken, the date as of which the holders of Common Shares of record to be entitled to such dividend, distribution or vote is to be determined, or (ii) the date on which such Fundamental Transaction, Sale of the Company, Majority Stock Transfer or other reorganization, reclassification, modification, consolidation, merger, sale or other conveyance, liquidation, dissolution or winding up or other action is expected to become effective, and such notice shall be so given as promptly as possible but in any event at least five (5) Business Days prior to the applicable record, determination or effective date specified in such notice. In each such case, the Holder shall be offered the opportunity to exercise this Warrant on a cashless basis pursuant to the terms and subject to the conditions of this Warrant (i) conditioned upon the consummation of the noticed event (such that, if the noticed event does not occur, the Holder shall be restored to its position under this Warrant immediately preceding such

-16-

exercise as though such exercise had never happened) or (ii) upon the record date of such event with Fair Market Value determined consistent with the noticed event.

14.2    The Company shall deliver to the Holder (i) the information described in Sections 5.01(a) and 5.01(b) of the LLC Agreement pursuant to and subject to the terms of the LLC Agreement and (ii) Valuation Reports as specified in Section 14.3 hereof.  The Company may make the information and reports (including the Valuation Report) to be provided pursuant to this Section 14.2 available to the Holder either by providing such information and reports pursuant to Article 12 or by posting such information and reports on an online data system, such as intralinks, with a "click-through" confidentiality agreement.  Any information or reports (including the Valuation Report) shall be Confidential Information subject to Article 15.

14.3    As promptly as practicable after each Valuation Date, the Board shall direct the Valuation Firm to determine the Fair Market Value of the Company as a whole as of such Valuation Date, together with the per Share valuation, calculated by dividing the Fair Market Value of the Company as a whole by the Fully Diluted number of Shares as of such Valuation Date.  Upon each such determination, but in no event later than the 90th day of the end of the applicable fiscal year (in the case of an Annual Valuation Date) or the 15th day prior to the Expiration Date (in the case of the Final Valuation Date), and upon any update thereto, the Company shall deliver to the Holder the applicable Valuation Report. Each Valuation Report shall be final and binding on the Company and the Holders absent manifest error and in each case shall be applicable until the next Valuation Report is provided under this Section 14.3, subject to any adjustments pursuant to Articles 3 and/or 4.  Notwithstanding the foregoing, provided that none of the circumstances described in clauses (a) through (d) of the definition of "Fair Market Value" applies, not more often than once each quarter, any Holder or the Company may request that the Valuation Firm update its determination of the Fair Market Value and per Share valuation of the Company, with any such update performed at the expense of the requesting party (other than any expenses of the Company in cooperating with a requesting Holder to obtain such valuation, which shall be borne by the Company).

**Article 15.    Confidentiality.**  While and after ceasing to be a Holder, the Holder agrees to keep confidential, not to disclose to any Person, and not to use (other than for the benefit of the Company or any of its Subsidiaries) any Confidential Information, which shall include, any information or reports provided pursuant to Section 14.2 and any Valuation Report (other than disclosure to such Holder's agents, accountants, legal counsel, advisors or representatives responsible for matters relating to the Company and who need to know such Confidential Information in order to perform such responsibilities in each case on a confidential basis (each such Person being hereinafter referred to as an "Authorized Representative")); provided, however, that such Holder or any of its Authorized Representatives may make such disclosure to the extent that (a) the Confidential Information is disclosed in connection with the preparation or filing of such Holder's tax returns or financial statements, in each case on a confidential basis, (b) the Confidential Information being disclosed is otherwise generally available to the public, in each case on a confidential basis (except to the extent such disclosure has resulted from a breach of this provision or any other confidentiality restriction), (c) such disclosure is required by (and only to the extent required by) any governmental body, agency, official or authority having jurisdiction over such Holder or Authorized Representative, (d) such disclosure, based upon the advice of legal counsel of such Holder or Authorized Representative, is otherwise required by law or statute, (e) the Confidential Information is disclosed on a confidential basis to any entity or its representatives engaged to provide a valuation for the Warrants (subject to such entity and its representatives entering into a confidentiality agreement reasonably acceptable to the Company or agreeing to be bound by the confidentiality provisions hereof), (f) the Confidential Information is disclosed on a confidential basis to any existing or potential lender or investor of the Holder, or to any third party that may be willing to purchase the Warrant from the Holder, or to the representatives of either, solely to the extent that such person needs to know such information in connection with due diligence relating to its investment in the Holder or the

Warrant (subject to such person entering into a confidentiality agreement reasonably acceptable to the Company or agreeing to be bound by the confidentiality provisions hereof), or (g) the Board has given its prior consent thereto. Prior to making any disclosure described in the foregoing sentence of this Article 15, the Holder shall notify the Company of such disclosure and of such advice of counsel. The Holder shall use all commercially reasonable efforts to cause each of its Authorized Representatives to comply with the obligations of such Holder under this Article 15. In connection with any disclosure described in clauses (c) or (d) above, the disclosing Holder shall use all commercially reasonable efforts to cooperate with the Company in seeking any protective order or other appropriate arrangement as the Board may request. Notwithstanding the foregoing, nothing in this Article 15 will prevent any Holder or its Affiliates from (A) complying with their respective accounting or compliance reporting obligations under applicable law or rule of any Governmental Authority, including any reporting obligations arising under the Exchange Act, as amended, or any obligation to comply with ordinary course regulatory exams not targeted specifically at information relating to the Company or any of its Subsidiaries, (B) from utilizing Confidential Information to enforce their rights under any contract, or (C) from communicating with such Holder's or its Affiliates' existing or potential investors on a confidential basis solely with respect to the industry and general description of the applicable Member's investment.

**Article 16.      Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.** This Warrant and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of law rules thereof (other than Section 5-1401 of the New York General Obligations Law). Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Warrant and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Warrant and the rights and obligations arising hereunder, whether in contract, tort or otherwise, brought by the other party(ies) hereto or its successors or assigns shall be brought and determined exclusively in the Supreme Court of the State of New York sitting in New York County, or in the event that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the Southern District of New York, and each party to this Warrant hereby submits to and accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts and appellate courts from any appeal thereof. Each party to this Warrant further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the delivery of copies thereof in the manner set forth in Article 12. Each party to this Warrant hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Warrant brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum. Nothing in this Article 16 shall be deemed to constitute a submission to jurisdiction, consent or waiver with respect to any matter not specifically referred to herein. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS WARRANT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Article 17.      Severability.** In the event that any court of competent jurisdiction shall determine that any provision, or any portion thereof, contained in this Warrant shall be unenforceable in any respect, then such provision shall be deemed limited to the extent that such court deems it enforceable, and as so limited shall remain in full force and effect. In the event that such court shall deem any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Warrant shall nevertheless remain in full force and effect if any provision of this Warrant, as applied to any party or to any circumstance, is adjudged by a court not to be enforceable in accordance with its terms, the parties agree that the court making such determination will have the power to modify the provision in a manner consistent with its

objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

**Article 18.    Termination.** This Warrant shall automatically terminate on the Expiration Date, in accordance with its terms, or on any earlier date when all of the Warrants have been exercised; provided, however, that if there is an unresolved dispute hereunder then the termination of this Warrant shall be tolled solely for the purpose of resolving such dispute until such time as such dispute is resolved.

**Article 19.    Acceptance.** Receipt of this Warrant by the Holder hereof shall constitute acceptance of and agreement to the terms and conditions set forth herein.

**Article 20.    No Third Party Beneficiaries.** Except as expressly provided herein, (a) there are no third party beneficiaries, expressed or implied, of this Warrant and (b) nothing in this Warrant, express or implied, is intended to confer upon any person other than the parties hereto and their successors and assigns, any rights or remedies under or by reason of this Warrant.

**Article 21.    Certain Remedies.** The Holder shall be entitled to seek an injunction or injunctions, without the posting of any bond or other security, to prevent breaches of the provisions of this Warrant and to seek specific enforcement of the terms and provisions of this Warrant in addition to any other remedy to which such Holder may be entitled at law or in equity.

**Article 22.    No Conflicts.** The Company represents and warrants to the Holder that, as of the date hereof, the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's Common Shares or any other Equity Interests (or securities convertible into Equity Interests) of the Company under any other agreements.

**Article 23.    Entire Agreement.** This Warrant constitutes the entire agreement of the Company and the Holder (and each of its successors and assigns) with respect to the subject matter hereof, and supersedes all prior oral and written agreements between the parties concerning or relating to the subject matter hereof.

**Article 24.    Titles and Subtitles; Cross-References; Interpretation.** The titles and subtitles used in this Warrant are used for convenience only and are not to be considered in construing or interpreting this Warrant. All references in this Warrant to Articles, Sections, subsections, Exhibits and Schedules, shall be to Articles, Sections, subsections, Exhibits and Schedules of this Warrant unless otherwise explicitly specified. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. This Warrant is the product of negotiations among the parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any party by reason of that party having drafted or caused to be drafted this Warrant, or any portion hereof, shall not be effective in regard to the interpretation hereof. The parties were each represented by counsel during the negotiations and drafting of this Warrant and continue to be represented by counsel. In this Warrant, unless the context otherwise requires (a) "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words, (b) references in this Warrant to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (.pdf), facsimile transmission or comparable means of communication, (c) words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa, (d) the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Warrant, shall refer to this Warrant as a whole, including all exhibits attached hereto, and not to any provision of this Warrant, (e) the term this "Warrant" shall be construed as a reference to this Warrant, including the exhibits attached hereto, as the

-19-

same may have been, or may from time to time be, amended, modified, varied, novated or supplemented in accordance with its terms, and (f) time is of the essence in the performance of the obligations of each of the parties.

**Article 25.**    <u>**Counterparts**</u>.  This Warrant may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

**[Signature page follows]**

**IN WITNESS WHEREOF**, the Company and the Holder have caused this Warrant to be executed on its behalf by one of its officers thereunto duly authorized.

**HORSEHEAD HOLDING LLC**

By: _____

Name: _____

Title: _____

*[SIGNATURE PAGE TO WARRANT TO PURCHASE COMMON SHARES]*

**ACCEPTED & ACKNOWLEDGED:**

**HOLDER**

By: _____
Name: _____
Title: _____


Notice Address: _____
                _____
                _____
                _____

*[SIGNATURE PAGE TO WARRANT TO PURCHASE COMMON SHARES]*

## APPENDIX A

### *NOTICE OF EXERCISE*

To:    **HORSEHEAD HOLDING LLC**

1.    The undersigned hereby elects to purchase ☐ all or ☐ _____ [specify whole number] Warrant Shares of HORSEHEAD HOLDING LLC pursuant to the terms of the attached Warrant.

2.    The Holder intends that payment of the Exercise Price shall be made as:

☐ a "Cash Exercise" with respect to ☐ all or ☐ _____ [specify whole number] Warrant Shares; and/or

☐ a "Cashless Exercise" with respect to ☐ all or ☐ _____ [specify whole number] Warrant Shares.

3.    In the event that the holder has elected a Cash Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the holder shall pay to the Company the total Exercise Price for the number of Warrant Shares as to which this Warrant is being exercised in the sum of $_____ by check or wire transfer of immediately available funds to an account designated to the holder by the Company in accordance with the terms of the Warrant.

4.    Please issue said Warrant Shares in the name of the undersigned or in such other name or names as are specified below:

_____

_____
            (Name)

_____
            (Address)

_____ (Signature)

_____ (Date)

5.    Please issue a new Warrant of equivalent form and tenor for the unexercised portion of the attached Warrant in the name of the undersigned or in such other name as is specified below:

_____

Date: _____

(Warrantholder) _____

Name: (Print) _____

By: _____

## APPENDIX B

### JOINDER TO
HORSEHEAD HOLDING LLC
LIMITED LIABILITY COMPANY AGREEMENT

The undersigned is executing and delivering this Joinder (this "Joinder") to that certain Limited Liability Company Agreement, dated as of _____ __, 2016 (as the same may be amended and/or restated from time to time, the "LLC Agreement") of HORSEHEAD HOLDING LLC, a Delaware limited liability company (the "Company"), by and among the Company and those certain members of the Company party thereto, in connection with the exercise of Warrants (as defined in the LLC Agreement) held by the undersigned.

By executing and delivering this Joinder to the Company, the undersigned hereby agrees and acknowledges that, with respect to the Warrant Shares issued to the undersigned upon exercise of the Warrant in accordance with its terms, the undersigned (i) is a "Member" as defined in the LLC Agreement, (ii) hereby agrees to be bound by, and to comply with all of the provisions, obligations and responsibilities, and entitled to the benefits of the LLC Agreement in the same manner as if the undersigned were an original signatory as a "Member" to the LLC Agreement, and (iii) authorizes this Joinder to be attached to the LLC Agreement.  Notwithstanding the foregoing, in no event shall the undersigned be obligated to make any Additional Capital Commitment, as defined in the LLC Agreement

Additionally, the undersigned agrees and acknowledges that the information provided on the signature page hereto shall be included as part of the current Schedule 1 of the LLC Agreement as if originally provided therein.

Executed, in counterpart, as of the ___ day of _____, 20___.

*[Please sign under only one (1) of the following choices as it applies to you.]*


If the Undersigned is an Individual:                    If the Undersigned is an entity (corporation, partnership, etc.):


_____                    _____
Print Name of Individual                                  Print Name of Entity


                                                                    By: _____
_____                    Name:
Signature of Individual                                    Title:


Address: _____                    Address: _____


_____                    _____

**ACCEPTED & ACKNOWLEDGED:**

**HORSEHEAD HOLDING LLC**

By: _____
      Name:
      Title:    Manager

## APPENDIX C

### *ASSIGNMENT*

       FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers all of the rights of the undersigned under the attached Warrant (Certificate No. W-_____) with respect to ☐ all or ☐ _____ [specify whole number] of the Warrant Shares covered thereby set forth below, unto:

Names of Assignee           Address           Number of Warrant Shares

Dated: _____

Signature: _____

Witness: _____